# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| [UNDER SEAL] | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. _____ |
| | § | |
| v. | § | **COMPLAINT FOR DAMAGES** |
| | § | **UNDER THE FEDERAL FALSE** |
| [UNDER SEAL] | § | **CLAIMS ACT AND VARIOUS STATE** |
| | § | **FALSE CLAIMS ACTS AND** |
| Defendants. | § | **DEMAND FOR JURY TRIAL** |
| | § | |
| | § | **FILED UNDER SEAL** |
| | § | **(PURSUANT TO 31 U.S.C. § 3730(b)** |
| | § | |
| | § | **DO NOT ENTER INTO PACER** |
| | § | |
| | § | **DO NOT PLACE IN PRESS BOX** |

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF CONNECTICUT, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF FLORIDA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF GEORGIA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF INDIANA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § | Civil Action No. _____ |
| STATE OF LOUISIANA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | **COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL** |
| COMMONWEALTH OF MASSACHUSETTS, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § § | **TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)** |
| STATE OF TENNESSEE, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, AND | § § § | **DO NOT ENTER INTO PACER** |
| STATE OF TEXAS, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § § | **DO NOT PLACE IN PRESS BOX** |
| Plaintiffs, | § § | |
| v. | § § § | |
| TEAM HEALTH HOLDINGS INC., TEAM FINANCE, L.L.C., & TEAM HEALTH INC., | § § § § | |
| Defendants. | § § | |
| _____ | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Relators DR. CALEB HERNANDEZ, D.O. and JASON WILLIAM WHALEY, PA-C, (collectively "Relators" or individually "Relator") in the above-styled action bring this suit on behalf of the United States of America (the "United States") and the States of Connecticut, Florida, Georgia, Indiana, Louisiana, Tennessee, and Texas, and the Commonwealth of Massachusetts (collectively hereinafter the "Plaintiff States") against Defendants TEAM HEALTH HOLDINGS, INC., TEAM FINANCE, L.L.C. and TEAM HEALTH, INC. (collectively hereinafter "Defendants" or "TeamHealth").

## I.  INTRODUCTION

1.      TeamHealth is an emergency room management company that staffs and operates hospital emergency departments across the nation.  This case is about TeamHealth's use of two fraudulent schemes (the "Schemes") to systematically submit false claims to the Centers for Medicare and Medicaid Services ("CMS") for reimbursement for services performed by healthcare providers at TeamHealth emergency rooms.  TeamHealth intentionally carries out these Schemes to unlawfully obtain grossly overpaid reimbursement amounts from CMS.

2.      Relators bring this action pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et. seq*. ("FCA"), and the similar *qui tam* provisions of the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 *et. seq.*; Florida False Claims Act, Fl. Stat. §§ 68.081 *et. seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et. seq.*; Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7-1 *et. seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12 §§ 5B *et. seq.*; Tennessee

Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et. seq.*; and the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.002 *et. seq.*

3.    Under the first Scheme, referred to herein as the "Shared Visit Scheme," TeamHealth falsifies medical charts by requiring emergency department physicians and non-physician practitioners (also called "mid-levels")—such as physician assistants ("PAs") and nurse practitioners ("NPs")—to report that services were provided by a midlevel and a physician *together*, when, in reality, no physician cared for the patient.  CMS typically only reimburses for mid-level services at 85% of a physician's rate, per federal statutory requirements.  However, when the physician and the mid-level treat the same patient during the same visit, CMS regulations allow the mid-level's services to be reimbursed at 100% of the physician rate.  Here, TeamHealth requires its mid-levels to treat patients alone, without any physician involvement, but then to indicate on medical records that a physician was involved in each patient encounter. TeamHealth then requires on-duty physicians to sign the medical records created by mid-levels. TeamHealth uses the falsified charts to improperly request (and receive) reimbursement for services performed solely by mid-levels at 100% of the physician rate.  TeamHealth has fraudulently obtained tens of millions of dollars every year since it began employing the Shared Visit Scheme nationwide in 2002 (the year the 85% regulation was established).

4.    Under the second Scheme, referred to herein as the "Critical Care Scheme," TeamHealth requires its healthcare providers to manipulate medical charts to support billing for ordinary emergency services at the higher "critical care" rate even when patients never received or did not require such critical care.  Critical care is a heightened level of treatment necessary when a patient has a high probability of imminent or life threatening deterioration that requires healthcare providers to exercise a higher degree of medical decision-making and devote longer

periods of time to that patient's treatment. Because of the heightened level of care required, CMS reimburses providers for critical care services at a significantly higher rate than ordinary emergency services. TeamHealth imposes unrealistic critical care quotas, and encourages healthcare providers to falsify medical charts to indicate that critical care is required when only ordinary emergency treatment is required. In other words, TeamHealth unlawfully uses critical care as a cash machine from which it can collect fraudulently inflated rates of reimbursement from the federal government. Again, TeamHealth has fraudulently obtained multiple millions of dollars through the Critical Care Scheme *each year* since at least 2008 (when the critical care regulations were last updated).

5. Both of these Schemes are clear violations of CMS billing regulations and guidelines. Both are carried out by TeamHealth on a nationwide basis. And, both defraud CMS of tens of millions of dollars each year. In this action, Relators seek recovery of damages and civil penalties under the federal and state false claims acts on behalf of the United States of America and the aforementioned States arising from TeamHealth's perpetration of these two fraudulent schemes.

## II.  PARTIES

### A.  RELATORS

6. Relator CALEB HERNANDEZ, D.O., is a citizen of the United States of America and currently a resident of the State of Colorado. Since becoming a licensed physician, Dr. Hernandez has been employed as an emergency physician in numerous emergency departments by multiple employers in Arizona, Colorado, Kansas, Missouri, and the Caribbean. He brings this *qui tam* action based upon direct and unique information obtained during his employment with the following hospital emergency departments, all of which were managed and/or operated

by TeamHealth: the North Colorado Medical Center in Greely, Colorado (employed from 2011 through 2015); the Sterling Regional Medical Center in Sterling, Colorado (employed from 2013 through 2015); and the Juan Luis Phillipe Hospital in St. Croix, United States Virgin Islands (employed in 2010). Through his work as an emergency physician at these TeamHealth-managed emergency departments, and through his work for TeamHealth as an independent contractor, Dr. Hernandez has acquired direct personal knowledge of and non-public information about TeamHealth's fraudulent billing for reimbursement from federal and state healthcare payers.

7.      Relator JASON WILLIAM WHALEY, PA-C, is a citizen of the United States of America. Mr. WHALEY is currently a resident of the State of Colorado. Mr. Whaley is currently a licensed physician assistant ("PA") in Colorado and Wyoming and holds inactive licenses in California and Alaska. He brings this *qui tam* action based upon direct and unique information obtained during his employment in the emergency department at North Colorado Medical Center, located in Greeley, Colorado, from May, 2011 until April 2013. Through his work as a PA at this TeamHealth-managed emergency department, and through his work for TeamHealth as an independent contractor, Mr. Whaley has acquired direct personal knowledge of and non-public information about TeamHealth's fraudulent billing for reimbursement from federal and state healthcare payers.

**B.      DEFENDANTS**

8.      Defendants are a system of affiliated entities operating as and collectively referred to herein as "TeamHealth." TeamHealth is a national healthcare practice management company that is one of the largest suppliers of outsourced physician staffing and administrative services to

hospitals in the United States. TeamHealth operates in at least 47 states and employs at least 13,000 healthcare professionals.

9. Defendant, TEAM HEALTH HOLDINGS, INC., is a corporation that is organized under the laws of Delaware and has its principal place of business in Knoxville, Tennessee. Team Health Holdings, Inc. is a publicly traded company listed on the New York Stock Exchange ("NYSE") under the symbol TMH. Team Health Holdings, Inc. is a holding company that conducts no operations, and its only material assets are its membership interests in Team Finance, L.L.C.

10. Defendant, TEAM FINANCE, L.L.C. is a subsidiary of Team Health Holdings, Inc. that is organized under the laws of Delaware. Because Team Finance, L.L.C. takes the citizenship of its member, Team Health Holdings, Inc., it is likewise a citizen of the States of Delaware and Tennessee.

11. Defendant, TEAM HEALTH, INC., is a subsidiary of Defendant Team Health Holdings, Inc., and does business under the name of "TEAMHEALTH." Team Health, Inc. is a Delaware corporation with its principle place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee. Team Health, Inc., or its subsidiaries, carry out all of the operations and employ all of the employees within the TeamHealth system.

### III.     VENUE, CONDITIONS PRECEDENT, AND JURISDICTIONAL ALLEGATIONS

12. This Court has jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345 because this civil action arises under the laws of the United States.

13. Relators bring this action under the FCA, 31 U.S.C. § 3729 *et. seq.*, to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses. Relators have authority to bring this action and their claims on behalf of the United

States pursuant to 31 U.S.C. §§ 3730(b) and 3730(e)(4), and Relators have satisfied all conditions precedent to their participation as Relators. Pursuant to 31 U.S.C. § 3730(e)(4)(A), the allegations contained herein have not been publically disclosed as defined by the FCA, or alternatively, Relators qualify as "original sources" within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B). Pursuant to 31 U.S.C. 3730(e)(4)(B), Relators have voluntarily provided in writing to the Attorney General of the United States and the United States Attorney's Office for the Eastern District of Texas, prior to filing this complaint, substantially all material evidence and information in Realtors' possession upon which these allegations are based. In accordance with 31 U.S.C. § 3730(b)(2), Relators served the United States pursuant to Federal Rule of Civil Procedure 4 prior to filing this complaint.

14. This Court has jurisdiction over Relators' state law claims pursuant to 31 U.S.C. § 3732, as those claims arise from the same transaction or occurrence as Relators' claim under § 3729. Additionally, this Court has supplemental jurisdiction over Relators' state law claims pursuant to 28 U.S.C. §1367(a), as those claims form part of the same case or controversy under Article III of the United States Constitution as relators' claim under the federal FCA. Relators have complied with all state law procedural requirements, including service upon the appropriate state Attorneys General prior to filing this action.

15. This Court may exercise personal jurisdiction over TeamHealth because TeamHealth transacts business within the State of Texas, in accordance with the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-17.042. Moreover, TeamHealth purposefully directs its services at the State of Texas, thereby purposefully availing itself of the privilege of conducting business within Texas and invoking the benefits and protections of its

laws. This action arises out of that conduct. This Court's exercise of jurisdiction over the Defendant does not offend traditional notions of fair play and substantial justice.

16. Venue is proper in the Eastern District of Texas pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c). TeamHealth can be found in, resides in, and/or transacts business in this judicial District. Additionally, one or more of the Defendants committed acts proscribed by 31 U.S.C. § 3729 in this judicial District. Specifically, during the relevant time period, TeamHealth has transacted business with and/or on behalf of at least the following healthcare providers located within the Eastern District of Texas: (1) the Christus St. Mary Hospital in Port Arthur, Texas; (2) the Longview Regional Hospital in Longview, Texas; and (3) Methodist Urgent Care in The Colony, Texas.

## IV.    MEDICARE AND MEDICAID PROGRAMS

### *The Medicare Program and Federal Administration*

17. Medicare[1] is a federally funded program administered by CMS[2] that provides "nearly every American 65 years of age and older a broad program of health insurance designed to assist the nation's elderly to meet hospital, medical, and other health costs."[3] Medicare is funded in part by taxpayer revenue. In 2014, Medicare spending totaled $618.7 billion and accounted for 20% of the total healthcare spending in the United States.[4] Unfortunately, "[f]raud

---

[1] Medicare is the popular name for the Health Insurance for the Aged and Disabled Act, which is title XVIII of the Social Security Act.
[2] CMS is part of the Department of Health and Human Services ("DHHS").
[3] CMS, MEDICARE GENERAL INFORMATION, ELIGIBILITY, AND ENTITLEMENT MANUAL, pub. 100-01, Ch. 1 § 10 (2015), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/ge101c01.pdf (hereinafter "MEDICARE GENERAL INFORMATION MANUAL").
[4] NHE FACT SHEET, https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last visited Mar. 10, 2016).

and systematic overcharging are estimated at roughly $60 billion, or 10 percent, of Medicare's costs every year."[5]

18.     Medicare is comprised of three primary insurance programs—Medicare Parts A, B and D—that cover different types of healthcare needs.[6]  Medicare Part A (Hospital Insurance) covers institutional care such as inpatient hospital care, nursing services, drugs and biologicals necessary during an inpatient stay, and other diagnostic or therapeutic services.[7]  Medicare Part B (Supplementary Medical Insurance) covers non-institutional care such as physician services, medical equipment and supplies, and services performed by qualified mid-levels under the supervision of a physician.[8]  Medicare Part D (Drug Coverage) covers the cost of prescription drugs.[9]

19.     Under Medicare's programs, the federal government reimburses healthcare providers for their labor and medical decision-making on a fee-for-service basis according to predetermined fee schedules, including the Medicare Physician Fee Schedule ("MPFS"), which establishes annual rates for more than 10,000 services provided by physicians and other healthcare professionals.[10]  The rates established in the MPFS correspond to specific codes

---

[5] Reed Abelson & Eric Lichtblau, *Pervasive Medicare Fraud Proves Hard to Stop*, N.Y. TIMES, Aug. 15, 2014, http://www.nytimes.com/2014/08/16/business/uncovering-health-care-fraud-proves-elusive.html.

[6] Medicare also includes Medicare Part C (also called Medicare Advantage), which is not a separate benefit, but a program whereby private companies approved by Medicare provide coverage under Medicare Part A and Part B. *See* HOW DO MEDICARE ADVANTAGE PLANS WORK?," https://www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/how-medicare-advantage-plans-work.html (last visited Mar. 10, 2016).

[7] CMS, MEDICARE BENEFIT POLICY MANUAL, pub. 100-02, Ch. 1, Table of Contents (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf (hereinafter "MEDICARE BENEFIT POLICY MANUAL").

[8] MEDICARE GENERAL INFORMATION MANUAL at Ch. 1 § 10.3.  Medicare Part B also covers emergency department services. *See* MEDICARE.GOV, EMERGENCY DEPARTMENT SERVICES, https://www.medicare.gov/coverage/emergency-dept-services.html (last visited Mar. 10, 2016).

[9] MEDICARE.GOV, DRUG COVERAGE (PART D), https://www.medicare.gov/part-d/ (last visited Mar. 29, 2016).

[10] *See* CMS, HOW TO USE THE SEARCHABLE MEDICARE PHYSICIAN FEE SCHEDULE (MPFS) at 1 (Apr. 2014), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/How_to_MPFS_Booklet_ICN901344.pdf.  CMS also has fee schedules for ambulance services, clinical laboratory services, and durable medical equipment, prosthetics, orthotics and supplies. FEE SCHEDULES – GENERAL INFORMATION, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/FeeScheduleGenInfo/index.html?redirect=/feeschedulegeninfo (last visited Mar. 10, 2016).

associated with each medical procedure or service provided. These codes, called Current Procedural Terminology, or CPT, codes are published annually by the American Medical Association ("AMA").

20.     The process by which healthcare services are submitted and reimbursed involves several steps and various entities. First, physicians and mid-levels must clearly and sufficiently document patient encounters in their medical charts. To ensure that documentation is clear and complete, CMS has developed specific documentation guidelines that healthcare providers are required to use—the 1995 Documentation Guidelines for Evaluation and Management Services and 1997 Document Guidelines for Evaluation and Management Services.[11] Evaluation and Management ("E/M") documentation is the process of documenting medical decision-making and care during a patient encounter so that services can be translated into the five-digit CPT codes required by Medicare for billing purposes.[12]

21.     In addition to selecting the appropriate CPT codes, the coder must submit the provider's National Provider Identifier ("NPI") and Provider Transaction Access Number ("PTAN") for billing. The NPI identifies the individual healthcare provider that performed the services to be reimbursed. The PTAN identifies the practice group or company for whom the provider works.

22.     Different types of healthcare providers are reimbursed by CMS at different rates. For example, as discussed in detail below, mid-levels are typically reimbursed at 85% of the full physician rate under federal statute and CMS regulations. As such, the coder must assign the appropriate provider's NPI to avoid improper billing, as the NPI triggers the billing rate for any

---

[11] Providers may use either the 1995 or the 1997 Guidelines, but not a combination of the two.
[12] *See* CMS, EVALUATION AND MANAGEMENT SERVICES GUIDE at 3-5 (November 2014), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/eval_mgmt_serv_guide-ICN006764.pdf.

particular E/M service. Once the appropriate CPT codes and NPI have been assigned to a medical record, healthcare providers submit claims to a fiscal intermediary called a Medicare Administrative Contractor ("MAC") based on their geographical location. The MAC then processes the claims and reimburses the provider according to Medicare's fee schedule. MACs are typically private insurance companies that have been contracted by the federal government to process medical claims, and are responsible for the majority of enforcement efforts when it comes to Medicare claims. For its part, CMS "manually reviews just three million of the estimated 1.2 billion claims it receives each year"—or 0.25% of all claims submitted.[13] Thus, over 99% of submitted claims are never actually review by CMS.

### *The Medicaid Program and State Administration*

23. The Medicaid Program ("Medicaid") is a Health Insurance Program administered by the Government of the United States and state agencies that is funded by state and federal taxpayer revenue. The United States Health and Human Services Department oversees the administration of the program. Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially-needy individuals that qualify for Medicaid.

24. While the federal government sets basic guidelines and pays between 50% and 80% of the cost of Medicaid (depending on the state's per capita income), each state itself administers the program, decides provider qualifications, and reimburses providers for their services.

25. Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines. Connecticut administers its

---

[13] Reed Abelson & Eric Lichtblau, *Pervasive Medicare Fraud Proves Hard to Stop*, N.Y. TIMES, Aug. 15, 2014, http://www.nytimes.com/2014/08/16/business/uncovering-health-care-fraud-proves-elusive.html.

Medicaid program through the Department of Social Services and within its Husky Health Program umbrella. Florida administers its Medicaid program through the Agency for Health Care Administration. Georgia administers its Medicaid program through the Medical Assistance Plans Division of the Department of Community Health. Indiana administers its Medicaid program through the Office of Medicaid Policy and Planning under the umbrella of the Indiana Health Coverage Programs. Louisiana administers is Medicaid program through the Department of Health and Hospitals. Massachusetts administers its Medicaid program through the department of Health and Human Services under the umbrella of the MassHealth Program. Tennessee administers its Medicaid program through the Division of Health Care Finance and Administration under the TennCare umbrella. Texas administers its Medicaid program through the Health and Human Services Commission.

<h1 style="text-align:center">V.    <u>FACTUAL ALLEGATIONS</u></h1>

**A.**    **BACKGROUND**

26. TeamHealth is among the nation's largest and most profitable physician practice management companies ("PPMs"), which provide management and human-resources services to hospitals and, in particular, to emergency departments. For decades now, the healthcare industry has blamed PPMs, and TeamHealth specifically, for ushering in an era defined by the corporate practice of emergency medicine, where profits are promoted over patient welfare. TeamHealth has been at the top of the practice management industry since its inception in the 1970s and is a poster child for this profits-based approach to emergency medicine. When profits are prioritized over patient care, reimbursement fraud can result, and in the case of TeamHealth, has resulted.

27. The PPM industry began as a cottage industry in the late 1960s and early 1970s and grew astronomically as "it became widely appreciated that 'there was gold in them there

hills' of emergency services."[14]   In the 1990s, as competition escalated, the largest PPMs, including TeamHealth, went to Wall Street to either merge with or become publicly traded companies.  An industry historian describes this evolution as follows:

> At a time when all of medicine was becoming more business-oriented, emergency medicine evolved into the most fertile field for corporate growth, profits, and exploitation.  The entrepreneurs were clever about keeping a step ahead of government regulations and the health care marketplace in building their empires.[15]

28.    Indeed, TeamHealth has systematically employed clever, albeit unlawful, strategies to become a national revenue leader in the multi-billion-dollar healthcare management industry.  TeamHealth generates the vast majority of its revenue by billing third-party payers, such as CMS or private insurers, for the services provided by TeamHealth healthcare providers. In 2015 alone, TeamHealth reported a total net revenue of $6.0 billion, with over 50% of that revenue coming from public-payer reimbursements: 25.4% paid by Medicare and 31.5% paid by Medicaid.

29.    TeamHealth's business model is based not on quality of care but on reducing emergency department costs and increasing their revenues.  TeamHealth promises to improve their client's bottom lines in three primary ways: (1) treat and bill more patients by increasing patient "flow"; (2) cut costs by employing mid-level providers in place of more costly physicians; and (3) capture more revenue through TeamHealth's proprietary coding and billing practices.

30.    First, an integral part of TeamHealth's business model is moving patients through the emergency department as quickly as possible—*i.e.*, increasing "flow."  TeamHealth uses a variety of administrative or procedural techniques that were formerly used in manufacturing,

---

[14] Brian J. Zink, M.D., ANYONE, ANYTHING, ANYTIME: A HISTORY OF EMERGENCY MEDICINE, 246 (Mosby, Inc. 2006).
[15] *Id.* at 256.

including floor management techniques. The primary floor management techniques utilized by TeamHealth are the "split-flow" model and the "zone" model, which are aimed at segregating physicians and mid-levels into different areas of the emergency room. These floor-management models enable TeamHealth to increase revenue by: (1) creating more bed space to increase the volume of patients treated, and (2) using lower cost staffing, such as PAs and NPs, to treat more patients.

31.     Second, TeamHealth's business model seeks to reduce costs by relying heavily on mid-level service providers, such as PAs and NPs, in place of physicians. These mid-levels are paid less than physicians and, thus, reduce TeamHealth's operating costs. TeamHealth derives significant revenue by submitting claims to CMS for reimbursement for mid-level services. In particular, Defendants have crafted a fraudulent system, described below, to obtain reimbursement from CMS for mid-level services at the full physician rate. Thus, TeamHealth maximizes its revenue by relying heavily on lower-paid mid-levels to provide care, while collecting reimbursements from CMS at the full physician rate.

32.     Finally, TeamHealth's business model relies on the implementation of national, standardized billing and coding practices aimed at capturing as much revenue as possible from third-party payers like CMS. TeamHealth contracts with hospitals to provide TeamHealth's standardized coding and billing services and performs many of these services at off-site locations across the United States. Coding is the process by which a patient's medical chart is translated into billable services that are then submitted to CMS (or private insurers) for reimbursement.

**B.     TEAMHEALTH'S FRAUDULENT SCHEMES**

33.     As former employees of TeamHealth, Relators have witnessed first hand several unlawful practices utilized by TeamHealth to fraudulently increase billing to and reimbursement

from CMS. Through their personal knowledge, experience, and investigation, Relators have uncovered two unlawful schemes that Defendants systematically and purposely use to submit false claims to CMS (the "Schemes"). TeamHealth carries out both Schemes by requiring healthcare providers to manipulate electronic medical records ("EMRs" or "medical charts"), which TeamHealth then uses to support up-coding and overbilling of emergency services.

34. Under the first Scheme, the "Shared Visit" Scheme, TeamHealth falsifies medical charts for services performed by mid-levels (PAs and NPs) to show or suggest that a shared visit occurred. A true shared visit occurs when both a physician and a mid-level are involved in treating the same patient on the same day. CMS regulations typically only allow reimbursement of mid-level services at 85% of the physician rate. However, when a shared visit occurs, CMS regulations allow the mid-level's services to be reimbursed at 100% of the physician rate—as if the mid-level services were an extension of the physician's services. Here, TeamHealth falsifies charts to reflect a shared visit and then uses the falsified charts to request (and receive) reimbursement for services performed solely by mid-levels at 100% of the physician rate, when only 85% is permitted by law. TeamHealth has employed this practice since 2002 (the year the 85% regulation was established) at every emergency department TeamHealth manages across the nation.

35. Under the second Scheme, the Critical Care Scheme, TeamHealth requires its healthcare providers to manipulate medical charts to support billing for ordinary emergency services at the higher "critical care" rate. Critical care is a heightened level of emergency treatment necessary when a patient has a severe medical condition (usually, an imminently life-threatening condition) that requires healthcare providers to exercise a higher degree of medical decision-making and devote undivided attention to that patient's treatment. CMS reimburses

providers for critical care services at a much higher rate than ordinary emergency services. Viewing critical care reimbursement as a lucrative opportunity, TeamHealth imposes unrealistic critical care quotas—typically 6% of patient encounters or more—on healthcare providers and threatens to pay-dock, suspend or terminate those providers who fail to meet such quotas. Of course, TeamHealth and its employees have no control over the severity of the injuries and illnesses that patients present with, and true critical care situations should account for approximately 1% or less of emergency cases. Thus, to meet the quotas, TeamHealth trains providers to falsify medical charts to indicate that critical care is required when, in fact, only ordinary emergency treatment is required. TeamHealth then uses the falsified medical charts to submit claims to CMS at the higher critical care rate. TeamHealth has been upcoding for critical care since at least 2008 (when the critical care regulations were last updated) at every emergency department TeamHealth manages across the nation. This Critical Care Scheme too accounts for millions of dollars in overpayment by CMS to TeamHealth every year.

36. Both of these Schemes are clear violations of CMS billing regulations and guidelines. Both are carried out on a nationwide basis. And, both defraud CMS of tens of millions of dollars each year.

### i. THE SHARED VISIT SCHEME

37. Under the Shared Visit Scheme, TeamHealth requires physicians and mid-levels to falsify medical charts to show or suggest that services provided by mid-levels were performed alongside and/or in conjunction with a supervising physician. This gives the appearance that a shared visit occurred and, thus, can support billing for mid-level services at the full physician rate.

38.     PAs and NPs are mid-level healthcare professionals who work under the general supervision of, or in collaboration with, physicians.  Accordingly, they are commonly referred to as mid-levels or non-physician practitioners.  Congress and CMS have developed specific regulations and requirements that must be met in order for services provided by mid-levels to be reimbursed.  The billing rates for services provided by mid-levels differ based on the healthcare setting in which the services were provided and the supervising physician's level of involvement.  A qualified mid-level may provide services without his or her supervising or collaborating physician being physically present or reviewing each patient seen by the mid-level.  According to Medicare, these typical mid-level services shall be billed at 85% of the physician billing rate for E/M services.[16]  *See* 42 U.S.C. § 1395l(a)(1)(O).  To determine the allowable rate for a service provided by a mid-level—and properly submitted under the mid-level's NPI—Medicare will select the proper amount based on the physician fee schedule and discount that amount by 15% to reach the appropriate 85% mid-level billing rate.

39.     However, when a mid-level performs services alongside and in conjunction with a supervising physician, the services are said to be split or shared between both practitioners and, thus, the patient visit can be billed to CMS as a "split/shared" visit (referred to herein simply as a "shared visit").  A shared visit requires that both the mid-level and the physician provided a substantive portion of the visit face-to-face with the patient.  In such cases, both the mid-level's services and the physician's services can be billed to CMS under the physician's NPI at the full physician rate.  Although, to be billed at the physician rate, split/shared services must be

---

[16] The Medicare statute specifically states, "with respect to services described in 1861(s)(2)(K) [42 USCS § 1395x(s)(2)(K)] (relating to services furnished by physician assistants, nurse practitioners, or clinic nurse specialists), the amounts paid shall be equal to 80 percent of (i) the lesser of the actual charge or 85 percent of the fee schedule amount provided under section 1848 [42 USCS § 1395w-4], or (ii) in the case of services as an assistant at surgery, the lesser of the actual charge or 85 percent of the amount that would otherwise be recognized if performed by a physician who is serving as an assistant at surgery[.]"  42 U.S.C. § 1395l(a)(1)(O).

supported by documentation from both the physician and the mid-level. A physician's signature alone on a mid-level's chart is *not* sufficient to justify billing the visit at the physician rate. *See* CMS, MEDICARE QUARTERLY PROVIDER COMPLIANCE NEWSLETTER GUIDANCE TO ADDRESS BILLING ERRORS 4 (April 2013), www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedQtrlyComp-Newsletter-ICN908625.pdf. TeamHealth wholly ignores federal regulations and requirements governing mid-level reimbursement rates by requiring practitioners to indicate physician involvement on all mid-level medical charts when such involvement did not occur, by requiring on-duty physicians to sign all mid-level charts, and by submitting claims to CMS for reimbursement as if a physician had performed the mid-level services.

40.    The Scheme starts when a patient walks into a TeamHealth-operated emergency department with the floor-management models described above, such as the "split-flow" model or the zone model. Again, in most TeamHealth facilities, physicians and mid-levels are housed in different areas of the emergency department under either the "split-flow" or "zone" floor-management model. Patients are assigned to either a physician or a mid-level depending on the severity of the patient's condition or injury. The result of dividing the emergency department floor plan in this way is that direct interaction between physicians and mid-levels is exceedingly rare. This is intentional, as it prevents overlap and maximizes the number of patients each individual healthcare provider is able to treat.

41.    Those patients that are assigned to mid-levels typically receive care from the mid-level alone without any physician involvement whatsoever. Under TeamHealth's floor-management models, it is extremely rare that mid-levels and physicians ever see the same patient or even discuss a patient's diagnosis or treatment plan.

42. During or immediately following treatment, the mid-level will create and complete an EMR (electronic medical chart) for the patient, documenting all of the elements of treatment, which will be used for billing later. These elements include a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered, and a description of the medical decision making required. There are several industry-standard software programs used to create and complete EMRs, and such software is implemented in all of TeamHealth's emergency departments.

43. After the patient visit is finished and the EMR is completed, TeamHealth requires every mid-level to indicate on every EMR that he or she was supervised by a physician during the patient's treatment, whether or not the mid-level was directly supervised by a physician or the physician ever saw the patient. TeamHealth simplifies this process by including an autocomplete function in the EMR software to indicate "supervision." With the click of a button, mid-levels can populate the chart with a statement such as, "I was supervised by Dr. X." The mid-level then types in the name of an on-duty physician, usually a physician to whom the mid-level has been nominally assigned for that shift. At the end of the mid-level's shift, every chart he or she created will indicate physician supervision, when in reality no physician involvement occurred whatsoever.

44. After each EMR is finalized and signed by a mid-level, TeamHealth requires each mid-level to send his or her EMRs to a physician for "countersignature." EMRs are typically sent to the physicians via email or through the EMR software's internal messaging system (which contains inboxes for each healthcare provider in the emergency department). After the shift, TeamHealth requires each physician to "countersign" every chart or EMR sent to him or her from a mid-level. TeamHealth tells its employees that physician countersignatures are

required for the mid-level services to be billed and reimbursed, even though there is no such CMS requirement.

45.     Physicians have no option to disagree with the care or documentation provided by the mid-level.  Nonetheless, every emergency physician is _required_ to sign and approve _every_ mid-level chart sent to him or her at the end of each shift.  In the vast majority of cases, it would have been physically impossible for the physician to have actually supervised the mid-level during the shift, let alone interacted with the mid-level or the patient.

46.     The physical impossibility of physician involvement is corroborated by the statements of a former TeamHealth coder, **Confidential Witness No. 1 ("CW1")**, in an interview conducted during Relators' investigation.  CW1, who was employed by TeamHealth as an Emergency Department Coder from February 2012 until August 2013 in Jacksonville, Florida, received patient charts directly from TeamHealth-managed hospitals and translated the physician services in the charts into codes, which were then submitted for billing.  CW1 was trained by TeamHealth that a physician signature on a patient's chart meant that the physician supervised the PA,  was physically present during the patient encounter, saw the patient and the treatment provided with his or her own eyes, and agreed with the mid-level's diagnosis and treatment plan.  However, in reviewing patient charts, CW1 discovered on several occasions that, due to the timing of physician signatures on the charts, physicians would have had to have been in two or more places at one time to have actually seen the patient as indicated by the physician's signature.

47.     Nonetheless, TeamHealth administrators adamantly insist that physicians countersign outstanding charts, often sending threatening emails to physicians requesting countersignatures.  These TeamHealth administrators also repeatedly press mid-levels to list a

supervising physician on all patient charts, regardless of whether the physician had any involvement with the patient or any interaction with the mid-level regarding the patient.

48.     When a mid-level submits a chart to TeamHealth's coding department without a physician's signature, the chart is sent back to the mid-level by a TeamHealth documentation specialist with a note to add a supervising physician.  TeamHealth ensures charts are submitted as instructed through threats of suspension and withholding compensation.  When a physician fails or refuses to countersign mid-level charts, TeamHealth threatens that the physician will lose his or her privileges, be pay-docked, or even fired.

49.     Once the physician-signed charts are completed and sent to the billing department, coding and billing specialists working for TeamHealth then reduce the falsified charts to CPT codes for E/M services and select the *physician's* NPI for billing purposes, despite the fact that the physician performed no services at all.  The codes (which are usually entered into an electronic database program for ease of processing) are then submitted to CMS through the appropriate MAC under the physician's NPI, such that the claims are reimbursed at the full physician rate instead of the proper 85% rate.  Thus, TeamHealth systematically submits false claims to CMS.

50.     TeamHealth is able to disguise these fraudulent claims because a claim for mid-level and physician services are "pass through" claims for billing purposes.  In essence, this means there is little or no front-end auditing of these charges.  Moreover, CMS does not require underlying EMRs to be submitted along with requests for reimbursement.  As such, these false "shared visit" claims go unnoticed by CMS and are automatically paid.

51.     A former TeamHealth Accounts Receivable ("A/R") Specialist, **Confidential Witness No. 2 ("CW2")**, corroborates the nature and prevalence of TeamHealth's Shared Visit

Scheme.  CW2 was employed as an A/R Specialist at TeamHealth's corporate headquarters in Lewisville, Tennessee from October 2013 to January 2015.  While a TeamHealth employee, CW2 dealt with Medicare billing on behalf of TeamHealth in numerous states, including North Carolina, Pennsylvania, New York, South Carolina, Texas, California and Michigan.  CW2 was responsible for denials and appeals for emergency department professional billings at TeamHealth-managed hospitals—*i.e.*, the type of claim at issue here.

52.    CW2 commonly reviewed electronic and paper "1500 Forms," which are the forms TeamHealth submits to Medicare for reimbursement for services provided.  When Medicare denied a claims form, CW2 would personally review the underlying EMR in search of the reason for the claim denial.  When reviewing EMRs and claims forms, CW2 often observed mid-level signatures on the charts, indicating that mid-levels were involved in the treatment of the patient.  However, even when a mid-level had signed a patient's chart, ***only a physician's name and NPI were transferred to the claims form and submitted to Medicare***.  In other words, TeamHealth *exclusively* submits the NPI of the physician in order to claim reimbursement for the mid-level's services at the full 100% physician rate, as if *every* patient encounter were a shared visit.

53.    **Confidential Witness No. 3 ("CW3")** worked at TeamHealth's Knoxville, TN facility in 2010 and 2011 as Billing Operations Analyst.  CW3 was responsible for analyzing reimbursement claim denials and fielding customer billing complaints.  CW3 explained that she regularly received calls from patients complaining that a physician's name appeared on their bill when they had not been treated by a physician at all.  CW3 would then access the patient's underlying medical record to determine if a physician's signature was present.  TeamHealth instructs its billing professionals that a physician's name is required on billing and claims

documents, even if the physician did not see or treat the patient. Billing professionals like CW3 relay this misinformation to complaining customers.

54. TeamHealth submits false claims to CMS and state payers with knowledge of the falsity of the underlying EMRs (*i.e.*, knowledge that a shared visit did not truly occur despite the attestations and signatures on the EMR) and the falsity of the resulting claims for mid-level services at the full physician rate. In the very least, TeamHealth submits such claims with reckless disregard for the truth or falsity of the information upon which the claims are made.

55. TeamHealth systematically perpetrates the Shared Visit Scheme nationwide. Relators observed the exact same policies regarding mid-level charting and physician countersignatures at every TeamHealth emergency department they worked in. The uniform nature of the Shared Visit Scheme is also corroborated by former TeamHealth employees, including CW1 and CW2.

56. TeamHealth's Shared Visit Scheme violates CMS regulations governing reimbursement for E/M services performed by mid-levels and thus the FCA. TeamHealth systematically perpetrates this fraudulent scheme on a nationwide basis.

ii. **THE CRITICAL CARE SCHEME**

57. Under the Critical Care Scheme, TeamHealth requires physicians to falsify medical charts to show that critical care was performed when it was not required and submits claims to CMS for reimbursement at the higher critical care rate based on the falsified charts. TeamHealth sets monthly or quarterly quotas for critical care that must be met by healthcare providers at each of its facilities. TeamHealth openly discusses with its employees the fact that these critical care quotas are in place to drive revenue.

58.     As with the Shared Visit Scheme, TeamHealth forces healthcare providers to comply with its critical care policies by threatening pay reduction, privilege suspension, and even firing.  However, healthcare providers have no control over the amount of true critical care that will be required in any given time period.  Thus, to meet the quotas, TeamHealth encourages its healthcare providers to document critical care for patients who only required ordinary (*i.e.*, non-critical) emergency care.  TeamHealth's Critical Care Scheme violates CMS regulations and the FCA.

59.     Like the Shared Visit Scheme, the Critical Care Scheme begins when a patient enters a TeamHealth-operated emergency department.  During or immediately after the administration of medical care, the provider completes the EMR (electronic medical record) like any other patient encounter, notating the required elements—*i.e.*, a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered and a description of the medical decision making required.  The EMR will indicate to the coder the level of care provided.

60.     CMS divides emergency medical treatment into five levels of care based on severity of the condition(s) presented.  Level 1 represents the lowest severity condition, and Level 5 represents the highest severity condition.  The higher the severity level, the higher the reimbursement rate CMS will pay.  Specifically, according to the CMS Physician Fee Schedule, a Level 1 patient encounter is reimbursed at $21.20, a Level 5 at $177.15, and Levels 2, 3, and 4 at amounts in between.[17]  These reimbursement rates are flat payments and are *not* based on the amount of time the provider spends with the patient.  Thus, a Level 1 encounter will be reimbursed at $21.20 whether it lasts 10 minutes or 2 hours.

---

[17] The reimbursement rates quoted above and listed below were obtained using CMS's Physician Fee Schedule Lookup Tool for 2015B at the National Payment Amount (available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PFSLookup/index.html?redirect=/pfslookup/).

61.     However, there is a level of care above Level 5: "critical care."  Critical care is the level of treatment and decision-making required by the highest severity conditions and can generally be described as that level of care required by imminently life-threatening emergency conditions.   Specifically, CMS defines "critical care" as "physician(s) medical care for a critically ill or critically injured patient," whose "critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient's condition."  MEDICARE CLAIMS PROCESSING MANUAL at Ch. 12, § 30.6.12(A) (emphasis added).

62.     True critical care conditions are extremely rare and typically account for 1% or less of all emergency department visits.   According to CMS, "[c]ritical care involves high complexity decision making to assess, manipulate, and support vital system functions(s) to treat single or multiple vital organ system failure and/or to prevent further life threatening deterioration of the patient's condition."  *Id*. at § 30.6.12(A).   Further, all critical care services must be *medically necessary* and reasonable.  *Id.* at § 30.6.12(B) (emphasis added).

63.     Due to its complex nature, CMS reimburses critical care at a higher rate than ordinary emergency care.  Also, unlike Levels 1 through 5, critical care billing is based on the amount of time the physician spends treating the critical patient such that the more time a physician administers critical care, the more reimbursement money the emergency department will receive.  The chart below shows the 2015B National Payment billing rates for Level 1 through critical care:

| CPT Code | 2015B Medicare Reimbursement Amount (National Payment Amount) - Facility |
| --- | --- |
| 99281 (ED Level 1) | $21.20 |
| 99282 (ED Level 2) | $41.68 |
| 99283 (ED Level 3) | $62.88 |
| 99284 (ED Level 4) | $119.66 |

| | |
|---|---|
| 99285 (ED Level 5) | $177.15 |
| 99291 (Critical Care, 1st 30-74 min) | $227.46 |
| 99292 (Critical Care, subsequent 30 min) | $113.55 |

64.     According to TeamHealth, critical care provides a lucrative opportunity to increase reimbursement revenues.  Indeed, the first 30 minutes of critical care alone provide a minimum of $50 in additional revenue over and above an hours-long Level 5 encounter.

65.     Thus, TeamHealth sets minimum quotas for critical care billing that it expects healthcare providers to meet—typically 6% of all patient encounters.  TeamHealth administrators circulate communications to employees of TeamHealth-managed emergency departments, indicating that TeamHealth physicians should be billing critical care in the 6-12% range.  These administrators further encourage TeamHealth providers to bill critical care time and to capitalize on opportunities to improve critical care billing.

66.     To be reimbursed for critical care, a physician must properly record his or her critical care treatment in the EMR.  To qualify for critical care billing, the treating physician must specifically document in the EMR that he or she performed "critical care" (using those words) and notate the amount of time (typically in minutes) such critical care was administered.

67.     In order to meet TeamHealth's unrealistic critical care quotas, TeamHealth requires physicians to provide this documentation for encounters in which critical care treatment was not necessary and to capitalize by maximizing every possible minute of critical care billing.

68.     Healthcare providers working for TeamHealth are desensitized to this over-charting and upcoding because TeamHealth constantly hammers them with training that contradicts the medical education that providers received during medical school or residency training.  During such training, TeamHealth redefines what constitutes critical care for its

healthcare providers.  In addition, TeamHealth publicly calls out healthcare providers who fail to document critical care in situations where TeamHealth claims they should.

69.     TeamHealth's training (or re-training) sessions are often conducted by non-physician coders.  Further, TeamHealth coding specialists also regularly send "feedback" to healthcare providers, attaching specific patient charts and instructing them on what additional information should have been included so that a chart can meet the higher-revenue critical care billing requirements.  TeamHealth has designed a uniform policy that encourages healthcare providers to memorize those medical conditions that, according to TeamHealth, will require critical care every time.  TeamHealth systematically perpetrates this one-size-fits-all Critical Care Scheme nationwide, rather than relying on trained healthcare professionals to provide the level of care they believe to be most appropriate.  TeamHealth emergency departments even have "critical care committees" that meet periodically to monitor critical care billing levels and brainstorm about how to increase those billing levels.

70.     TeamHealth uses the falsified medical records to upcode for nonexistent or unnecessary critical care.  With knowledge of the falsity of the medical records, TeamHealth knowingly submits false claims for reimbursement to CMS and state agencies for the reimbursement at the higher critical care rates.

71.     Relators observed the same policies with respect to critical care at every TeamHealth emergency department they have worked in.  At every TeamHealth-managed facility the Relators worked at, healthcare providers were encouraged and/or required to increase the amount of critical care they performed and were consistently told that critical-care billing was a priority.

72. Importantly, as with the charges for mid-level billing, TeamHealth is able to disguise these fraudulent claims in plain sight because a critical care claim is a "pass through" claim for billing purposes, meaning there is no front-end auditing of these charges. The absence of the risk of auditing emboldens TeamHealth to encourage the submission of fraudulent claims for reimbursement of critical care services with impunity.

73. Undoubtedly, the Critical Care Scheme is a company-wide policy. National and regional TeamHealth administrators often send emails to TeamHealth physicians and mid-levels instructing and reminding them of TeamHealth's critical care policy.

## VI.     CAUSES OF ACTION

### Count One:  Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

74. The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

75. The FCA, 31 U.S.C. § 3729(a)(1)(A) imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval to the United States government.

76. When submission of such false claims are discovered by private citizens, the FCA allows those citizens to bring an action on behalf of the United States against the perpetrators. 31 U.S.C. § 3730(b)(1).

77. Through their conduct, Defendants have knowingly submitted, or caused to be submitted, false claims for payment, as set forth above, in violation of 31 U.S.C. § 3729(a)(1). Specifically, Defendants have submitted false claims for reimbursement for: (1) evaluation and management services performed solely by non-physician practitioners in TeamHealth emergency

departments as if they were performed by or in conjunction with a physician; and (2) unnecessary or non-existent "critical care."

78.     Relators have brought this action pursuant to 31 U.S.C. § 3730(b)(1) and provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

79.     By reason of Defendants' actions, the United States has incurred and continues to incur damages.

**Count Two:  Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B))**

80.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

81.     Section 3729(a)(1)(B) of the FCA imposes liability upon those who make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the United States government.  *See* 31 U.S.C. § 3729(a)(1)(B).

82.     Through their conduct, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B).

83.     By reason of Defendants' actions, the United States has incurred and continues to incur damages.

**Count Three:  Connecticut False Claims Act,  CONN. GEN. STAT. § 4-274 *et seq.***

84.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

85.     Similar to Medicare, the Connecticut Medicaid rules reimburse services provided by NPs at a rate below the physician's rate.  Specifically, Connecticut reimburses for the services of NPs at a rate of  ninety percent (90%) of the department's fees for physician procedure codes.

*See* Conn. Agencies Regs. § 17b-262-617.  Also similar to Medicare, Connecticut Medicaid rules and regulations provide for reimbursement of services provided by PAs at a rate below the physician's rate.  Specifically, Connecticut Medicaid reimburses for services rendered by a PA at ninety percent (90%) of the physician department's fees for physician procedure codes.  *See* Conn. Agencies Regs. § 17b-262-347; *see also* Connecticut Medical Assistance Program, Policy Transmittal 2013-19, PB 2013-40 (July 2013).

86.     Like Medicare, the Connecticut Medicaid rules also reimburse for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.  *See, e.g.*, Connecticut Medical Assistance Program Enhanced Fee Schedule, at 32 (March 30, 2016).[18]

87.     The Connecticut False Claims Act imposes liability upon those who knowingly present, or cause to be presented, false or fraudulent claims for payment or approval under a state-administered health or human services program. Conn. Gen. Stat. §§ 4-274, 4-275.  Additionally, it imposes liability upon those who knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program.  *Id.*

88.     Through their conduct, Defendants have knowingly presented or caused to be presented, false or fraudulent claims for reimbursement, as set forth above, to the Connecticut Medicaid program in violation of Connecticut General Statute § 4-275.

89.     Through their conduct, Defendants have additionally knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of Connecticut General Statute § 4-275.

---

[18]    The Connecticut Medical Assistance Program Enhanced Fee Schedule is available online at https://www.ctdssmap.com/CTPortal/Portals/0/StaticContent/Publications/Fee_Schedule_Instructions.pdf.

90.     Relators bring this action in accordance with the civil action provision in Connecticut General Statute § 4-277 and have served a copy of this Complaint and written disclosure of substantially all material evidence and information on the Connecticut Attorney General as provided thereunder.

91.     By reason of Defendants' actions, the State of Connecticut has incurred and continues to incur damages.

**Count Four:  Florida False Claims Act, FL. STAT. § 68.081 *et seq.***

92.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

93.     Florida statutes enable the Agency for Health Care Administration to establish the maximum allowable fee for providers through Medicaid rules, policy manuals and handbooks. Fl. Stat. §§ 409.901(2), 409.908.   Similar to Medicare, the Florida Agency rules allow for reimbursement for PA services and NP services at a rate below the physician rate, specifically at eighty percent (80%) of the physician rate.  Florida Medicaid Practitioner Services Coverage and Limitations Handbook (April 2014), Ch. 3, § 3-6.

94.     Also, like Medicare, the Florida Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.  *See, e.g.*, Florida Medicaid Practitioner Fee Schedule (January 1, 2016).[19]

95.     The Florida False Claims Act imposes liability upon those who knowingly present or cause to be presented a false or fraudulent claim for payment or approval and those who

---

[19]    The Florida Medicaid Practitioner Fee Schedule is available online at http://portal.flmmis.com/FLPublic/Portals/0/StaticContent/Public/FEE%20SCHEDULES/2016-01-01_Practitioner_Fee_Schedule_v1-2.pdf.

knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim.  Fl. Stat. § 68.082(2).

96.     Through their conduct, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval, as set forth above, to the Florida Medicaid system in violation of Florida Statute § 68.082(2).

97.     Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of Florida Statute § 68.082(2).

98.     Relators bring this action in accordance with the civil action provision in Florida Statute § 68.083(2) and have complied with all requirements therein.

99.     By reason of Defendants' actions, the State of Florida has incurred and continues to incur damages.

**Count Five:  Georgia State False Medicaid Claims Act, GA. CODE § 49-4-168**

100.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

101.    Similar to Medicare, Georgia Medicaid rules limit reimbursement for services provided by a Physician Assistant to no more than 90% of the maximum allowable amount paid to a physician.  *See* Georgia Department of Community Health, Division of Medicaid, Policies and Procedures for Physician Services Handbook Ch. 1001.

102.    Also, like Medicare, the Georgia Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.  *See, e.g.*, Georgia Department of Community Health,

Georgia Medicaid Management Information System, Schedule of Maximum Allowable Physician Payments (April 2016).[20]

103.     The Georgia State False Medicaid Claims Act imposes liability upon those who knowingly present or cause to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval and those who knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim to the Georgia Medicaid program.  Ga. Code § 49-4-168.

104.     Through their conduct, Defendants have knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, as set forth above, in violation of Georgia Code § 49-4-168.

105.     Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the Georgia Medicaid program, as set forth above, in violation of Georgia Code § 49-4-168.

106.     Relators assert this claim in accordance with the civil action provision in Georgia Code § 49-4-168.2 and have complied with all requirements therein.

107.     By reason of the Defendants' actions, the State of Georgia has incurred and continues to incur damages.

**Count Six:  Indiana Medicaid False Claims and Whistleblower Protection Act,**
**IND. CODE § 5-11-5.7-1 *et seq.***

108.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

---

[20] The Georgia Medicaid Practitioner Fee Schedule for April 2016 is available online at https://www.mmis.georgia.gov/portal/Portals/0/StaticContent/Public/ALL/FEE%20SCHEDULES/Schedule%20of%20%20Maximum%20%20Allowable%20Payments%20Physician%20April%202016%2014-03-2016%20213423.pdf.

109. Similar to Medicare, the Indiana Medicaid rules allow for reimbursement of services provided by NPs at a rate below the physician's rate, specifically at seventy-five percent (75%) of the physician rate on file. Indiana Health Coverage Programs BR 200422 (June 1, 2004).

110. Also, like Medicare, the Indiana Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.[21]

111. The Indiana Medicaid False Claims and Whistleblower Protection Act imposes liability upon those who knowingly present, or cause to be presented, a false claim to the State of Indiana for payment or approval and those who make, use, or cause to be made or used, a false record or statement that is material to a false or fraudulent claim. Ind. Code § 5-11-5.7-2.

112. Through their conduct, Defendants have knowingly presented, or caused to be presented, false claims to the State of Indiana for payment or approval, as set forth above, in violation of Indiana Code § 5-11-5.7-2.

113. Through their conduct, Defendants have also made, used, or caused to be made or used, false records or statements that are material to false or fraudulent claims submitted to the State of Indiana for payment or approval, as set forth above, in violation of Indiana Code § 5-11-5.7-2.

114. Relators assert this claim in accordance with the civil action provision in Indiana Code § 5-11-5.7-4 and have complied with all requirements therein.

115. By reason of Defendants' actions, the State of Indiana has incurred and continues to incur damages.

---

[21] The Indiana Health Coverage Programs allows the most recent Fee Schedules to be downloaded at the following URL: http://provider.indianamedicaid.com/ihcp/Publications/MaxFee/fee_home.asp.

**Count Seven:  Louisiana Medical Assistance Programs Integrity Law,**
**LA. REV. STAT. § 46:437.1** *et seq.*

116.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

117.    Similar to Medicare, Louisiana Medicaid rules allow for reimbursement of services provided by NPs and PAs at a rate below the physician rate, specifically at eighty percent  (80%) of the fee for physician services. Louisiana Medicaid Professional Services Fee Schedule, Report No. RF-0-76 (Jan. 1, 2016).

118.    Also, like Medicare, the Louisiana Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.   *See* Louisiana Medicaid Program, *Professional Services Provider Manual*, Ch. 5, Sect. 5.1.[22]

119.    The Louisiana Medical Assistance Programs Integrity Law imposes liability upon those who knowingly present or cause to be presented a false or fraudulent claim and those who knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the State's medical assistance programs. La. Rev. Stat. § 46:438.3.

120.    Through their conduct, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims to the State of Louisiana, as set forth above, in violation of Louisiana Revised Statute § 46:438.3.

121.    Through their conduct, Defendants have also knowingly engaged in misrepresentation and/or made, used, or caused to be made or used, false records or statements

---

[22] The Louisiana Medicaid Program enables the most recent Professional Services Fee Schedules to be downloaded at the following URL: http://www.lamedicaid.com/provweb1/fee_schedules/ProfServ_FS.htm.

material to false or fraudulent claims submitted to the Louisiana medical assistance programs, as set forth above, in violation of Louisiana Revised Statute § 46:438.3.

122.    Relators bring this action in accordance with the civil action *qui tam* provision in Louisiana Revised Statute §§ 46:439.1 – 46:439.4 and have complied with all requirements therein.

123.    By reason of Defendants' actions, the State of Louisiana has incurred and continues to incur damages.

**Count Eight:  Massachusetts False Claims Act, MASS. GEN. LAWS CH. 12 § 5B *et seq*.**

124.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

125.    Similar to Medicare, Massachusetts Medicaid rules allow for reimbursement for services provided by mid-levels at a rate below the physician's rate, specifically at eighty-five percent (85%) of the physician fee on file.  101 Code Mass. Regs. § 317.03(4) (2013).

126.    Also, like Medicare, the Massachusetts Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.  *See* 101 Code Mass. Regs. § 317.04(4) (Fee Schedule).

127.    The Massachusetts False Claims Act imposes liability upon those who knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval and those who knowingly make, use or cause to be made or used a false record or statement material to a false or fraudulent claim.  Mass. Gen. Laws Ann. 12 § 5B.

128.    Through their conduct, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the Commonwealth of Massachusetts, as set forth above, in violation of Massachusetts General Law 12 § 5B.

129.    Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the Commonwealth of Massachusetts, as set forth above, in violation of Massachusetts General Law 12 § 5B.

130.    Relators bring this action in accordance with the civil action *qui tam* provision in Massachusetts General Law 12 § 5C and have complied with all requirements therein.

131.    By reason of Defendants' actions, the Commonwealth of Massachusetts has incurred and continues to incur damages.

**Count Nine:  Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181 *et seq*.**

132.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

133.    Similar to Medicare, Tennessee Medicaid rules allow for reimbursement for services performed by a PA at a rate below the physician rate, specifically at no more than sixty percent (60%) of the charges provided for licensed physicians.  Tenn. Code Ann. § 71-5-129.

134.    Also, like Medicare, the Tennessee Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.[23]

135.    The Tennessee Medicaid False Claims Act imposes liability upon those who knowingly present, or causes to be presented, a false or fraudulent claim for payment or approval

---

[23] TennCare allows the Professional Services Fee Schedules for TennCare's managed care organizations to be downloaded from the following website: https://www.tn.gov/tenncare/topic/providers-managed-care-organizations.

under the Medicaid program and those who knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program. Tenn. Code Ann. § 71-5-182.

136.     Through their conduct, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval under the Tennessee Medicaid program, as set forth above, in violation of Tennessee Code § 71-5-182.

137.     Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted under the Tennessee Medicaid program, as set forth above, in violation of Tennessee Code § 71-5-182.

138.     Relators bring this action in accordance with the civil action *qui tam* provision in Tennessee Code § 71-5-183 and have complied with all requirements therein.

139.     By reason of Defendants' actions, the State of Tennessee has incurred and continues to incur damages.

### Count Ten:  Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE § 36.002 *et seq.*

140.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

141.     Similar to Medicare, Texas Medicaid rules allow for reimbursement for services provided by a mid-levels at a rate below the physician rate, specifically at ninety-two percent (92%) of the reimbursement for the same professional service paid to a physician.  Tex. Admin. Code tit. 1, §§ 355.8093, 355.8281.

142.     Also, like Medicare, the Texas Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than

for ordinary, or non-critical, levels of care.  *See* TEXAS MEDICAID & HEALTHCARE PARTNERSHIP, *Texas Medicaid Provider Procedures Manual* (March 2016), Vol. 2, *Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook* § 9.2.58.6.4 ("Critical Care").[24]

143.   The Texas Medicaid Fraud Prevention Act imposes liability upon those who: (1) knowingly make or cause to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, and (2) knowingly conceal or fail to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.  Tex. Hum. Res. Code § 36.002.

144.   Through their conduct, Defendants have (1) knowingly made or caused to be made false statements or misrepresentation of material fact in order to receive payment under the Texas Medicaid program that is not authorized, and/or (2) knowingly concealed or failed to disclose information to receive payment under the Texas Medicaid program that is not authorized, as set forth above, in violation of Texas Human Resources Code § 36.002.

145.   Relators bring this action in accordance with the civil action *qui tam* provision in Texas Human Resources Code § 36.101 and have complied with all requirements therein.

146.   By reason of Defendants' actions, the State of Texas has incurred and continues to incur damages.

## VII.   DEMAND FOR JURY TRIAL

147.   Relators expressly demand a trial by jury.

---

[24]   The *Texas Medicaid Provider Procedures Manual* can be downloaded at the following URL: http://www.tmhp.com/TMHP_File_Library/Provider_Manuals/TMPPM/2016/Mar_2016%20TMPPM.pdf.

# VIII.   PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves, the United States and the Plaintiff States, request that this Court:

(a)    Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. §§ 3729-3733;

(b)    Enter judgment against each Defendant in an amount equal to three times the damages the United States has sustained as a result of each and all of Defendants' actions, as well as a civil penalty against each Defendant of $11,000 for each violation of 31 U.S.C. § 3729;

(c)    Find joint and several liability against Defendants pursuant to 31 U.S.C. § 3729;

(d)    Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims violating the statutes of the respective Plaintiff States as pled herein;

(e)    Enter judgment against each Defendant in an amount equal to three times the damages the respective Plaintiff States have sustained as a result of each and all Defendants' actions, as well as a civil penalty against each Defendant in the maximum amount allowable under the statutes of each respective Plaintiff State for each and every false record, statement, certification and claim submitted to the respective Plaintiff States;

(f)    Award Relators the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and the relevant provisions of the statutes of each of the Plaintiff States;

(g)    Award Relators all costs and expenses of this action, including court costs, expert fees, and all attorneys' fees incurred by Relators in prosecution of this action; and

(h)   That the United States, the Plaintiff States and Relators be granted each other and further relief as the Court deems just and proper.

Respectfully submitted,

_____*/s/ Michael Angelovich*_____
Michael Angelovich, TX Bar No. 785666
mangelovich@nixlaw.com
Trey Duck, TX Bar No. 24077234
tduck@nixlaw.com
Britt Glass, TX Bar No. 24092424
bglass@nixlaw.com
Nix, Patterson & Roach, LLP
3600 N. Capital of Texas Hwy.
Building B, Suite 350
Austin, TX 78746
Telephone: 512.328.5333
Facsimile: 512.328.5335

Ed Dougherty, MO#26862
edougherty@dh-law.com
DOUGHERTY & HOLLOWAY, LLC
7200 NW 86th St., Suite D
Kansas City, MO 64153
Telephone: 816.891.9990
Facsimile: 816.891.9905