## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF CONNECTICUT, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF FLORIDA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF GEORGIA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF INDIANA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § | Civil Action No. 2:16-cv-00432-JRG |
| STATE OF LOUISIANA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| COMMONWEALTH OF MASSACHUSETTS, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § § | |
| STATE OF TENNESSEE, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, AND | § § § § | |
| STATE OF TEXAS, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | |
| TEAM HEALTH HOLDINGS INC., TEAM FINANCE, L.L.C., TEAM HEALTH INC., & AMERITEAM SERVICES, L.L.C., | § § § § | |
| *Defendants*. | § § § | |

## RELATORS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

I.   INTRODUCTION AND RESPONSE TO TEAMHEALTH'S
     STATEMENT OF ISSUES ................................................................................1

II.  STANDARD OF REVIEW ...............................................................................8

III. ARGUMENT ......................................................................................................9

   A.  RELATORS' COMPLAINT SATISFIES THE RULE 9(B) PLEADING STANDARD. ...........................9

      1.  TeamHealth Mischaracterizes the Applicable Pleading Standard. ................................10

      2.  Relators Pled the Mid-Level Scheme with Sufficient Particularity. .............................13

      3.  Relators Pled the Critical Care Scheme with Sufficient Particularity. .........................19

      4.  Defendants Have Not Been Prejudiced by Relators' Amendment. ...............................22

      5.  Relators Sufficiently Pled Their State Law Claims. ....................................................23

   B.  RELATORS' MID-LEVEL SCHEME ALLEGATIONS ARE NOT BASED ON
       PUBLICLY DISCLOSED INFORMATION. ...................................................................23

      1.  Relators' Allegations Must be Analyzed Under Both the Pre- and Post-
          PPACA Public Disclosure Tests and Original Source Exceptions. ..............................24

      2.  The Court Has Jurisdiction over Pre-2010 Claims. ....................................................25

      3.  TeamHealth's Public Disclosure Defense for Post-2010 Claims Also
          Fails. ......................................................................................................................29

   C.  RELATORS ALLEGED CONDUCT THAT IS MATERIAL TO THE GOVERNMENT'S
       DECISION-MAKING. ..............................................................................................30

      1.  The Governments' Continued Payment of Claims Is Not Evidence of
          Immateriality. .........................................................................................................31

      2.  Non-Intervention Is Not Relevant to Materiality. ......................................................33

      3.  TeamHealth's Conduct Under the Mid-Level Scheme Is Material. ...............................33

   D.  RELATORS' CLAIMS ARE NOT BARRED BY STATUTE. ............................................34

   E.  RELATORS REQUEST LEAVE TO AMEND TO CURE ANY DEFICIENCIES. ..................35

IV.  CONCLUSION ...............................................................................................35

**TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................. 8-9

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544, 564 (2007) ..........................................................8, 9

*Firestone v. Firestone,*
76 F.3d 1205 (D.C. Cir.1996)........................................................34

*Foglia v. Renal Ventures Mgmt., LLC,*
754 F.3d 153 (3d Cir. 2014) .........................................................10

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson,*
559 U.S. 280 (2010) ..................................................................29

*United States ex rel. Bibby v. Wells Fargo Bank, N.A.,*
165 F. Supp. 3d 1340 (N.D. Ga. 2015)...............................................16

*United States ex rel. Bilotta v. Novartis Pharm. Corp.,*
50 F. Supp. 3d 497 (S.D.N.Y. 2014) .................................................16

*United States ex rel. Carpenter v. Abbott, Inc.,*
723 F. Supp. 2d 395 (D. Mass. 2010)................................................16

*United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.,*
865 F.3d 71 (2d Cir. 2017) ...........................................................10

*United States ex rel. Clausen v. Laboratory Corporation of America, Inc.,*
290 F.3d 1301 (11th Cir. 2002) ....................................................3, 11

*United States ex rel. Duxbury v. Ortho Biotech Products, L.P.,*
579 F.3d 13 (1st Cir. 2009)........................................................11,16

719 F.3d 31 (1st Cir. 2013)...........................................................16

*United States ex rel. Grubbs v. Ravikumar Kanneganti,*
565 F.3d 180 (5th Cir. 2009) ....................................................*passim*

*United States ex rel. Harman v. Trinity Indus.,*
Case No. 2:12-CV-00089-JRG,
2014 U.S. Dist. LEXIS 973 (E.D. Tex. Jan. 6, 2013)..........................*passim*

ii

*United States ex rel. Heath v. AT & T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015) ................................................................................ 10

*United States ex rel. Hudalla v. Walsh Const.Co.*,
834 F. Supp. 2d 816 (N.D. Ill. 2011) ...................................................................... 16

*United States ex rel. Hunt v. Cochise Consultancy, Inc.*,
887 F.3d 1081 (11th Cir. 2018), cert. granted sub nom.
*Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*,
No. 18-315 2018 WL 4385694 (U.S. Nov. 16, 2018) ........................................... 34

*United States ex rel. Johnson v. Shell Oil Co.*,
183 F.R.D. 204 (E.D. Tex. 1998) ............................................................................ 13

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2015) .................................................................................... 30

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
865 F.3d 29 (1st Cir. 2017) ..................................................................................... 11

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*,
238 F. Supp. 2d 258 (D.D.C. 2002) ........................................................................ 16

*United States ex rel. Polukoff v. St. Mark's Hosp.*,
895 F.3d 730 (10th Cir. 2018) ................................................................................ 10

*United States ex rel. Presser v. Acacia Mental Health Clinic,* LLC,
836 F.3d 770 (7th Cir. 2016) .................................................................................. 10

*United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*,
794 F.3d 457 (5th Cir. 2015) ........................................................................ 2, 12, 16

*United States ex rel. Roby v. Boeing Co.*,
184 F.R.D. 107 (S.D. Ohio 1998) ........................................................................... 13

*United States ex rel. Rost v. Pfizer, Inc.*,
253 F.R.D. 11 (D. Mass. 2008) ............................................................................... 16

*United States ex rel. Spay v. CVS Caremark Corp.*,
913 F. Supp. 2d 125 (E.D. Pa. 2012) ..................................................................... 16

*United States ex rel. Springfield Terminal Ry. v. Quinn*,
14 F.3d 645 (D.C. Cir. 1994) ............................................................................ 25, 27

iii

*United States ex rel. Williams v. Bell Helicopter Textron Inc.*,
    417 F.3d 450 (5th Cir. 2005) ................................................................................33

*United States v. Bollinger Shipyards, Inc.*,
    775 F.3d 255 (5th Cir. 2014) .....................................................................3, 9, 10

*United States v. Paramedics Plus LLC*,
    United States Combined Responses In Opposition to Defendants'
    Motions to Dismiss (Apr. 14, 2014) ....................................................................33

    Civil Action No. 4:14-CV-00203,
    2017 U.S. Dist. LEXIS 177342 (E.D. Tex. Oct. 25, 2017) .................................8

*United States v. United Healthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016) ............................................................................10

*Universal Health Servs. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ................................................................................*passim*

**Statutes**

The False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ....................................................*passim*

42 C.F.R. §§ 410 ........................................................................................................26

42 U.S.C. § 13951(a)(1)(O) ......................................................................................33

**Other Authorities**

Fed. R. Civ. P. 9(b) ...................................................................................................8

Fed. R. Civ. P. 15(a)(2) ...........................................................................................35

Advanced Practice Registered Nurses, Anesthesiologist Assistants, and
    Physician Assistants, Medicare Learning Network (2016).........................14

Medicare Claims Processing Manual,
    Centers for Medicare and Medicaid Services ........................................26

Relators Caleb Hernandez and Jason Whaley ("Relators") file this Response in Opposition to Defendants' Motion to Dismiss Relators' First Amended Complaint (Dkt. No. 37).[1,2] For the reasons stated herein, the Court should deny the Defendants' Motion. Alternatively, the Court should grant Relators leave to amend their Complaint to cure any perceived pleading deficiency.

## I.    INTRODUCTION AND RESPONSE TO TEAMHEALTH'S STATEMENT OF ISSUES

This case is as simple as FCA cases come. TeamHealth engaged in two straightforward but fraudulent healthcare Schemes: (1) the Mid-Level Scheme; and (2) the Critical Care Scheme. Under each Scheme, TeamHealth unlawfully obtained millions in reimbursement dollars from CMS[3] for services allegedly provided in emergency departments that TeamHealth operated. Through the **Mid-Level Scheme**, TeamHealth overbills CMS for emergency services performed by mid-level providers (*e.g.*, physician assistants) by requesting reimbursement under physician ID numbers at physician rates. TeamHealth covers up the Mid-Level Scheme by falsifying medical records to indicate that a physician had face-to-face interaction with the patient—which would allow the services to be billed under the physician's ID number as a "split/shared visit"—when no such interaction ever took place. Through its **Critical Care Scheme**, TeamHealth overbills CMS

---

[1] "Defendants" or "TeamHealth" refers collectively herein to named Defendants, Team Health Holdings Inc., Team Finance, L.L.C., Team Health Inc., and AmeriTeam Services, L.L.C. "Motion" or "Mot." refers to Defendants' Motion to Dismiss Relators' First Amended Complaint (Dkt. No. 37). With their First Amended Complaint (Dkt. No. 33) (the "Complaint"), Relators amended their original complaint as a matter of course to clarify certain statements or allegations and to add the AmeriTeam Defendant. Relators added no new substantive claims or causes of action.

[2] Citations to "¶__" are citations to Relators' First Amended Complaint (Dkt. No. 33) unless otherwise provided. All emphasis is added, and internal citations and quotations are omitted herein, unless otherwise noted.

[3] The Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS") administers the Medicare program and works in partnership with state governments to administer their Medicaid programs. As used herein, "CMS" refers to these federal agencies and their state-level Medicaid counterparts for the named Plaintiff States.

for normal emergency services by upcoding the services to "critical care," a special designation for high-intensity treatment that fetches a higher reimbursement rate.

In its Statement of the Issues, TeamHealth's Motion identifies three grounds as purported support for dismissal of Relators' claims: (1) Relators did not sufficiently plead their claims under Rules 12(b)(6) and 9(b); (2) Relators' allegations under the Mid-Level Scheme were publicly disclosed in a prior lawsuit; and (3) the statute of limitations bars certain periods of Relators' claims. Though not identified in TeamHealth's Statement of the Issues, the Motion also raises a fourth argument for dismissal: (4) the alleged public disclosure of the Mid-Leve Scheme means the fraud perpetrated through this Scheme was and is not "material" to the government's decision to pay such claims. None of these arguments provides a valid basis for dismissal of the Complaint.

*First*, Relators have satisfied the Rule 9(b) pleading standard that applies to FCA cases. Throughout its Motion, TeamHealth largely ignores a "central purpose" of Relators' pleading burden: to "provide defendants with fair notice of the plaintiffs' claims[.]" *U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 467 (5th Cir. 2015)[4]; *see also U.S. ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). Yet, the Motion makes clear this central purpose has been served—TeamHealth has full and fair notice of Relators' claims. This is critical. Before the end of page seven, the Motion identifies the parties at issue, lays out Relators' factual allegations in clear language, accurately explains the CMS regulations applicable to both Schemes, and even describes the two fraudulent Schemes with ease. TeamHealth's Motion itself would satisfy the applicable pleading standards were it a complaint instead. It is simply unreasonable, if not impossible, to read TeamHealth's description of this case and conclude that TeamHealth lacks fair notice of precisely what Relators' factual and legal allegations are.

---

[4] The other "central purpose" noted in *Rigsby* is to "protect defendants from the institution of strike suits," which the court defines as a case "based on no valid claim." *Id.* This case is no "strike suit."

Moreover, TeamHealth's Motion misstates what is required at the pleading stage. In the Fifth Circuit, "an FCA claim can meet Rule 9(b)'s standard if it alleges 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014) (*citing Grubbs*, 565 F.3d at 190). The Complaint is replete with both particular details and reliable indicia. *See* Section III.A.2-3, *infra* (detailing Relators' allegations).

To circumvent this standard, TeamHealth misleadingly conflates the applicable Fifth Circuit pleading standard with a stricter (and irrelevant) standard applied in a diminishing minority of circuits. This minority standard, first articulated in *U.S. ex rel. Clausen v. Laboratory Corp. of Am., Inc*. 290 F.3d 1301, 1311 (11th Cir. 2002), has been construed to require relators to allege the detailed contents of at least one specific false claim actually submitted for reimbursement. *Id.*; *see Grubbs*, 565 F.3d at 186. Citing only minority-circuit cases, TeamHealth's Motion contains statements such as, "[t]he presence of factual allegations describing *actual false claims billed to the government* is the fundamental underpinning of a claim of FCA violations." Mot. at 11 (emphasis original). Such statements are flat wrong—in this Circuit and the majority of others.

In *Grubbs*, the Fifth Circuit expressly rejected the *Clausen* standard in favor of the majority view: "We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, ***if it cannot allege the details of an actually submitted false claim, may*** <u>***nevertheless***</u> ***survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.***" *Grubbs*, 565 F.3d at 190. The Court has reaffirmed this standard time and again. *See, e.g.*, *Bollinger Shipyards*, 775 F.3d at 260. Though TeamHealth cleverly cites other language from *Grubbs* and its progeny—and even pays lip service to the "strong inference"

standard—the Motion plainly attempts to persuade the Court to disavow binding precedent and hold Relators to a heightened minority standard that does not apply.

Relators have satisfied the standard that *does* apply by alleging details of two Schemes and reliable factual indicia that lead to a strong inference that TeamHealth actually submitted claims:

**Mid-Level Scheme—Reliable Indicia:**
- Mid-level services can be billed under a physician national provider identifier ("NPI") number if and only if the physician and the mid-level both saw the patient "face to face"—*i.e.*, a split/shared visit occurred (¶¶3-4, 45, 50-51);
- TeamHealth does not allow mid-levels and physicians to work in the same area of its emergency departments (¶¶4, 39-40, 55-56, 63);
- Mid-levels and physicians at TeamHealth very rarely treat patients together (*i.e.*, in "shared visits") (¶¶4, 55-56);
- TeamHealth employs more mid-levels than it does physicians (¶¶39, 41);
- TeamHealth requires mid-levels to state in their charts (usually electronic medical records or "EMRs") that they were supervised by a physician during each visit; (¶¶5, 45, 52, 57-58, 64);
- TeamHealth creates "macros" (or electronic short cuts) in the EMR that allow mid-levels to click a box stating physician supervision occurred (¶58);
- TeamHealth requires physicians to sign each mid-level EMR, typically long after the patient has left the premises (¶¶5, 45, 52, 59-62, 64; 71);
- TeamHealth randomly assigns mid-level charts to physicians for signature—even if the physician was not on-duty during the mid-levels' shifts (¶¶52-53);
- TeamHealth employs "billing liaisons" whose primary job responsibility is to hound physicians to sign mid-level EMRs (¶¶64-65);
- These "billing liaisons" explain to physicians that without their signatures, mid-level charts cannot be billed to CMS (¶¶60, 64);
- TeamHealth physicians have no ability to disagree with or challenge the documentation in the EMRs (¶61);
- TeamHealth threatens pay cuts and suspension when physicians fall behind on signing mid-level charts or refuse to sign them (¶¶61, 64-65);
- Coding professionals at TeamHealth are instructed that (1) a physician signature in an EMR indicates the physician was physically present during the visit (¶63), and (2) when a physician has signed and/or attested to a mid-level chart, the physician's NPI should be used for billing purposes (¶66);
- TeamHealth silos its billing departments and isolates billing information as it progresses from the provider to coding to billing CMS (¶¶39, 42, 68, 70);
- TeamHealth uses falsified EMRs to bill CMS for mid-level services under a physician NPI number when no shared visit occurred (¶¶2, 5, 6, 41, 48-49, 69-74);
- TeamHealth billing liaisons conceal information from patients who complain about why physician information appears on their bill when a physician never treated them (¶71); and
- Claims under the Scheme are "pass through" claims subjected to little to no front-end auditing and CMS pays them automatically (¶¶49, 67-68).

**Critical Care Scheme—Reliable Indicia:**

- Critical care is the highest level of emergency E/M service that can be provided and is reimbursed at the highest rate (¶¶7, 81, 84-85);
- Critical care can generally be described as that level of care required by imminently life-threatening emergency conditions (¶82, 84);
- TeamHealth sets critical care "quotas" to drive revenue (¶¶7, 75, 78-79, 86, 88, 93);
- These quotas are arbitrary, as TeamHealth physicians "have no control over the amount of true critical care that will be required in any given time period." (¶¶76, 79);
- True critical care conditions are "rare" and typically only "account for approximately 1% of all emergency department visits" (¶83);
- TeamHealth's critical care quotas far exceed average critical care rates (¶¶83-86);
- TeamHealth views critical care scenarios as extremely lucrative, as they are more profitable than E/M levels 1-5 scenarios (¶¶7, 81, 84-85);
- TeamHealth ties revenue to critical care billing (¶¶78-79, 85, 90, 93);
- TeamHealth encourages physicians to falsify critical care documentation (¶¶7, 86, 91, 93, 95), threatens physicians when they do not meet their quotas (¶¶76, 79), and chastises physicians for failing to chart for critical care (¶¶79, 89-90, 95);
- TeamHealth trains its providers to upcode critical care through falsified EMRs (¶¶7, 75-76, 78, 86, 89-90, 95);
- TeamHealth regularly sends "feedback to healthcare providers, attaching specific patient charts and instructing them on what additional information should have been included so that a chart can meet the higher-revenue critical care billing requirements." (¶90);
- TeamHealth has "designed a uniform policy that encourages healthcare providers to memorize [certain] medical conditions that, according to TeamHealth, will require critical care every time." (*Id.*);
- TeamHealth encourages physicians to use macros or similar short cuts to populate EMRs with language such, as "Performed critical care for 30-74 minutes." (¶91);
- TeamHealth uses the falsified EMRs to bill CMS (¶¶7-8, 76-77, 92, 93); and
- Critical care claims are "pass through"; MACs pay them automatically with little to no front-end auditing (¶94).

These allegations are reliable indicia that TeamHealth submits false claims to CMS, just as Relators allege. *See Grubbs*, 565 F.3d at 190. Yet, despite having every incentive to do so, TeamHealth's Motion does not deny any of these allegations or offer a single alternative inference. The reason? There is no alternative inference to be drawn. The <u>only</u> reason TeamHealth would engage in these actions is to increase its billing revenue by submitting false claims for reimbursement. Because only one reliable inference can be drawn from the facts alleged, that inference is inherently "strong." *Id*.

Moreover, after working for TeamHealth for many years and gaining first-hand, eye-witness knowledge of TeamHealth's profit-seeking behavior, Relators took it upon themselves to investigate their allegations further: they spoke with multiple confidential witnesses ("CW") and peers, who confirmed that TeamHealth submitted false claims to CMS. ¶¶63-71. For example:

- "CW1 received patient charts directly from TeamHealth-managed hospitals and translated the physician services in the charts into codes, which were then submitted for billing." (¶63);
- "CW1 explained that TeamHealth billing departments return charts lacking signatures to physicians." (¶65);
- "CW2 often observed mid-level signatures on [] charts, indicating that mid-levels were involved in the treatment of the patient. However, even when a mid-level had signed a patient's chart, only a physician's name and NPI were transferred to the claims form and submitted to CMS." (¶70); and
- "CW3 explained that she regularly received calls from patients complaining that a physician's name appeared on their bill when they had not been treated by a physician at all." (¶71).

These facts are clearly and sufficiently alleged in the Complaint. And, when taken as true (as they must be at this stage), it is evident that Relators have met the Rule 9(b) pleading standard.

**Second**, TeamHealth argues that Relators' allegations under the Mid-Level Scheme (but not the Critical Care Scheme) were disclosed in a prior complaint against TeamHealth (the "*Endre-Day*" complaint), which TeamHealth attached to its Motion.[5]  Thus, TeamHealth argues Relators' claims under the Mid-Level Scheme should be dismissed under the FCA's public disclosure provision. This is wrong. The *Endre-Day* case—a fledgling and nondescript complaint filed in 2000 and voluntarily dismissed—superficially describes a generic billing scheme that, if true,

---

[5] In attaching the *Endre-Day* Complaint, TeamHealth requested the Court take judicial notice of it. Mot. at 19 n.6. Relators contend the *Endre-Day* Complaint does not constitute evidence sufficient to convert the Motion to a motion for summary judgment. Rather, the Court can resolve Defendants' public disclosure challenge (and the related materiality argument) though comparison of *Endre-Day* to Relators' Complaint. However, should the Court choose to convert the Motion into a summary judgment motion, out of an abundance of caution, Relators have attached controverting evidence hereto, including Declarations of Relators (Exs. 1 and 2) showing their direct and independent knowledge and the Declaration of coding and billing expert Elin Baklid-Kuntz (Ex. 3) to clarify and highlight the distinct billing regulations at issue in each complaint.

implicated a completely different CMS billing regulation that does not even apply here. In fact, the CMS regulation at issue under the Mid-Level Scheme here—the "split/shared visit" regulation—did not even exist at the time of the *Endre-Day* case. *See* Declaration of Elin Baklid-Kunz, attached as Ex. 3 at ¶¶1, 22-24, 35, 39. As such, this case and *Endre-Day* are not "substantially similar," nor could the present allegations be "based on" the prior lawsuit. Indeed, it is impossible that *Endre-Day* could have set the government on the trail of Relators' claims— Relators' claims did not and could not have existed at the time of *Endre-Day*. *See* Section III.B.2, *infra*. TeamHealth fails to acknowledge, much less reconcile, this fundamental reality.

However, even if *Endre-Day* had somehow disclosed aspects of Relators' allegations (which it could not), Relators easily qualify as "original sources"—an exception to the public disclosure bar. Relators have direct and independent knowledge through their employment at TeamHealth and related investigation. *See* Declarations of Relators Hernandez and Whaley, Exs. 1 and 2. And, the specific facts they allege—*e.g.*, the facts listed in the bullets above—more than "materially add to" the barebones *Endre-Day* Complaint.

**Third**, drawing on its flawed and expansive interpretation of the *Endre-Day* allegations, TeamHealth constructs a convoluted argument that (1) *Endre-Day* supplied the government with prior knowledge of the Mid-Level Scheme, (2) the government has continued to reimburse TeamHealth's "split/shared visit" claims since *Endre-Day*, and thus, (3) the fraud TeamHealth has continued to commit under the Mid-Level Scheme must not be "material" to the government. In addition to impliedly admitting the Mid-Level Scheme, this argument fails for the same reasons TeamHealth's public disclosure argument fails, and further crumbles under additional scrutiny. *See* Section III.C, *infra*. TeamHealth simply attached the *Endre-Day* Complaint—which, again, did not disclose the Mid-Level Scheme—without providing any evidence that the government had actual knowledge of the Mid-Level Scheme. Such knowledge cannot be assumed at this stage—

Relators' allegations—not TeamHealth's—must be taken as true. Moreover, because claims for split/shared services are "pass-through" claims paid automatically by CMS, the government would have had no way of discovering the Mid-Level Scheme absent a manual audit of TeamHealth's EMRs. And, perhaps most importantly, the Mid-Level Scheme alleges *direct* fraud that is undoubtedly material. This is not the type of "implied certification" scheme recently subjected to materiality challenges under *Universal Health Servs. v. U.S. ex rel. Escobar*. 136 S. Ct. 1989, 1999-2001 (2016).

*Finally*, TeamHealth argues that certain periods of Relators claims are barred by the FCA's statute of limitations. TeamHealth's statute of limitations argument is inappropriate at the pleading stage and should be denied. The statute of limitations is an affirmative defense that should be considered at the appropriate time after at least minimal discovery has been conducted. Further, because a challenge to the application of the FCA statute of limitations is currently on appeal to the United States Supreme Court, Relators respectfully request that the Court defer its decision on this issue until that matter has been resolved.

As shown below, the Court should deny the Motion in full. However, if the Court should find any pleading deficiency in Relators' Complaint, Relators respectfully request leave to amend.

## II.   STANDARD OF REVIEW

Rule 9(b) states that in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "Rule 9(b) does not 'reflect a subscription to fact pleading' and requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud.'" *Grubbs*, 565 F.3d at 186. "A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *Grubbs*, 565 F.3d at 185 n.8.

When considering a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all well-pleaded facts in plaintiff's complaint and view those facts in the light most favorable to

the plaintiff." *United States v. Paramedics Plus LLC*, No. 4:14-CV-00203, 2017 U.S. Dist. LEXIS 177342, at *6 (E.D. Tex. Oct. 25, 2017) (Mazzant, J.). The court "look[s] for plausibility in th[e] complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). This is not "a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the alleged claim for relief." *Id.* at 556. "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

In *Grubbs*, the Fifth Circuit stated: "We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act [] claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190; *see also Bollinger Shipyards*, 775 F.3d at 260. In sum, Relators must: "(1) plead 'enough facts [taken as true] to state a claim to relief that is plausible on its face,' and (2) plead 'with particularity the circumstances constituting fraud or mistake,' although '[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Bollinger Shipyards*, 775 F.3d at 260 (brackets original).

## III.   ARGUMENT

### A.   Relators' Complaint Satisfies the Rule 9(b) Pleading Standard.

Relators have alleged more than sufficient facts to satisfy Rule 9(b) and state plausible claims under the FCA. *See Twombly*, 550 U.S. at 564. Arguing to the contrary, TeamHealth contends Relators failed to plead with sufficient particularity that TeamHealth actually presented

9

false claims to CMS in violation of 31 U.S.C. § 3729(a)(1)(A).[6] In doing so, TeamHealth misstates the applicable law and relies on the wrong standard. Relators have satisfied the applicable Fifth Circuit pleading standard for both Schemes.

### 1. TeamHealth Mischaracterizes the Applicable Pleading Standard.

Faced with the detailed allegations regarding the two fraudulent Schemes pled here, TeamHealth's Motion distorts the legal standard governing this Court's decision. Specifically, TeamHealth conflates binding Fifth Circuit law with a stricter pleading standard applied in a minority of circuits. To be sure, there is a circuit split on the applicable 9(b) pleading standard in FCA cases.[7] However, in *Grubbs*, the Fifth Circuit adopted the majority view that relators may allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted," and need not "allege the details of an actually submitted false claim" to satisfy Rule 9(b). *Grubbs*, 565 F.3d at 190.[8] The Fifth Circuit

---

[6] TeamHealth's Motion only challenges Count I of Relators' Complaint—the "presentment" claim. The Motion does not appear to challenge Relators' Count II (¶¶105-11), which alleges violations of FCA § 3729 (a)(1)(B) "false records" provision. *See Grubbs*, 565 F.3d at 193.

[7] In fact, TeamHealth's counsel published an article on its website in 2014, entitled "*Supreme Court Declines to Opine on Circuit Split Over Rule 9(b) Pleading Requirements for FCA claims*," which states: "While all circuits require qui tam complaints to allege fraud 'with particularity' consistent with Rule 9(b), circuits are split on the issue of whether particularity' requires the plaintiff to identify specific false claims that were submitted for payment by a federal health care program." *See Health Care & Life Sciences Client Alert*, Epstein Becker Green (June 2014) *available at* https://www.ebglaw.com/content/uploads/2014/09/HCLS-Client-Alert_Supreme-Court-Declines-to-Opine-on-Circuit-Split-Over-Rule9b.pdf (last visited Jan. 31, 2019).

[8] *See also U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 89 (2d Cir. 2017) ("Our holding today is clearly consistent with the approach taken by the Third, **Fifth**, Seventh, Ninth, Tenth, and D.C. Circuits, which have overtly adopted a 'more lenient' pleading standard. Those courts have allowed a complaint that does not allege the details of an actually submitted false claim to pass Rule 9(b) muster by 'alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to strong inference that claims were actually submitted.'"); *U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 745 (10th Cir. 2018); *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014) (*quoting Grubbs*); *U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (same); *U.S. ex rel. Presser v. Acacia Mental Health Clinic*, LLC, 836 F.3d 770, 777 (7th Cir. 2016) ("plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted

has confirmed this holding repeatedly. *See, e.g.*, *Bollinger Shipyards*, 775 F.3d at 260.

However, TeamHealth's Motion is premised in large part on the "strained" and sweeping minority standard articulated in *Clausen*, 290 F.3d at 1311.[9] There, the Eleventh Circuit held that "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the government." *Id.* This has been interpreted as requiring specific allegations of at least one false claim actually submitted for reimbursement. *See Grubbs*, 565 F.3d at 186-87. The Fifth Circuit **specifically rejected** the *Clausen* standard. *Id.* at 187.

Despite paying partial lip service to *Grubbs* and its "strong inference" standard, TeamHealth's Motion asks the Court to apply the *Clausen* standard. For example, TeamHealth states: "Not one factual statement—by Relators or by the Confidential Witnesses—identifies a single false claim presented to the government, the specific parties involved in submission of a false claim, or a specific date on which a false claim was billed." Mot. at 13; *see also id.* at 13-14, 15. This is the *Clausen* standard to the letter. And, by advocating for its application here, TeamHealth asks the Court require Relators to marshal specific evidence of actual false claims at the pleading stage. Indeed, this is precisely why the Fifth Circuit rejected the *Clausen* standard: at trial "a reasonable jury could *infer* that more likely than not the defendant presented a false bill to the government, this despite no evidence of the particular contents of the misrepresentation." *Grubbs*, 565 F.3d at 189. "***And surely a procedural rule ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial***." *Id.*

---

to the Government."); *U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 126 (D.C. Cir. 2015) ("precise details of individual claims are not, as a categorical rule, an indispensable requirement of a viable False Claims Act complaint"); *see also*

[9] *Grubbs* criticized the First Circuit's adoption of this "strained" minority view in *Clausen* as "sweep[ing] too far" and leading to absurd results. *Grubbs*, 565 F.3d at 191. The First Circuit has since retreated from that position; it no longer imposes any such bright-line requirement. *See, e.g.*, *U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 40-41 (1st Cir. 2017); *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 31 (1st Cir. 2009) (*Duxbury I*).

Rather, *Grubbs* provides, "[t]he time, place, contents, and identity standard is not a straitjacket for Fed. R. Civ. P. 9(b)." *Id.* at 188. "Put plainly, the [FCA] is remedial" and, thus, courts should "effectuat[e] Rule 9(b) without stymieing legitimate efforts to expose fraud." *Id.* at 189-90. In other words, TeamHealth's asks this Court to don a legal "straitjacket" in analyzing Relators' allegations, even though the Fifth Circuit has emancipated Courts from such a stricture.[10]

In a related attempt to back-door the *Clausen* standard, TeamHealth argues that without minute details of specific false claims, they are "hamstrung from investigating Relators' claims and mounting an appropriate defense." Mot. at 14. But this argument is entirely at odds with *Grubbs*. TeamHealth need only review their own records to find those claims Relators allege are false. As the Fifth Circuit explained in *Grubbs*:

> Defendants either have or do not have evidence that the alleged phony services were actually provided; they either have or do not have evidence that recorded, but unprovided or unnecessary, services did not result in bills to the government. ***Discovery can be pointed and efficient, with a summary judgment following on the heels of the complaint if billing records discredit the complaint's particularized allegations. That is the balance Rule 9(b) attempts to strike.***

*Grubbs*, 565 F.3d at 191. TeamHealth has adequate and fair notice of the claims they must defend; they are sufficiently prepared to produce responsive pleadings; and they will have an opportunity to conduct discovery and review their records to defend themselves with evidence. Despite TeamHealth's artful dodging, the legal standard governing this Motion has been clearly articulated by the Fifth Circuit. And, as shown below, Relators have fully satisfied that binding standard here.

---

[10] Furthermore, TeamHealth conflates Relators' allegations under FCA § 3729(a)(1(A) ("presentment theory") and FCA § 3729(a)(1)(B) ("false record theory"). Here, Relators have alleged both. Relators' false record theory under Count II (¶¶105-11) stands unchallenged. *Grubbs* clearly states that "the recording of a false record, when it is made with the requisite intent, is enough to satisfy the statute; [the Court] need not make the step of inferring that the record actually *caused* a claim to be presented to the Government." 565 F.3d at 193 (emphasis in original). TeamHealth's reliance on *Rigsby*, 794 F.3d at 467, is misplaced. *Rigsby* was not a Rule 9(b) opinion and does not state that § 3729(a)(1)(B) requires proof of "presentment."

### 2.    Relators Pled the Mid-Level Scheme with Sufficient Particularity.

Relators sufficiently pled TeamHealth's Mid-Level Scheme as an FCA violation. The Complaint alleges "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190.[11] While "[t]he time, place, contents, and identity standard is not a straitjacket," Relators sufficiently alleged the who, what, when, where, and how of the Mid-Level Scheme. *Id.* at 188.

*Who*: Relators clearly pled the identity of *who* perpetrated the alleged FCA violations throughout the Complaint: **TeamHealth**. Relators need not identify each specific employee involved in submitting the false claims. *See U.S. ex rel. Johnson v. Shell Oil Co*., 183 F.R.D. 204, 207 (E.D. Tex. 1998) (Hannah, J) ("A plaintiff cannot be expected to have personal knowledge of the daily activities of the multitude of corporate clerks involved in the filing in government forms.") Relators introduced TeamHealth in ¶1 and detailed its involvement in the Mid-Level Scheme throughout the Complaint. *See* ¶¶1-6, 9, 12-16, 32-34, 36-74.

The company-wide policies—which TeamHealth pressured Relators and other employees to implement—were not the product of a single employee. Rather, TeamHealth developed these company-wide policies throughout its corporate structure and business operations. ¶73. Relators have not sued individual employees in their personal capacities; Relators have alleged TeamHealth created their fraudulent schemes through coordinated corporate action. Furthermore, the "identities of those at [a defendant organization] who may have actually engaged in the alleged fraudulent activities at different stages of the process would require the government to know evidentiary matters that may be exclusively within the knowledge of [the defendant]." *U.S. ex rel. Roby v. Boeing Co*., 184 F.R.D. 107, 110 (S.D. Ohio 1998). The same is true here.

---

[11] For ease of reference and to demonstrate the level of pleading required in *Grubbs*, the *Grubbs* Complaint is attached hereto as Exhibit 6.

***What***: Relators clearly pled *what* TeamHealth did to violate the FCA. Relators introduced the mechanics of the Mid-Level Scheme in ¶¶2-6 and detailed them in ¶¶36-74. Relators explained that TeamHealth "systematically submits claims for mid-level services under various physicians' NPIs..., triggering the 100% rate when in fact the 85% rate applied." ¶3. Relators described the "split/shared visit" billing exception in which TeamHealth hides the Scheme:

> TeamHealth attempts to cover up the Mid-Level Scheme by characterizing mid-level services as "split/shared." Under CMS rules, "split/shared" services occur when both a mid-level and a physician treat the same patient during the same visit, such that the services are split or shared between a mid-level and a physician. When this happens, the mid-level's services may be billed under the physicians' NPI at 100% of the physician rate. However, true split/shared visits are exceedingly rare at TeamHealth facilities—they almost never occur. This is because TeamHealth requires mid-levels to treat patients alone, maximizing mid-levels' efficiency and profitability. To cover this up, TeamHealth requires its healthcare providers to falsify medical records to reflect a split/shared visit when none actually occurred.

¶4; *see also* ¶¶45, 51-52. "After the physician signs a mid-level chart, the result is a patient medical record that appears to indicate a split/shared visit occurred when in fact the mid-level treated the patient alone." ¶54. Relators explained TeamHealth's countersignature requirement, which is central to the Scheme, in detail:

> TeamHealth tells its employees that physician countersignatures are required for the mid-level services to be billed and reimbursed. That is, TeamHealth's explanation to its employees is that mid-levels' services cannot be billed *at all* without a physician signature. This is wrong. There is no such CMS requirement. Mid-level services that are reflected in an EMR can be billed *under the mid-levels' NPI* without a physician signature—triggering the appropriate 85% billing rate.[12] But, TeamHealth takes advantage of the system and its employees by requiring physician signature (for no legitimate billing reason) and then submitting mid-level claims under a physician NPI.

---

[12] *See* Advanced Practice Registered Nurses, Anesthesiologist Assistants, and Physician Assistants, Medicare Learning Network (2016), available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Medicare-Information-for-APRNs-AAs-PAs-Booklet-ICN-901623.pdf (last visited Jan. 31, 2019), attached as Exhibit 4 and incorporated herein.

¶60; *see also* ¶¶59-62. Relators explained that "physicians have no option to disagree with the care or documentation provided by the mid-level," but rather "[e]very emergency physician is *required* to sign and approve some amount of mid-level charts or EMRs at the end of each shift," and "TeamHealth has no good reason for doing this other than to commit fraud." ¶¶61-62. However, because of "TeamHealth's floor-management models, it is extremely rare that mid-levels and physicians ever see the same patient or even discuss a patient's diagnosis or treatment plan." ¶55. Therefore, "under the Mid-Level Scheme, TeamHealth submits claims for reimbursement related to mid-level services under a physician's NPI, but it is *highly unlikely* that the physician whose NPI was used ever saw or talked to the mid-level that actually performed the services being billed." ¶56; *see* ¶¶40-41. Relators clearly and specifically alleged *what* TeamHealth does under the Mid-Level Scheme in the Complaint.

**Where**: TeamHealth employed its Mid-Level Scheme "at every emergency department TeamHealth manages across the nation." ¶¶6, 46, 73; *see also* ¶57. "Relators observed the exact same policies regarding Mid-Level charting and physician countersignatures at every TeamHealth emergency department that employed them." ¶73. Relators detailed the locations at which they personally observed TeamHealth's fraudulent behavior, including "the North Colorado Medical Center in Greeley, Colorado (from 2011 to 2015); Sterling Regional Medical Center in Sterling, Colorado (from 2013 to 2015);[] Juan Luis Phillipe Hospital in St. Croix, United States Virgin Islands (in 2010)" for Dr. Hernandez, and "North Colorado Medical Center, located in Greeley, Colorado (from 2011 to 2013)" for Mr. Whaley. ¶¶10-11, 43. Relators provided the locations at which confidential witnesses, who are described in detail, observed TeamHealth's fraudulent behavior, which corroborates these allegations. ¶¶63-71. Relators pled that TeamHealth "relies on the implementation of national, standardized billing and coding practices aimed at capturing as much revenue as possible from [] CMS." ¶42. Relators described other locations integral to the

15

Mid-level Scheme, including billing and coding centers generally (TeamHealth has dozens) and where the confidential witnesses were employed:

- "TeamHealth coder, **Confidential Witness No. 1 ("CW1")** […] employed by TeamHealth as an Emergency Department Coder from February 2012 until August 2013 in Jacksonville, Florida." *Id.* ¶63.
- "**Confidential Witness No. 2 ("CW2")**[…]was employed as an Accounts Receivable Specialist at TeamHealth's corporate headquarters in Lewisville, Tennessee from October 2013 to January 2015." *Id.* ¶69.
- "**Confidential Witness No. 3 ("CW3")** worked at TeamHealth's Knoxville, TN facility in 2010 and 2011 as Billing Operations Analyst." *Id.* ¶71.

Indeed, "courts have found that allegations of specific claims in one state or region satisfy 9(b) requirements by establishing a nationwide inference of fraud."[13] Relators have alleged "where."

**When**: Relators alleged the Mid-Level Scheme violations occurred "every year since [TeamHeath] began employing the Mid-Level Scheme nationwide in or around 2002 (the year the 85% regulation was established)." ¶¶6, 46. Relators pled the dates during which they personally

---

[13] *U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1340, 1347 (N.D. Ga. 2015) (*quoting U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 174-75 (E.D. Pa. 2012)) (allegations that numerous false claims originated from Puerto Rico and four other states were sufficient to allege a nationwide scheme); *see also Duxbury I*, 579 F.3d at 31 (allegations that eight medical providers in the western U.S. had submitted false claims "support[ed] a strong inference that such claims were filed nationwide."); *U.S. ex rel. Carpenter v. Abbott, Inc.*, 723 F. Supp. 2d 395,409-10 (D. Mass. 2010) (allegation that false claims were submitted in one state sufficient to support claims in twelve other states);*U.S. ex rel. Rost v. Pfizer, Inc.*, 253 F.R.D. 11, 15-17 (D. Mass. 2008) (complaint that alleged false claims were submitted in Indiana was sufficient to allege nationwide scheme,); *U.S .ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 513 (S.D.N.Y. 2014) (*rejecting* defendant's assertion that complaint was deficient because it "rel[ied] on only a handful of sham speaker events as examples of [an] alleged nationwide kickback scheme"); *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 268 (D.D.C. 2002) (allegations that a fraudulent scheme was nationwide and occurred over twelve years were sufficient, despite the fact that "the only specific place mentioned is [a single hospital]"); *see also, gen*., *U.S. ex rel. Hudalla v. Walsh Const.Co.*, 834 F. Supp. 2d 816, 822-23 (N.D. Ill. 2011) (*rejecting* 9(b) challenge as relator sufficiently pled fraudulent billing practices in connection with construction projects, and those allegations could fairly be considered to encompass projects not specifically named in complaint). In allowing broader claims to survive dismissal, some courts initially limit discovery to smaller regions more-specifically pled in the complaint. *See, e.g*., *U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P*., 719 F.3d 31, 39 (1st Cir. 2013) ("Duxbury II"); *Rost*, 253 F.R.D. at 15-17; *see also Rigsby*, 794 F.3d at 467 n.6.

observed TeamHealth's fraudulent behavior: "the North Colorado Medical Center in Greeley, Colorado (**from 2011 to 2015**); Sterling Regional Medical Center in Sterling, Colorado (f**rom 2013 to 2015**);[] Juan Luis Phillipe Hospital in St. Croix, United States Virgin Islands (**in 2010**)" for Dr. Hernandez, and "North Colorado Medical Center, located in Greeley, Colorado (**from 2011 to 2013**)" for Mr. Whaley. ¶¶10-11; *see* ¶¶43, 73. And, Relators provided the dates during which their corroborating confidential witnesses observed TeamHealth's fraudulent behavior as well. ¶¶63-71. Relators adequately alleged the "when" of the Mid-Level Scheme.

**How**: Relators pled *how* TeamHealth perpetrates and hides its Scheme in sufficient detail, which overlaps with the "what" described above. ¶¶ 47-62. Relators first provided a thorough background on TeamHealth's business model, which "facilitates and encourages fraudulent behavior in its emergency departments." ¶43, *see* ¶¶36-43.  This included the way TeamHealth segregates its providers: "in TeamHealth facilities, physicians and mid-levels are housed in different areas of the emergency department," which makes "direct interaction between physicians and mid-levels [] exceedingly rare, and it is equally rare for a patient to see both a physician *and* a mid-level." ¶55, *see* ¶40. Relators explained that "[t]his is intentional, as it prevents overlap and maximizes the number of patients each individual healthcare provider is able to treat." *Id*. While "TeamHealth submits claims for reimbursement related to mid-level services under a physician's NPI, [] it is *highly unlikely* that the physician whose NPI was used ever saw or talked to the mid-level that actually performed the services being billed." ¶56.

Relators provided a detailed explanation of CMS reimbursement of mid-level services and the split/shared exception, which TeamHealth uses to disguise its fraud. ¶¶47-54. Most importantly, "a split/shared visit requires that both the physician and the mid-level provided a substantive portion of the visit face-to-face with the patient. Simply put, both the physician and the mid-level must lay eyes on the patient and directly treat the patient." ¶51.

Relators explained that "TeamHealth requires mid-levels to indicate that he or she was supervised by a physician during the patient's treatment—even though physicians and mid-levels typically do not interact at all." ¶58; *see* ¶¶57-62. Then, "TeamHealth requires physicians to 'countersign' mid-level charts or EMRs" (¶59), in hopes of satisfying CMS's requirement that "a mid-level's split/shared services must be supported by documentation from both the physician and the mid-level." ¶51. TeamHealth's "coding and billing specialists [then] reduce the falsified charts to CPT codes for E/M services and select the *physician's* NPI for billing purposes, despite the fact that the physician performed no services at all." ¶66.

Relators corroborated these allegations with statements from three confidential witnesses—all former TeamHealth employees. ¶73; *see* ¶¶63-74. "CW1 received patient charts directly from TeamHealth-managed hospitals and translated the physician services in the charts into codes, which were then submitted for billing." ¶63. "CW1 explained that TeamHealth billing departments return charts lacking signatures to physicians." ¶65. "CW2 often observed mid-level signatures on [] charts, indicating that mid-levels were involved in the treatment of the patient. However, even when a mid-level had signed a patient's chart, only a physician's name and NPI were transferred to the claims form and submitted to CMS." ¶70. "CW3 explained that she regularly received calls from patients complaining that a physician's name appeared on their bill when they had not been treated by a physician at all." ¶71.

Finally, Relators alleged precisely how TeamHealth kee's its Scheme undetected: "[C]laims for mid-level and physician E/M services are 'pass through' claims for billing purposes. This means there is little or no front-end review or auditing of these charges—the MAC pays them automatically. In essence, the reimbursement system for the E/M services at issue here is an honor system." ¶67. "CMS does not require underlying EMRs to be submitted along with requests for reimbursement for E/M services" so "CMS cannot perform a medical chart or EMR review to

18

determine where TeamHealth's claims are accurate." ¶68. "As such, these claims go unnoticed by CMS and are automatically paid. TeamHealth takes advantage of this 'pass-through' honor system." *Id*.; *see* ¶49.

A plain reading of Relators' Complaint satisfies TeamHealth's search for the "factual pleading of the nexus between a physician signature on the patient chart and a false claim actually billed." Mot. at 12. Relators support the strong inference that false claims were submitted by describing the operations of CMS system in detail (¶¶22-31, 44-54); the TeamHealth billing policies and practices used to effectuate its Scheme (¶¶36-43, 55-56); the ways in which TeamHealth aimed those billing policies at the federally-reimbursed healthcare system (¶¶57-74); the different roles and functions that medical providers serve in completing charts and placing them into the TeamHealth revenue stream (¶¶57-74); and confirmatory accounts of three confidential witnesses (¶¶63-74). These allegations "connect the dots" in supporting a strong inference under *Grubbs* that TeamHealth submitted false claims for mid-level services under physician NPIs. Notably, TeamHealth does not offer a single alternative inference or explanation for the specific allegations in the Complaint. The Mid-Level Scheme allegations satisfy Rule 9(b).

### 3.    Relators Pled the Critical Care Scheme with Sufficient Particularity.

Relators sufficiently pled TeamHealth's Critical Care Scheme as an FCA violation. The Complaint provides "particular details" of the Critical Care Scheme "paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190.

***Who***: Relators clearly pled the identity of those *who* perpetrated the alleged FCA violations throughout the Complaint: **TeamHealth**. *See* Section III.A.2 above; ¶¶1, 7-9, 12-16, 32-33, 35, 36-43, 75-95. TeamHealth has sufficient notice of "who" committed this fraud.

***What***: Relators introduced the mechanics of the Critical Care Scheme in Complaint ¶¶7-9 and provided thorough details of the Scheme in ¶¶75-95. The Complaint explains that

TeamHealth's Critical Care Scheme is "classic upcoding." ¶¶7, 75. "CMS defines 'critical care' as 'physician(s) medical care for a critically ill or critically injured patient," whose "critical illness or injury acutely impairs one or more vital organ systems such that there is a *high probability of imminent or life-threatening deterioration* in the patient's condition.'" ¶82. "TeamHealth bills CMS for 'critical care'—the highest level of emergency treatment—when in fact critical care services were not rendered and/or not medically necessary, thereby submitting false claims through fraudulent billing." ¶7; *see* ¶75. Specifically, the Complaint alleged:

> TeamHealth imposes unrealistic critical care quotas—typically 6% of patient encounters or more—on healthcare providers and threatens to pay-dock, suspend, or terminate those providers who fail to meet such quotas. Of course, TeamHealth and its employees have no control over the severity of the injuries and illnesses that their patients present with. … Thus, to meet the quotas, TeamHealth trains providers to falsify medical charts to indicate that critical care is required when, in fact, only ordinary emergency treatment is required. TeamHealth then uses the falsified medical charts to submit claims to CMS at the higher critical care rate.

¶76; *see* ¶¶78-79, 86-88. TeamHealth trains its providers to upcode and this training "contradicts the medical education that providers received during medical school or residency. During such training, TeamHealth redefines what constitutes critical care for its healthcare providers." ¶¶89-90. TeamHealth then uses the "falsified medical records" to "submit[] false claims for reimbursement to CMS and state agencies for the reimbursement at the higher critical care rates." *Id.* ¶92. The Complaints alleges exactly "what" the Critical Care Scheme is.

**Where**: Relators clearly pled *where* TeamHealth's violations occurred. TeamHealth implements this Scheme at "every emergency department [it] manages across the nation." ¶¶9, 77, 90, 95. Relators detailed the locations where they personally observed TeamHealth's fraudulent behavior while employed in TeamHealth emergency departments. ¶¶10-11. "Relators observed the same policies with respect to critical care at every TeamHealth emergency department they have worked in." ¶93. Relators pled that TeamHealth "relies on the implementation of national, standardized billing and coding practices aimed at capturing as much revenue as possible from []

20

CMS." ¶42. "National and regional TeamHealth administrators often send emails to TeamHealth physicians and Mid-Levels instructing and reminding them of TeamHealth's critical care policy. ¶95. As explained in Section III.A.2 n.13, *supra*, allegations of specific claims in one state or region satisfy 9(b) requirements by establishing a nationwide inference of fraud.

*When*: Relators clearly pled *when* TeamHealth violated the FCA. "TeamHealth has been upcoding for critical care since at least 2008 (when the critical care regulations were last updated)." ¶77, *see* ¶8. Relators personally observed TeamHealth's fraudulent behavior from at least 2010 to 2015, while employed at TeamHealth. ¶¶10-11, 93.

*How*: Relators clearly pled *how* TeamHealth perpetrates and hides its Critical Care Scheme, which overlaps with the "what" described above. "TeamHealth imposes unrealistic critical care quotas" and "threatens to pay-dock, suspend, or terminate those providers who fail to meet such quotas" (¶76; *see* ¶¶78-79, 86-88). "True critical care conditions are rare and typically account for approximately 1% of all emergency department visits, with the overwhelming majority of critical patients ultimately being admitted to critical care units within the hospital." ¶83. "In order to meet TeamHealth's unrealistic critical care quotas, TeamHealth requires physicians to provide this documentation for encounters in which critical care treatment was not necessary and to capitalize by maximizing every possible minute of critical care billing." ¶88. "TeamHealth constantly hammers [its providers] with training that contradicts the medical education that providers received during medical school or residency" and "redefines what constitutes critical care." ¶89.

"TeamHealth coding specialists also regularly send 'feedback' to healthcare providers, attaching specific patient charts and instructing them on what additional information should have been included so that a chart can meet the higher-revenue critical care billing requirements." ¶90.

"TeamHealth uses the falsified medical records to upcode for nonexistent or unnecessary critical care" and "knowingly submits false claims for reimbursement to CMS and state agencies." ¶92.

Relators described how "TeamHealth is able to disguise these fraudulent claims in plain sight because a critical care claim is a 'pass through' claim," which means "there is no front-end auditing of these charges." ¶94

Relators provide personal accounts of TeamHealth efforts to trump up unnecessary critical care services. The *only* reason TeamHealth could require physicians to include unnecessary or non-existent critical care notations in their EMRs is to bill for those critical care services. And, TeamHealth does not dispute these allegations or offer any alternative inference or explanation. Relators have sufficiently pled the Critical Care Scheme under the pertinent legal standard here.

### 4.    Defendants Have Not Been Prejudiced by Relators' Amendment.

TeamHealth makes a hollow cry of prejudice that Relators' Original Complaint did not allege the "medical necessity" component of the Critical Care Scheme. Mot. at 16. This is not accurate. *Compare* Relators' First Amended Complaint ¶¶75-95 to Relators' Original Complaint (Dkt. No. 2) ¶¶35, 57-73. Though the original complaint may not have included the phrase "medical necessity," it plainly states:

- "TeamHealth requires physicians to falsify medical charts to show that critical care was performed when it was *not **required***[.]" Original Complaint ¶57;
- "TeamHealth requires physicians to provide this documentation for encounters in which critical care treatment was not ***necessary***." *Id.* ¶67;
- "TeamHealth uses the falsified medical records to upcode for nonexistent or ***unnecessary*** critical care." *Id.* ¶70.

Thus, TeamHealth's argument that Relators' "medical necessity" allegation is new lacks merits.[14]

---

[14] Even if the "medical necessity" allegation were new, the remedy is not dismissal, but rather, sealing that part of the Complaint while the government investigates the allegations. However, re-sealing the case is not required because these allegations are not new.

### 5.      Relators Sufficiently Pled Their State Law Claims.

Relators' claims are not limited to federal FCA violations. Relators' personal knowledge and investigation indicates that TeamHealth perpetrated the two Schemes across the nation, in violation of various state-law FCA statutes as well. Relators hereby incorporate all of the arguments related to their federal FCA claims as if fully set forth herein in support for their state-law claims. Relators' allegations sufficiently extend to each named-state, and by satisfying the heightened federal pleading standards, the Complaint satisfies the pleading standards of each state. TeamHealth has not challenged this Court's jurisdiction to hear the state-law claims or otherwise explained how the Complaint fails to meet any specific state-law pleading standard.

### B.      Relators' Mid-Level Scheme Allegations Are Not Based on Publicly Disclosed Information.

TeamHealth incorrectly argues that Relators' allegations regarding the Mid-Level Scheme should be dismissed under the FCA's public disclosure provisions.[15] This public disclosure argument rests entirely on a threadbare and inapplicable complaint from a prior lawsuit against TeamHealth—the *Endre-Day* case—which TeamHealth attached to its Motion. *See* Mot. at Ex.1. The Court need only review the *Endre-Day* Complaint itself to understand the shaky foundation upon which TeamHealth's argument is built. The Mid-Level Scheme alleged here simply is *not* the same scheme alleged in *Endre-Day*. Nor could it be; the "shared visit" provision underlying the Mid-Level Scheme did not even exist at the time of the *Endre-Day* case. TeamHealth's public disclosure argument fails under both applicable tests. And because Relators qualify as original sources under the applicable exceptions, the argument fails for a third reason as well.

---

[15] TeamHealth does not raise a public disclosure challenge to Relators' allegations concerning the Critical Care Scheme. Its public disclosure argument concerns only the Mid-Level Scheme.

1.    **Relators' Allegations Must be Analyzed Under Both the Pre- and Post-PPACA Public Disclosure Tests and Original Source Exceptions.**

As the Court knows, prior to the March 23, 2010 Patient Protection and Affordable Care Act ("PPACA") Amendment to the FCA, the public disclosure bar was jurisdictional. 31 U.S.C. §3730(e)(4)(A) (2006). Under the pre-PPACA version of the statute, the Court retains jurisdiction *unless*: (1) "there has been a 'public disclosure' of allegations or transactions," (2) "the *qui tam* action is 'based upon' such publicly disclosed allegations," and (3) the relator is *not* "the 'original source' of the information." *Trinity*, 2014 U.S. Dist. LEXIS 973, at *9. To qualify as an "original source," a relator must have "direct and independent knowledge of the information on which the allegations are based" and "voluntarily provided the information to the government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (2009); *Trinity*, 2014 U.S. Dist. LEXIS 973, at *15.

Through the 2010 PPACA Amendment to the FCA, Congress removed the jurisdictional element of the public disclosure bar, which now states simply that "[t]he court shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." 31 U.S.C. § 3730(e)(4)(A) (2010). The PPACA Amendment "recharacterize[d] the public disclosure bar as a ground for dismissal—effectively, an affirmative defense—rather than a jurisdictional bar." *Trinity*, 2014 U.S. Dist. LEXIS 973, at *10. As with any affirmative defense, the defendants bear the burden of proof. "The new statute replaces the old statute's 'based upon' public disclosures test with a new test that asks whether the allegations in the complaint are 'substantially the same' as allegations which have been publicly disclosed." *Id*. at *11 This Court has observed:

> The 2010 amendment eliminated the pre-2010 'direct and independent knowledge' requirement for qualifying as an 'original source,' extending the universe of original sources to both those who alert the government to the basis of the claim before public disclosure, and those who have independent knowledge that materially adds to publicly disclosed allegations. The 2010 amendment only expanded the definition of 'original source'; thus, if a party would qualify as an

original source under the pre-2010 statute, *a fortiori* that party would qualify under the 2010 amendments.

*Id*. at *11-12. For ease, Relators' claims are referred to as "pre-2010" and "post-2010" claims.

As explained below, the *Endre-Day* Complaint fails to satisfy either applicable public disclosure test. And, even if the Court finds an applicable public disclosure, Relators qualify as original sources under both exceptions to the public disclosure bar. *See* Exs. 1 and 2.

### 2.    The Court Has Jurisdiction over Pre-2010 Claims.

Subject to the Court's ruling on the statute of limitations (*see* Section III.D, *infra*), Relators' pre-2010 claims should be analyzed under the public disclosure jurisdictional bar. Here, the public disclosure bar would not strip the Court of jurisdiction over Relators' pre-2010 claims. The public disclosure bar arises "only when enough information exists in the public domain to expose the fraudulent transaction […], or the allegation of fraud[]." *U.S. ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994) (explaining and employing the "X+Y=Z" test). "Fraud requires recognition of two elements: a misrepresented state of facts *and* a true state of facts. The presence of one or the other in the public domain, but not both, cannot be expected to set government investigators on the trail of fraud." *Id*. at 655.

Relators' action is not "based upon" the *Endre-Day* Complaint. 31 U.S.C. § 3730(e)(4)(A) (2009). *Endre-Day* does not present the essential combination of fraud elements that would set the government on the trail of Relators' allegations. The *Endre-Day* Complaint was filed in 2000 and addressed alleged conduct dating from 1994 to 2000. In a *single* paragraph, the *Endre-Day* Complaint alleges that TeamHealth billed for "physician services" that were actually performed by a "physician assistant." Mot. at Ex. 1, ¶24. It contains no mention of chart signing, supervision attestations, mid-levels other than physician assistants, NPIs, or any of the other mechanisms of

fraud alleged here. More importantly, the *Endre-Day* Complaint does not concern "split/shared visit" billing at all. It concerns "incident to" billing under 42 C.F.R. §§ 410.10 and 410.26.[16]

TeamHealth entirely omits from its Motion that the *Endre-Day* Complaint turned on different CMS billing regulations than those involved in the Mid-Level Scheme. CMS revised the applicable guidelines for mid-level services billing in 2002—*after Endre-Day* was dismissed—to reflect present-day "face-to-face" requirements.[17,18] Relators' allegations under the Mid-Level Scheme are premised on these revised "split/shared visit" rules, as TeamHealth used the shared visit requirement to hide the Mid-Level Scheme. *See, e.g.*, ¶45 ("TeamHealth requires its healthcare providers to falsify medical charts to reflect a split/shared visit when, in reality, a physician never even saw the mid-level's patient. This presumably provides TeamHealth with at least some cover (in the unlikely event of an audit) when it submits claims for mid-level services under the physician's NPI."); ¶¶51-62.

What little, if any, relation *Endre-Day* may have to Relators' accusations is far too attenuated for the present case to be "based upon" the former. No public disclosure, in the absence of Relators' investigation, would have "fully brought to light the basis of [Relators'] claims before

---

[16] *See* Baklid-Kunz Declaration (Ex. 3) at ¶¶16-17 ("[S]ervices and supplies furnished as 'incident to' a physician's services may be billed as though the physician personally performed the service. The incident-to regulations allow practices to bill for services and supplies commonly furnished in the clinic or physician office setting that are provided by auxiliary staff or MLPs and that are an integral, although incidental, to the physician's professional services. […] Incident-to billing *only* applies to services provided in physician offices and clinics. It cannot be used in the facility setting such as hospitals, *emergency rooms*, or nursing facilities[.]")

[17] *See* Ex. 3 at ¶¶22-34; *see also* Medicare Claims Processing Manual, Chapter 12—Physicians/Nonphysician Practitioners, at §30.6.12 (2018), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf (last visited Jan. 31, 2019).

[18] CMS issued these revised rules on October 25, 2002—after *Endre-Day* was dismissed. *See* Ex. 3 at ¶¶35-39; see also Exhibit 4); CMS, Medicare Quarterly Provider Compliance Newsletter Guidance to Address Billing Errors 4 (April 2013), (attached hereto as Exhibit 5).

[Relators] filed this suit[.]," *Trinity*, 2014 U.S. Dist. LEXIS 973, at *14, or "set government investigators on the trail of [TeamHealth's] fraud." *See Springfield Terminal*, 14 F.3d at 655.

Relators do not dispute that TeamHealth has a long history of improper billing practices. Nonetheless, the means employed in pursuit of the schemes alleged in the *Endre-Day* Complaint differ in scope, breadth, mechanics, content, and applicable CMS regulations from those alleged here. The *only* commonality between the *Endre-Day* case and this one is that both alleged TeamHealth improperly billed for mid-level services (*Endre-Day* in a *single* paragraph; the present Complaint in at least forty-three paragraphs). However, the manner by which TeamHealth carried out the fraud is markedly different in this case. TeamHealth asks the Court to shield it from any future FCA liability related in any way with mid-level services billing based on a single paragraph in a near-two-decade-old complaint that was voluntarily dismissed before split/shared billing even existed. Accepting TeamHealth's position would effectively inoculate it from any potential liability for any improper mid-level billing under the FCA.[19] Relators allege a very specific Scheme that simply is not present in the *Endre-Day* Complaint. That Scheme should not be barred. And, this Court should not endorse TeamHealth's use of this barebones Complaint as an insurance policy for committing fraud on the government in perpetuity.

Alternatively, even if the Court determines that Relators' action is "based upon" the *Endre-Day* Complaint, the Court retains jurisdiction over Relators' actions as Relators qualify as original sources. 31 U.S.C. §§ 3730(e)(4)(A)-(B) (2009). As described in Relators' affidavits, Relators have "direct and independent knowledge of the information on which the allegations are based." *See* Exs. 1 and 2. Direct knowledge is "derived from the source without interruption or gained by

---

[19] By TeamHealth's logic, if CMS creates a rule in 2020 allowing mid-levels to bill at a higher rate when both physician and mid-level wear matching outfits, TeamHealth would be insulated from any FCA liability under this new regulation because *Endre-Day* and Relators' allegations *also dealt with mid-level services*. That result—and TeamHealth's position—is untenable.

the relator's own efforts rather than learned second-hand through the efforts of others." *Trinity*, 2014 U.S. Dist. LEXIS 973, at *15-16. Relators worked in TeamHealth emergency rooms, where they personally observed instances of the fraud they alleged against TeamHealth. ¶¶10-11, 43, 73; Ex. 1 at ¶¶5, 7-22; Ex. 2 at ¶¶4, 6-12, 14-16. Relators derived their allegations from their own personal, direct, and independent knowledge, their observations, as well as their experience. Ex. 1 at ¶ 23; Ex. 2 at ¶17. Relators conducted a thorough investigation into the Schemes. *Id*.

Independent knowledge is "not derived from the public disclosure." *Trinity*, 2014 U.S. Dist. LEXIS 973, at *16. Relators provided forty-three substantive paragraphs supporting their allegations of TeamHealth's Mid-Level Scheme. ¶¶2-6 (summary), 36-43 (TeamHealth's business practices), 44-74 (the Mid-Level Scheme in detail). The *Endre-Day* Complaint provides only one. As explained in Relators' affidavits, Relators were unaware of the *Endre-Day* Complaint when they filed their case. Ex. 1 at ¶25; Ex. 2 at ¶18. They uncovered TeamHealth's fraud and developed their allegations independently from any allegations contained therein. *See* Ex. 1 and 2.

Relators also "voluntarily provided the information to the government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (2009). Ex. 1 at ¶28, Ex. 2 at ¶20. Relators' Complaint alleged:

> Relators have satisfied all conditions precedent to their participation as Relators [and] voluntarily provided in writing to the Attorney General of the United States and the United States Attorney for the Eastern District of Texas, prior to filing this complaint, substantially all material evidence and information in Relators' possession upon which these allegations are based. In accordance with 31 U.S.C. § 3730(b)(2), Relators served the United States pursuant to Federal Rule of Civil Procedure 4 prior to filing this complaint.

¶18; 31 U.S.C. § 3730(e)(4)(B)(1) and (2). Further, "Relators have complied with all state law procedural requirements, including service upon the appropriate state Attorneys General prior to filing this action." ¶19. Relators are original sources under the pre-2010 test.

**3.      TeamHealth's Public Disclosure Defense for Post-2010 Claims Also Fails.**

For Relators' post-2010 claims, TeamHealth has raised the public disclosure affirmative defense, for which it bears the burden of proof. *See Trinity*, 2014 U.S. Dist. LEXIS 973, at *10. When considering TeamHealth's Motion for post-2010 claims, Relators' allegations are accepted as true and disputed facts construed in their favor. *Id*. TeamHealth has not met its burden.[20]

The *Endre-Day* Complaint does not contain "substantially the same allegations or transactions" as Relators' Complaint. 31 U.S.C. § 3730(e)(4)(A) (2010). While both address mid-level billing, the similarities end there. Relators' Complaint turns *substantially* on a CMS regulation that did not go into effect until after the *Endre-Day* Complaint was dismissed. *See* Section III.B.2, *supra*. TeamHealth's claim that a single paragraph in *Endre-Day* presents substantially the same allegations as Relators' Complaint is nothing more than empty rhetoric and hyperbole; *Endre-Day* could not have set the government on the trail of Relators' accusations, as explained above. *Compare* Mot. at Ex.1, ¶24 *to* First Amended Complaint ¶¶32-74.

Nevertheless, even if the Court found Relators' Complaint was substantially similar to the single paragraph of the *Endre-Day* Complaint, Relators satisfy the PPACA-amended original source exception. 31 U.S.C. §3730(e)(4)(B). Relators have disclosed and alleged their ***independent knowledge***. *See id. at* §3730(e)(4)(B)(2). Relators worked in TeamHealth emergency rooms, where they personally observed instances of the fraud they alleged against TeamHealth. Complaint ¶¶10-11, 73; *see* Exs. 1 and 2; *Trinity*, 2014 U.S. Dist. LEXIS 973, at *18 (Relator's "knowledge is independent because the crux of his cause of action—the falseness of the claims he targeted—was made plain only through his own efforts.").

---

[20] Though relegated to footnote, Defendants acknowledge that the pre-2010 public disclosure bar does not stand as a jurisdictional bar to claims after March 23, 2010. *See* Mot. at 18 n.4; *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010).

Further, Relators' independent knowledge *materially adds* to any publicly-disclosed allegations or transactions the Court may find. *See* 31 U.S.C. § 3730(e)(4)(B)(2). To "materially add to the publicly disclosed allegation or transaction of fraud, *a relator must contribute significant additional information* to that which has been publicly disclosed so as to improve its quality." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306 (3d Cir. 2015). The Complaint details the Mid-Level Scheme over thirty-six paragraphs of allegations. ¶¶2-6, 36-74; *see* Section III.A.2, *supra*. The Complaint details conduct occurring as late as nearly sixteen years after the *Endre-Day* Complaint was filed. On the other hand, the *Endre-Day* Complaint—over its scant nine pages—provides none of the detail Relators allege in their Complaint. The *Endre-Day* Complaint provides but one substantive paragraph of material allegations, supported by only eleven paragraphs of information about "incident to" billing regulations. Relators have thus contributed significant, specific, additional, unique and quality details that were not publicly disclosed as to how TeamHealth perpetrated its Mid-Level Scheme.

Relators voluntarily provided this information to the government before filing this action. *See* Section III.B.2, *supra*; ¶¶18, 19, 31. Relators clearly meet the post-2010 original source exception. Thus, even if the *Endre-Day* Complaint somehow publicly disclosed the Mid-Level Scheme, dismissal would be inappropriate.

## C.  Relators Alleged Conduct that Is Material to the Government's Decision-Making.

In a convoluted amalgamation of its other meritless arguments, TeamHealth wrongly argues that, since the government purportedly knew about TeamHealth's Mid-Level Scheme from the single paragraph in *Endre-Day* yet continued to pay claims TeamHealth submitted for mid-level services under physician NPIs, this fraud must not be "material." Mot. at 23-24.[21] In addition to being based on faulty premises, this argument itself is a *non sequitur*.

---

[21] Defendants do not challenge the materiality of the Critical Care Scheme.

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4). "[M]ateriality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Escobar*, 136 S. Ct. at 2001-02 (2016). Tellingly, TeamHealth does not attack the materiality of Relators' allegations directly. Indeed, it would defy logic to suggest that the government would choose to ignore TeamHealth's blatant violations of the applicable billing regulations. Recognizing this, TeamHealth attempts to bootstrap a materiality argument from the irrelevant *Endre-Day* Complaint.

As an initial matter, TeamHealth's materiality argument fails because the public disclosure argument it is based upon fails. *See* Section III, *supra*. Stripped of its flawed premise, TeamHealth's materiality argument completely crumbles. However, this argument fails for three additional reasons. First, even if a public disclosure occurred, the government's knowledge of fraud occurring before 2000 does not impute current knowledge of the Mid-Level Scheme. *See, e.g.*, *Escobar*, 136 S. Ct. at 2001 (identifying relevant considerations in evaluating materiality but labeling none as dispositive). Second, the government's decision not to intervene is irrelevant. Finally, the Mid-Level Scheme alleges fraud committed *directly* upon CMS through fundamental violations of the billing regulations, not through the type of implied certification theories recently subjected to materiality challenges. *See id.* Thus, TeamHealth's materiality argument fails.

1.  **The Governments' Continued Payment of Claims Is Not Evidence of Immateriality.**

TeamHealth insists the government had prior knowledge of TeamHealth's fraud through *Endre-Day* yet continued to pay TeamHealth's claims pursuant to the Mid-Level Scheme. TeamHealth hypothesizes, without any evidence, that the government "thoroughly investigated the claims [alleged by *Endre Day*], and by not intervening in the matter prior to dismissal, determined they were meritless." Mot. at 24. Then, based on these assumptions, TeamHealth

concludes the fraud Relators allege must not be material to the government's payment decision. Mot. at 23-24. This argument is wrong.

The question of whether the government has actual knowledge of the current Mid-Level Scheme is a question of fact that is inappropriate for the motion to dismiss stage. And even if the *Endre-Day* Complaint constitutes a public disclosure of the Mid-Level Scheme, that alone does not amount to actual knowledge presently held by the government. To the contrary, Relators have alleged that the government does *not* know about the Mid-Level Scheme due to pass through billing and TeamHealth's effective efforts to cover up the scheme. At this stage, Relators' allegations must be taken as true—not the other way around.

Further, the Complaint sets forth in detail the ways in which TeamHealth disguised their Mid-Level Scheme from detection. ¶¶52 (describing the use of attestation to cover up the Scheme), 67 (describing the claims as pass-through), 68 (describing the lack of chart review prior to reimbursement). In particular, the Mid-Level Scheme preys upon the pass-through nature of CMS reimbursement. ¶67. In essence, claims for the mid-level services at issue are billed on an honor system. *See id.* Inherent to the Scheme is the concept that CMS will not discover the false claims through its regular course of automated audits and reimbursement. ¶¶67-68 ("[T]here is little or no front-end review or auditing of these charges—the MAC pays them automatically. In essence, the reimbursement system for the E/M services at issue here is an honor system."). When TeamHealth submits claims for mid-level services under a physician NPI, the claims get paid automatically and reliably. By using physician NPIs, TeamHealth *automatically* obtains 100% of the physician rate. Though perhaps brilliant, this is still a fraudulent Scheme. And deliberately disguising one's fraud to avoid governmental detection hardly supports the notion that the government knows about that fraud. Rather, "continued government approval…would support and not conflict with a finding that Defendants' misrepresentations are material." *Trinity*, 2014 U.S. Dist. LEXIS 973, at *25.

### 2.     Non-Intervention Is Not Relevant to Materiality.

TeamHealth's non-intervention argument—made in passing—is irrelevant. *See* Mot. at 24.

Indeed, as the government recently stated in briefing in this Court, "the Fifth Circuit has held that

reading into the United States' intervention decisions is a speculative exercise."[22] The FCA

expressly allows relators to proceed with a *qui tam* action even after the government has declined

to intervene. *See* 31 U.S.C. § 3730(d)(2); s*ee U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*,

417 F.3d 450, 455 (5th Cir. 2005). The government "may opt out for any number of reasons,"

including "a cost-benefit analysis." *Williams*, 417 F.3d at 455. As such, "[i]f relators' ability to

plead sufficiently the element of materiality were stymied by the government's choice not to

intervene, this would undermine the purposes of the Act." *Id.*[23] Therefore, the government's

decision not to intervene in either the *Endre-Day* case or this case is irrelevant.

### 3.     TeamHealth's Conduct Under the Mid-Level Scheme Is Material.

Materiality under the FCA is an objective standard, requiring proof only that TeamHealth's

conduct *could have* influenced the government's decisions, not that it actually did. *See* 31 U.S.C.

§3729(b)(4) ("material" means "having a natural tendency to influence, or be capable of

influencing, the payment or receipt of money or property"). In fact, Relators' allegations under the

Mid-Level Scheme are material to the government's decision to reimburse for those services. ¶31.

It is difficult to imagine what could be more material to the government's payment decision than

the fraud alleged here—*i.e.,* the identity and qualifications of the individual who provided the

services for which reimbursement is sought. The Complaint alleges that that claims TeamHealth

---

[22] United States Combined Responses In Opposition to Defendants' Motions to Dismiss at 21, n.21, *U.S. ex rel. Stephen Dean v. Paramedics Plus, LLC, et al.*, Case No. 14-CV-203-ALM, (E.D. Tex. April 14, 2017).

[23] Defendants further ignore the fact that, for good cause, the government can later seek to intervene in a *qui tam* case, even though it originally declined to do so. 31 U.S.C. §3730(c)(3).

submits falsely represent services were performed by a fully licensed and qualified physician. In reality, those services were performed by mid-level providers. Thus, TeamHealth is acting in direct contravention of the CMS billing regulations (*see* 42 U.S.C. § 13951(a)(1)(O)), which require services be billed under the NPI of the healthcare professional that actually provided the services.[24]

Finally, the Mid-Level Scheme is not the type of implied certification theory recently subjected to materiality challenges. *See Escobar*, 136 S. Ct. 1989. In *Escobar*, the relators alleged that claims submitted to CMS for counseling services were fraudulent because the defendants providing those services were not properly licensed and had unlawfully obtained NPIs from CMS. *Id.* at 1997-98. The district court dismissed the case. *Id.* at 1998. The First Circuit reversed on the grounds "that any statutory, regulatory, or contractual violation is *material* so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation." *Id.* at 2004. After acknowledging that "implied certification" theories like this can indeed form a basis for liability under the FCA, the Supreme Court reversed and remanded because is disagreed with the materiality test applied below. *Id. Escobar* is inapplicable. Relators do not allege an implied certification theory, but rather *direct* fraud. The Mid-Level Scheme is material.

**D.     Relators' Claims Are Not Barred by Statute.**

TeamHealth last argues that the statute of limitations limits this case to claims presented within six years of filing. Relator acknowledges that Fifth Circuit case law holds the FCA's six-year limitations periods applies to suits by a private Relator, though the government may be entitled to a ten-year limitations period. 31 U.S.C. §3731(b)(1)(2). However, "courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the

---

[24] In fact, paying healthcare providers the appropriate fees for services is so important to CMS that CMS created an online tool to allow billers to look up the applicable fee. *See* Medicare Physician Fee Schedule Look-up Tool, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PFSLookup/index.html?redirect=/pfslookup/ (last visited Jan. 24, 2019).

complaint . . . because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir.1996). Further, the issue of whether the six-year or ten-year period applies was recently appealed to the U.S. Supreme Court, and review was granted. *U.S. ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1097 (11th Cir. 2018) ("Applying our conclusions that § 3731(b)(2) applies in non-intervened cases and is triggered by the knowledge of a government official, not of the relator, we hold that it is not apparent from the face of Hunt's complaint that his FCA claim is untimely."), cert. granted sub nom. *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, No. 18-315 2018 WL 4385694 (U.S. Nov. 16, 2018). As such, Relators respectfully submit that TeamHealth's arguments related to the statute of limitations should be denied at this stage, while the issue is pending appeal, and revisited by summary judgment or otherwise prior to trial. No prejudice will result to Defendants from this prudent approach, although Relator would be substantially prejudiced by the alternative course.

## E.    Relators Request Leave to Amend to Cure Any Deficiencies.

In the event that any part of the complaint is dismissed, Relators request leave to amend to cure any deficiencies. "The court should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(A)(2). Relators submit that should any part of the Complaint be dismissed, justice requires an opportunity to amend as it would be the first opportunity for Relators to cure any deficiencies identified by TeamHealth.

## IV.    CONCLUSION

Relators' Complaint provides "fair notice of plaintiff's claims" and opens the door to federal discovery apparatus." *Grubbs*, 565 F.3d at 190. TeamHealth's Motion should be denied. Alternatively, the Court should grant Relators leave to amend to cure.

Dated:          January 31, 2019

Respectfully Submitted,

**/s/ Michael Angelovich**
Michael B. Angelovich, TX Bar No. 78566
mangelovich@nixlaw.com
Trey Duck, TX Bar NO. 24077234
tduck@nixlaw.com
Bradley W. Beskin, TX Bar No. 24105463
bbeskin@nixlaw.com
**NIX, PATTERSON LLP**
3600 N. Capital of Texas Hwy.
Building B, Suite 350
Austin, Texas 78746
Telephone: 512.328.5333
Facsimile: 512.328.5335

Ed Dougherty, MO # 26862
Pro Hac Vice in Progress
**DOUGHERTY & HOLLOWAY, LLC**
7200 NW 86th Street, Suite D
Kansas City, MO 64153
Telephone: 816.891.9990
Facsimile: 816.891.9905

## CERTIFICATE OF SERVICE

I hereby certify that I filed this *Relators' Response in Opposition to Defendants' Motion to Dismiss Relators' First Amended Complaint* with the Clerk of the Court by means of the Court's ECF system, which served copies of the filing on at least the following attorneys:

| | |
|---|---|
| Eric Hugh Findlay<br>Brian Craft<br>**Findlay Craft PC**<br>102 N College Avenue<br>Suite 900<br>Tyler, TX 75702<br>903/534-1100<br>Fax: 903/534-1137<br>efindlay@findlaycraft.com<br>bcraft@findlaycraft.com<br><br>George B. Breen<br>Christopher M. Farella<br>Erica F. Sibley<br>**Epstein Becker & Green, P.C.**<br>1227 25th St NW, Suite 700 Washington, D.C. 20037<br>Tel: (202) 861-0900<br>Fax: (202) 861-3523<br>*gbreen@ebglaw.com cfarella@ebglaw.com esibley@ebglaw.com*<br><br>*Counsel for Defendants* | James G. Gillingham<br>**United States Attorney's Office**<br>Eastern District of Texas<br>101 E. Park Blvd, Suite 500<br>Plano, TX  75074<br>james.gillingham@usdoj.gov<br><br>*Counsel for the United States* |

I further certify that any counsel for the Named States not enrolled in the Court's EFC system will be promptly served with *Relators' Response in Opposition to Defendants' Motion to Dismiss Relators' First Amended Complaint* in accordance with the Federal Rules of Civil Procedure.

/s/ Michael Angelovich

Michael Angelovich
*Counsel for Relators*