# EXHIBIT 1

**Declaration of Relator Dr. Caleb Hernandez**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., EX REL. CALEB HERNANDEZ & JASON WHALEY, RELATORS<br><br>*Plaintiffs*,<br><br>v.<br><br>TEAM HEALTH HOLDINGS INC., et al.<br><br>*Defendants*. | Civil Action No. 2:16-CV-00432-JRG<br><br>**Declaration of Relator Dr. Caleb Hernandez** |

## DECLARATION OF RELATOR DR. CALEB HERNANDEZ

Relator Dr. Caleb Hernandez declares and states as follows:

### *Background*

1. I am over the age of eighteen and am fully competent to make this Declaration. I have never been convicted of a felony or a crime of moral turpitude. The factual information contained in this Declaration is true and correct, and based on my personal and direct knowledge.

2. I am currently a resident of Denver, CO and work part time in New York, NY.

3. I am currently a practicing Emergency Physician as a Medical Director of the First Responder System for Anheuser Busch, Fort Collins, Colorado, and I have privileges in various facilities in Colorado, including University of Colorado Health Emergency Room.

4. I received my Bachelor of Arts degree from the University of Colorado, Boulder, in 2000 with a double-major in Kinesiology and Applied Physiology and Spanish literature. Following undergraduate, I attended medical school at Kansas City University of Medicine and Biosciences in Kansas City, MO, where I obtained a Doctor of Osteopathic Medicine degree. Following medical school, I completed a three-year residency in emergency medicine at

1

Maimonides Medical Center in Brooklyn, NY.

5. During my 12-year career as an emergency physician, I have worked for both private physician groups and so-called "mega groups," such as TeamHealth. I have worked for TeamHealth at the following hospital emergency departments: North Colorado Medical Center in Greely, CO (20011-2015); Sterling Regional Medical Center in Sterling, CO (2013-2015); and Juan Luis Phillipe Hospital in St. Croix, U.S. Virgin Island (2010). I first worked for TeamHealth on a *locum tenens* basis—*i.e.*, as a temporary traveling physician—and then under a full-time employment contract. I no longer work for TeamHealth.

6. The purpose of this Declaration is to describe and summarize my personal, direct, and independent knowledge and the results of my independent investigation regarding the "Mid-Level Scheme" being carried by TeamHealth, as described in the Original and First Amended Complaint in this case. I have come forward as a whistleblower because I believe this Scheme (along with TeamHealth's "Critical Care Scheme" described in the First Amended Complaint) has: (1) significantly diminished the quality of care provided at TeamHealth emergency departments facilities across the nation; (2) deteriorated patient-provider trust by requiring healthcare providers to operate below the standard of care and unnecessarily increasing the cost of healthcare; and (3) allowed TeamHealth to siphon multiple millions of dollars illegally from the Centers for Medicare and Medicare Services ("CMS") each year.

## *The Mid-Level Scheme*

7. My personal, direct, and independent knowledge and independent investigation leads me to conclude and believe that the Mid-Level Scheme is a fraudulent billing practice carried out by TeamHealth whereby the services of mid-level providers (like physician assistants and nurse practitioners) are billed to CMS as if they were performed by a physician (and under the physician's NPI), which fetches a higher reimbursement rate. Under most circumstances,

CMS reimburses mid-level services at 85% of the physician rate for the same services. My understanding of appropriate shared/split visit billing is that an emergency department can bill CMS for services performed by a mid-level at the full physician rate only when both the physician and the mid-level actually treated the patient face-to-face and documented their respective face-to-face interaction in the medical chart. But my personal, direct, and independent knowledge and independent investigation leads me to conclude and believe that TeamHealth bills for mid-level services at the full physician rate when the physician never even laid eyes on the patient.

8. The Mid-Level Scheme works as follows: when a patient arrives at the emergency room, he or she is greeted by a nurse or technician for in-take and triage. The purpose of triage is to determine what kind of care the patient requires and, thus, whether the patient should see a mid-level or a physician. TeamHealth purposely segregates mid-levels and physicians into different parts of the emergency department (or in different buildings altogether) to minimize overlap in the workforce. This is done through various floor-management models, such as the "split-flow" model or the zone model. Physicians are stationed in an area of the emergency department that will treat higher acuity patients—*i.e.*, those patients that are more severely injured or sick; while Mid-Levels are stationed in area of the emergency department that will treat lower acuity patients—*i.e.,* those patients that are less severely injured or sick. Because triage is not a perfect science, there is sometime overlap between the level of severity being treated in the different zones of the emergency room. That is, some median severity patients may be assigned to either the mid-level area or the physician area of the emergency room.

9. It is my understanding that TeamHealth employs these types of patient flow models nationwide. I base this on conversations I had during my tenure as "director of flow," an unpaid position imposed on me by TeamHealth which required me to investigate and report back to my supervisor, Matt Ledges, as to how physicians and mid-level providers could be segregated

even further in terms of both patient contact and care. Ledges repeatedly informed me that this was intentional, on the part of TeamHealth's national leadership, as it prevents overlap of physician and mid-level provider services by keeping them from seeing the patients at the same time, and that it maximizes the number of patients each individual healthcare provider is able to treat separately.

10. I frequently questioned Ledges and other TeamHealth superiors about how TeamHealth could demand the charting language it required of mid-levels and physicians given the nature of its "flow" operations during monthly meetings or when they reprimanded me for not providing the charting language TeamHealth required.

11. TeamHealth's stated reason for segregating mid-levels and physicians is to increase efficiency by preventing physician supervision of mid-levels and reducing the chance that a patient will see both a mid-level and a physician. For example, during monthly department meetings, TeamHealth often explained to my colleagues and me that the division of labor was intended to ensure that mid-levels were seeing at least 50% of the emergency department's patients. During orientations at TeamHealth facilities, onsite administrators would explain the "flow" procedure used at that particular emergency department and, each time, I was told segregation was put in place to increase efficiency. In addition, TeamHealth always told me the reason it could pay physicians higher rates than other emergency departments was because its mid-levels were treating patients on their own, which increased the total amount of patients seen and, thus, the total amount of revenue received.

12. In my experience, across all TeamHealth facilities I have worked for, a patient will be seen by both a mid-level *and* a physician in less than 1% of cases. That is, 99% of the time the patient will only be treated by a mid-level *or* a physician, but not by both. Thus, TeamHealth achieves its goal of substantially reducing the occurrence of a patient being seen by both a mid-

level and a physician in the same visit.

13. Although physicians and mid-levels see patients independently, each mid-level was assigned to a physician for a particular shift for "supervision" purposes. Usually, more than one mid-level was assigned to me for each shift. However, I never knew which mid-levels were assigned to me until after the shift was over because I did not communicate with the mid-levels assigned to me and we certainly did not treat patients together during the shift. Rather, at the end of each shift, my electronic inbox on the medical chart software would be full of mid-level medical charts that had been sent to me for my signature. At the end of a shift, there would be anywhere from 40 to 80 mid-level charts in my inbox. The same would be true for every other physician on duty. These were the electronic medical charts (or "EMRs") created by the mid-levels while they independently treated patients during their shifts. Because it was the end of the shift, I would receive these EMRs long after the patients had been either discharged or admitted to the hospital for long-term treatment. In fact, given the high volume of patients being treated, sometimes it would take mid-levels a couple of days to finalize their EMRs and send them to their assigned physician. So, occasionally the EMRs being sent to me were a couple of days old.

14. TeamHealth requires that each mid-level chart be countersigned by a physician before the chart can be "closed." Thus, mid-levels are required to send all of their charts to their assigned physician for that shift as soon as possible after finalizing the chart. Each chart must also contain a statement that the mid-level was "supervised" by his or her assigned physician. TeamHealth requires mid-levels to include this statement on every chart. For example, I have seen the following statements on mid-level charts that were sent to me:

- "I delivered care to this patient under the direct supervision of Dr. Hernandez."

- "I was personally supervised by Dr. Hernandez."

- "I was supervised by Dr. Hernandez."

5

- "Supervised by Dr. Hernandez."

Each of these iterations of the supervision statement seemed to satisfy TeamHealth. Most, if not all, mid- level charts I saw included a similar statement that the mid-level was supervised by his or her assigned physician.

15. TeamHealth also requires every physician to electronically sign and approve every EMR in their inboxes. I have signed countless mid-level charts. Physicians can sign EMRs by clicking a pre-programmed electronic signature button in the software. Though the software program used in each TeamHealth emergency department sometimes varied, in every case, clicking the signature button would imprint on the chart my personal electronic signature and a statement that I agreed with the care and documentation provided by the mid-level in the EMR. And, again, the mid-level's documentation always includes a statement that I had supervised the mid-level. So by approving the documentation, I was essentially agreeing that I *had* in fact supervised the mid-level, even though I had not. There was no option to disagree with the care or documentation provided by the mid-level. Of course, given that I would have seen between 20 and 35 patients myself during each shift, it would have been physically impossible for me to have also supervised up to 40 mid-level patient visits during the same shift. Still, every emergency physician was *required* to sign and approve *every* mid-level chart sent to him or her at the end of each shift.

16. When I first started working for TeamHealth, I chose not to sign Mid-Level charts. I did not expressly refuse to sign charts, I just intentionally neglected to do so and the charts began to pile up in my electronic inbox. My reasoning was that I could not be sure that the mid-level had actually performed the appropriate care because I never saw the patient, and I did not want to endorse questionable care, as it could affect my own license. However, I was told that I should not complain about signing mid-level charts since the reason TeamHealth could afford to pay me

6

higher rates than other hospitals was because the mid-levels were treating patients on their own, which increased revenue. I was also told that I would lose my privileges, be pay-docked, or even fired if I did not sign every mid-level chart that was sent to me. Disciplinary actions and loss of privileges must be reported to state licensing agencies. Thus, TeamHealth thought that obtaining a physician's signature on mid-level charts was so important that they were not only willing to reduce my pay but jeopardize my medical licenses and my career. Ultimately, I complied with TeamHealth's policies regarding physician signatures.

17.  I spoke with physician colleagues of mine who encountered similar pressure to sign mid-level charts from TeamHealth. One colleague in particular felt TeamHealth had subjected them to potential malpractice claims by forcing them to operate below the standard of care. This colleague challenged the signature requirement and was ultimately encouraged to resign, or risk being fired, unless she changed this practice.

18.  Most of the physicians I worked with at TeamHealth facilities had a problem with the chart review and signature requirements. We all thought it exposed us to liability. In addition, more times than not, we would review and sign mid-level charts *after* our shift was over. Thus, we were not getting paid for the time it took to review and sign the charts. Just "rubber stamping" the charts without meticulous review would take approximately one hour to complete because the EMR software is cumbersome and difficult to maneuver, and each individual EMR requiring signature takes time to load into the software. Actually reviewing the charts to determine whether the mid-level's medical decision-making was appropriate would have taken *hours*. However, most physicians simply learn that mid-level chart signing is part of the job with TeamHealth, and, thus, physicians become desensitized to it. If you want to keep your job, you sign the mid-level charts and move on. While most physicians would see little harm in stating that they generally "supervised" a mid-level during a shift, very few, if any, physicians would be willing to go

beyond that to falsify a medical record by stating he performed services that he did not perform.

19. TeamHealth's managers explained that physician supervision and counter-signature was required for "billing purposes." However, they would never explain exactly why physician supervision and counter-signatures were required for billing. There is no quality control system in place to ensure the chart review and signature process was being performed meticulously—TeamHealth seemed happy with physicians rubber-stamping the EMRs. It was clear to all physicians that TeamHealth did not care if we actually reviewed the mid-levels' charts at all. They just wanted the signatures so they could bill for the services.

20. During the period I worked for TeamHealth, I rarely interacted with the coders and billers who were actually processing the mid-level charts I signed. However, prior to filing my Original Complaint in this matter and as a result of our independent investigation, I learned of information that leads me to conclude and believe that the mid-level charts that physicians are required to sign (or at least some portion of them) are used by billers and coders to charge CMS at the full physician rate. In other words, for the mid-level charts I signed, my personal, direct, and independent knowledge and independent investigation leads me to conclude and believe that TeamHealth billed CMS as if I had performed the services myself or in conjunction with the mid-level. But, again, I never even saw these patients.

21. With respect to the supervision of mid-levels and signing of mid-levels' charts, the policies and procedures were consistently the same at every TeamHealth-managed facility I worked at, regardless of location. Specifically, at every TeamHealth-managed facility I worked for, I and other physicians were required to sign mid-level charts when, in 99% of cases, the physician had not seen the patient or even spoken to the mid-level about the care provided. Systematically signing mid-level charts did not sit well with me because I was uncomfortable signing my name to a chart for a patient I had never seen or talked to the mid-level about.

22. Because I worked *locums tenens*, I frequently worked with other *locums* physicians from around the nation who told me they were required to sign mid-level charts at all of the TeamHealth facilities they worked at. It was very clear to me and the other *locums* physicians that this physician signature policy and practice had been implemented by TeamHealth across the nation. I have no doubt that TeamHealth requires physicians at all of their emergency departments—at the least the ones that employee mid-levels—to sign mid-level charts.

### *Investigation; Relator's Direct and Independent Knowledge*

23. I derived the allegations contained in this declaration, the Original Complaint, and First Amended Complaint from my own personal, direct, and independent knowledge, as well as my experience as a TeamHealth provider in its Emergency Departments.[1] Additionally, my co-Relator and I conducted a thorough investigation into the Schemes outside of working hours, which contributed to our allegations.

24. As a licensed Medicare provider, I am charged with knowledge of the billing rules that govern federal reimbursement of services I provide to federally insured patients. I am familiar with the rules governing the billing of physician and mid-level services in the emergency department, as well as the split/shared exception implicated in the First Amended Complaint against TeamHealth. I have participated in on-the-job training and instruction, directed educational coursework outside of work hours, and have work experience regarding medical

---

[1] I am able to provide example emails from TeamHealth employees, which (1) discuss monthly patient flow; (2) share charts detailing "Monthly Metrics"; (3) describe zone floor model; and (4) explain the purpose of zone floor model to increase performance metrics. Further, I can provide example emails from TeamHealth employees, which (1) chastise and/or hound me for unsigned charts from mid-levels whom I did not supervise; (2) threaten me with suspension of privileges for unsigned charts from mid-levels whom I did not supervise; and (3) tie this requirement to billing and lost revenue for TeamHealth. Finally, I can provide TeamHealth Practice Policies related to physician and mid-level services, which were sent to me by TeamHealth employees, that explain that "When a chart is incomplete, for any reason, it is sent back to you for information needed to bill. This holds up compensation…"

9

charting requirements and their impact on care and billing.

25. In the development of our disclosure of information to the government, preparation of the Original Complaint and First Amended Complaint, and the filing of this lawsuit, I did not learn of the *Endre-Day* Complaint or the allegations in the *Endre-Day* lawsuit. The first time I learned of *Endre-Day* was when I read Defendants' Motion to Dismiss. In no way did I rely on the *Endre-Day* Complaint in preparing this lawsuit against TeamHealth, nor did I base any of my allegations against TeamHealth on it. I did not know about *Endre-Day*. All of my information and knowledge regarding the Mid-Level and Critical Care Schemes is entirely independent of the *Endre-Day* Complaint.

26. Even if I had been aware of the *Endre-Day* Complaint, any reliance on it on my (or any other party's part) would have been worthless in discovering or understanding the fraud alleged in the Original and First Amended Complaint. The CMS requirements implicated by the *Endre-Day* Complaint are not relevant to what Medicare currently requires of physician-level billing for mid-level services under the split/shared exception, nor to what TeamHealth currently demands of its physicians and mid-level providers in order to take advantage of the split/shared exception. Further, *Endre-Day* fails to provide any of the specific details provided in our Original and First Amended Complaint in this case—such as how TeamHealth requires physicians' signatures and mid-level attestations.

27. As part of our overall investigation into the Mid-Level and Critical Care Schemes, my co-Relator and I, with help from investigators, located and interviewed former TeamHealth employees, including the three confidential witnesses referenced in the First Amended Complaint, to gain additional information regarding the Schemes. All aspects of the investigation occurred under the direction and supervision of Mr. Whaley and me for the sole purpose of providing us with additional direct and independent knowledge about the Shared Visit and

Critical Care Schemes.

***Voluntary Disclosure to the Government***

28. Prior to filing our Original Complaint in this matter, my co-Relator and I, with the assistance of counsel, prepared a comprehensive disclosure statement, which included, among other things, our written affidavits and all evidence in our possession related to the Schemes. We provided that disclosure statement to the United States Attorney General, the United States Attorney for the Eastern District of Texas, and the appropriate state officials prior to filing this False Claims Act lawsuit against TeamHealth. This disclosure statement constituted a written disclosure of substantially all material evidence and information I possessed related to TeamHealth's False Claims Act violations through the Mid-Level and Critical Care Schemes. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the forgoing is true and correct.

Executed on January 31, 2019

_____
Dr. Caleb Hernandez

11