# EXHIBIT 2

## Declaration of Relator Jason Whaley

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., EX REL. CALEB HERNANDEZ & JASON WHALEY, RELATORS | Civil Action No. 2:16-CV-00432-JRG |
| *Plaintiffs,* | **Declaration of Relator Jason Whaley** |
| v. | |
| TEAM HEALTH HOLDINGS INC., et al. | |
| *Defendants.* | |

**DECLARATION OF RELATOR JASON WHALEY**

Relator Jason Whaley declares and states as follows:

*Background*

1.     I am over the age of eighteen and am fully competent to make this Declaration. I have never been convicted of a felony or a crime of moral turpitude. The factual information contained in this Declaration is true and correct, and based on my personal and direct knowledge.

2.     I am currently a resident of Greeley, Colorado.

3.     I have been a practicing PA for just over twenty (20) years. During this time, I have worked in medical settings ranging from urgent care and emergency departments to private clinics and hospitals. My curriculum vitae is attached hereto as Exhibit B-1.

4.     In May 2011, I was hired by TeamHealth as a PA in the emergency department at North Colorado Medical Center ("NCMC"). I moved to part time work for TeamHealth from November 2012 to April 2013. I was terminated via email by TeamHealth from my part-time position in April 2013 and was told the reason for my termination was that Team Health no longer needed the additional support. However, I believe part of the reason I was terminated by

1

TeamHealth was because I was known to be vocal regarding my concerns with management decisions that appeared arbitrary or without logical bases. In particular, I told Team Health managers and the administrative head of Team Health at NCMC that the split-flow and zone floor-management models Team Health employed (described below) were inefficient and resulted in reduced levels of patient care.

5.     The purpose of this Declaration is to describe and summarize my personal, direct, and independent knowledge and the results of my independent investigation regarding the "Mid-Level Scheme" being carried out by TeamHealth, as described in Original and First Amended Complaints filed in this case and the Disclosure Statement I provided to the government. I have come forward as a whistleblower because I believe this Scheme[1] has (1) significantly diminished the quality of care provided at TeamHealth managed facilities across the nation; (2) deteriorated patient-provider trust by substituting medical decision making with policies aimed solely at generating revenue; and (3) caused at least multiple millions of dollars to be illegally siphoned by TeamHealth from the Centers for Medicare and Medicaid Services ("CMS") each year.

### The Mid-Level Scheme

6.     My personal, direct, and independent knowledge and independent investigation leads me to conclude and believe that the Mid-Level Scheme is a fraudulent billing practice carried out by TeamHealth whereby the services of mid-level providers (like PAs and nurse practitioners) are billed to CMS as if they were performed by a physician, which warrants a higher reimbursement rate under CMS regulations. Specifically, CMS reimburses mid-level providers at 85% of the physician rate for the same services. My understanding of the billing requirements under Medicare is that an emergency department can bill CMS for services performed by a mid-level provider without the supervision of a physician at 85% of the physician rate. Further, an

---

[1] I also alleged the Critical Care Scheme against team health. As TeamHealth has not raised a public disclosure argument to that Scheme, I do not address it herein.

emergency department can bill for services performed by a mid-level provider at the full physician rate (and under the physicians NPI number) only when both the physician and the mid-level actually saw the patient face-to-face, treated the patient, and documented their respective treatment in the medical record. My personal, direct, and independent knowledge and independent investigation leads me to conclude and believe that TeamHealth regularly bills for services provided by mid-level providers at the full physician rate when no physician has had contact with the patient or even discussed the patient with the mid-level provider.

7.      The basic strategy of TeamHealth's Mid-Level Scheme is as follows. TeamHealth purposely segregates mid-level providers from physicians while requiring mid-levels to list a supervising physician on every chart and requiring physicians to sign the charts of every patient seen by mid-level providers, regardless of whether the physician actually saw the patient. Due to the volume of ER patients, it is typically impossible for the physicians to see the patients evaluated by mid-level providers, but TeamHealth requires both mid-level and physician to sign the chart as if the physician evaluated the patient.

8.      During the nearly two years that I worked in the emergency department at NCMC, TeamHealth employed three different floor-management models that increasingly segregated (both physically and functionally) mid-level providers from physicians so that lower acuity patients would be seen by mid-level providers and higher acuity patients would be seen by physicians. It was clear to me that the purpose of the floor-management models was to increase efficiency by ensuring that mid-level providers see as many of the patients that came into the emergency department as possible without involvement from the physicians, freeing up the physicians to also see more patients and bring in more revenue. These models are cost-effective for TeamHealth because mid-level providers are all paid the same amount regardless of skill or

3

experience level and were all paid substantially less than physicians. However, these floor-management models necessarily sacrifice quality of care in order to increase efficiency.

9.        The floor-management models worked as follows: when a patient would come to the emergency department, he or she would go through in-take and be triaged by a nurse based on the patient's vitals, chief complaint and the overall severity of his or her condition. For approximately the first six months that I worked in the TeamHealth-managed emergency department at NCMC, workload in the department was shared amongst mid-level providers and physicians based upon provider availability and the complexity of the cases. When not treating patients, physicians and mid-level providers shared a common workspace, allowing some interaction between physicians and mid-levels. Approximately six months into my tenure at NCMC, TeamHealth adopted a "split-flow" floor-management model. TeamHealth administrators said that the purpose of the new model was to increase productivity and efficiency. Patients who presented with less severe complaints were predominantly assigned to mid-level providers and patients with more severe complaints were predominantly assigned to physicians. Mid-level providers had very little interaction with physicians under the split-flow model. Ultimately, due to spacing constraints and increased patient complaints, TeamHealth moved from the split-flow model to the zone model. This is the model currently used by the emergency department. Under the zone model, each patient was briefly assessed by a triage nurse and assigned to one of five zones (red, orange, yellow, green and blue zones). Each zone was located in a separate physical area of the emergency department and staffed by a single provider. Mid-level providers staffed the blue and yellow zones and physicians staffed the red and orange zones; currently a mid-level provider staffs the green zone but this has not always been the case. The physical separation under both the split-flow and zone models significantly reduced any opportunity for interaction between mid-level providers and physicians in the emergency department.

4

10.     Under each of the three floor-management models, it was extremely rare that midlevel providers and physicians saw the same patient or even discussed the diagnosis or treatment plan for a patient. In my experience with TeamHealth, I would estimate that patients were seen by both a mid-level and a physician in less than 2% of cases. Based on my direct observation and communication with other mid-level providers, these other mid-level providers in the emergency department had the same experience—they would rarely see a patient in conjunction with a physician. This was true regardless of the mid-level provider's experience or clinical acumen. Thus, a true split/shared visit scenario as envisioned by CMS billing regulations was exceedingly rare.

11.     The segregation of mid-level providers and physicians implemented at TeamHealth stood in stark contrast to my experience at my part-time positions at Lutheran Medical Center and Good Samaritan Medical Center (i.e., emergency departments not managed by TeamHealth) during the same time. At both of those hospitals, every patient in the emergency department was seen at least minimally by a physician. At these hospitals, mid-level providers would be assigned to a physician for each patient. The mid-level would typically evaluate the patient, then consult with the physician. The physician would then see the patient and the mid-level would provide the treatment. I was told by a staff member at these other emergency departments that the purpose of a physician seeing every patient was for combined medical, legal, and billing purposes.

12.     A typical patient encounter at NCMC would go as follows: I would sign up for a particular patient, or under the split-flow and zone models, be assigned to a patient by the triage nurse. Once assigned to a patient, I would review the patient's chart, otherwise known as an electronic medical record ("EMR"), which is the electronic charting system used to track all patient records. I would then evaluate the patient and provide the appropriate care, which may include ordering labs, tests, treatments, and medications in the EMR based on the patient's diagnosis. After

that, I would determine a disposition for the patient, which may include discharge, admission to the hospital or transfer to another hospital. In the majority of cases, I completed each patient's chart shortly after I saw the patient or at the end of my shift.

13.     There are several different EMR systems, but the NCMC Emergency Department primarily uses the CERNER First Net program. The EMR program tracks each entry made by a provider and places timestamp on each entry. I understand that the EMR program also has a back-end audit function, whereby it can track every provider that opens and reviews the chart and the date and time of each review. As such, if any other provider reviewed the patient's chart, CERNER should have a record including the date and time of the review. Banner Health, the operator of NCMC, implemented CERNER in approximately late 2011; this was during TeamHealth's operation of the Emergency Department. Before that time, mid-level providers typically did not document within the medical chart who their supervising physician was, but did submit charts to a supervising physician.

14.     Following the implementation of CERNER, TeamHealth began requiring midlevel providers to identify their "supervising physician" in the body of the patient's medical chart with a statement such as "I was supervised by Dr. X." I received several emails from TeamHealth managers enforcing this requirement. TeamHealth continued to require mid-level providers to submit each chart to such physician. Mid-level providers were instructed to indicate a supervising physician, whether or not the mid-level was directly supervised by a physician or the physician saw the patient. For each patient I saw, TeamHealth instructed me to list as my supervising physician that physician whose shift most closely paralleled my shift, whether or not that physician ever saw the patient or had any interaction with me regarding the patient. The midlevel providers were not told by TeamHealth why the supervising physician language was required, however

6

TeamHealth managers repeatedly made it clear that mid-level providers were expected to follow the policy. I know of no licensing or other legitimate reason why such language would be required.

15.     I would document physician supervision using the following macros:

a.   "Supervised by Dr. X," in cases where I had no interaction with my supervising physician, which constitutes the vast majority of cases.
b.   "Supervised by Dr. X, with whom I spoke about the patient," in the rare case where I had spoken with a supervising physician.
c.   Supervised by Dr. X, who also evaluated the patient," in the even rarer case where a supervising physician saw the patient.

I documented patient encounters this way in order to provide protection for my supervising physician in the event that a patient complained or took legal action for services I performed without physician involvement. The majority of mid-level providers did not include the same level of detail and simply included a statement to the effect of "Supervised by Dr. X" on every patient's chart, pursuant to TeamHealth's instructions. In addition to including language regarding the supervising physician in the patient's chart, all mid-level providers were required to select the supervising physician to whom the patient's chart should be sent for countersignature. I typically submitted all patient charts for a particular day to the supervising physician or physicians by the end of each shift. In other words, my "supervising" physicians did not review patient charts until after I had treated a patient and discharged, admitted, or transferred the patient. Aside from the less than 2% of cases where I worked in conjunction with a physician, I cannot recall a physician ever consulting me about a medical chart I submitted for countersignature.

16.     If one of my medical charts reached the coding department without a supervising physician notation and countersignature it was sent back to me by a TeamHealth coding and documentation specialist with a note to add the supervising physician.[2] When I received an email

---

[2] I can provide example emails from TeamHealth employees, which (1) note over twenty-five outstanding, unsigned charts and state, "[i]f everyone could let me know when they have completed there (sic) charts I would really appreciate it, so I can them sent into billing! . . . All PA's need to add who their supervising physician is and all charts need to be signed within 48hrs of the [visit]."; (2) request addition of supervising physician information to patient records; and (3) state "Please add the supervising physician so he/she can sign for [name redacted]."

requesting the supervising physician language, I would have to go back to the patient's electronic chart and make an amendment to the chart to include the supervising physician language. Typically, I would determine the correct supervising physician by looking back to the shift schedule for the relevant shift and determining what physician had the shift that most closely corresponded to my shift. During the period I worked for TeamHealth, I never interacted with the coders and billers who were actually processing the patient charts I submitted. However, I have since learned though our investigation that the midlevel charts that physicians are required to sign are almost certainly used by billers and coders to charge CMS at the full physician rate—or at least some percentage of these chart are submitted under a physician NPI.

### *Additional Investigation*

17.   My investigation of the Mid-Level Scheme primarily occurred while I was actually working in a TeamHealth facility and resulted from my personal and direct observation of the TeamHealth Emergency Department and TeamHealth's policies and procedures. However, I did also conduct additional investigation outside my working hours at a TeamHealth Emergency Department.

18.   In the development of the Original Complaint and First Amended Complaint, and the filing of this lawsuit, I did not learn of the *Endre-Day* Complaint or the allegations in that lawsuit. It was not until Defendants presented it in their Motion to Dismiss that I learned of the *Endre-Day* case. Therefore, I did not rely on the *Endre-Day* Complaint in making the allegations in this lawsuit against TeamHealth or base any of my allegations against TeamHealth on it. The allegations in the Orginal and First Amended Complaint are based on my personal and direct observations and experiences, those of Dr. Hernandez, and our investigation prior to filing. All of my information and knowledge regarding the Mid-Level and Critical Care Schemes is entirely independent of the *Endre-Day* Complaint.

8

19.     As part of our overall investigation into the Mid-Level and Critical Care Schemes, Dr. Caleb Hernandez and I, with help from investigators, located and interviewed former TeamHealth employees, including the three confidential witnesses referenced in the First Amended Complaint, to gain additional information regarding the Schemes. All aspects of the investigation occurred under the direction and supervision of Dr. Hernandez and me for the sole purpose of providing us with additional direct and independent knowledge about the Shared Visit and Critical Care Schemes.

### *Voluntary Disclosure to the Government*

20.     Prior to filing the Original Complaint, I prepared a written affidavit as part of a comprehensive disclosure statement, which also included all of the evidence I had in my possession related to the Mid-Level and Critical Care Schemes. I provided that disclosure statement to the United States Attorney General, the United States Attorney for the Eastern District of Texas, and the appropriate state officials prior to filing this False Claims Act lawsuit against TeamHealth. The disclosure statement constituted a written disclosure of substantially all material evidence and information I possessed related to TeamHealth's False Claims Act violations through the Mid-Level and/or Critical Care Schemes. I voluntarily disclosed the information contained in the disclosure statement to the United States. The written disclosure statement represented my direct and independent knowledge of the Schemes, which I obtained through personal knowledge, discussions with my co-Relator, and my overall investigation.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the forgoing is true and correct.

Executed on January 31, 2019

_Jason Wu. Whaley_

9