# EXHIBIT 3

**Declaration of Elin Baklid-Kunz**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ET AL., EX REL. CALEB HERNANDEZ & JASON WHALEY, RELATORS | Civil Action No. 2:16-CV-00432-JRG |
| *Plaintiffs,* | **Declaration of Elin Baklid-Kunz** |
| v. | |
| TEAM HEALTH HOLDINGS INC., et al. | |
| *Defendants.* | |

## DECLARATION OF ELIN BAKLID-KUNZ

I, Elin Baklid-Kunz, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to make this Declaration.  I have never been convicted of a felony or a crime of moral turpitude. The factual information contained in this Declaration is true and correct, and based on my personal knowledge.

## I.      Introduction

1.      Relators have retained me to offer my opinion on whether the Mid-Level Scheme Relators alleged in their First Amended Complaint is the same as or substantially similar to the allegations in the *Endre-Day* Complaint such that the *Endre-Day* complaint disclosed Relators' allegations. Based on my detailed review of the *Endre-Day* Complaint, my detailed review of Relators' First Amended Complaint, and my knowledge of and experience with CMS coding and billing regulations, it is my opinion that the *Endre-Day* Complaint did not and could not have disclosed Relators' Mid-Level Scheme allegations because *Endre-Day* is based on incident-to billing, while Relators' allege a scheme based on split/shared visit rules that did not exist until

after the *Endre-Day* case was dimissed.

## II.     Qualifications & Compensation

2.     My name is Elin Baklid-Kunz, and I am the Principal of KUNZ, LLC. My statements and opinions in this report are based on over twenty years in the healthcare reimbursement, compliance and medical coding/billing field. I am intimately familiar with the applicable billing guidelines, including CMS regulations and guidelines, as well as American Medical Associations ("AMA") Current Procedural Terminology ("CPT") guidelines. I have lectured, authored articles, and performed audits related to Mid-Level Providers, Split/Shared Visits, and Incident-to Services since 2005.

3.     I hold a Bachelor of Science degree in Hospitality Management and a Master's degree in Business Administration (Stetson University). I am also Certified in Healthcare Compliance ("CHC"), a Certified Professional Coder ("CPC"); a Certified Professional Medical Auditor ("CPMA"), a Certified Coding Specialist ("CCS"), and an Approved ICD-10-CM/PCS Trainer with the American Health Information Management Association ("AHIMA").

4.     As an expert in medical coding compliance, I support clients in matters across the United States. In addition to teaching documentation guidelines and ICD-10 compliance to physicians, my experience includes six years as an adjunct professor and curriculum developer at Seminole State College where I taught courses pertaining to healthcare reimbursement and data analysis and served on the advisory committee for the Health Information Management ("HIM") program.

5.     I have practical and personal experience with serious compliance issues. I was the Director of Physician Services for Halifax Health in Daytona Beach, Florida until I discovered Medicare fraud being perpetrated by the Hospital and worked with federal authorities to stop it. In

2014, Halifax settled with the U.S. Department of Justice by repaying to Medicare $86 million. In recognition of our extraordinary efforts to ensure compliance, in 2014 Taxpayers Against Fraud awarded me its Whistleblower of the Year award. My recent speaking engagements include:

- 2019 New York State Bar Association Presidential Summit;
- 2018 European Symposium on Ethics and Governance in Paris for the Organization Economic Cooperation and Development;
- 2018 AHIMA National Conference; "Key Strategies to Reduce your Compliance Risk for Shared Visits and Incident to Services";
- 2016-2008 American Academy of Professional Coders ("AAPC") Coding & Compliance Workshops; and
- 2019-2009 Keynote presentations for Eli Research Coding Institute & Audio Educator.

I am being compensated at a rate of $200 per hour for this engagement.

## III.   **Background**

6.      Relators' First Amended Complaint contains allegations regarding TeamHealth's improper billing of mid-level services in the emergency room setting based on falsified records that disguise the services as a split/shared visit.[1] The split/shared billing regulation was adopted by Medicare in October 2002. Prior to this time, split/shared visits did not exist.

7.      In contrast, the *Endre-Day* complaint alleges that, from 1994 to 2000, TeamHealth billed CMS under the "incident to" billing regulations for emergency room physician services performed by physician assistants lacking physician participation. It is my understanding that the *Endre-Day* case was dismissed in April 2002—prior to the passage of the split/shared visit regulations.

## IV.   **Applicable Regulatory Framework for Mid-Level Billing**

8.      In order to describe and compare the pre-2002 and post-2002 billing regulations

---

[1] Relators refer to this as the "Mid-Level Scheme" throughout their complaint.

applicable to emergency room services performed by mid-levels some background information related to the billing and regulatory framework is necessary.

A. **Documentation of Services in the EMR**

9.      CMS requires providers to document all services rendered adequately in the patient chart or electronic medical record ("EMR") to justify the resultant billing codes (explained below) submitted to CMS for reimbursement. This documentation requirement is exemplified by CMS's acknowledgement in its Evaluation and Management Services Guide (August 2017)[2] of "*if it isn't documented it hasn't been done.*" Specifically, CMS cites the following as key principles of provider documentation:

- The medical record should be complete and legible;
- The documentation of each patient encounter should include:
  - Reason for the encounter and relevant history, physical examination findings, and prior diagnostic test results;
  - Assessment, clinical impression, or diagnosis;
  - Medical plan of care; and
  - Date and legible identity of the observer;
- If the rationale for ordering diagnostic and other ancillary services is not documented, it should be easily inferred;
- Past and present diagnoses should be accessible to the treating and/or consulting physician;
- Appropriate health risk factors should be identified;
- The patient's progress, response to and changes in treatment, and revision of diagnosis should be documented;
- The diagnosis and treatment codes reported on the health insurance claim form or billing statement should be supported by documentation in the medical record;
- To maintain an accurate medical record, services should be documented during the encounter or as soon as practicable after the encounter; and
- The medical record cannot be altered. Errors must be legibly corrected so that the reviewer can draw an inference as to their origin. These corrections or additions must be dated, preferably timed, and legibly signed or initialed.

---

[2] CMS Evaluation and Management Services Guide (2017).

Accurate and complete documentation of services provided is the cornerstone of appropriate billing under CMS regulations.

10.      The EMR is a digital version of a patient's chart where different providers may add information to the same progress note. When this occurs, each provider should be allowed to sign his or her entry, allowing verification of the amount of work performed and which provider performed the work.[3]

### B.  **Medical Coding**

11.      Medical coding is the process of abstracting healthcare diagnosis, procedures, medical services, and equipment into universal medical alphanumeric codes. The diagnoses and procedure codes are taken from medical record documentation, such as physician's notes. Medical billers use those codes to create claims for reimbursement that are submitted to CMS on the CMS-1500 claims form (Exhibit 1), or its electronic counterpart. Accurate billing can be determined upon review of the EMR when circumstances warrant.

12.      After a provider treats a patient and documents that treatment in the patient's EMR, the appropriate provider and/or medical coding professional should review the completed EMR. Because the physician (or other practitioner) whose name goes on the billing form is legally responsible for any codes submitted for the service, at a minimum, the practitioners should be made aware of the codes submitted on their behalf.

13.      CMS also utilizes certain codes that correspond to diagnosis and inpatient procedures and services knowns as the International Classification of Diseases, 10th Revision, Clinical Modification/Procedure Coding System. The use of ICD-10-CM diagnosis codes supports the medical necessity of a service or procedure by showing *why* a provider performed that service

---

[3] CMS Electronic Health Records Provider Fact Sheet, December 2014

or procedure. CPT codes show *what* service or procedure that provider performed.

14.     Evaluation and Management ("E/M") services codes are CPT codes[4] that describe services provided by healthcare providers to evaluate patients and manage their care. These codes are widely used by healthcare providers in all specialties and describe the particular type of medical care provided to the patient. The several levels of E/M codes correspond to the level of treatment provided and describe the wide variations in skill, effort, time, responsibility, and medical knowledge required for the prevention or diagnosis and treatment of illness or injury, and the promotion of optimal health. CMS reimburses the different levels of E/M services at different rates. Generally speaking, E/M services that require higher levels of skill and treatment are reimbursed at higher rates. The AMA outlines definitions for each category of E/M CPT codes and for the ER setting the category of codes most often used are the Emergency Departments codes (CPT 99281-99285) as well as Critical Care codes (CPT 99291-99292).

### C. **Mid-Level Providers**

15.     Mid-Level Providers ("MLPs") are health care professionals permitted by law to provide care and services within the scope of the individual's licensure and consistent with individually granted privileges by a facility's Board of Trustees. Examples of MLPs are certified nurse-midwives, certified registered nurse anesthetists, clinical psychologists, clinical social workers, physician assistants, nurse practitioners, and clinical nurse specialists. MLPs are often referred to as Non-Physician Practitioners ("NPPs") and Advanced Practice Providers ("APPs"). These are all synonyms. Any services provided by the MLP must be performed within the State scope of his/her practice. Today, there are three billing options for MLP services depending on the setting:

---

[4] CPT Professional Edition, American Medical Association (2018).

    i.    In any setting, MLP services may be billed under their own national provider identification number ("NPI"), receiving 85 percent the Medicare Physician Fee Schedule ("MPFS:) amount;

    ii.    In the clinic setting, MLP services may be billed as "incident-to" the physician's services, receiving 100 percent of the MPFS if the appropriate requirements are met; and

    iii.    In the hospital or **emergency room setting**, MLP services may be billed as a "Split/Shared Visit" receiving 100 percent of MPFS if the appropriate requirements are met.

**D.  Incident-to Services**

16.    In the clinic setting, services and supplies furnished as "incident to" a physician's services[5] may be billed as though the physician personally performed the service. The incident-to regulations allow practices to bill for services and supplies commonly furnished in the clinic or physician office setting that are provided by auxiliary staff or MLPs and that are an integral, although incidental, to the physician's professional services. Services meeting the incident to requirements are reimbursed under the physician's NPI and paid at 100% of the MPFS amount for the CPT code. If incident to requirements are not met, the services may be billed under the MLP's NPI and paid at 85% of the MPFS.

17.    Incident-to billing ***only*** applies to services provided in physician offices and clinics. It cannot be used in the facility setting such as hospitals, ***emergency rooms***, or nursing facilities:

> *For hospital patients and for SNF patients who are in a Medicare covered stay, there is no Medicare Part B coverage of the services of physician-employed auxiliary personnel as services incident to physicians' services under 279H§1861(s)(2)(A) of the Act. Such services can be covered only under the hospital or SNF benefit and payment for such services can be made to only the hospital or SNF by a Medicare intermediary.[6]*

Incident-to services must meet all the requirements for coverage specified in the CMS MBPM.

---

[5] CFR 42 § 410.26 & Medicare Benefit Policy Manual, Chapter 15 §§ 60.1–60.3.

[6] Medicare Benefit Policy Manual, Chapter 15 § 60.1.B.

Specifically, the services must be:

- an integral, although incidental, part of the physician's or practitioner's professional services;
- of a type that is commonly furnished in a physician's office or clinic;
- furnished under the physician's/practitioner's <u>direct supervision;</u>
- provided by an individual who qualifies as an employee of the physician, MLP or professional association or group that furnishes the services or supplies; and
- part of the patient's normal course of treatment, during which a physician personally performs an initial service and remains actively involved in the course of treatment.

18.     Incident-to services ***do not*** require the physician to participate or see the patient "face-to-face" for the visit to be billed under the physicians NPI number. Instead, the incident-to regulations require physician "direct supervision," which means the physician must be present in the office suite and immediately available throughout the performance of the service to furnish assistance if needed. However, the physician does not need to be in the room when the MLP services are provided. Additionally, the mid-level cannot see new patients or established patients with new problems on an incident to basis as the physician must perform an initial service.

### E.  <u>MLP Billing Prior to 2002</u>

19.     Prior to October 2002, the role of MLPs and appropriate billing practices related to the services they provided were not clearly defined. Typically, an MLP would assist the physician in inpatient, outpatient, or ER visits and the services were billed under the physician's NPI. While certain documentation requirements applied, those requirements were not clearly defined or scrutinized, and they varied by carriers. Whether and how to bill for MLP services provided independently of a physician was unclear prior to 1998.

20.     However, the 1997 Balanced Budget Act ("BBA")[7] attempted to bring more uniformity to MLP billing. Specifically, the BBA modified the way CMS paid for MLP services by enabling MLPs to bill CMS *independently* under their own NPI for all allowable services in all settings, as governed by the State's scope of practice. Unsurprisingly, this led to an increase in MLP billing, and there was still confusion about the rules.

21.     However, in October 2002, CMS introduced new rules and regulations, including split/shared billing. These changes provided clear requirements regarding when MLP services must be billed under the MLP's NPI and when those services could appropriately be billed under a physician's NPI.

### F.  Split/Shared Visit Policy Introduced in 2002

22.     On October 25, 2002, CMS issued Transmittal 1776[8], which identified a new payment policy for a split/shared E/M service. The Medicare Claims Processing Manual Publication ("MCPM")[9] defines split/shared visits as follows:

> A split/shared E/M visit is defined by Medicare Part B payment policy as a medically necessary encounter with a patient where the physician and a qualified NPP *each personally perform a substantive portion of an E/M visit **face-to-face** with the same patient on the same date of service*. A substantive portion of an E/M visit involves all or some portion of the history, exam or medical decision-making key components of an E/M service. The physician and the qualified NPP must be in the same group practice or be employed by the same employer.

23.     With the passage of these new regulations, for the first time, CMS implemented the "face-to-face" requirement, under which MLP services could only be billed under a physician's

---

[7] FR Vol.3 No.211, Nov. 2,1998, Rules and Regulations 58871-58878 III.D."Payment for Services of Certain Nonphysician Practitioners and Services Furnished Incident to Their Professional Services".

[8] CMS Transmittal 1776, CR 2321, Oct. 25, 2002; *see also* Exhibit 2.

[9] The Medicare Claims Processing Manual, ch.12, §30.6.13H .

NPI when a patient visit was either split or shared between the MLP and the physician—*i.e.*, when both the MLP and the physician saw and treated the patient face to face.

24.     While these new regulations provided additional clarity and uniformity to MLP billing, split/shared visits are not apparent to CMS from claims submitted for reimbursement. Because a physician's NPI is used to submit claims for split/shared services, they look just like a claim for physician-only services. This is because payment is made at the appropriate MPFS rate based on the provider number entered on the claim. If the physician's NPI is used, then 100% of the MPFS rate is applied to the entire claim; if the MLP's NPI is used, then 85% of the MPFS rate is applied to the entire claim.

25.     As explained below, the split/shared rule (i) applies only to select settings; (ii) applies only to certain E/M CPT codes; and (iii) requires face-to-face interaction between physician and patient:

26.     **Split/Shared Visits—Selected Settings Only**: The Split/Shared E/M visit policy applies only to selected settings: hospital inpatient, hospital outpatient, hospital observation, *emergency department*, and office and non-facility clinics.

27.     **Split/Shared Visits—Certain E/M Codes Only**: Shared visits in the facility (hospital and ER) apply to the following CPT codes:

- Hospital admissions (99221-99223)
- Subsequent hospital visits (99231-99233)
- Discharge management (99238-99239)
- Observation care (99217-99220, 99234-99236)
- ***Emergency room visits*** (99281-99285)
- Prolonged care (99354-99357)
- Hospital provider-based office visits (99201-99215) Place of Service (POS) 22

However, Split/Shared Visits do not apply to:

- Critical Care Services (99291-99292)
- Procedures
- EM codes used in NF and SNF
- Consultations (CPT 99241-99255) Prior to 1/1/2010

28.    **Split/Shared Visits—The Face-to-Face Requirement**: Split/shared visits require a face-to-face interaction between physician and patient. If the physician does not personally perform and document ***a substantive face-to-face*** portion of the E/M encounter with the patient, then the MLP's E/M services cannot be billed under the physician's NPI and may be billed _only_ under the MLP's name and provider number. A substantive portion of an E/M visit involves all or some portion of the history, exam or medical decision-making key components of an E/M service. If the physician participated in the service by only reviewing the patient medical record, the service may only be billed under the MLP's NPI.

29.    **Split/Shared Visit Examples**: The following two examples of appropriate split/shared visits are provided by CMS in the MCPM:[10]

> **Example 1**:   If the MLP sees a hospital inpatient in the morning and the physician follows with a later face-to-face visit with the patient on the same day, the physician or the MLP may report the service.

> **Example 2**:   In an office setting the MLP performs a portion of an E/M encounter and the physician completes the E/M service. If the "incident to" requirements are met, the physician reports the service. If the "incident to" requirements are not met, the service must be reported using the MLP's NPI

30.    *Example 1* captures the main intent behind the split/shared visit. It allows the MLP to see the patient while the physician may be in surgery or otherwise unavailable. The physician would then see the patient later in the day if there was a medically necessary reason, such as more

---

[10] The Medicare Claims Processing Manual Publication (MCPM) chapter 12, §30.6.B

complex patients needing the physician's experience. The split/shared visit rules are not designed to encourage physicians to simply show up—*i.e.*, without a medically necessary reason—to capture an additional 15% in revenue. Additionally, the split/shared visit rules are certainly not designed to allow physicians to sign charts after the fact and capture the extra 15% reimbursement.

31.     *Example 2* provided in the physician office setting is not as often used because of the additional requirement to also meet incident-to guideline with split/shared billing in this setting. This eliminates services for new patients or established patients coming in with a new problem, which tend to be most of the visits. Operationally most physician offices have found that the most productive use of the MLPs time, is for the MLP to see less acute patients, and to bill under the MLPs NPI. Notably, this setting is *not* at issue in this case because it does not involve the emergency room.

32.     Below are two examples of split/shared visits that **do not** meet requirements to be billed under the physician's NPI:

> **Example 1**:   *The MLP sees a hospital inpatient in the morning while the physician is in surgery. MLP documents history, exam & medical decision making & signs the note. Physician provides a face-to-face visit with the patient later in the day and reviews the labs. The physician documents "labs reviewed, agree with treatment" and co-signs the note.*

This visit does not meet the split/shared visit requirements to be billed under the MD's NPI. Even though the physician provided a face-to-face visit, there is no documentation to establish this presence or involvement. Physician participated in the service by only reviewing the patient's medical record and co-signing the note. There is insufficient documentation to support that the physician did see the patient. Co-signatures do not "prove" that the service was provided by the physician; rather, the merely demonstrate that the documentation of the service was reviewed. The presence of documentation of "review and signed" by the physician does not equate with a Split/Shared Visit:

**Example 2**:   The following example is from Comprehensive Error Rate Testing Program[11]: *A split/shared E&M claim was submitted for payment. While the submitted documentation contained a physician's signature on the NPP's clinical note, no other documentation was made by the physician supporting that the physician performed a substantive portion of the split/shared E&M service.*

This claim was scored an improper payment due to an "insufficient documentation error." This example, which is provided in CMS material, is very much like the Mid-Level Scheme here.

### G.  Incident-to and Split/Shared Visits Are Different

33.      Again, split/shared visits did not exist prior to October 2002, while incident-to services have been in place since the inception of the Medicare program.[12] Today both split/shared visits and incident-to services exist, though each in different settings and with different requirements.  Providers still confuse split/shared visits and incident-to services and their respective billing requirements.  However, the two are very different:

**Incident-to services:**
- do not apply in the facility setting, such as an ER;
- can be provided for procedures in addition to E/M services;
- can be provided by auxiliary personnel;
- require direct supervision;
- do not require "face-to-face" visit by physician; and
- require that the physician performs the initial visit with patient and remains actively involved in care
- MLPs can have incident-to services.

**Split/Shared Visits:**
- apply in the facility setting, such as the ER;
- apply only to certain E/M services, not for procedures;

---

[11] Medicare Quarterly Provider Compliance Newsletter-Volume 3, Issue 3, April 2013 (ICN908625) (attached as Exhibit 3)

[12] Federal Register/Vol.3.No.211/November 2,1998, Rules and Regulations58871-58878 III.D, "Payment for Services of Certain Nonphysician Practitioners and Services Furnished Incident to Their Professional Services".

- for two licensed providers: physician and MLP, not auxiliary personnel;

- do not require physician "supervision";

- require "face-to-face" interaction between the physician and the patient, and the MLP and the patient, as well as documentation of such encounters;

- require physician's participation, and not just an attestation; and

- require performance and documentation that of the physician's substantive portion of the E/M visit.

34.     It is important that healthcare providers, billing professionals, and the companies that employ them understand the differences between split/shared visits and incident-to services.

**H.  The _Endre-Day_ Complaint:**

35.     The allegations in the Hernandez/Whaley Complaint (which deal with split/shared visits) are significantly different than the allegations in the _Endre-Day_ complaint (which deals with incident-to services billings). Split/shared visits did not even exist until after the _Endre-Day_ case was dismissed. And, split/shared visits and incident-to services—and their corresponding billing regulations and requirements—are very different.

36.     Today, both split/shared billing and incident-to billing exist, though they function in different contexts and settings and with different requirements. While providers often confuse these two forms of billing, there is no situation where incident-to services billing is applicable in the emergency room setting. The _only_ way that MLP emergency services can be billed under a physician NPI is through a split/share visit when all applicable requirements are met. Relators alleged a scheme that TeamHealth disguises within the shared/visit exception—an exception that did not exist when _Endre-Day_ was filed.

37.     _While Endre-Day_ correctly states that incident-to billing does not apply in the emergency room setting, it fails to identify what billing guidelines applied in this setting for

physicians who utilized PAs to assist with their professional service.[13] The only MLPs *Endre-Day* references are PAs, and the only billing guidelines referenced are the incident-to guidelines from the HCFA Carrier Manual and the HCFA billing form certification related to incident-to service. Without specific billing guidance available at the time, *Endre-Day* appears to compare the PA billing practices to the physician direct supervision required by incident-to guidelines, which would not have been (and never have been) applicable in the emergency room setting. This is evident when *Endre-Day* alleges "lacking physician participation" when referring to PA services.

38.     In addition to turning on a completely different billing regulation and supervision requirement, Relators' allegations provide significantly more detail than *Endre-Day*. The allegations described in *Endre-Day* do not explain what actually took place in the ER. The *Endre-Day* complaint failed to detail how the services were actually performed in the ER, how the services could and should have been performed accurately, or how TeamHealth documented the services at issue.[14] In contrast to *Endre-Day*, the Hernandez/Whaley Complaint provides specifics at to TeamHealth's operational practices, including details of how TeamHealth told PAs to falsify in medical records that their services were split or shared with a physician. Relators allege

---

[13] Use of MLPs in the ER prior to the 2002 inception of split/share visits was a common practice. However, the lack of billing guidelines for facility MLP services would make it hard for these services to be scrutinized. *See* Department of Health and Human Services (HHS), Office of Inspector General (OIG) report OEI-02-00-00290, "Medicare Coverage of Non-Physician Practitioner Services" June, 2001. It is common belief that this was rationale behind CMS's implementation of the split/shared policy in 2002. While *Endre-Day* mentions independent billing for PAs, this was not implemented until 1998.

[14] Additionally, *Endre-Day* is unclear as to whether the PAs in question simply acted as scribes. At the time, some hospital bylaws did not distinguish between RNs and MLPs services, and physicians were often reluctant to view MLPs as providing physician services. This is very different from Hernandez/Whaley Complaint, where Relators are providers who personally performed patient services in TeamHealth ERs and signed MLP charts at the insistence of TeamHealth.

TeamHealth instructed physicians to falsify medical records by providing an attestation statement for patients they had not seen. According to the Complaint, this attestation was meant to support the medical record documentation required to bill a split/shared visit for the two providers under the physician's NPI number. However, according to Relators, the physicians did not see the patient face-to-face, and did not participate by performing and documenting a substantial portion of the E/M service as required by the split/shared visit Policy. This detail is lacking in the *Endre-Day*.

V.   **Conclusion**

39.   The *Endre-Day* Complaint did not and could not have disclosed Relators' Mid-Level Scheme allegations. As explained in this report, split/shared visits are not the same thing as incident-to services. They *never* have been. Incident-to services billing existed before October 2002 and still exists today. However, it has never been permitted in the emergency room setting. CMS introduced the split/shared billing regulations in 2002, after the *Endre-Day* case was dismissed. Split/shared billing *does* apply in the emergency room setting, but TeamHealth must comply with the applicable requirements. Further, the *Endre-Day* case does not contain detailed allegations necessary to determine what exactly TeamHealth's providers were doing in the emergency room. Here, Relators have provided much detail about the specific split/shared scheme alleged. Thus, Relators' allegations are not the same as or substantially similar to the *Endre-Day* allegations.

40.   I reserve the right to supplement or revise by opinion based on my review of additional documents or other information that becomes available.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 31, 2019

Respectfully submitted,

*Elin Baklid-Kunz*

Elin Baklid-Kunz, MBA, CHC, CPC, CPMA, CCS
KUNZ, LLC

<u>**Exhibits**</u>**, all of which are true and correct copies.**

1. Sample CMS 1500 claim form

2. Elin Baklid-Kunz, *Hot Topic: Medicare's Split/Shared Visit Policy*, Coding Edge Magazine, American Academy of Professional Coders (Aug 2008).

3. CMS Medicare Quarterly Provider Compliance Newsletter, Vol.3, Issue 3, April 2013, pages 4-5

EXHIBIT 1

**1500**

**HEALTH INSURANCE CLAIM FORM**
APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE 08/05

PICA | | PICA

CARRIER

1. MEDICARE  MEDICAID  TRICARE  CHAMPVA  GROUP  FECA  OTHER | 1a. INSURED'S I.D. NUMBER (For Program in Item 1)
(Medicare #)  (Medicaid #)  CHAMPUS (Sponsor's SSN)  (Member ID#)  HEALTH PLAN (SSN or ID)  BLK LUNG (SSN)  (ID)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE MM DD YY  SEX M☐ F☐ | 4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED Self☐ Spouse☐ Child☐ Other☐ | 7. INSURED'S ADDRESS (No., Street)

CITY | STATE | 8. PATIENT STATUS Single☐ Married☐ Other☐ | CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code) ( ) | Employed☐ Full-Time Student☐ Part-Time Student☐ | ZIP CODE | TELEPHONE (Include Area Code) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) YES☐ NO☐ | a. INSURED'S DATE OF BIRTH MM DD YY  SEX M☐ F☐

b. OTHER INSURED'S DATE OF BIRTH MM DD YY  SEX M☐ F☐ | b. AUTO ACCIDENT? YES☐ NO☐  PLACE (State) | b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT? YES☐ NO☐ | c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES☐ NO☐ If yes, return to and complete item 9 a-d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _____ DATE _____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _____

14. DATE OF CURRENT: MM DD YY ◄ ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION MM DD YY  FROM _____ TO _____

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY  FROM _____ TO _____
| 17b. NPI |

19. RESERVED FOR LOCAL USE | 20. OUTSIDE LAB? YES☐ NO☐  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY (Relate Items 1, 2, 3 or 4 to Item 24E by Line)
1. |___.___        3. |___.___
2. |___.___        4. |___.___ | 22. MEDICAID RESUBMISSION CODE _____ ORIGINAL REF. NO. _____

23. PRIOR AUTHORIZATION NUMBER

PHYSICIAN OR SUPPLIER INFORMATION

| 24. A. DATE(S) OF SERVICE From MM DD YY  To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | NPI |
| 2 | | | | | | | | | NPI |
| 3 | | | | | | | | | NPI |
| 4 | | | | | | | | | NPI |
| 5 | | | | | | | | | NPI |
| 6 | | | | | | | | | NPI |

25. FEDERAL TAX I.D. NUMBER  SSN☐ EIN☐ | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) YES☐ NO☐ | 28. TOTAL CHARGE $ | 29. AMOUNT PAID $ | 30. BALANCE DUE $

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED _____ DATE _____ | 32. SERVICE FACILITY LOCATION INFORMATION

a.         b. | 33. BILLING PROVIDER INFO & PH # ( )

a.         b.

NUCC Instruction Manual available at: www.nucc.org | **PLEASE PRINT OR TYPE** | APPROVED OMB-0938-0999 FORM CMS-1500 (08-05)

PATIENT AND INSURED INFORMATION

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 12 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown in Medicare assignment of CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits programs through civilian affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured", i.e. items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his employee, 2) they must be an integral although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I am not an employed and rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
### (PRIVACY ACT STATEMENT)

We are authorized by CMS, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a), and 424.5(a)(6), and 44 USC 3101 41 CFR 101-30 and 10 USC 1079 and 1086, 5 USC 8101 et seq. and 30 USC 901 et seq; 38 USC 613, E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, "Carrier Medicare Claims Record," published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and modified.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register, Vol. 55 No. 40, Wed Feb. 28, 1990. See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR CHAMPUS CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service; private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claim adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURE(S): Voluntary; however, failure to provide information will result in denial of payment, or result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name of claim number, or physical data, payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 380 3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988," permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

hot topic

EXHIBIT 2



# Medicare's
# Split/Shared Visit Policy

Rules for Medicare's split/shared visit policy can be a lot to choke down. Here's our simplified interpretation to make it easier to digest.

By Elin Baklid-Kunz, MBA, CPC, CCS

EXPERT

O n Oct. 25, 2002, the Center for Medicare & Medicaid Services (CMS) issued Transmittal 1776 giving non-physician practitioners (NPPs) and their supervising physicians increased latitude for hospital and office billing of evaluation and management (E/M) services. The instructions found at www. cms.hhs.gov/transmittals/downloads/R1776B3.pdf allowed NPPs and physicians who work for the same employer/entity to share patient visits on the same day by billing the combined work under the physician's provider number for 100 percent of the Medicare physician fee schedule (MPFS) reimbursement—although the NPP may have done the majority of the work.

Medicare defines NPPs as physician assistants (PAs), nurse practitioners (NPs), and clinical nurse specialists (CNSs).

These instructions are referred to as Medicare's Split/ Shared Visit Policy. The policy is one of three billing options for NPPs:

- NPPs own provider number receiving 85 percent of the MPFS amount
- Incident-to the physician receiving 100 percent of the MPFS
- Split/shared service receiving 100 percent of MPFS

Billing using the NPP's provider number is easy but can cause confusion about Medicare's Split/Shared Visit Policy when it relates to new patient office or other outpatient visits (CPT® 99201–99205).

## Medicare's Split/Shared Visit Policy

The definition of split/shared visits can be found in the CMS Internet Only Manual (IOM): Medicare Claims Processing Manual Publication 100-04, chapter 12, section 30.6.1.H Split/Shared E/M Visit:

*"A split/shared E/M visit is defined by Medicare Part B payment policy as a medically necessary encounter with a patient where the physician and a qualified NPP each personally perform a substantive portion of an E/M visit face-to-face with the same patient on the same date of service. A substantive portion of an E/M visit involves all or some portion of the history, exam or medical decision making key components of an E/M service. The physician and the qualified NPP must be in the same group practice or be employed by the same employer."*

## Different Rules for Different Settings

The split/shared E/M visit policy applies only to selected settings: hospital inpatient, hospital outpatient, hospital observation, emergency department, and office and non-facility clinics. A split/shared E/M visit cannot be reported in the skilled nursing facility (SNF) or nursing facility (NF) setting.

When a non-hospital outpatient clinic or physician office E/M visit is split or shared between a physician and a NNP, the E/M encounter may be billed under the physician's name and provider number if the patient is an established patient and the incident-to rules are met. (Note: Medicare clarifies that incident-to billing is not allowed for new patient visits).

Let's look at an example. An established patient visits. The NPP performs the history and physical exam and the physician performs the medical decision-making. The "incident-to" requirements are met. In this same example, if the physician and the NPP shared the visit and it does not meet incident-to rules, the entire visit is billed under the NPP's provider number.

When a hospital inpatient, hospital outpatient, or emergency department E/M visit is split or shared between a physician and a NPP from the same group practice, the E/M visit may be billed under the physician's name and provider number if the physician provides any face-to-face portion of the E/M encounter (also applies to same day as the NPP's portion) and the physician personally documents in the patient's record the physician's face-to-face portion of the E/M encounter with the patient. (Co-signatures are NOT sufficient).

An example of an E/M visit that may be billed under the physician's name and provider number is hospital rounds at different times of the day on the same date of service. In a provider-based physician office (i.e., hospital outpatient department) or the emergency room, an example is a new or established patient visit where the NPP performs the history and physical exam, and the physician is the medical decision-maker.

## Rule Applies ONLY to Selected E/M Visits

The split/shared E/M visit rule applies only to selected E/M visits such as these in the hospital settings:

**Because incident-to criteria can be applied only in the office and non-facility clinic, the patient must be established.**

- hospital admissions (99221-99223)
- follow-up visits (99231-99233)
- discharge management (99238-99239)
- observation care (99217-99220, 99234-99236)
- emergency department visits (99281-99285)
- prolonged care (99354-99357)
- hospital outpatient departments (provider-based visits) (99201-99215)

In a physician office setting, use codes 99211-99215 for an established patient with an established plan of treatment. Incident-to requirements must be met.

**Remember:** Split/shared visits do not apply to consultations (99241-99255), critical care services (99291-99292) or procedures.

### Relationship to Incident-to

To bill a split/shared visit in the physician office setting, the visit must meet incident-to rules. For the services of a NPP to be covered as incident-to the services of a physician, the services must meet all the requirements for coverage specified in the CMS IOM: Medicare Benefit Policy Manual Publication 100-02, chapter 15 §60-61:

- The service or supplies are an integral, although incidental, part of the physician's or practitioner's professional services
- The services or supplies are of a type that are commonly furnished in a physician's office or clinic
- The services or supplies are furnished under the physician's/practitioner's direct supervision
- The services or supplies are furnished by an individual who qualifies as an employee of the physician, NPP or professional association or group that furnishes the services or supplies
- The service is part of the patient's normal course of treatment, during which a physician personally performs an initial service and remains actively involved in the course of treatment

According to the Medicare Benefit Policy Manual, incident-to apply only to non-institutionalized settings (i.e., not hospital or SNF settings); section 60.1B of the Medicare Claims Processing Manual states:

*"For hospital patients and for SNF patients who are in a Medicare covered stay, there is no Medicare Part B coverage of the services of physician-employed auxiliary personnel as services incident to physicians' services under 279H§1861(s)(2)(A) of the Act. Such services can be covered only under the hospital or SNF benefit and payment for such services can be made to only the hospital or SNF by a Medicare intermediary."*

### Can New Patients Office or Other Outpatient Visits (99201–99205) be Split/Shared?

Because incident-to criteria can be applied only in the office and non-facility clinic, the patient must be established. A hospital outpatient clinic/office is considered a hospital or facility setting, and not a non-institutional setting. Incident-to regulations do not apply and New Patient Office or Other Outpatient Visits (99201–99205) can be reported as a split/shared visit in the hospital outpatient clinic/office (POS 22). The physician must perform some aspect of the E/M service with the patient face-to-face and both the NPP and the physician must personally document what he/she performed.

**Remember:** Exclude the NPP's salary and benefits from the hospital's cost report when the NPP performs professional services. If the NPP does both facility and professional services, keep time sheets so the expense for professional services can be excluded from the facility's cost report.

In a provider-based clinic/office, the cost for the hospital staff is reported in the facility's cost report and reimbursement for the service is received through the facility payment. If the NPP performs professional services, remember to exclude the NPP's salary and benefits from the cost report. If the NPPs perform both hospital and professional services, keep track of the time spent on professional services so this component can be excluded from the cost report.

The cost report manuals are paper based manuals found at:

**www.cms.hhs.gov/Manuals/PBM/list.asp**

(publication 15: Provider Reimbursement, Provider Reimbursement Manual Part 1

chapter 21: Cost Related to Patient Care, section 2108: Reimbursement For Services by Provider-Based Physicians)

**The physician must perform some aspect of the E/M service with the patient face-to-face and both the NPP and the physician must personally document what he/she performed.**

Provider-based regulations can be found in Transmittal A03-030, CR 2411, April 18, 2003: **www.cms.hhs.gov/transmittals/downloads/A03030.PDF**

## Documentation of Split/Shared Visits

Documentation for split/shared visits should follow the documentation guidelines for any E/M Service, and you must follow these documentation requirements:

- Each physician/NPP should personally document in the medical record his/her portion of the E/M split/shared visit.
- The physician's documentation must clearly indicate that a face-to-face visit took place. (i.e, documenting an exam component to substantiate the physician had a face-to-face visit with the patient, is recommended.)
- Documentation must support the combined service level reported on the claim.
- Auxiliary staff may document the review of systems, past family history, and social history. The physician and NPP must personally review this documentation and confirm and/or supplement it in the medical record.

If the physician does not personally perform and document a face-to-face portion of the E/M encounter with the patient, then the E/M encounter is not billed under the physician's name and provider number and is billed only under the NPP's name and provider number.

If the physician's participation is only reviewing the patient's medical record, the service is billed under the NPPs name and provider number. Payment will be made at the appropriate physician fee schedule based on the provider number entered on the claim.

## Acceptable Physician Documentation

Because teaching physician services involving residents is somewhat analogous to split/shared visits, these examples from the CMS material on teaching physician services (CMS Pub.100-4, Chapter 12, Section 100.1.1.A General Documentation Instruction and Common Scenarios), help establish acceptable documentation for split/shared visits:

- "I performed a history and physical examination of the patient and discussed his management with the NPP. I reviewed the NPP note and agree with the documented findings and plan of care."

- "I saw and evaluated the patient. I reviewed the NPP's note and agree, except that picture is more consistent with pericarditis than myocardial ischemia. Will begin NSAIDs."
- "I saw and evaluated the patient. Agree with NPP's note but lower extremities are weaker, now 3/5; MRI of L/S Spine today."

Examples of unacceptable documentation by a physician:

- "Agree with above," followed by legible countersignature or identity.
- "Rounded, Reviewed, Agree," followed by legible countersignature or identity.
- "Discussed with NPP. Agree," followed by legible countersignature or identity.
- "Seen and agree," followed by legible countersignature or identity.
- "Patient seen and evaluated," followed by legible countersignature or identity.
- A legible countersignature or identity alone.

Such documentation is not acceptable as it is not possible to determine whether the physician was present, evaluated the patient, and/or had any involvement with the plan of care.

## Scribing is Not a Billable Service

A scribe's role is to document in the medical record a physician's visit with the patient. In a hospital setting, a scribe makes rounds with the physician and documents the visit. Scribing is not a billable service and is not always straightforward. For example, it is no longer considered scribing if the NPP adds an opinion to the progress note.

If your hospital or office uses scribes, establish a protocol that clearly outlines scribes to not render any opinions and to provide an accurate transcription of physicians' comments. Watch out for scribes who improve documentation to facilitate optimization of the claim to maximize revenue.

Guidelines for scribes published by First Coast Service Option, the Part B carrier for Florida and Connecticut in the third quarter 2006 Part B update (www.floridamedicare.com/Part_B/Medicare_B_Update/Archive/106399.pdf) are:

hot topic

- If a nurse or NPP acts as a scribe for the physician, the individual writing the note, history, discharge summary, or any entry in the record; should note "written by X, acting as scribe for Dr. Y." Dr. Y should co-sign, indicating the note accurately reflects work and decisions made.

- It is inappropriate for an employee of the physician to make rounds and write entries in the record, and then for the physician to make rounds several hours later and note "agree with above," unless the employee is a licensed, certified provider (PA, NP) billing Medicare for services under his/her own name and number.

- Scribes should record entries upon dictation by the physician, and should clearly document the level of service provided at that encounter. This requirement is no different from other encounter documentation requirements.

- Medicare pays for medically necessary and reasonable services, and expects the person receiving payment to deliver services and create the record. There is no carrier Part B incident-to billing in the hospital setting (inpatient or outpatient). The scribe should only write what the physician dictates and does, acting independently there is no payment for this activity.

## Understand Private Payer Differences

There is a distinction between Medicare regulations and private payers' policies. Medicare rules do not necessarily impact private payers. Some payers may defer to state law, so understand your state's scope of practice. Follow the requirements set out by private payers. Some hospitals query private payers to see what their rules are. An alternative to querying the private payers is to send the private plans a certified letter advising the hospital's procedures plan for billing NPP service, unless the plan advises the hospital otherwise, in writing. When querying payers about policies, ask how to report services such as critical care and consultations.

Most private payers do not issue numbers to NPPs and request that billing occur under a supervising physician. Some payers may only ask to follow state law when NPPs deliver care. For such cases, it might be appropriate for the NPP to provide care without a physician face-to-face encounter in the emergency room and bill the private payer under the physician's number.

## Follow Medicaid's State Rules

Medicaid also has different rules from Medicare when it comes to NPPs. Check your local state Medicaid Web site for your state's rules. Medicaid pays NPPs on a separate fee schedule and has a separate limitation and coverage book for NPPs.

In Florida, NPP services under the direct supervision of a physician may be billed using the physician's provider number instead of the NPPs provider number with some exceptions. Florida Medicaid direct supervision means the physician is on the premises when the services are rendered and he/she reviews, signs, and dates the medical record.

## Get on Target with Split/Share Visits Compliance

In January's incident-to article, Robert Pelaia Esq., CPC identified incident-to billing as completely transparent to the payer. This transparency exists for split/shared visit billing as well. When a claim for a split/shared visit is received for reimbursement, it looks just like a claim for a physician service and the provider usually gets paid for the claim even if it did not comply with the split/shared visit policy. Although transparent to the payer, non-compliance with the split/shared visit policy could be an easy target for Recovery Audit Contractors (RACs) when the permanent RAC program starts. In the revised scope of work released on Nov. 7, 2007, E/M codes were added to the services list that RAC can review. The RAC will also have hospital and provider specific medical record request limits and they may only send the provider one review result per claim. This may lead to auditors checking for multiple issues before sending denial letters. Because the RACs have the complete medical record and the claims submitted, it will be very easy to identify a progress note documented by the NPP and merely signed by the physician.

With the permanent RAC program near, now is a good time to a review a few internal progress notes for compliance with the split/shared visit policy. You may discover your physicians are not aware of the face-to-face requirement for billing split/shared visits, do not realize incident-to rules do not apply in emergency room and provider-based offices, or are using the split/shared visits for consultations. ▪



Elin Baklid-Kunz, MBA, CPC, CCS, works for Halifax Health in Daytona Beach, Florida. Kunz has 15 years of health care experience, including seven years in finance. She is a freelance writer for HCPro, Inc. JustCoding.com, and presents workshops for the AAPC. She is an adjunct professor at Seminole Community College. Kunz earned her master's degree in business administration from Stetson University and her bachelor's degree from Florida International University.

letters to the editor

*Please send your letters to the editor to:*
*letterstotheeditor@aapc.com.*

# Letters to the Editor

## Documenting Counseling Discussion is Time Well Spent

Dear *Coding Edge*,

I am confused with the E/M and consultation verbiage in August's article "Orlando Report: High Stakes for High-Risk Pregnancy." The second sentence indicates to use time when greater than 50 percent of your patient encounter is involved in counseling then goes on to indicate they "cannot" be billed as such "I spent 40 minutes with the patient of which greater than 50 percent of the time was spent counseling the patient about …"

It is my understanding that when billing on time you need to indicate time spent in counseling and coordination of care and indicate that more than 50 percent of the encounter was spent counseling. Please advise.

**Aurelia Barraco, CHC, CPC**

Dear Aurelia,

Consultations "can" be billed by time provided that greater than 50 percent of the time was spent in counseling or coordination of care. It is appropriate to document what was discussed. It is not enough to just say "I spent X amount of time counseling the patient. Some auditors will look for total time spent and counseling time.

**Peggy Stilley, CPC, CPC-OBGYN, ACS-OB**

## Split Guidance on Shared Visits

Dear *Coding Edge*,

I read Elin Baklid-Kunz excellent article, "The Skinny on Medicare's Split/Shared Visit Policy," in the August issue. There was one section that I was hoping to clarify. The second bullet under Documentation of Split/Shared Visits states:

- The physician's documentation must clearly indicate that a face-to-face visit took place. (i.e, documenting an exam component to substantiate the physician had a face-to-face visit with the patient, is recommended.)

This seems to contradict the first bullet under Acceptable Physician Documentation:

- "I performed a history and physical examination of the patient and discussed his management with the non-physician practitioners (NPP). I reviewed the NPP note and agree with the documented findings and plan of care."

The acceptable physician documentation is not specific to the patient—the statement could apply to any patient. We have residents and NPPs and struggle with our compliance education to keep TP guidelines and shared visit guidelines separate. We educate our physicians perform-

ing split/shared visits that they may agree with the NPP's note; however, they must document some element of the visit to show a face-to-face visit. For example, "Patient seen and agree with above, less abdominal pain today, proceed with endoscopy," followed by a legible physician signature.

Thank you,
**Marianne Lockwood, CPC, CPC-H, RCC**

Dear Marianne,

I agree with you that TP and shared visits guidelines are different. However, some of our physicians want to see what the manual says, and there are no examples in the CMS manuals for shared visits.

We give them the TP examples as acceptable documentation. However, our recommendation to our physicians is to clearly indicate that a face-to-face visit took place by writing "patient seen and evaluated" and we recommend that they document an exam component. In an audit, this would justify that they had a face to face with the patient. We prefer an exam component where they have to touch the patient. For example, lungs clear. We feel less has to be documented for shared, but start out with TP guidelines since these are more restrictive. I personally feel we will be getting more specific guidance from CMS on this issue, especially if this ends up being a Recovery Audit Contractor (RAC) issue, which it very easily could.

Our biggest issue has been making sure the physicians document that the patient was seen, rather than just agree with above. If they write agree with above without documenting that the patient was seen or evaluated, we don't give them credit in an internal audit. We also explain that if they document the medical decision making (MDM) without documenting the patient was seen, and an outside audit could determine the patient was not seen, as the MDM could have been done based on the NPPs note.

I also have checklists for auditing these services to give physicians' staff to help keep track of this.

**Elin Baklid-Kunz, MBA, CPC, CCS**

***Coding Edge Readers,***

There was a typographical error in August's "Medicare's Split/Shared Visit Policy," article on page 15, paragraph 5. There is no IOM 100-04, 12, 30.6.1H. The reference should be IOM 100-04, chapter 12, 30.6.13H. We apologize for any inconvenience this may have caused.

Sincerely,
***Coding Edge***

EXHIBIT 3

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Centers for Medicare & Medicaid Services**



**Medicare**
**Learning**
**Network** ®

**Official Information Health Care**
**Professionals Can Trust**

# Medicare Quarterly Provider Compliance Newsletter

## Guidance to Address Billing Errors



Updated Provider
Index Now Available!

See the Introduction
section for more details

**Volume 3, Issue 3 - April 2013 (Revised)**

ICN 908625/ April 2013

# Table of Contents

**Comprehensive Error Rate Testing (CERT) Special Study:** Chiropractic Services ....................................... 1

**CERT Finding:** Split/Shared Evaluation & Management Services............................................................ 4

**Recovery Auditor Finding:** Neoplasm Surgery...................................... 6

**Recovery Auditor Finding:** Pancreas, Liver & Shunt Procedures, Medicare Severity-Diagnosis Related Groups (MS-DRG) 405, 406, and 407 ..................... 8

**Recovery Auditor Finding:** Medical Necessity Review for Medicare Severity- Diagnosis Related Grouper (MS-DRG) 181 Respiratory neoplasms with complication or comorbidity (CC)................................. 10

**Recovery Auditor Finding:** Esophagitis, Gastroenteritis, and Miscellaneous Digestive Disorders with MCC DRG 182 (MSDRG 391)........................................ 14

**Recovery Auditor Finding:** Acute Inpatient Hospitalization - Signs and Symptoms w/o MCC (DRG 948)................................................................... 17

**Recovery Auditor Finding:** MS-DRG Validation: Female Reproduction Disorders............................................ 19

**Archive of Previously-Issued Newsletters**

**Note: This newsletter was revised on April 30 to delete one of the examples from the issue discussed on pages 4-6. All other information remains the same.**

This educational tool was current at the time it was published or uploaded onto the web. Medicare policy changes frequently so links to the source documents have been provided within the document for your reference.

This educational tool was prepared as a service to the public and is not intended to grant rights or impose obligations. This educational tool may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations, and other interpretive materials for a full and accurate statement of their contents.

The Medicare Learning Network® (MLN), a registered trademark of CMS, is the brand name for official CMS educational products and information for Medicare Fee-For-Service Providers. For additional information, visit the MLN's web page at **http://go.cms.gov/MLNGenInfo** on the CMS website.

Your feedback is important to us and we use your suggestions to help us improve our educational products, services and activities and to develop products, services and activities that better meet your educational needs. To evaluate Medicare Learning Network® (MLN) products, services and activities you have participated in, received, or downloaded, please go to **http://go.cms.gov/MLNProducts** and click on the link called 'MLN Opinion Page' in the left-hand menu and follow the instructions. Please send your suggestions related to MLN product topics or formats to **MLN@cms.hhs.gov**.

CPT only copyright 2012 American Medical Association. All rights reserved.

ICD-9-CM Notice: The International Classification of Diseases, 9th Edition, Clinical Modification (ICD-9-CM) is published by the United States Government. A CD-ROM, which may be purchased through the Government Printing Office, is the only official Federal government version of the ICD-9-CM. ICD-9-CM is an official Health Insurance Portability and Accountability Act standard.

# Comprehensive Error Rate Testing (CERT) Finding: Split/Shared Evaluation & Management Services

**Provider Types Affected:** Physicians and Non Physician Practitioners (NPP)

**Background:** A Split/Shared service is an encounter in which a physician and an NPP, such as a Nurse Practitioner (NP), Physician Assistant (PA), Clinical Nurse Specialist (CNS), or Certified Nurse-Midwife (CNM) each personally perform a substantive portion of an Evaluation/Management (E/M) visit face-to-face with the same patient on the same date of service.

**Problem Description:** The most common cause of improper payments identified for these claim types was insufficient documentation errors. Most of these errors were due to insufficient documentation to support that both the physician and NPP performed a substantive portion of the split/shared E/M service.

**Example:** A split/shared E&M claim was submitted for payment. While the submitted documentation contained a physician's signature on the NPP's clinical note, no other documentation was made by the physician supporting that the physician performed a substantive portion of the split/shared E&M service. This claim was scored an improper payment due to an "insufficient documentation error."

## Guidance on How Providers Can Avoid These Problems:

As noted in the Medicare Fee-for-Service 2011 Improper Payments Report (found at **http://www.cms. gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/ CERT/CERT-Reports-Items/ MedicareFFS2011CERTReport. html** on the CMS website), a major

driver of E/M improper payments during the 2011 reporting period was insufficient documentation. "If it isn't documented, it hasn't been done" is an adage that is frequently heard in the health care setting. (Quoted from the Evaluation and Management Services Guide, which you can find at **http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNEdWebGuide/ EMDOC.html** on the CMS website).

As mentioned above, a split/shared E/M visit is defined by Medicare Part B payment policy as a medically necessary encounter with a patient in which both the physician and a qualified NPP (who must be in the same group practice or be employed by the same employer) personally perform a substantive portion of the E/M visit face-to-face with the same patient, on the same date of service. A substantive portion of an E/M visit involves all, or some portion of, the

history, exam, or medical decision making (all key components of an E/M service).

The split/shared E/M visit applies only to selected E/M visits and settings (hospital inpatient, hospital outpatient, hospital observation, emergency department, hospital discharge, office and non-facility clinic visits, and prolonged visits associated with these E/M visit codes). The split/shared E/M policy does not apply to critical care services or procedures and a split/shared E/M visit cannot be reported in the SNF/NF setting.

(For more information regarding split/shared E/M policy issues, please refer to the "Medicare Claims Processing Manual," Chapter 12, Section 30.6.13, Subsection H, which you can find at **http://www.cms. gov/Regulations-and-Guidance/ Guidance/Manuals/downloads/ clm104c12.pdf** on the CMS website).



The following rules for reporting split/shared E/M services between physicians and NPPs (summarized below) are described in the "Medicare Claims Processing Manual," Chapter 12, Section 30.6.1:

1. In the office/clinic setting, when the physician performs the E/M service, or when the E/M service is a split/shared encounter between the physician and NPP, is provided to an "established" patient, and meets "incident to" requirements; you must report using the physician's National Provider Identifier (NPI) and signature. ("Incident to" a physician's professional services means that the services or supplies are furnished as an integral, although incidental, part of the physician's personal professional services in the course of diagnosis or treatment of an injury or illness).

If "incident to" requirements are not met for the shared/split E/M service, however, the service must be billed under the NPP's NPI and signature.

(You can find more about "incident to" requirements in the "Medicare Benefit Policy Manual," Chapter 15, Section 60.1 at **http://www.cms.gov/Regulations-and-Guidance/Guidance/manuals/Downloads/bp102c15.pdf** on the CMS website.)

2. When a hospital inpatient/hospital outpatient or emergency department E/M is shared between a physician and an NPP from the same group practice and the physician provides any face-to-face portion of the E/M encounter with the patient, the service may be billed under either the physician's or the NPP's NPI.  However, if there was no face-to-face encounter between the patient and the physician, the service may only be billed under the NPP's NPI.

For example, if the NPP sees a hospital inpatient in the morning and the physician follows with a later face-to-face visit with the patient on the same day, either the physician or the NPP may report the service.

Sufficient medical record documentation is the key to proper reimbursement for split/shared evaluation/management services.

**Resources:**

✓ The "Medicare Claims Processing Manual," Chapter 12, Section 30.6.13, Subsection H is available at **http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf** on the CMS website).

✓ The "Medicare Benefit Policy Manual," Chapter 15, Section 60.1, is available at **http://www.cms.gov/Regulations-and-Guidance/Guidance/manuals/Downloads/bp102c15.pdf** on the CMS website.

✓ The Evaluation and Management (E/M) Services Fact Sheet: Complying with Documentation Requirements is available at **http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/Evaluation_Management_Fact_Sheet_ICN905363.pdf** on the CMS website.



Did you know...

The Medicare Learning Network® (MLN) has released a new package of products designed to educate physicians and other Medicare and Medicaid providers about medical identity theft and strategies for addressing it. These products include a web-based training course that is approved for Continuing Education (CE) and Continuing Medical Education (CME) credit. For more information, visit the MLN Provider Compliance web page at **http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/ProviderCompliance.html** and click on the 'Medicaid Program Integrity: Safeguarding Your Medical Identity Educational Products' link under 'Downloads' at the bottom of the page.