IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, CALEB HERNANDEZ & JASON WHALEY, RELATORS; ET AL.; | § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 2:16-CV-00432-JRG |
| TEAM FINANCE, L.L.C., TEAM HEALTH, INC., TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, L.L.C., | § § § § § § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants Team Health Holdings, Inc., Team Finance, LLC, Team Health, Inc., and AmeriTeam Services, LLC's (collectively, "Defendants" or "TeamHealth") Motion to Dismiss the Relators' First Amended Complaint (the "Motion"). (Dkt. No. 37.) Having considered the Motion, briefing, and relevant authorities, the Court hereby **GRANTS** the Motion to the extend and for the reasons discussed herein.

I. **BACKGROUND**

   A. **Procedural History**

On April 25, 2016, Relators Caleb S. Hernandez and Jason W. Whaley (collectively, "Relators") filed suit against Defendants Team Health Holdings, Inc. ("THHI"), Team Finance, LLC ("TF"), and Team Health, Inc. ("THI") under the *qui tam* provisions of the Federal False Claims Act, 31 US.C. §§ 3729 *et seq.* ("FCA"), and analogous state statutes. (Dkt. No. 1

1

(complaint).)[1] On June 28, 2018, the United States of America and the Plaintiff state governments declined to intervene. (Dkt. No. 20.) Relators subsequently amended the Complaint on November 12, 2018 to add AmeriTeam Services, LLC ("AmeriTeam") as a defendant. (Dkt. No. 33 (First Amended Complaint).) Defendants now move to dismiss the First Amended Complaint ("FAC") under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b). (Dkt. No. 37.)

### B. The Parties and the Alleged Fraud

TeamHealth is a healthcare practice management company that "provides staffing, operations, and billing services to emergency departments as an outside contractor." (Dkt. No. 33 ¶ 1.) According to Relators, TeamHealth "is one of the largest suppliers of outsourced physician staffing and administrative services to hospitals in the United States," "operates in at least forty-seven states, and employs at least 13,000 healthcare professionals." (*Id.* ¶ 12.)

Relators are healthcare providers that formally worked for TeamHealth as independent contractors. (*Id.* ¶¶ 10–11.) Relator Hernandez is a physician and has worked "at the following hospital emergency departments managed and/or operated by TeamHealth: the North Colorado Medical Center in Greely, Colorado (from 2011 to 2015); Sterling Regional Medical Center in Sterling, Colorado (from 2014 to 2015); and Juan Luis Phillipe Hospital in St. Croix, United States Virgin Islands (in 2010)." (*Id.* ¶ 10.) Relator Whaley is a physician assistant and worked "at the emergency department at North Colorado Medical Center, located in Greely, Colorado (from 2011 to 2013), which was and is operated and/or managed by TeamHealth." (*Id.* ¶ 11.)

---

[1] Relators also sued Defendants on behalf of the following state governments: Connecticut, Florida, Georgia, Indiana, Louisiana, Massachusetts, Tennessee, and Texas. (Dkt. Nos. 1, 33.)

Relators allege that TeamHealth has engaged in two schemes to defraud Medicare and several state Medicaid programs. The introductory paragraphs from the Relators' FAC succinctly summarize each alleged scheme:

> 2. **The first Scheme is the "Mid-Level Scheme."** Under the Mid-Level Scheme, TeamHealth overbills for services provided by "mid-level" practitioners. The term "mid-level" refers to non-physician healthcare providers, such as Physician Assistants ("PAs") and Nurse Practitioners ("NPs"). Under [the Medicare and/or Medicaid (collectively, "CMS")] rules, a mid-level's services are reimbursed at 85% of the standard physician rate, while services rendered by a physician are reimbursed at 100% of the standard physician rate. These rates and percentages are set by CMS, and the Plaintiff States have largely, if not entirely, adopted these same rates and percentages for reimbursement.
>
> 3. The appropriate rate payable for services rendered to a CMS beneficiary is automatically triggered by the National Provider Identifier ("NPI") submitted with the claim for reimbursement. Services rendered by a mid-level should be submitted under the mid-level's NPI, triggering the 85% rate. Services rendered by a physician should be submitted under the physician's NPI, triggering the 100% rate. However, as outlined in ¶¶ 2-6, herein, and stated with more particularity in §§ V-IV, *infra* (principally § V.B), TeamHealth—*through its billing policies, procedures, and protocols (which include training and guidelines), and through its coordinated operation and influence over its subsidiaries and affiliated professional entities*—systematically submits claims for mid-level services under various physicians' NPIs (*as assigning charts to a physician by a midlevel is usually based on shift assignments and how shifts overlap*), triggering the 100% rate when in fact the 85% rate applied. TeamHealth does this intentionally and has done so for years.
>
> 4. Through its billing policies and practices, TeamHealth attempts to cover up the Mid-Level Scheme by characterizing mid-level services as "split/shared." Under CMS rules, "split/shared" services occur when both a mid-level and a physician treat the same patient during the same visit, such that the services are split or shared between a mid-level and a physician. When this happens, the mid-level's services may be billed under the physicians' NPI at 100% of the physician rate. However, true split/shared visits are exceedingly rare at TeamHealth facilities—they almost never occur. This is because TeamHealth requires mid-levels to treat patients alone, maximizing midlevels' efficiency and profitability. To cover this up, TeamHealth requires its healthcare providers to falsify medical records to reflect a split/shared visit when none actually occurred.
>
> 5. TeamHealth accomplishes this cover-up in two ways. First, TeamHealth requires its mid-levels to indicate on medical records that a physician was involved in each patient encounter, when in fact a physician never saw the patient. Second,

TeamHealth requires on-duty physicians to sign mid-level medical records, again suggesting that the physician treated the patient. The result is a medical record that appears to indicate that a split/shared visit occurred. TeamHealth then sends these falsified medical records to a coding and billing employee who "relies" on the falsified record to submit claims for reimbursement under the physician's NPI. This results in the mid-level's services being reimbursed at 100% of the physician rate.

6. TeamHealth employs this Scheme through its billing policies and practices to bill federal and state governments for millions of dollars for the services concerned. Through the Scheme, TeamHealth has fraudulently obtained tens of millions of dollars every year since it began employing the Mid-Level Scheme nationwide in or around 2002 (the year the 85% regulation was established).

7. **The second Scheme is the "Critical Care Scheme."** This Scheme is a classic upcoding scheme. Under the Critical Care Scheme, TeamHealth bills CMS for "critical care"—the highest level of emergency treatment—when in fact critical care services were not rendered and/or were not medically necessary, thereby submitting false claims through fraudulent billing. Because of the heightened skill and decision-making critical care requires, CMS reimburses providers for critical care services at a significantly higher rate than ordinary emergency services. To capitalize on this upcharge, TeamHealth requires its providers to (1) meet stated critical care quotas each month; (2) falsify critical care on patient medical records when the care they provided did not meet CMS critical care requirements; and/or (3) perform and chart critical care services when those services were not medically necessary. Again "relying" on falsified medical records, TeamHealth coding and billing employees submit claims for reimbursement for the critical care services reflected in the patient chart.

8. TeamHealth employs this Scheme through its billing policies and practices to bill federal and state governments for millions of dollars for the services concerned. Through the Scheme, TeamHealth has fraudulently obtained multiple millions of dollars through the Critical Care Scheme each year since at least 2008 (when the critical care regulations were last updated).

9. Both of TeamHealth's Schemes clearly violate CMS's and the Plaintiff States' billing regulations and guidelines. TeamHealth perpetrates both Schemes on a nationwide basis. Additionally, both Schemes defraud CMS and the Plaintiff States of tens of millions of dollars each year, with the exact amount being known only to private accounting of the TeamHealth defendants. In this action, Relators seek damages, civil penalties, and other remedies under the FCA and analogous laws of the Plaintiff States arising from TeamHealth's two fraudulent Schemes.

(*Id.* ¶¶ 2–9 (emphasis in original).)

## II. LEGAL STANDARDS

### A. The False Claims Act

The FCA prohibits any person from defrauding the federal government. 31 U.S.C. §§ 3729 *et seq.* To aid in its enforcement, private persons may, in certain circumstances, sue for violations of the FCA on behalf of the United States. *Id.* at § 3730(b); *see also U.S. ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376 (5th Cir. 2009). These lawsuits are known as "*qui tam*" actions, and the person bringing the suit is referred to as the "relator." *Id. See also U.S. ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 351 (5th Cir. 2003).

Relators Hernandez and Whaley bring this *qui tam* action under two FCA provisions: 31 U.S.C. § 3792(a)(1)(A) and 31 U.S.C. § 3792(a)(1)(B). Section 3792 (a)(1)(A) imposes liability on "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3792 (a)(1)(A). Section 3792 (a)(1)(B) imposes liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3792 (a)(1)(B). Under either provision, the elements of a FCA violation are: "(1) . . . a false statement or fraudulent course of conduct; (2) [that] was made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out or to forfeit money due (i.e., that involve a claim)." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012).

### B. Pleading Standards

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive dismissal, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Thompson v. City of Waco, Texas*, 764 F.3d 500, 503 (5th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). This

means the "factual allegations must be enough to raise a right to relief above the speculative level," *Jabaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555), and "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Thompson*, 764 F.3d at 503 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court must accept all well-pleaded facts as true, view those facts in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *See Thompson*, 764 F.3d at 503 (citing *Iqbal*, 556 U.S. at 678). "[C]onclusory allegations and unwarranted factual inferences or legal conclusions are not accepted as true." *U.S. ex rel. Foster v. Bristol-Myers Squibb, Co.*, 587 F. Supp. 2d 805, 812 (E.D. Tex. 2008) (citing *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)); *see also U.S. ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003) ("[W]hile allegations may be based upon information and belief, 'the complaint must set forth the factual basis for such belief.'") (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

In resolving a Rule 12(b)(6) motion, the court may only consider (1) the contents of the complaint, (2) any matters of public record, and (3) matters that are incorporated by reference in the complaint. *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011). If the court considers matters outside the pleadings, then "the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d).

A complaint filed under the FCA must also meet the heightened pleading requirements of Rule 9(b).[2] *See U.S. ex rel. Colquitt v. Abbott Lab.*, 858 F.3d 365, 371 (5th Cir. 2017) (internal

---

[2] In the Fifth Circuit, a motion to dismiss under Rule 9(b) is treated as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F. 3d 899, 901 (5th Cir. 1997). This means the pleading must contain "'simple, concise and direct' allegations of the 'circumstances constituting fraud,'

citation omitted). Rule 9(b) provides that a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). At a minimum, this requires a plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). This is often referred to as the "who, what, when, where, and how of the alleged fraud." *Colquitt*, 858 F.3d at 371 (citing *Williams*, 112 F.3d at 179). These particularity requirements serve four important screening functions: "[1] [they] ensur[e] the complaint 'provides defendants with fair notice of the plaintiffs' claims; [2] [they] protect[] defendants from harm to their reputation and goodwill; [3] [they] reduce[] the number of strike suits; and [4] [they] prevent[] plaintiffs from filing baseless claims [and] then attempting to discover unknown wrongs.'" *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)).

The Fifth Circuit applies Rule 9(b) "with 'bite' and 'without apology,'" *id.* at 185, but also recognizes that the rule is "context-specific." *Id.* at 188. "[T]here is no single construction of Rule 9(b) that applies in all contexts," and the specificity demanded will "depend[] on the elements of the claim at hand." *Id.* In FCA cases, Rule 9(b) should be applied in a way that still "effectuates [the Rule] without stymieing . . . legitimate efforts to expose fraud." *Grubbs*, 565 F.3d at 190. Therefore, if a relator cannot sufficiently plead the details of an actually submitted false claim, the complaint "may nevertheless survive [dismissal] by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* This only means that a relator need not plead the specific contents of an

---

which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009).

7

individual false claim to satisfy Rule 9(b). *Id.* (explaining that "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted" because "[f]raudulent presentment [under the FCA] requires proof only of the claim's falsity, not of its exact contents"). A relator must still plead with particularity the circumstances constituting the fraud—*i.e.*, the who, what, where, when, and how. *Id. See also U.S. ex rel. Parikh v. Citizens Med. Ctr.,* 977 F. Supp. 2d 654, 671 (S.D. Tex. 2013) ("*Grubbs* makes clear that it is the scheme, rather than individual instances of fraudulent claims, that an FCA relator must plead with particularity. . . But although the *Grubbs* court relaxed the standard for pleading presentment of false claims . . . it did not relax the pleading requirements for alleging the existence of the more crucial element—the scheme.").

## III. DISCUSSION

Defendants move to dismiss the FAC under Federal Rules of Civil Procedure 12(b)(6) and 9(b). (Dkt. No. 37.)[3] They assert that Relators only provide "conclusory allegations of misconduct" and fail to allege any particularized facts that identify the "who, what, where, when, and how" of each alleged scheme. (*Id.* at 1–2.) According to Defendants, "Relators do not plead . . . with any remote specificity the who (to which patients the allegedly upcoded services were provided, or the individuals who knowingly submitted the false claims), the when (the specific dates on which the services were provided); the where (the particular locations the upcoded services were provided), or the how (the mechanics of actually billing a false claim)." (*Id.* at 12; *see also id.* at 15.) Instead, the FAC contains "boilerplate" language that "ask[s] the Court to draw

---

[3] Defendants' arguments under Rules 12(b)(6) and 9(b) are directed to both Relators' federal and state law claims. (Dkt. No. 37 at 26–27.) Since liability under both sets of claims are premised on the same basic elements and are both held to the same pleading requirements, the Court's analysis is limited to only the federal claims. *See U.S. ex rel. Colquitt v. Abbott Lab.*, 858 F.3d 365, 537–38 (5th Cir. 2017).

the sweeping inference that TeamHealth systematically" submits false claims to the government under each scheme. (*Id.* at 12; *see also id.* at 15.) Defendants believe these allegations fail to meet the heightened pleading requirements of Rule 9(b) and should be dismissed in their entirety.

Relators claim that they have plead the "who, what, where, when, and how" of each alleged scheme. (Dkt. No. 46 at 13–22.)[4] For the "who," Relators explain that "TeamHealth" is responsible for the alleged fraud. (*Id.* at 13, 19.) They contend that specific individuals do not have to be identified because Defendants perpetuated each scheme through "company-wide policies" that "were not the product of a single employee." (*Id.* at 13.) For the "where," Relators argue that each scheme occurred "nationwide" based on: (1) Relators' experience at TeamHealth emergency departments in Colorado and the Virgin Islands; and (2) the "national" and "standardized" nature of TeamHealth's billing and coding practices. (*Id.* at 15, 20–21.) As to "when," Relators allege that the Mid-Level Scheme began "in or around 2002 (the year the 85% regulation was established)" and that the Critical Care Scheme began "since at least 2008 (when the critical care regulations were last updated)." (*Id.* at 16, 21.) Relators rely on their personal experience at TeamHealth locations from 2010 to 2015 to support these allegations. (*Id.* at 16–17, 21.) Finally, Relators claim that they have provided detailed allegations for the "what" and "how"

---

[4] Relators also argue that Defendants apply the incorrect legal standard in their Motion. (Dkt. No. 46 at 10–12.) According to Relators, Defendants apply the minority rule, which requires "specific allegations of at least one false claim actually submitted for reimbursement." (*Id.* at 11.) Relators explain that the Fifth Circuit has rejected this approach, and that Rule 9(b) may be satisfied without alleging the details of any specific claims actually submitted. (*Id.* at 10 (citing *Grubbs*, 565 F.3d at 190).) Having reviewed the parties' briefing, the Court finds that Defendants applied the correct legal standard. While Defendants do state in their Motion that Relators allegedly failed to plead with particularity the facts of any specific false claims submitted, the substance of their arguments falls in line with Fifth Circuit precedent: a complaint alleging violations of the FCA must plead with particularity the "who, what, where, when, and how" of the alleged fraud and contain factual allegations to support a strong inference that false claims were submitted to the government. (*See* Dkt. No. 37 at 11–17; Dkt. No. 51 at 2.)

9

of each alleged scheme. For the Mid-Level Scheme, Relators point to allegations "describing the operations of [the] CMS system in detail ([Dkt. No. 33] ¶¶ 22–31, 44–54); the TeamHealth billing policies and practices used to effectuate [the] Scheme ([*id.*] ¶¶ 36–43, 55–56); the ways in which TeamHealth aimed those billing policies at the federally-reimbursed healthcare system ([*id.*] ¶¶ 57–74); the different roles and functions that medical providers serve in completing charts and placing them into the TeamHealth revenue stream ([*id.*] ¶¶ 57–74); and confirmatory accounts of three confidential witnesses ([*id.*] ¶¶ 63–74)." (Dkt. No. 46 at 19.) Similarly, for the Critical Care Scheme, Relators allege that TeamHealth: (1) imposes "unrealistic critical care quotas;" (2) "threatens to pay-dock, suspend, or terminate those providers who fail to meet such quotas;" (3) "requires" its clinicians "to provide [critical care] documentation for encounters in which critical care treatment was not necessary" in order "to capitalize" on critical care billing; and (4) redefines what constitutes critical care to capture services that are not medically necessary. (*Id.* at 21.) Taken together, Relators believe these allegations are sufficient under Rules 12(b)(6) and 9(b).

Having considered the parties' arguments and after a careful review of the FAC, the Court finds that Relators have not satisfied the strict and heightened pleading requirements of Rule 9(b).[5,6]

---

[5] Defendants also move to dismiss under the Public Disclosure Bar and the statute of limitations. (Dkt. No. 37 at 17–26.) Since the FAC fails to satisfy the pleading requirements of Rule 9(b), the Court does not reach these alternative grounds for dismissal.

[6] Both parties incorporate matters outside the pleadings in their respective briefing. (Dkt. No. 46-1 (Declaration of Relator Hernandez); Dkt. No. 46-2 (Declaration of Relator Whaley); Dkt. No. 51 at 7–8 (discussion of Colorado state law regulations concerning physician-assistant performed services).) "It is well known that when 'matters outside the pleading' are presented with a motion to dismiss under 12(b)(6), a district court has complete discretion to either accept or exclude the evidence." *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. Appx. 775, 783 (5th Cir. 2007) (internal citation omitted); *see also* FED. R. CIV. P. 12(d). The Court, in exercising its discretion, declines to consider those outside materials and resolves the present Motion solely on the pleadings. (*See also* Dkt. No. 51 at 2 n.2 ("[B]oth parties agree the Motion should not be converted into a motion for summary judgment.").)

First, Relators do not adequately identify the "who" of each scheme. Rule 9(b) requires that "the identity of the person making the misrepresentation must be stated in the complaint." *Gregory v. Hous. Indep. Sch. Dist.*, No. H-14-2768, 2016 WL 56610701, at *5 (S.D. Tex. Sept. 30, 2016) (quoting *U.S. ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003)). This standard is met where a general scheme is alleged "so long as specific or representative examples of entities involved in the scheme are also offered." *Id.* (citation omitted). No such representative sample is alleged here. Instead, Relators allege "TeamHealth" without identifying any specific TeamHealth-affiliated hospital, practice group, agent, or clinician. Relators base their FAC on experiences at TeamHealth hospitals in Colorado and the Virgin Islands, but do not tie any specific experiences at those facilities relating to either scheme. (Dkt. No. 33 ¶¶ 10–11.) *See Gregory*, 2016 WL 56610701, at *5 (finding complaint against corporate entities deficient because "Relators fail[ed] to provide even a representative example of an individual involved in the fraudulent scheme as part of a specific or representative example"); *U.S. ex rel. Bennett v. Boston Scientific Corp.*, No. H-07-2467, 2011 WL 1231577, at *30 (S.D. Tex. Mar. 31, 2011) ("The relator has not identified any hospital or physician who did in fact 'upcode' improperly in a Medicare reimbursement submission. . . . [A]lthough the Fifth Circuit qualified the 'time, place, and contents' requirements in *Grubbs*, the relator's complaint in this case is still deficient.") (internal citation omitted).

Relators also fail to plead with particularity "when" each scheme occurred. To satisfy Rule 9(b), "allegations must be more specific than a course of years." *Gregory*, 2016 WL 56610701, at *5; *see also U.S. ex rel. Wismer v. Branch Banking and Trust Co.*, No. 3:12-cv-1894, 2013 WL 5989312, at *5 (N.D. Tex. Nov. 12, 2013) ("[The Complaint] also fails to adequately allege when the false representations were made, vaguely asserting that false claims were submitted in '2010,'

11

'December 2010,' and 'numerous occasion subsequent' to these dates."). While it is not necessary to provide the date of each and every fraudulent occurrence over a multi-year period, a relator must at least allege "a 'representative sample' or even an 'instance of submission.'" *Bennett*, 2011 WL 1231577, at * 17 (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509–10 (6th Cir. 2007)). The FAC contains no such allegations. Instead, Relators assert that the Mid-Level Scheme began "in or around 2002" and that the Critical Care Scheme began "since at least 2008." (Dkt. No. 33 ¶¶ 6, 8.) Relators must allege more than a span of years.

The allegations also fail under Rule 12(b)(6). Relators claim that each scheme occurred in 2002 and 2008, respectively, because that is when the at-issue Medicare regulations were established. (Dkt. No. 33 ¶¶ 6, 8.) However, Relators were employed by Defendants from 2010 to 2015, and offer *no facts* to support that either scheme occurred before 2010.[7] The Court will not rely on speculation to reach unwarranted factual inferences or conclusions covering those interim years. *See Wismer*, 2013 WL 5989312, at *6 ("Here, Wismer neither contends that these facts are peculiarly within BB & T's knowledge nor sets forth the factual basis for his conclusory belief. Accordingly, these allegations fall short of meeting the Rule 9(b) standard."); *see also Foster*, 587 F. Supp. 2d at 812.

The Court reaches much the same conclusions as to Relator's allegations of "where" the fraud occurred. Relators broadly allege that Defendants have violated the FCA "nationwide" based on their experiences at TeamHealth hospitals in Colorado and the Virgin Islands. (Dkt. No. 46 at 15–26, 20–21.) Like the "who" and "when" of each scheme, Relators provide no facts about their experiences at those locations to support a plausible claim of nationwide fraud. At most, they

---

[7] For the Mid-level Scheme, Relators offer accounts from three confidential witnesses. (Dkt. No. 33 ¶¶63–74.) However, those witnesses were employed by Defendants from 2011 to 2015, collectively. As such, the Court reaches the same conclusion.

allege that Defendants' billing and coding practices are the impetus of each scheme and that those policies are "national" and "standardized." (*Id.* at 15.) Relators also rely on accounts from three confidential witnesses for the Mid-Level Scheme, but those allegations are equally vague and conclusory. (Dkt. No. 33 ¶¶63–74.) *See U.S. ex rel. Bibby v. Wells Fargo Bank, N.A.*, 165 F. Supp. 3d 1340, 1347–49 (N.D. Ga. 2015) (upholding nationwide claims of fraud because relators plead facts regarding their "years of experience in the mortgage industry" and how "[t]hat experience spans across almost the entire South all the way to Texas"); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 177 (E.D. Pa. 2012) (upholding nationwide claims of fraud given "the sheer number of claims identified by Plaintiff in at least three states and Puerto Rico").

Finally, the FAC does not provide sufficient facts to support the "what" and "how" of the Critical Care Scheme. Relators allege that Defendants "require" clinicians to code for services as "critical care" when no such services were rendered. (Dkt. No. 33 ¶ 88.) Relators also allege that Defendants set critical care quotas, and "redefine[] what constitutes critical care for its healthcare providers" "to capitalize" on critical care billing. (*Id.* ¶¶ 86, 88–89.) The FAC defines "requires" in a footnote to mean "that TeamHealth has made the issue concerned a protocol, business practice, policy, procedure, matter of training, and/or something that can be, and is, used to threaten employment if there they do not comply." (*Id.* ¶ 4 n.4.) Nowhere do Relators allege why the services billed as "critical care" are unnecessary or provide an example of such. Nor do Relators provide any facts about Defendants' alleged "requirement" that physicians code certain services as "critical care." These allegations are conclusory. They fail to contain the necessary detail to establish the "what" and "who" of the alleged fraud. *See Colquitt*, 858 F.3d at 373; *see also Gregory*, 2016 WL 56610701, at *4 (finding relators' allegation that defendants provided

"medically unnecessary" services conclusory because relators did not "specify[] why the services are medically unnecessary or even provide an example of a service that was provided").[8]

Even though the FAC fails to meet the pleading standards of Rules 12(b)(6) and 9(b), the Court believes that Relators should be granted leave to amend before dismissing the case with prejudice. *See U.S. ex rel. Adrian v. Regents of Univ. of California*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, Fed. R. Civ. P. 15(a), and outright refusal to grant leave to amend without a justification such as 'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' is considered an abuse of discretion.") (internal citation omitted). In this case, there is no showing of any basis upon which leave to amend might be refused.

## IV. CONCLUSION

For the reasons described herein, the Court **GRANTS** Defendants Team Health Holdings, Inc., Team Finance, LLC, Team Health, Inc., and AmeriTeam Services, LLC's Motion to Dismiss the Relators' First Amended Complaint (Dkt. No. 37). The Relators' First Amended Complaint (Dkt. No. 33) is **DISMISSED WITHOUT PREJUDICE**. It is further **ORDERED** that Relators are granted leave to replead their claims by filing a second amended complaint, with such second amended complaint to be filed within 30 days from the date of the issuance of this Order.

---

[8] To be clear, Relators are not required to offer factual allegations tantamount to *proof* of an FCA violation at this stage of the proceedings. However, they must provide some underlying facts to support a *reasonable inference* that a violation occurred. *See Gregory*, 2016 WL 5661701, at *7 ("The first amended complaint does not provide enough factual basis for the court to infer these poor educational outcomes were caused by HISD's alleged fraudulent scheme without providing the factual basis to support that conclusion.").

**So ORDERED and SIGNED this 20th day of August, 2019.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE