IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ET AL., EX REL. CALEB HERNANDEZ & JASON WHALEY, RELATORS; | § § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § | CIVIL ACTION NO. 2:16-CV-00432-JRG |
| TEAM FINANCE, L.L.C., TEAM HEALTH, INC., TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, L.L.C., HCFS HEALTH CARE FINANCIAL SERVICES, L.L.C., & QUANTUM PLUS, L.L.C. | § § § § § § § | |
| *Defendants*. | § | |

## **MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants Team Health Holdings, Inc., Team Finance, L.L.C., Team Health, Inc., AmeriTeam Services, L.L.C., HCFS Health Care Financial Services, L.L.C. and Quantum Plus, L.L.C.'s (collectively, "TeamHealth" or "Defendants") Motion to Dismiss Relators' Second Amended Complaint (the "Motion"). (Dkt. No. 85.) Having considered the Motion, the briefing, and the relevant authorities, the Court is of the opinion that the Motion should be and hereby is **DENIED**.

**I.   BACKGROUND**

    **A.  Procedural History**

On April 25, 2016, Relators Caleb S. Hernandez and Jason W. Whaley (collectively, "Relators") filed suit against Defendants Team Health Holdings, Inc., Team Finance, L.L.C. , and Team Health, Inc. under the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729

*et seq.* ("FCA"), and analogous state statutes.[1] (Dkt. No. 1.) On June 28, 2018, the United States of America and the Plaintiff state governments declined to intervene. (Dkt. No. 20.) Relators subsequently amended the Complaint on November 12, 2018 (the "First Amended Complaint" or "FirstAC") to add AmeriTeam Services, L.L.C. as a defendant. (Dkt. No. 33.)

On December 3, 2018, Defendants moved to dismiss the FirstAC under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b) (the "Motion to Dismiss the FirstAC"). (Dkt. No. 37.) The Court granted the Motion to Dismiss the FirstAC on the basis that it had failed to satisfy the pleading requirements under Rule 9(b). (Dkt. No. 81.) However, the Court granted the Relators leave to replead their claims. (*Id*. at 14.)

Relators subsequently filed its Second Amended Complaint ("SecondAC") on September 19, 2019. (Dkt. No. 83.) Defendants now move to dismiss the SecondAC under Federal Rules of Civil Procedure 12(b)(6), 8(a), and 9(b). (Dkt. No. 85.)

### B. The Parties and the Alleged Fraud

TeamHealth is a healthcare practice management company that "provides staffing, operations, and billing services to emergency departments as an outside contractor." (Dkt. No. 83 ¶1.) According to Relators, TeamHealth "is one of the largest suppliers of outsourced physician staffing and administrative services to hospitals in the United States, . . . operates in at least forty-seven states, and employs at least 13,000 healthcare professionals." (*Id*. ¶16.)

Relators are healthcare providers that formally worked for TeamHealth as independent contractors. (*Id.* ¶¶14–15.) Relator Hernandez is a physician and has worked "at the following hospital emergency departments managed and/or operated by TeamHealth: the North Colorado Medical Center in Greely, Colorado (from 2011 to 2015); Sterling Regional Medical Center in

---

[1] Relators also sued Defendants on behalf of the following state governments: Connecticut, Florida, Georgia, Indiana, Louisiana, Massachusetts, Tennessee, and Texas. (Dkt. Nos. 1, 33, 83.)

2

Sterling, Colorado (from 2014 to 2015); and Juan Luis Phillipe Hospital in St. Croix, United States Virgin Islands (in 2010)." (*Id*. ¶14.) Relator Whaley is a physician assistant and worked "at the emergency department at North Colorado Medical Center, located in Greely, Colorado (from 2011 to 2013), which was and is operated and/or managed by TeamHealth." (*Id.* ¶15.)

Relators allege that TeamHealth has engaged in two schemes to defraud Medicare and several state Medicaid programs. The introductory paragraphs from the Relators' SecondAC succinctly summarize each alleged scheme:

> **2. The first Scheme is the "Mid-Level Scheme."** Under the Mid-Level Scheme, TeamHealth overbills for services provided by "mid-level" practitioners. The term "mid-level" refers to non-physician healthcare providers, such as Physician Assistants ("PAs") and Nurse Practitioners ("NPs"). Under Centers for Medicare and Medicaid Services ("CMS") rules, a mid-level's services are reimbursed at 85% of the standard physician rate, while services rendered by a physician are reimbursed at 100% of the standard physician rate. These rates and percentages are set by CMS, and the Plaintiff States have largely, if not entirely, adopted these same rates and percentages for reimbursement.
>
> 3. The appropriate rate payable for service rendered to a CMS beneficiary is automatically triggered by the National Provider Identifier ("NPI") submitted with the claim for reimbursement. Services rendered by a mid-level should be submitted under the mid-level's NPI, triggering the 85% rate. Services rendered by a physician should be submitted under the physician's NPI, triggering the 100% rate. However, as outlined in ¶¶ 2-7, herein, and stated with more particularity in §§ V-IV, *infra* (principally § V.B), TeamHealth—*through its billing policies, procedures, and protocols* (which include training and guidelines)*, and through its coordinated operation and influence over its subsidiaries and affiliated professional entities*—systematically submits claims for mid-level services under various physicians' NPIs (*as assigning charts to a physician by a midlevel is usually based on shift assignments and how shifts overlap*), triggering the 100% rate when in fact the 85% rate applied. TeamHealth does this intentionally and has done so for years.
>
> 4. Through its billing policies and practices, TeamHealth attempts to cover up the Mid-Level Scheme by characterizing mid-level services as "split/shared." Under CMS rules, "split/shared" services occur when both a mid-level and a physician treat the same patient during the same visit, such that the services are split or shared between a mid-level and a physician. When this happens, the mid-level's services may be billed under the physicians' NPI at 100% of the physician rate. However, true split/shared visits are exceedingly rare at TeamHealth facilities—they almost *never* occur. This is because TeamHealth requires mid-levels to treat patients alone, maximizing mid-levels'

3

efficiency and profitability. To cover this up, TeamHealth requires its healthcare providers to falsify medical records to reflect a split/shared visit when none actually occurred.

5. TeamHealth accomplishes this cover-up in two ways. First, TeamHealth requires its mid-levels to indicate on medical records that a physician was involved in each patient encounter, when in fact a physician never saw the patient. For example, an August 11, 2011 email from TeamHealth West mid-level, Chuck Nemejc, indicates that TeamHealth mid-levels must add supervising physicians to patient charts. For each patient Relator Whaley saw, TeamHealth instructed him to list as his supervising physician that physician whose shift most closely paralleled his shift, whether or not that physician ever saw the patient or had any interaction with Relator regarding the patient. Relator Whaley complied with this policy daily while he worked for TeamHealth so that he would not lose his job.

6. Second, TeamHealth requires on-duty physicians to sign mid-level medical records, again suggesting that the physician treated the patient. TeamHealth's formal policy (as adopted on October 5, 2011 at the North Colorado Medical Center Emergency Department) requires that physicians "**for billing purposes**… review and sign all charts forwarded to them within 48 hours of the encounter, regardless of whether they saw the patient or not." (emphasis added). Relator Dr. Hernandez complied with this policy daily at every TeamHealth location at which he worked by signing patient charts regardless of whether he saw the patient or not—so that he would not lose his job. The result is a medical record that appears to indicate that a split/shared visit occurred. TeamHealth then sends these falsified medical records to a coding and billing employee who "relies" on the falsified record to submit claims for reimbursement under the physician's NPI. This results in the mid-level's services being reimbursed at 100% of the physician rate.

7. TeamHealth employs this Scheme through its billing policies and practices to bill federal and state governments for millions of dollars for the services concerned. Through the Scheme, TeamHealth has fraudulently obtained tens of millions of dollars every year since at least 2011 (the year Relators began working for TeamHealth). Based on information and belief (and the specific example in ¶ 93 *infra*), TeamHealth began employing the Scheme much earlier than 2011 and continues to employ the Mid-Level Scheme today.

**8. The second Scheme is the "Critical Care Scheme."** This Scheme is a classic upcoding scheme. Under the Critical Care Scheme, TeamHealth bills CMS for "critical care"—the highest level of emergency treatment reserved for life-threatening situations—when in fact critical care services were not rendered and/or were not medically necessary, thereby submitting false claims through fraudulent billing. For example, in an April 2014 email from TeamHealth West Associate Medical Director Elisa Dannemiller, Relator Dr. Hernandez was told, "Just a reminder to keep up the critical care billing! Abnormal vital signs, ICU admits, blood transfusions, trauma activations, and IV ggts all warrant critical care. We are still

missing some obvious opportunities…" However, these situations Dannemiller lists do not necessarily, and likely do not, require critical care in every instance because they do not necessarily meet the CMS definition for "critical care." Yet Dannemiller told healthcare providers that all of these situations warrant critical care every time. Dannemiller also explained in an October 2, 2013 PowerPoint presentation, "[y]ou can bill for critical care and send the patient home!" And in an October 26, 2014 email, Dannemiller imposed critical care billing quotas at 6-12%.

9. Because of the heightened skill and decision-making critical care requires, CMS reimburses providers for critical care services at a significantly higher rate than ordinary emergency services. To capitalize on this up-charge, TeamHealth requires its providers to (1) meet stated critical care quotas each month; (2) falsify critical care on patient medical records when the care they provided did not meet CMS critical care requirements; and/or (3) perform and chart critical care services when those services were not medically necessary. Again "relying" on falsified medical records, TeamHealth coding and billing employees submit claims for reimbursement for the critical care services reflected in the patient chart.

10. TeamHealth employs this Scheme through its billing policies and practices to bill federal and state governments for millions of dollars for the services concerned. Through the Critical Care Scheme, TeamHealth has fraudulently obtained multiple millions of dollars *each year* since at least 2011 (when Relators began working for TeamHealth). Based on information and belief, TeamHealth began the Scheme much earlier than 2011 and continues to employ the Critical Care Scheme today.

11. TeamHealth is able to conceal these fraudulent claims because a critical care claim is a "pass through" claim for billing purposes, meaning there is no front-end auditing of these charges. For example, the April 2, 2014 TeamHealth Meeting Minutes reveal the following findings from a meeting regarding charting and billing: "Critical care billing has tapered to 3% compliance in February. There is significant variability in billing for those services and continued efforts are occurring to reach the desired 5-8%. Anything that can be done to enhance charting to collect more through billing is greatly appreciated and *members noted that this type of charge is a pass through for billing, noting there is no auditing of these charges.*" (emphasis added).

12. Both of TeamHealth's Schemes clearly violate CMS's and the Plaintiff States' billing regulations and guidelines. TeamHealth perpetrates both Schemes on a nationwide basis. For example, evidence of the Mid-Level Scheme on a nationwide basis is seen in a January 31, 2012 email from a Kansas-based TeamHealth administrator, Jan Hook, to Relator Dr. Hernandez at the Colorado TeamHealth facility requiring Relator Dr. Hernandez to co-sign a patient chart. Further, in a May 24, 2013 email from Gloria Brunette, a TeamHealth Site Coordinator located in Arizona, Brunette requests "Supporting Physician Documentation" for multiple mid-level charts from Relator Dr. Hernandez. And in a May 6, 2011 email from TeamHealth West's California facility employee, Kathryn E. Moreno, to Relator Whaley and others, Moreno explains that TeamHealth's North Colorado facility will soon implement

5

a new Chart Documentation system. An example of the nationwide scope of the Critical Care Scheme is seen in an April 10, 2013 email from a Texas-located TeamHealth administrator, Kim-Diep Do. In the email, Do encourages TeamHealth providers to bill critical care and points out the loss of money (*i.e.,* "*loss of **RVUs***") when providers fail to bill critical care.

13. Both Schemes also defraud CMS and the Plaintiff States of tens of millions of dollars each year, with the exact amount being known only to private accounting of the TeamHealth defendants. In this action, Relators seek damages, civil penalties, and other remedies under the FCA and analogous laws of the Plaintiff States arising from TeamHealth's two fraudulent Schemes.

(*Id.* ¶¶ 2–13 (emphasis in original).)

## II. LEGAL STANDARDS

### A. The False Claims Act

The FCA prohibits any person from defrauding the federal government. 31 U.S.C. §§ 3729 *et seq.* To aid in its enforcement, private persons may, in certain circumstances, sue for violations of the FCA on behalf of the United States. *Id.* at § 3730(b); *see also United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 376 (5th Cir. 2009). These lawsuits are also known as "*qui tam*" actions, and the person bringing the suit is properly referred to as the "relator." *Id.; see also United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs. Co.*, 336 F.3d 346, 351 (5th Cir. 2003).

Relators bring this *qui tam* action under two FCA provisions: 31 U.S.C. § 3792(a)(1)(A) and 31 U.S.C. § 3792(a)(1)(B). (Dkt. No. 95 ¶¶133, 142.) Section 3792 (a)(1)(A) imposes liability on "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3792 (a)(1)(A). Section 3792 (a)(1)(B) imposes liability on "any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3792 (a)(1)(B). Under either provision, the elements of a FCA violation are: "(1) . . . a false statement or fraudulent course of conduct; (2) [that] was made or carried out with the requisite scienter; (3) that was material; and (4) that caused

6

the government to pay out or to forfeit money due (*i.e.*, that involve a claim)." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012).

### B. Pleading Standards

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive dismissal, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Thompson v. City of Waco, Texas*, 764 F.3d 500, 503 (5th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). This means the "factual allegations must be enough to raise a right to relief above the speculative level," *Jabaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555), and "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Thompson*, 764 F.3d at 503 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The court must accept all well-pled facts as true, view those facts in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *See Thompson*, 764 F.3d at 503 (citing *Iqbal*, 556 U.S. at 678). "[C]onclusory allegations and unwarranted factual inferences or legal conclusions are not accepted as true." *United States ex rel. Foster v. Bristol-Myers Squibb, Co.*, 587 F. Supp. 2d 805, 812 (E.D. Tex. 2008) (citing *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)); *see also United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003) ("[W]hile allegations may be based upon information and belief, 'the complaint must set forth the factual basis for such belief.'") (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

In resolving a Rule 12(b)(6) motion, the court may only consider (1) the contents of the complaint, (2) any matters of public record, and (3) matters that are incorporated by reference in the complaint. *See Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).

7

If the court considers matters outside the pleadings, then "the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d).

A complaint filed under the FCA must also meet the heightened pleading requirements of Rule 9(b).[2] *See United States ex rel. Colquitt v. Abbott Lab.*, 858 F.3d 365, 371 (5th Cir. 2017) (internal citation omitted). Rule 9(b) provides that a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). At a minimum, this requires a plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). This is often referred to as the "who, what, when, where, and how of the alleged fraud." *Colquitt*, 858 F.3d at 371 (citing *Williams*, 112 F.3d at 179). These particularity requirements serve four important screening functions: "[1] [they] ensur[e] the complaint 'provides defendants with fair notice of the plaintiffs' claims; [2] [they] protect[] defendants from harm to their reputation and goodwill; [3] [they] reduce[] the number of strike suits; and [4] [they] prevent[] plaintiffs from filing baseless claims [and] then attempting to discover unknown wrongs.'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (quoting *Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994)).

The Fifth Circuit applies Rule 9(b) "with 'bite' and 'without apology,'" but also recognizes that the rule is "context-specific." *Id.* at 185, 188. "[T]here is no single construction of Rule 9(b) that applies in all contexts," and the specificity demanded will "depend[] on the elements of the

---

[2] In the Fifth Circuit, a motion to dismiss under Rule 9(b) is treated as a dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F. 3d 899, 901 (5th Cir. 1997). This means the pleading must contain "'simple, concise and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *Grubbs*, 565 F.3d at 186.

8

claim at hand." *Id.* In FCA cases, Rule 9(b) should be applied in a way that still "effectuates [the Rule] without stymieing . . . legitimate efforts to expose fraud." *Grubbs*, 565 F.3d at 190. Therefore, if a relator cannot sufficiently plead the details of an actually submitted false claim, the complaint "may nevertheless survive [dismissal] by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* This means that a relator need not plead the specific contents of an individual false claim to satisfy Rule 9(b). *Id.* (explaining that "a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted" because "[f]raudulent presentment [under the FCA] requires proof only of the claim's falsity, not of its exact contents"). A relator, however, must still plead with particularity the circumstances constituting the fraud—*i.e.*, the who, what, where, when, and how. *Id. See also United States ex rel. Parikh v. Citizens Med. Ctr.,* 977 F. Supp. 2d 654, 671 (S.D. Tex. 2013) ("*Grubbs* makes clear that it is the scheme, rather than individual instances of fraudulent claims, that an FCA relator must plead with particularity. . . But although the *Grubbs* court relaxed the standard for pleading presentment of false claims . . . it did not relax the pleading requirements for alleging the existence of the more crucial element—the scheme.").

### III. DISCUSSION

TeamHealth moves to dismiss the SecondAC under Federal Rules of Civil Procedure 12(b)(6), 8(a), and 9(b). (Dkt. No. 85.)[3] TeamHealth asserts that Relators have failed to follow the road map set out for them in the Court's previous order dismissing the FirstAC as the SecondAC is filled with "irrelevant" information that does not relate to "specific experiences of false coding

---

[3] Defendants' arguments under Rules 12(b)(6) and 9(b) are directed to both Relators' federal and state law claims. (Dkt. No. 85 at 28.) Since liability under both sets of claims are premised on the same basic elements and are both held to the same pleading requirements, the Court's analysis is limited to only the federal claims. *See Colquitt*, 858 F.3d at 537–38.

9

or billing . . . nor does it tie back to a single false or fraudulent request for payment to a government payor." (*Id.* at 1–2.) Additionally, TeamHealth argues that Relators fail to state a claim under Rule 8(a) for the Mid-Level Scheme. (*Id.* at 17.) Finally, TeamHealth contends that some of Relators' claims are barred by the FCA statute of limitations. (*Id.* at 26.)

### A. Rule 9(b)

First, Defendants argue that Relators have failed to set forth their claims with the particularity required setting out the "who, what, when, where, and how" of the Mid-Level Scheme. (*Id.* at 9.) Defendants contend that the SecondAC's recitation of individuals employed by TeamHealth-affiliated entities is insufficient because none of the facts pled show that these individuals were directly involved in the making of a misrepresentation. (*Id.* at 11–12.) Defendants further contend that the SecondAC fails to adequately plead where such misrepresentations occurred beyond stating where such employees are located. (*Id.* at 13.) As for the "when" of the misconduct, the Defendants argue that the SecondAC alleges nothing more than a course of years over which the conduct occurred. (*Id.*) As for the "what" and "how" of the scheme, the Defendants argue that the Relators failed to include any type of particularized information connecting their allegations to a single claim falsely billed to a government payor. (*Id.* at 17.)

Likewise, Defendants argue that the Relators also failed to plead the Critical Care Scheme with particularity. Defendants contend that the SecondAC only identifies one clinician in the performance of critical care and in that instance such complaint does not allege that the clinician actually billed critical care time. (*Id.* at 22.) Further, the Defendants argue that none of the critical care allegations detail where or when the particular allegations occurred. (*Id.*) As for the "what" and "how" of the critical care scheme, Defendants argue that the current complaint does not include any allegations of what pressure was being applied to the doctors coding critical care, who applied such pressure, or how such coding was unethical or fraudulent. (*Id.* at 23.)

Relators respond that the SecondAC satisfies the particularity requirement imposed by Rule 9(b). (Dkt. No. 95 at 6.) First, Relators contend that the "who" element is satisfied by including a representative sample of individual participants in the Mid-Level Scheme. (*Id.* at 9.) As for the persons making the misrepresentations, Relators argue that the current complaint is clear that the employee-coders make misrepresentations by submitting bills to the government which contain reimbursement for mid-level services at the physician rate. (*Id.* at 10.)

Additionally, Relators respond that the SecondAC satisfies the "who" requirements by naming a representative sample of individuals and entities involved in the Critical Care Scheme. (*Id.* at 17.) Relators also contend that the SecondAC satisfies the "what" and "how" requirements by providing specific examples of the Critical Care Scheme and the associated course of conduct, most of which is provided from the Relators' individual experiences. (*Id.* at 19.) As for the "where" requirement, Relators contend they have observed the policies implementing the Critical Care Scheme in every facility in which they worked, and examples are provided to establish a nationwide scope. (*Id.* at 23.) Finally, the Relators contend the "when" requirement is satisfied because Relators pled the specific dates on which TeamHealth carried out the Critical Care Scheme. (*Id.* at 24.)

Having considered the parties' arguments and after careful review of the SecondAC, the Court finds that Relators have satisfied the strict and heightened pleading requirements of Rule 9(b) regarding both the Mid-Level Scheme and the Critical Care Scheme.

### 1. Relators sufficiently pled who was involved in the fraudulent schemes.

First, Relators adequately identify the "who" of each scheme. "It is acceptable to plead schemes generally, as long as specific or representative examples of entities involved in the scheme are also offered." *Gregory v. Hous. Ind. Sch. Dist.*, H-14-2768, 2016 WL 5661701, at *5 (S.D.

Tex. Sept. 30, 2016). In the FirstAC, Relators failed to identify any "specific TeamHealth-affiliated hospital, practice group, agent, or clinician." (Dkt. No. 81 at 11.) However, Relators have addressed this deficiency in the current complaint. Relators provide a list of individual participants in the Mid-Level Scheme all of whom are alleged to be involved in a fraudulent course of conduct that culminates in misrepresentations being made to CMS. (Dkt. No. 83 ¶¶76–95.) Furthermore, Relators provided specific examples of doctors signing patient charts for patients only seen by mid-level providers. (*Id.* ¶94.) Accordingly, Relators have adequately pled who was involved in the fraudulent scheme. *See United States ex rel. Bennett v. Boston Scientific Corp.*, No. H-07-2467, 2011 WL 1231577, at *30 (S.D. Tex. Mar. 31, 2011) (granting motion to dismiss because the relator failed to identify a hospital or physician who improperly coded a patient visit in a Medicare reimbursement submission).

Likewise, the Relators adequately pled who was involved in the Critical Care Scheme. Just as the SecondAC provides a list of participants in the Mid-Level Scheme, it also includes a list of participants in the Critical Care Scheme. (Dkt. No. 83 ¶131.) Additionally, the SecondAC includes examples of how those individuals were involved. (*Id.* ¶128 ("Elisa Dannemiller instructed Relator Dr. Hernandez to document critical care for 'chest pain' in every case. However, chest pain alone does not necessarily require critical care.").) Additionally, Relators allege that once this false critical care documentation is created, it is billed to CMS by TeamHealth's billing department. (*Id.* ¶130.) The Court is persuaded that the Relators sufficiently allege who is involved in making misrepresentations to CMS.

### 2. Relators sufficiently pled when the fraudulent schemes occurred.

Relators also sufficiently plead with particularity when each scheme occurred. As stated in this Court's Order dismissing the FirstAC, "[t]o satisfy Rule 9(b), 'allegations must be more

specific than a course of years.'" (Dkt. No. 81 at 11 (quoting *Gregory*, 2016 WL 5661701, at *5).) While it is not necessary to provide the date of each and every fraudulent occurrence over a multi-year period, a relator must at least allege a representative sample or an instance of submission. *Bennett*, 2011 WL 1231577, at *17. The Court previously found that Relators' allegations in the FirstAC of the Mid-Level Scheme occurring "in or around 2002" to be insufficient because Relators merely alleged a span of years. (Dkt. No. 81 at 12.) Relators have addressed this deficiency for both the Mid-Level and Critical Care Scheme in the SecondAC. For the Mid-Level Scheme, Relators provide patient charts which include the dates of service and the type of services rendered. (Dkt. No. 83 ¶76.) Furthermore, Relators identify a TeamHealth coder that worked as an Emergency Department Coder from February 2012 to August 2013, which provided a description of the billing system that records were likely entered into. (*Id.* ¶94.) Considered together, Relators have reduced their allegations of when the fraudulent conduct occurred to something more specific than a course of years.[4]

Similarly, Relators have satisfied the "when" requirement for the Critical Care Scheme. Relators allege specific dates on which they were encouraged to code critical care at higher rates than the national average and identified a specific date on which critical care was coded but allegedly was not medically necessary. (*Id.* ¶¶106, 109, 124, 125, 128, 129, 130.)

---

[4] The thrust of TeamHealth's argument concerning the "when" requirement is that Relators failed to provide allegations or evidence that false claims were actually submitted to government payors. (Dkt. No. 85 at 15.) However, there is no requirement that Relators show that false claims were actually submitted. Instead, Relators need only show the particular details of a scheme and allegations making it likely bills were actually submitted. *Grubbs*, 565 F.3d at 190–191 ("Confronting False Claims Act defendants with both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted—such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into—gives defendants adequate notice of the claims.").

### 3. Relators sufficiently pled where the fraudulent schemes occurred.

Relators have also addressed the deficiencies of the prior complaint as to where the fraud occurred. In the FirstAC, Relators broadly alleged that the Defendants violated the FCA "nationwide" based on their experiences with TeamHealth. (Dkt. No. 33 ¶9.) The Court found this allegation to be deficient because Relators provided no facts about their experiences at those locations to support a nationwide claim of fraud. (Dkt. No. 81 at 12.) In the SecondAC, Relators cure this defect by tying their individual experiences in TeamHealth facilities to the nationwide allegations and identifying involvement by people across the country. (Dkt. No. 81 ¶12 ("[E]vidence of the Mid-Level Scheme on a nationwide basis is seen in a January 31, 2012 email from a **Kansas**-based TeamHealth administrator, Jan Hook, to Relator Dr. Hernandez at the **Colorado** TeamHealth facility requiring Relator Dr. Hernandez to co-sign a patient chart. Further, in a May 24, 2013 email from Gloria Brunette, a TeamHealth Site Coordinator located in **Arizona**, Brunette requests "Supporting Physician Documentation" for multiple mid-level charts from Relator Dr. Hernandez. And in a May 6, 2011 email from TeamHealth West's **California** facility employee, Kathryn E. Moreno, to Relator Whaley and others, Moreno explains that TeamHealth's North **Colorado** facility will soon implement a new Chart Documentation system. An example of the nationwide scope of the Critical Care Scheme is seen in an April 10, 2013 email from a **Texas**-located TeamHealth administrator, Kim-Diep Do. In the email, Do encourages TeamHealth providers to bill critical care and points out the loss of money . . . when providers fail to bill critical care.") (emphasis added).) These allegations taken as true supports an inference that TeamHealth engaged in the alleged fraudulent conduct nationwide. *See United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 177 (E.D. Pa. 2012) (finding that a large number of claims identified in three states suggests a nationwide scheme); *see also United States v. Exec. Health*

14

*Res., Inc.*, 196 F. Supp. 3d 477, 496 (E.D. Pa. 2016) (finding that a Relator was not required to plead specific facts in every state in order to pursue nationwide claims).[5]

### 4. Relators sufficiently pled the "what" and "how" of the fraudulent schemes.

Finally, Relators have sufficiently pled the "what" and "how" of both the Mid-Level Scheme and the Critical Care Scheme. TeamHealth's argument that Relators fail to allege the "what" and "how" requirement under Rule 9(b) for the Mid-Level Scheme is not persuasive. TeamHealth argues that the bills and patient records referenced by Relators do not prove that false claims were ever submitted to government payors, and as such, Relators' allegations are not sufficiently particularized. (Dkt. No. 85 at 16–17.) However, this Court is of the opinion that Relators need not allege the details of a false claim that was actually submitted, so long as Relators allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *See Colquitt*, 858 F.3d at 372 (quoting *Grubbs*, 565 F.3d at 191).

Additionally, Relators have addressed the deficiencies concerning the "what" and "how" of the Critical Care Scheme identified in the Court's Order (Dkt. No. 81) addressing the FirstAC. In the Court's prior Order, the Court found Relators' allegations insufficient because Relators failed to "allege why the services billed as 'critical care' are unnecessary or provide an example of such." (Dkt. No. 81 at 13.) Additionally, the Court stated that Relators failed to "provide any facts about Defendants' alleged 'requirement' that physicians code certain services as 'critical care.'" (*Id.*) However, Relators now allege that TeamHealth instructed healthcare providers that certain situations "warrant critical care" in every instance despite the fact that those situations

---

[5] The Court finds that this analysis equally applies to the Critical Care Scheme. Thus, Relators have adequately pled the "where" of the Critical Care Scheme.

15

would not always warrant critical care coding. (Dkt. No. 81 ¶96.) Additionally, the SecondAC includes specific examples of doctors being pressured to code critical care "inappropriately," even on patients that were discharged. (*Id.* ¶125; *see also id.* ¶128 (alleging that health care providers were instructed to document critical care for "chest pain" in every case, although chest pain alone does not necessarily require critical care).) Accordingly, the Court finds that Relators have addressed the deficiencies in the prior complaint, and the current complaint meets the pleadings standards of Rule 9(b).

### B. Rule 8(a)

As a second ground for dismissal, TeamHealth argues that Relators fail to state a plausible claim for the Mid-Level Scheme under Rule 8(a). (Dkt. No. 85 at 17.) Specifically, TeamHealth argues that its requirement that physicians attest to supervising mid-level healthcare providers is in an effort to comply with federal[6] and state[7] law. (*Id.*) Accordingly, TeamHealth contends that Relators' fraud allegation is merely consistent with TeamHealth's liability and as such it stops short of a plausible entitlement to relief. (*Id.* (citing *Iqbal*, 556 U.S. at 678).) In other words, TeamHealth argues there is a lawful explanation for the alleged unlawful conduct.

Relators respond that there are no Medicare regulations that require physicians to sign mid-level charts and that the regulations cited by TeamHealth pertain to licensing requirements, not billing requirements. (Dkt. No. 95 at 25.) Additionally, the regulations referenced by TeamHealth are not applicable in every mid-level encounter. (*Id.* at 25–26.) For example, the cited regulations

---

[6] CMS regulations dictate that a physician assistant's physician supervisor need not be physically present with the physician assistant when a service is being furnished to a patient unless state law or regulations would otherwise require the physician's physical presence. Medicare Benefit Policy Manual, Chapter 15, Sec. 190.

[7] TeamHealth directs the Court's attention to Texas and Colorado provisions which require physician supervision of a physician assistant when performing medical functions in a hospital, but that such supervision does not require the physical presence of the supervising physician. (*Id.* at 19 (citing 22 Tex. Admin. Code § 185.14(a); Colo. Rev. Stat. § 12-36-106(5)(b)(II)).)

16

do not apply to nurse practitioners or, in the case of Colorado, to physician assistants who have been licensed for longer than six months, yet TeamHealth requires a physician signature in every instance. (*Id.*) Accordingly, Relators contend they have stated a plausible claim regarding the Mid-Level Scheme and the inclusion of physician signatures is not merely to comply with federal or state regulations.

The Court finds that Relators' factual allegations raise a right to relief above the speculative level. The SecondAC includes allegations that the purpose of obtaining physician signatures on mid-level charts was "for billing purposes" and these allegations are supported by references to internal TeamHealth communications. (Dkt. No. 81 ¶¶6, 77, 94.) These allegations give rise to a plausible inference that the physician signatures are being used to effectuate the Mid-Level Scheme.

### C. Statute of Limitations

Finally, TeamHealth argues that the FCA statute of limitations bars certain claims made by Relators. (Dkt. No. 85 at 26.) The FCA provides that a civil action may not be brought:

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b). TeamHealth contends that subsection (b)(2) only applies in instances where the United States has intervened in the *qui tam* action. (Dkt. No. 85 at 26–27.) Since the government did not intervene in this matter, TeamHealth argues any alleged violations committed

more than six years prior to the filing of the SecondAC are time-barred.[8] (*Id.* at 27.) Alternatively, TeamHealth argues that if subsection (b)(2) applies to nonintervened cases, a relator must have "raised concerns" with the government prior to filing the initial complaint in order for a relator to take advantage of the expanded statute of limitations provided by subsection (b)(2). (Dkt. No. 99 at 8–9.)

Relators respond that TeamHealth's reading of the FCA statute of limitations is misguided. (Dkt. No. 95 at 27.) Relators argue that subsection (b)(2)'s application is not limited to cases in which the government intervenes. (*Id.* at 28.) Relators argue that their allegations beginning in 2011 are within ten years of the Complaint being filed, and as such, Relators' claims are timely. (*Id.*) Finally, Relators argue that they did "raise concerns" prior to filing their Complaint and alleged that they did so in the SecondAC. (Dkt. No. 101 (citing Dkt. No. 83 ¶138 ("Relators . . . provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).")).)

The Court finds that Relators' claims viewed under the Rule 12(b)(6) standard are timely. Despite TeamHealth's assertion to the contrary, the United States Supreme Court has made clear that subsection (b)(2) "applies in nonintervened actions." *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1511–13 (2019). As a result, Relators may be entitled to the FCA's extended limitations period. Further, TeamHealth does not direct the Court to any affirmative showing in the SecondAC showing that Relators are not otherwise entitled. *See Doe v. Linam*, 225 F. Supp. 2d 731, 734 (S.D. Tex. 2002) ("A Rule 12(b)(6) motion to dismiss for failure to state a claim is the proper vehicle by which to assert a limitations defense where a plaintiff's

---

[8] TeamHealth makes an identical argument concerning Relators' state-law claims arguing that the same are barred by the relevant state-law statutes.

complaint shows affirmatively that his claims are time-barred."). Accordingly, the Court is of the opinion that a grant of Defendants' Rule 12(b)(6) motion on statute of limitations grounds would be improper.[9]

IV. **CONCLUSION**

For the reasons described herein, the Court **DENIES** Defendants Team Health Holdings, Inc., Team Finance, L.L.C., Team Health, Inc., AmeriTeam Services, L.L.C., HCFS Health Care Financial Services, L.L.C. and Quantum Plus, L.L.C.'s Motion to Dismiss Relators' Second Amended Complaint. (Dkt. No. 85.)

**So ORDERED and SIGNED this 12th day of February, 2020.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[9] Likewise, the Court declines to dismiss Relators' state-law claims on statute of limitations grounds. TeamHealth has failed to direct the Court to something apparent on the face of the current complaint which would serve as a time bar to Relators' state-law claims.