## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF CONNECTICUT, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF FLORIDA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF GEORGIA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | |
| STATE OF INDIANA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | Civil Action No. 2:16-CV-00432-JRG |
| STATE OF LOUISIANA, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § | **PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL** |
| COMMONWEALTH OF MASSACHUSETTS, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § § | |
| STATE OF TENNESSEE, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, AND | § § § § | |
| STATE OF TEXAS, *ex rel.* Caleb Hernandez & Jason Whaley, Relators, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | |
| TEAM HEALTH HOLDINGS INC., TEAM FINANCE, L.L.C., TEAM HEALTH INC., AMERITEAM SERVICES, L.L.C., HCFS HEALTH CARE FINANCIAL SERVICES, L.L.C., & QUANTUM PLUS, L.L.C. (d/b/a TEAMHEALTH WEST) | § § § § § § § | |
| *Defendants*. | § § | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

Relators CALEB S. HERNANDEZ, D.O. and JASON W. WHALEY, PA-C, (collectively "Relators" or individually "Relator") in the above-styled action bring this suit on behalf of the United States of America (the "United States") and the States of Connecticut, Florida, Georgia, Indiana, Louisiana, Tennessee, and Texas, and the Commonwealth of Massachusetts (collectively hereinafter the "Plaintiff States") against Defendants TEAM HEALTH HOLDINGS, INC., TEAM FINANCE, L.L.C., TEAM HEALTH, INC., AMERITEAM SERVICES, L.L.C., HCFS HEALTH CARE FINANCIAL SERVICES, L.L.C., QUANTUM PLUS, L.L.C. (d/b/a TEAMHEALTH WEST), and their affiliates and predecessors (collectively hereinafter "Defendants" or "TeamHealth"). Relators bring this action pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et. seq.* ("FCA"), and analogous state laws.[1]

## I.      INTRODUCTION

1.      TeamHealth is an emergency room management company that operates hospital emergency departments across the nation. TeamHealth, who is currently being investigated by the United States Senate and House of Representatives[2], provides staffing, operation, and billing services to emergency departments as an outside contractor, promising to increase efficiency and profitability in exchange for a share of the emergency departments' earnings. TeamHealth emergency departments frequently render healthcare services to beneficiaries of public healthcare programs administered by

---

[1] Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 *et. seq.*; Florida False Claims Act, Fl. Stat. §§ 68.081 *et. seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et. seq.*; Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7-1 *et. seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12 §§ 5B *et. seq.*; Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et. seq.*; and the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.002 *et. seq.*

[2] *See* https://republicans-energycommerce.house.gov/wp-content/uploads/2019/12/TeamHealth.2019.12.19.-Letter-Surprise-Billing.OI-PRESS.pdf (last visited September 9, 2020) (letter to TeamHealth CEO, Leif M. Murphy, from various United States House and Senate Committee members regarding a Congressional investigation into TeamHealth's "surprise billing" practices).

the Centers for Medicare and Medicaid Services ("CMS")[3] and the Plaintiff States. This case is about two fraudulent schemes (the "Schemes") that TeamHealth has carried out for years to obtain grossly overpaid reimbursements from these public healthcare programs.

2.     **The first Scheme is the "Mid-Level Scheme."** Under the Mid-Level Scheme, TeamHealth overbills for evaluation and management ("E/M") services provided and documented by "mid-level" practitioners. E/M services refers to the medical decision-making and level of care (*i.e.*, the labor component) provided by a healthcare provider during a patient encounter.  The term "mid-level" refers to non-physician healthcare providers, such as Physician Assistants ("PAs") and Nurse Practitioners ("NPs"). Mid-levels are also sometimes referred to as Advanced Practice Clinicians ("APCs"). Under CMS rules, a mid-level's E/M services are reimbursed at 85% of the standard physician rate, while services rendered by a physician are reimbursed at 100% of the standard physician rate. These rates and percentages are set by CMS, and the Plaintiff States have largely, if not entirely, adopted these same rates and percentages for reimbursement.

3.     The appropriate rate payable for services rendered to a CMS beneficiary is automatically triggered by the National Provider Identifier ("NPI") submitted with the claim for reimbursement. Services rendered and sufficiently documented by a mid-level should be submitted under the mid-level's NPI, triggering the 85% rate. Services rendered and sufficiently documented by a physician should be submitted under the physician's NPI, triggering the 100% rate. However, as outlined in ¶¶ 2-13, herein, and stated with more particularity in §§ V-IV, *infra* (principally § V.B), TeamHealth—*through its coding and billing policies, procedures, and protocols* (which include

---

[3] The Centers for Medicare & Medicaid Services ("CMS") is a federal agency within the United States Department of Health and Human Services ("HHS") that administers the Medicare program and works in partnership with state governments to administer Medicaid, the Children's Health Insurance Program ("CHIP"), and health insurance portability standards. CMS oversees the administrative simplification standards from the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

training and guidelines)*, and through its coordinated operation and influence over its subsidiaries and affiliated professional entities*—systematically submits claims for mid-level services under various physicians' NPIs, triggering the 100% rate when in fact the 85% rate applied. TeamHealth does this intentionally and has done so since at least 2006.

4.      Through its coding and billing policies and practices, TeamHealth attempts to cover up the Mid-Level Scheme by characterizing mid-level services as "split/shared." Under CMS rules, "split/shared" services occur when both a mid-level and a physician each personally perform and sufficiently document a ***substantive portion*** of a face-to-face visit with the same patient on the same day, such that the services are split or shared between a mid-level and a physician.[4]  "A substantive portion of an E/M visit involves all, or some portion of, the history, exam, or medical decision making (all key components of an E/M visit)."[5]  Complete documentation of a substantive portion of an E/M visit by the physician is a conditional prerequisite to billing and receiving payment for a split/shared visit at the 100% physician rate.  As CMS itself explained in a 2013 publication related to split/shared visits:  "If it isn't documented, it hasn't been done[.]" *Id.*

5.      When a true and sufficiently documented split/shared visit occurs, the mid-level's services may be billed under the physician's NPI at 100% of the physician rate. However, true and sufficiently documented split/shared visits are exceedingly rare at TeamHealth facilities—they rarely occur.[6] This is because TeamHealth mid-levels typically treat patients alone, maximizing mid-levels' efficiency and profitability. For example, in a March 17, 2016 email, TeamHealth physician, Vera

---

[4] *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at §§ 30.6.1(B), 30.6.13(H) (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf (last visited Sept. 10, 2020).

[5]        *See*        https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedQtrlyComp-Newsletter-ICN908625.pdf (last visited Sept. 14, 2020) at 4.

[6] In fact, TeamHealth's Executive Vice President of Revenue Cycle Operations, Paula Dearolf, indicated in March of 2011 that "████████████████████████████." *See* TH-EDTX-00087472.

Masutti, indicated that ███████████████████████████████████████████

████████████████████████████████████████████████████████"[7]

6.      TeamHealth carries out the Mid-Level Scheme in four ways. ***First***, TeamHealth requires[8] its mid-levels to indicate on medical records that a physician was involved in patient encounters, when in fact a physician never saw or sufficiently documented their involvement with the patient. For example, an August 11, 2011 email from TeamHealth West mid-level, Chuck Nemejc, indicates that TeamHealth mid-levels must add supervising physicians to patient charts. TeamHealth regularly instructed Relator Whaley to list as his supervising physician that physician whose shift most closely paralleled his shift, whether or not that physician ever saw the patient or had any interaction with Relator Whaley regarding the patient. Relator Whaley complied with this policy daily while he worked for TeamHealth so that he would not lose his job.

7.      ***Second***, TeamHealth requires physicians to sign mid-level medical records, again suggesting that the physician treated the patient. TeamHealth's formal policy (as adopted on October 5, 2011 at the North Colorado Medical Center Emergency Department) requires that physicians "**for billing purposes**… review and sign all charts forwarded to them within 48 hours of the encounter, regardless of whether they saw the patient or not." (emphasis added). Relator Dr. Hernandez complied with this policy daily at every TeamHealth location at which he worked by signing patient charts regardless of whether he saw the patient or not—so that he would not lose his job. The result is a medical record that appears to indicate that a split/shared visit occurred. TeamHealth then sends these falsified medical records to coding and billing personnel who rely on the falsified

---

[7] TH-EDTX-00277199-201 at TH-EDTX-00277200.

[8] As used throughout this Complaint, whenever referencing what TeamHealth "requires," the term "require" means that TeamHealth has communicated that the issue concerned "must" be done, "needs" to be done, and/or has made the issue concerned a protocol, business practice, policy, procedure, matter of training and/or something that can be, and is, used to threaten employment if there is no compliance.

record to submit claims for reimbursement to CMS under the physician's NPI. This results in a fraudulent reimbursement of the mid-level's services at 100% of the physician rate.

8.      ***Third,*** TeamHealth also requires physicians to use its "attestations" or "macros" that misrepresent or otherwise wholly fail to sufficiently document physician involvement with the care of a mid-level's patient. "Attestations" are pre-written statements that providers add to patient medical records by simply checking a box. An example of such an attestation that TeamHealth fraudulently uses to submit split/shared claims to CMS is: "████████████████████ ████████████████████████████████████████████."[9]  This bare-bones attestation does *not* satisfy CMS's requirement that the physician document a "substantive portion of the E/M visit" in order to bill and obtain payment from CMS at the 100% physician rate for a split/shared visit.  Yet, TeamHealth required physicians to sign and attest mid-level charts on a regular basis through the insufficient attestation quoted above or a materially similar (and equally insufficient) version thereof. In fact, TeamHealth's goal was that *every* mid-level chart include a physician signature and some form of attestation.

9.      ***Fourth***, TeamHealth requires its coders and billers to code and submit claims to CMS for payment for split/shared services at the 100% physician rate based on patient medical records that TeamHealth knows wholly fail to sufficiently document a physician's involvement with the patient and/or misrepresent a physician's involvement with the patient. For example, ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[9] TH-EDTX-00228614-44 at TH-EDTX-00228615.



quoted above and also set out again below

for emphasis:

- █████████████████████████████████████████.”[10]

This is all TeamHealth required a physician to document within a mid-level's medical record to bill the mid-level's services under the physician's NPI. A single conclusory sentence. By submitting claims for split/shared services to CMS when this wholly insufficient attestation is the only physician documentation contained within the mid-level's medical record, TeamHealth not only misrepresents the physician's involvement with the patient and the services provided, but also knowingly violates CMS regulations requiring that the physician document "all or some portion of the history, exam or medical decision making key components of an E/M service."[11] Moreover, CMS made clear in a March 15, 2013 Transmittal that "**physician attestations by themselves do NOT provide sufficient documentation of medical necessity, even if signed by the ordering physician**."[12] That is, through its policies and requirements, TeamHealth systematically submitted claims for payment to CMS that expressly misrepresented the identity of the provider of the services and expressly and impliedly misrepresented that CMS' clear requirements and conditions for payment for split/shared services at

---

[10] TH-EDTX-00228614-44 at TH-EDTX-00228615.

[11] *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at § 30.6.13(H) (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf (last visited Sept. 10, 2020).

[12] *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited Sept. 11, 2020) (emphasis added); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, Chapter 3 – Verifying Potential Errors and Taking Corrective Actions, at § 3.3.2.1.1 (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf (last visited Sept. 11, 2020).

the 100% physician rate were satisfied by the associated and supposedly supporting documentation and medical records.

10.    As discussed more fully in § V.B, *infra*, ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ submitting split/shared claims to CMS pursuant to its

violative policies—thereby capturing the full 100% physician rate for mid-level services.

11.    ████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████ ██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[13] TH-EDTX-00058603-04.

[14] TH-EDTX-00086281-372.

[15] TH-EDTX-00089554-80.

[16] TH-EDTX-00075911-20 at TH-EDTX-00075911-17.

███████ [17] However, TeamHealth's corporate representative admitted that ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████.

    12.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ policies did not satisfy CMS regulations—which regulations have not changed

at all over the relevant time period—and that TeamHealth knew it all along.

    13.    TeamHealth employs its Mid-Level Scheme through its billing policies and practices

to bill federal and state governments for millions of dollars for the services concerned. Through the

---

[17] However, as discussed in Section § V.B, *infra*, ████████████████████████████████████

████████████████████████████████████████████████████████, *See* Transcript of
September 3, 2020 deposition of Hamilton Lempert, M.D. at 184:16-25, 206:8-16; TH-EDTX-00075911-20 at TH-
EDTX-00075911-17.

[18] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 184:16-25, 206:8-16.

Scheme, TeamHealth has fraudulently obtained tens of millions of dollars every year since at least 2006 and—█████████████████████████████████████████—TeamHealth continued to employ its Mid-Level Scheme at least through 2020.

14.     **The second Scheme is the "Critical Care Scheme."** This Scheme is a classic upcoding scheme. Under the Critical Care Scheme, TeamHealth bills CMS for "critical care"—the highest level of emergency treatment reserved for life-threatening situations—when in fact critical care services were not rendered, were not medically necessary, and/or were not sufficiently supported by the necessary documentation required by CMS, thereby submitting false claims through fraudulent billing.[19] TeamHealth carries out this Scheme in at least two ways.

15.     *First*, TeamHealth fraudulently requires its providers to falsely document that critical care services were provided within patient medical records when critical care services were not provided or were not medically necessary. For example, in an April 2014 email from TeamHealth West Associate Medical Director Elisa Dannemiller, Relator Dr. Hernandez was told, "Just a reminder to keep up the critical care billing! Abnormal vital signs, ICU admits, blood transfusions, trauma activations, and IV ggts all warrant critical care. We are still missing some obvious opportunities…" However, these situations Dannemiller lists do not necessarily, and likely do not, require critical care in every instance because they do not necessarily meet the CMS definition for "critical care."[20] Yet Dannemiller told healthcare providers that all of these situations warrant

---

[19] Critical care is a heightened level of treatment necessary when a patient has a high probability of imminent or life threatening deterioration that requires healthcare providers to exercise a higher degree of medical decision-making and devote longer periods of time to that patient's treatment. *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at § 30.6.12 (2018).

[20] The circumstances referenced by Dannemiller were missing important elements necessary to qualify. Those circumstances lack three simultaneous conditions that must be met to qualify as critical care: (1) a life threatening diagnosis; (2) critical intervention; and (3) care so intensive it requires the physicians undivided attention (such that the provider cannot see other patients).

critical care. Dannemiller also explained in an October 2, 2013 PowerPoint presentation, "[y]ou can bill for critical care and send the patient home!"

16.     TeamHealth requires its providers to falsely document critical care services by, *e.g.*, imposing critical care billing quotas and offering incentives to providers that bill critical care services as TeamHealth requires. For example:

- TeamHealth imposed ███████████████████████████████████████████████████████████ [21]

- In an October 26, 2014 email, Dannemiller imposed critical care billing quotas at 6-12%.

- ████████████████████████████████████████████████████████████████ [22]

- As discussed in ¶178, *infra*, a TeamHealth emergency department medical director has even offered to buy TeamHealth providers beer for billing more critical care services.

- And TeamHealth Chief Medical Officer and corporate representative, Dr. Hamilton Lempert, ████████████████████████████████████████████████████████████████████████████████████████████ [24]

17.     ***Second***, much like the Mid-Level Scheme, TeamHealth also executes the Critical Care Scheme by requiring its coders and billers to code and submit claims to CMS for critical care services based on patient medical records that TeamHealth knows do not contain the necessary documentation

---

[21] *See, e.g.*, TH-EDTX-00000569-71.

[22] TH-EDTX-00044141-333 at TH-EDTX-00044219.

[23] Exhibit 83 (TH-EDTX-00270235) to the September 3, 2020 deposition of Hamilton Lempert, M.D.

[24] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 252:4-17.

to satisfy and comply with CMS' explicit criteria for designating services as "critical care" services. As a result, TeamHealth instructs its coders and billers to code and submit claims to CMS for payment for critical care services based on medical records and documentation that TeamHealth knows do not establish that the services provided met CMS' criteria and payment conditions for "critical care" services and, therefore, do not support claiming reimbursement for such services at CMS' elevated rate of reimbursement for true critical care services. For example, since at least ███ [25], ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ [26]—no other documentation was required, ████████████████████████████████████████████

██████████████████████████████████████████████. Admittedly,

TeamHealth "████████████████" [27] ████████████████████████

████████████████████████████████████.

    18.    TeamHealth received ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[25] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 56:6-16, 60:1-2.

[26] TH-EDTX-00087428-29.

[27] TH-EDTX-00077752-54 at TH-EDTX-00077752.

[28] TH-EDTX-00269444-61.



[29]

[30]

19. 

[31] In doing so, TeamHealth not only misrepresents the physician's involvement with the patient, but also knowingly violates CMS regulations requiring that the patient's "critical illness or injury acutely impairs one or more vital organ systems such that there is a <u>high probability of imminent or life threatening deterioration</u> in the patient's condition."[32,33] That is, through its policies and requirements, TeamHealth systematically submitted claims to CMS for payment for "critical care" services, as defined by CMS' explicit criteria, that expressly misrepresented the level and nature of the services provided and expressly and impliedly misrepresented that CMS' clear

---

[29] TH-EDTX-00269444-61 at TH-EDTX-00269447.

[30] TH-EDTX-00087599-604 at TH-EDTX-00087603.

[31] *See, e.g.,* TH-EDTX-00236432-34 at TH-EDTX-0023643.

[32] MEDICARE CLAIMS PROCESSING MANUAL at Ch. 12, § 30.6.12(A) (emphasis added).

[33] And again, CMS made clear in its March 15, 2013 Transmittal that "**physician attestations by themselves do NOT provide sufficient documentation of medical necessity, even if signed by the ordering physician.**" *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited Sept. 11, 2020) (emphasis added); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, Chapter 3 – Verifying Potential Errors and Taking Corrective Actions, at § 3.3.2.1.1 (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf (last visited Sept. 11, 2020).

requirements and conditions for payment for "critical care" services were satisfied by the associated and supposedly supporting documentation and medical records.



20. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ "[34]

21. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ "[35] How many false critical care claims did TeamHealth submit to CMS ████████████████████████████

████████████████████? TeamHealth's corporate representative testified under oath that he "████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ "[36]

22.     Because of the heightened skill and decision-making critical care requires, CMS reimburses providers for critical care services at a significantly higher rate than ordinary emergency services. TeamHealth employs this Scheme through its billing policies and practices to bill federal and state governments for millions of dollars for the services concerned. Through the Critical Care Scheme, TeamHealth has fraudulently obtained multiple millions of dollars *each year* since at least 2006 and

---

[34] TH-EDTX-00032240-44 at TH-EDTX-00032241.

[35] TH-EDTX-00077760-63 at TH-EDTX-00077760.

[36] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 226:8-17.

continues to employ the Critical Care Scheme today, notwithstanding the ████████████
██████████████ .

23.     TeamHealth is able to conceal these fraudulent claims because a critical care claim is a
"pass through" claim for billing purposes, meaning there is no front-end auditing of these charges. For
example, the April 2, 2014 TeamHealth Meeting Minutes reveal the following findings from a
meeting regarding charting and billing: "Critical care billing has tapered to 3% compliance in
February. There is significant variability in billing for those services and continued efforts are
occurring to reach the desired 5-8%. Anything that can be done to enhance charting to collect more
through billing is greatly appreciated and *members noted that this type of charge is a pass through
for billing, noting there is no auditing of these charges.*" (emphasis added).

24.     Both of TeamHealth's Schemes clearly violate CMS's and the Plaintiff States' billing
regulations and guidelines. TeamHealth perpetrates both Schemes on a nationwide basis. For example,
evidence of the Mid-Level Scheme on a nationwide basis is seen in a January 31, 2012 email from a
Kansas-based TeamHealth administrator, Jan Hook, to Relator Dr. Hernandez at the Colorado
TeamHealth facility requiring Relator Dr. Hernandez to co-sign a patient chart. Further, in a May 24,
2013 email from Gloria Brunette, a TeamHealth Site Coordinator located in Arizona, Brunette requests
"Supporting Physician Documentation" for multiple mid-level charts from Relator Dr. Hernandez.
And in a May 6, 2011 email from TeamHealth West's California facility employee, Kathryn E.
Moreno, to Relator Whaley and others, Moreno explains that TeamHealth's North Colorado
facility will soon implement a new Chart Documentation system. An example of the nationwide
scope of the Critical Care Scheme is seen in an April 10, 2013 email from a Texas-located TeamHealth
administrator, Kim-Diep Do. In the email, Do encourages TeamHealth providers to bill critical care
and points out the loss of money (*i.e.,* "*loss of **RVUs***") when providers fail to bill critical care. As

15

TeamHealth's corporate representative testified, ███████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ [37]

25.     Moreover, as discussed more fully in ¶¶ 108, 166, *infra*, below is a non-exhaustive list of states from which Relators and their experts identified ***actual false claims submitted by TeamHealth to CMS*** based on the Medicare claims data TeamHealth produced to Relators in this case:

- Ohio, Alabama, New York, Colorado, Texas, Pennsylvania, New Jersey, Virginia, California, Illinois, Florida, West Virginia, Michigan, Arizona, Georgia, Arkansas, Tennessee, Indiana, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, Washington, and West Virginia.

26.     Unquestionably, TeamHealth operates both Schemes nationally to defraud CMS and the Plaintiff States of tens of millions of dollars each year. In this action, Relators seek damages, civil penalties, and other remedies under the FCA and analogous laws of the Plaintiff States arising from TeamHealth's two fraudulent Schemes.

## II.      PARTIES

### III.   THE RELATORS

27.     Relator CALEB S. HERNANDEZ, D.O., is a citizen of the United States of America and is a resident of the State of Colorado. Since becoming a licensed physician, Dr. Hernandez has been employed as an emergency physician in numerous emergency departments in Arizona, Colorado, Kansas, Missouri, and the Caribbean. He brings this *qui tam* action based upon direct and unique information he obtained during his employment at the following hospital emergency departments managed and/or operated by TeamHealth: the North Colorado Medical Center in Greely, Colorado (from 2011 to 2015); Sterling Regional Medical Center in Sterling, Colorado (from 2013 to 2015); and

---

[37] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 66:6-10.

Gov. Juan F. Luis Hospital in St. Croix, United States Virgin Islands (in 2011). Through his work as an emergency physician at these TeamHealth emergency departments, and through his work for TeamHealth as an independent contractor, Dr. Hernandez has acquired direct personal knowledge of and non-public information about TeamHealth's fraudulent billing for reimbursement from federal and state healthcare payers.[38]

28.     Relator JASON W. WHALEY, PA-C, is a citizen of the United States of America and is a resident of the State of Colorado. Mr. Whaley holds active PA licenses in Colorado and Wyoming and inactive licenses in California, Nebraska and Alaska. He brings this *qui tam* action based upon direct and unique information obtained during his employment at the emergency department at North Colorado Medical Center, located in Greeley, Colorado (from 2011 to 2013), which was and is operated and/or managed by TeamHealth. Through his work as a PA at this TeamHealth emergency department, and through his work for TeamHealth as an independent contractor, Mr. Whaley has acquired direct personal knowledge of and non-public information about TeamHealth's fraudulent billing for reimbursement from federal and state healthcare payers.

**B.     DEFENDANTS**

29.     Defendants are a system of affiliated entities operating as and collectively referred to herein as "TeamHealth." TeamHealth is a national healthcare practice management company that is one of the largest suppliers of outsourced physician staffing and administrative services to hospitals in the United States. TeamHealth operates in at least forty-seven states and employs at least 13,000 healthcare professionals. TeamHealth has a history of bad behavior. In fact, TeamHealth is currently

---

[38] Dr. Hernandez has ample experience, including experience in oversight, and training regarding a physician's role in charting and billing, including physician supervision requirements and the Medicare billing process. As such, Dr, Hernandez is familiar with the kinds of transactions referenced in this Complaint. Likewise, Dr. Hernandez is familiar with the charting and documentation requirements that are now applicable to the emergency department setting following the 2002 changes in the CMS guidelines for Medicare billing, charting, and documentation requirements, including how they differ from the previous requirements.

being investigated by the United States Senate and House of Representatives for large-scale improper billing practices related to "surprise billing" and TeamHealth's ability to substantially increase billing revenue through improper means (as discussed in ¶ 64, *infra*).

30.     Defendant, TEAM HEALTH HOLDINGS, INC., is a corporation that is organized under the laws of Delaware and has its principal place of business in Knoxville, Tennessee. Team Health Holdings, Inc. was acquired in 2017 in a $6.1 Billion take-private deal.[39] Team Health Holdings, Inc. professes to be a holding company that conducts no operations, with no employees. Further, Team Health Holdings, Inc. claims its only material asset(s) to be its membership interests in Team Finance, L.L.C.

31.     Defendant, TEAM FINANCE, L.L.C. is a subsidiary of Team Health Holdings, Inc. that is organized under the laws of Delaware. Because Team Finance, L.L.C. takes the citizenship of its member, Team Health Holdings, Inc., it is likewise a citizen of the States of Delaware and Tennessee.

32.     Defendant, TEAM HEALTH, INC., is a subsidiary of Defendant Team Health Holdings, Inc., and does business under the name of "TEAMHEALTH." Team Health, Inc. is a Delaware corporation with its principal place of business at 265 Brookview Centre Way, Suite 400, Knoxville, Tennessee. Although—as of October of 2014—it has claimed to be a holding company that conducts no operations and has no employees, Team Health, Inc., alone or through its subsidiaries, has carried out operations and employed employees within the TeamHealth system.[40]

---

[39] On February 6, 2017, Team Health Holdings, Inc. announced the successful completion of its acquisition by funds affiliated with Blackstone, a global asset manager, and certain other investors, including Caisse de dépôt et placement du Québec ("CDPQ"), the Public Sector Pension Investment Board ("PSP Investments"), and the National Pension Service of Korea ("NPS") for $43.50 per share in cash, valued at approximately $6.1 billion. TeamHealth announced the transaction on October 31, 2016, and received approval from TeamHealth's stockholders on January 11, 2017. As a result of the transaction, TeamHealth is now a privately held company.

[40] The fact that Team Health Holdings, Inc. purportedly has no employees indicates that its own corporate functions, are significantly shared, coordinated and/or dependent upon its subsidiaries and/or the personnel operating those subsidiaries, through which Team Health Holdings, Inc. has extended its FCA policies and procedures to all of its

33.     Defendant, AMERITEAM SERVICES, L.L.C., is Tennessee Limited Liability Company and is an administrative and support services subsidiary of Defendant Team Health Holdings, Inc., which employs officers and other TeamHealth affiliated representatives, including those who are members of the referenced departments, committees and TeamHealth's purported [FCA] Compliance Advisory Group. Its principal place of business and mailing address is 265 BROOKVIEW CENTRE WAY, STE 400 KNOXVILLE, TN 37919-4052 USA—the same address as the other TeamHealth defendants. It does business under the name of "TEAMHEALTH." It was created in Tennessee in October 2014 and reportedly has one member, Tennessee Parent, Inc., which Blackstone created to facilitate the take-private deal.

34.     Defendant, HCFS HEALTH CARE FINANCIAL SERVICES, L.L.C., is Florida Limited Liability Company and subsidiary of Defendant Team Health Holdings, Inc, which provides billing, collections, coding, documentation, compliance, and reporting services. Its principal place of business and mailing address is 265 BROOKVIEW CENTRE WAY, STE 400 KNOXVILLE, TN 37919-4052 USA—the same address as the other TeamHealth defendants.

35.     Defendant, QUANTUM PLUS, L.L.C., is a California Limited Liability Company and subsidiary of Defendant Team Health Holdings, Inc. with its principal place of business at 5000 HOPYARD RD STE 100, PLEASANTON, CA 94588. It does business under the name of

---

subsidiaries and affiliated professional entities. As such, Team Health Holdings, Inc. is used as a cloak or disguise to escape corporate liability. Team Health Holdings, Inc. is so organized and controlled, and its affairs are so conducted, as to make it an instrumentality or adjunct of TEAM HEALTH, INC. and the personnel operating  TEAM HEALTH, INC. (before October of 2014) and AMERITEAM SERVICE, L.L.C. and the personnel and entities operating AMERITEAM SERVICES, L.L.C. (after October of 2014) for purposes of the FCA and for purposes of the fraudulent Schemes complained of herein. The nature of AMERITEAM SERVICES, L.L.C., as provided in ¶ 33, *infra*, also indicates that the operational structure of TeamHealth serves to shield the proceeds of the fraudulent Schemes concerned. TeamHealth admits that it has uniform, nationwide practices and procedures, which are promulgated in cooperation between AmeriTeam Services, L.L.C. and Team Health Holdings, Inc., especially with regard to practices and procedures that concern practices regulated by the False Claims Act. *See* https://www.teamhealth.com/wp-content/uploads/2018/09/Federal-and-State-False-Claims-Act-Education-Policy-1.pdf  (last visited September 11, 2020).

"TEAMHEALTH WEST." Its mailing address is the same as the other TeamHealth defendants: 265

BROOKVIEW CENTRE WAY, STE 400 KNOXVILLE, TN 37919-4052 USA. TeamHealth West is

an operational division that covers the western region of the United States, including Colorado and

Texas.

### IV.   VENUE, CONDITIONS PRECEDENT, AND JURISDICTIONAL ALLEGATIONS

36.     This Court has jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C.

§§ 1331 and 1345 because this civil action arises under the laws of the United States.

37.     Relators bring this action under the FCA, 31 U.S.C. § 3729 *et. Seq.*, to recover treble

damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses. Relators

have authority to bring this action and their claims on behalf of the United States pursuant to 31 U.S.C.

§§ 3730(b) and 3730(c)(4), and Relators have satisfied all conditions precedent to their participation

as Relators. Pursuant to 31 U.S.C. § 3730(e)(4)(A), the allegations contained herein have not been

publicly disclosed as defined by the FCA, or alternatively, Relators qualify as "original sources" within

the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B). Pursuant to 31 U.S.C. 3730(e)(4)(B), Relators have

voluntarily provided in writing to the Attorney General of the United States and the United States

Attorney's Office for the Eastern District of Texas, prior to filing this complaint, substantially all

material evidence and information in Relators' possession upon which these allegations are based. In

accordance with 31 U.S.C. § 3730(b)(2), Relators served the United States pursuant to Federal Rule of

Civil Procedure 4 prior to filing this action.

38.     This Court has jurisdiction over Relators' state law claims pursuant to 31 U.S.C.

§ 3732, as those claims arise from the same transaction or occurrence as Relators' claim under § 3729.

Additionally, this Court has supplemental jurisdiction over Relators' state law claims pursuant to 28

U.S.C. §1367(a), as those claims form part of the same case or controversy under Article III of the

United States Constitution as Relators' claim under the federal FCA. Relators have complied with all state law procedural requirements, including service upon the appropriate state Attorneys General prior to filing this action.

39.     This Court may exercise personal jurisdiction over TeamHealth because TeamHealth transacts business within the State of Texas, in accordance with the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-17.042. Moreover, TeamHealth purposefully directs its services at the State of Texas, thereby purposefully availing itself of the privilege of conducting business within Texas and invoking the benefits and protections of its laws. This action arises out of that conduct. This Court's exercise of jurisdiction over the Defendant does not offend traditional notions of fair play and substantial justice.

40.     Venue is proper in the Eastern District of Texas pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c). TeamHealth can be found in, resides in, and/or transacts business in this judicial District. Specifically, during the relevant time period, TeamHealth has transacted business with and/or on behalf of at least the following hospital emergency departments located within the Eastern District of Texas: (1) the Christus St. Mary Hospital in Port Arthur, Texas; (2) the Longview Regional Hospital in Longview, Texas; (3) Methodist Urgent Care in The Colony, Texas; (4) Christus St. Michael in Texarkana, Texas; (5) North Texas Medical Center in Gainesville, Texas. Additionally, one or more of the Defendants committed acts proscribed by 31 U.S.C. § 3729 in this judicial District. Specifically and as discussed more fully in ¶¶ 106, 164, *infra*, TeamHealth **submitted actual false claims to CMS** for services purportedly rendered **in this judicial District**, including at Christus St. Michael in Texarkana, Texas and North Texas Medical Center in Gainesville, Texas. Moreover, ████

████████████████████████████████████████████████

████████████████████████████████████████████████



.[41]

## IV.     LEGAL AND REGULATORY FRAMEWORK

### The Medicare Program and Federal Administration

41.    Medicare[42] provides "nearly every American 65 years of age and older a broad program of health insurance designed to assist the nation's elderly to meet hospital, medical, and other health costs."[43] Medicare is funded in part by taxpayer revenue, apparently unbeknownst to TeamHealth's Vice President of Revenue Cycle Support, who testified under oath that she did not know whether Medicaid and Medicare are publicly funded by taxpayer dollars.[44] In 2018, Medicare spending totaled $750.2 billion and accounted for 21% of the total healthcare spending in the United States.[45] Unfortunately, "[f]raud and systematic overcharging are estimated at roughly $60 billion, or 10 percent, of Medicare's costs every year."[46]

---

[41] TH-EDTX-00052110-15 at TH-EDTX-00052115.

[42] Medicare is the popular name for the Health Insurance for the Aged and Disabled Act, which is title XVIII of the Social Security Act. Medicare is a federally funded program administered by CMS. CMS is part of the Department of Health and Human Services ("DHHS").

[43] CMS, MEDICARE GENERAL INFORMATION, ELIGIBILITY, AND ENTITLEMENT MANUAL, pub. 100-01, Ch. 1 § 10 (2015), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/ge101c01.pdf (hereinafter "MEDICARE GENERAL INFORMATION MANUAL").

[44] Transcript of June 24, 2020 deposition of Christa Cortez at 113:6-13, 233:22-234:5.

[45] NHE FACT SHEET, https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last visited Sept. 11, 2020).

[46] Reed Abelson & Eric Lichtblau, *Pervasive Medicare Fraud Proves Hard to Stop*, N.Y. TIMES, Aug. 15, 2014, http://www.nytimes.com/2014/08/16/business/uncovering-health-care-fraud-proves-elusive.html.

42.     Medicare is comprised of three primary insurance programs—Medicare Parts A, B, and D—that cover different types of healthcare needs.[47] Medicare Part A (Hospital Insurance) covers institutional care such as inpatient hospital care, nursing services, drugs and biologicals necessary during an inpatient stay, and other diagnostic or therapeutic services.[48] Medicare Part B (Supplementary Medical Insurance) covers non-institutional care such as physician services, medical equipment and supplies, and services performed by qualified mid-levels under the supervision of a physician.[49] Medicare Part D (Drug Coverage) covers the cost of prescription drugs.[50]

43.     Under Medicare's programs, the federal government reimburses healthcare providers for their labor and medical decision-making on a fee-for-service basis according to predetermined fee schedules, including the Medicare Physician Fee Schedule ("MPFS"), which establishes annual rates for more than 10,000 services provided by physicians and other healthcare professionals.[51] The MPFS-established rates correspond to specific codes associated with each medical procedure or service provided. The American Medical Association publishes these codes, called Current Procedural Terminology ("CPT") codes, annually.

---

[47] Medicare also includes Medicare Part C (also called Medicare Advantage), which is not a separate benefit, but a program whereby private companies approved by Medicare provide coverage under Medicare Part A and Part B. *See* HOW DO MEDICARE ADVANTAGE PLANS WORK?," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans/how-do-medicare-advantage-plans-work (last visited Sept. 11, 2020).

[48] CMS, MEDICARE BENEFIT POLICY MANUAL, pub. 100-02, Ch. 1, Table of Contents (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf (hereinafter "MEDICARE BENEFIT POLICY MANUAL").

[49] MEDICARE GENERAL INFORMATION MANUAL at Ch. 1 § 10.3. Medicare Part B also covers emergency department services. *See* MEDICARE.GOV, EMERGENCY DEPARTMENT SERVICES, https://www.medicare.gov/coverage/emergency-dept-services.html (last visited Sept. 11, 2020).

[50] MEDICARE.GOV, DRUG COVERAGE (PART D), https://www.medicare.gov/part-d/ (last visited Mar. 29, 2016).

[51] *See* CMS, HOW TO USE THE SEARCHABLE MEDICARE PHYSICIAN FEE SCHEDULE (MPFS) at 1 (Apr. 2014), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/How_to_MPFS_Booklet_ICN901344.pdf. CMS also has fee schedules for ambulance services, clinical laboratory services, and durable medical equipment, prosthetics, orthotics and supplies. FEE SCHEDULES – GENERAL INFORMATION, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/FeeScheduleGenInfo/index.html?redirect=/feeschedulegeninfo (last visited Mar. 10, 2016).

44.     The process by which healthcare providers submit claims for and receive reimbursement involves several steps and various entities. First, physicians and mid-levels must clearly and sufficiently document patient encounters in their medical charts. As CMS regularly instructs providers, "If it isn't documented, it hasn't been done."[52] TeamHealth's very own former CEO, Greg Roth, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████"[53]

45.     To ensure clear, complete, and accurate documentation, CMS has developed specific documentation guidelines that it requires healthcare providers to use—the 1995 Documentation Guidelines for Evaluation and Management Services and 1997 Document Guidelines for Evaluation and Management Services.[54] Evaluation and Management ("E/M") documentation is the process of documenting medical decision-making and care during a patient encounter so that coders can translate services into the five-digit CPT codes as CMS requires for billing purposes.[55]

46.     In addition to selecting the appropriate CPT codes, the coder must submit the provider's National Provider Identifier ("NPI") and Provider Transaction Access Number ("PTAN") for billing. The NPI identifies the individual healthcare provider that performed the services to be reimbursed. The PTAN identifies the practice group or company for whom the provider works.

---

[52] *See* CMS, Medicare Quarterly Provider Compliance Newsletter Guidance to Address Billing Errors at 4 (April 2013), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedQtrlyComp-Newsletter-ICN908625.pdf. (last visited September 10, 2020).

[53] TH-EDTX-00085922-68 at TH-EDTX-00085943.

[54] Providers may use either the 1995 or the 1997 Guidelines, but not a combination of the two.

[55] *See* CMS, EVALUATION AND MANAGEMENT SERVICES GUIDE at 4 (January 2020), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/eval-mgmt-serv-guide-ICN006764.pdf

47.     CMS reimburses different types of healthcare providers at different rates. For example, as discussed in detail below, CMS typically reimburses mid-levels at 85% of the full physician rate under federal statute and CMS regulations. As such, the coder must assign the appropriate provider's NPI to avoid improper billing, as the NPI triggers the billing rate for any particular E/M service. Once a coder assigns the appropriate CPT codes and NPI to a medical record by entering the CPT codes and provider NPI onto a claim form, healthcare providers then submit such claims to a fiscal intermediary called a Medicare Administrative Contractor ("MAC") based on their geographical location. The MAC then processes the claims and reimburses the provider according to Medicare's fee schedule. MACs are typically private insurance companies that carry out the instructions of Medicare, as MACs are Medicare's statutorily appointed agents. MACs are responsible for the majority of enforcement efforts when it comes to Medicare claims. For its part, CMS "manually reviews just three million of the estimated 1.2 billion claims it receives each year"—or 0.25% of all claims submitted.[56] Thus, over 99% of submitted claims evade CMS review.

48.     Claims for reimbursement for E/M services pursuant to Medicare Part B are submitted to CMS on a standard CMS Form 1500 (or an electronic derivation thereof).[57] On the CMS Form 1500, the provider or entity submitting the claim must, among other things, expressly identify, state and represent to CMS: (i) the identity of the provider who rendered the services for which the claim for reimbursement is submitted by listing the rendering provider's NPI in Field 24(J) of the Form; and (ii) the specific procedures, services or supplies for which the claim for reimbursement is submitted by listing the claimed CPT Code(s) in Field 24(D) of the Form. By submitting the NPI and CPT Code(s)

---

[56] Reed Abelson & Eric Lichtblau, *Pervasive Medicare Fraud Proves Hard to Stop*, N.Y. Times, Aug. 15, 2014, http://www nytimes.com/2014/08/16/business/uncovering-health-care-fraud-proves-elusive.html.

[57] An example of a sample CMS Form 1500 is publicly available on CMS' website at the following URL: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf

in the Form, the provider or entity expressly represents to CMS who provided the services and which services were provided for which reimbursement and payment from CMS is sought. Moreover, the CMS Form 1500 specifically provides notice that: (i) "No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32)"; and (ii) "Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws." Finally, the CMS Form 1500 requires that the provider or entity expressly make the following certifications, among others, to CMS regarding the claim submitted for reimbursement:

> In submitting this claim for payment from federal funds, I certify that: (1) the information on this form is true, accurate and complete; (2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; (3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; (4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); (5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare. . . .

> I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction . . . This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.[58]

---

[58]    CMS    Form    1500,    *available    at*    https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf. The quoted certifications and notices are listed on the "reverse" side (or second page) of the CMS Form 1500. In Field 31 on the front side (or first page) of the Form, the provider must certify with each claim submitted "that the statements on the reverse apply to this bill and are made a part thereof."

*The Medicaid Program and State Administration*

49.     The Medicaid Program ("Medicaid") is a Health Insurance Program administered by federal and state agencies. Both state and federal taxpayer revenue fund the Medicaid program. The United States Health and Human Services Department ("HHS") oversees the administration of the program. Medicaid assists participating states in providing medical services, durable medical equipment, and prescription drugs to financially-needy individuals that qualify for Medicaid.

50.     While the federal government sets basic guidelines and pays between 50% and 80% of the cost of Medicaid (depending on the state's per capita income), each state itself administers the program, decides provider qualifications, and reimburses providers for their services.

51.     Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines. The following table provides the Plaintiff States' Medicaid administrative agency and designated program name:

| State | Department | Medicaid Program Name |
|---|---|---|
| Connecticut | Department of Social Services | Husky Health |
| Florida | Agency for Health Care Administration | Florida Medicaid |
| Georgia | Department of Community Health | Georgia Medicaid |
| Indiana | Office of Medicaid Policy and Planning | Indiana Health Coverage Programs |
| Louisiana | Department of Health | Healthy Louisiana |
| Massachusetts | Department of Health and Human Services | MassHealth |
| Tennessee | Division of Health Care Finance and Administration | TennCare |
| Texas | Health and Human Services Commission | Texas Medicaid |

***The False Claims Act***

52.     The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et. seq*, provides, in pertinent part,

that any person who

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> \*\*\*
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
> is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31  U.S.C. § 3729(a)(l), (7) (2006), amended by 31 U.S.C. § 3729(a)(l)(A), (G). The False Claims Act further provides that "knowing" and "knowingly"

> (A) mean that a person, with respect to information--
>     (i) has actual knowledge of the information;
>     (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>     (iii) acts in reckless disregard of the truth or falsity of the information; and
> (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b) (2006), amended by 31 U.S.C. § 3729(b)(l). Violations of the kind described herein—the upcoding of mid-level services and improper billing of critical care—are material to the government's decision to reimburse for those services.

## V.     FACTUAL ALLEGATIONS

53.     Relators allege two fraudulent Schemes through which TeamHealth unlawfully pads

its pockets with federal and state funds.

54.     In subsection A, Relators provide a detailed background on TeamHealth's business

practices. TeamHealth's corporate culture—which is outlined in subsection A, *infra*—facilitates and

fuels the Schemes; those TeamHealth providers who further the Schemes reap rewards, while those

TeamHealth providers who challenge the fraud face threats and disciplinary action.

55.     In subsection B, Relators provide a detailed description of TeamHealth's Mid-Level Scheme through which TeamHealth has engaged in a fraudulent course of conduct of systematically submitting and/or causing the submission of false and fraudulent claims to CMS to unlawfully obtain payment from CMS for mid-level E/M services at the full physician rate.

56.     In Subsection C, Relators provide a detailed description of TeamHealth's Critical Care Scheme through which TeamHealth has engaged in a fraudulent course of conduct of systematically submitting and/or causing the submission of false and fraudulent claims to CMS to unlawfully obtain payment from CMS for purported critical care services that did not satisfy or comply with CMS' criteria and requirements for reimbursement or payment for critical care services.

## A.     BACKGROUND

57.     TeamHealth is among the nation's largest and most profitable physician practice management companies ("PPMs"). PPMs provide management and human-resources services to hospitals and, in particular, to emergency departments. For decades, the healthcare industry has blamed PPMs, and TeamHealth specifically, for ushering in the era of corporate practice of emergency medicine—one where companies like TeamHealth promote profits over patient welfare. TeamHealth has been at the top of the PPM industry since its inception in the 1970s and is a poster child for this profits-based approach to emergency medicine. When healthcare companies prioritize profits over patient care, reimbursement fraud is the likely result. This is precisely the case with TeamHealth.

58.     PPMs emerged as a cottage industry in the late 1960s and early 1970s. They grew astronomically as "it became widely appreciated that 'there was gold in them there hills' of emergency services."[59] In the 1990s, as competition escalated, the largest PPMs, including TeamHealth, went to

---

[59] Brian J. Zink, M.D., Anyone, Anything, Anytime: A History of Emergency Medicine, 246 (Mosby, Inc. 2006).

Wall Street to either merge with or become publicly traded companies. An industry historian describes this evolution as follows:

> At a time when all of medicine was becoming more business-oriented, emergency medicine evolved into the most fertile field for corporate growth, profits, and exploitation. The entrepreneurs were clever about keeping a step ahead of government regulations and the health care marketplace in building their empires.[60]

59.     Indeed, TeamHealth has systematically employed clever, albeit unlawful, strategies to become a national revenue leader in the multi-billion-dollar healthcare management industry. TeamHealth generates the vast majority of its revenue by billing third-party payers, such as CMS or private insurers, for the services its healthcare providers provide. In 2015 alone, TeamHealth reported a total net revenue of $6 billion, with over 50% of that revenue coming from public-payer reimbursements: 25.4% paid by Medicare and 31.5% paid by Medicaid.

60.     TeamHealth's business model is based not on quality of care but on reducing emergency department costs and increasing their revenues. TeamHealth promises to improve their clients' bottom lines in three primary ways: (1) treat and bill more patients by increasing patient "flow";[61] (2) cut costs by employing mid-level providers in place of more costly physicians; and (3) capture more revenue through TeamHealth's proprietary coding and billing practices.

61.     First, an integral part of TeamHealth's business model is moving patients through the emergency department as quickly as possible—*i.e.*, increasing "flow." TeamHealth uses a variety of

---

[60] *Id.* at 256.

[61] Relator Dr. Hernandez's first-hand experiences as a "director of flow" revealed that TeamHealth's "flow" program made any increased supervision of mid-levels impossible. Given these realizations, Relator Dr. Hernandez requested—on numerous occasions—that TeamHealth provide him with the billings associated with his provider number, something with which it never complied.  Similarly, whenever Relator Dr. Hernandez questioned Matt Ledges and other TeamHealth superiors about how TeamHealth could demand the charting language it required of mid-levels and physicians, given the nature of its "flow" operations—*during monthly meetings or when being reprimanded for not providing the charting language TeamHealth required as to mid-levels*—he was met with nervousness and avoidance. The goal of "flow," as Matt Ledges admitted to Dr. Hernandez in his time as "director of flow," from February 3, 2013 until he left TeamHealth, was to make it "impossible" for both a physician and a mid-level to see the same patient during the patient's time in the ER.

administrative or procedural techniques it adopted from the manufacturing industry, including floor management. TeamHealth primarily utilizes floor management techniques called "split-flow" modeling and the "zone" modeling, which segregate physicians and mid-levels into different areas of the emergency room. In fact, as indicated by a TeamHealth physician in a March 2016 email, many of TeamHealth's emergency departments "█████████████████████████████████████████████ ███████████████████████████████████████████████"[62] And TeamHealth Vice President of Operations, Beth Parks, also indicated in a January 2016 email that many of TeamHealth's "█████████████████████████████████████████████████████████████████████████ ███████████████████████"[63] These floor-management models enable TeamHealth to increase revenue by: (1) creating more bed space to increase the volume of patients treated, and (2) using lower cost staffing, *i.e.*, mid-levels, to treat more patients.

62.     Second, TeamHealth's business model seeks to reduce costs by relying heavily on mid-level service providers, such as PAs and NPs, in place of physicians. TeamHealth compensates these mid-levels at a lower rate than physicians. Using mid-levels instead of physicians to treat patients reduces TeamHealth's operating costs. TeamHealth derives significant revenue by submitting claims to CMS for reimbursement for mid-level services. And, as described herein (particularly in § V.B, *infra*), TeamHealth has crafted a fraudulent Scheme to obtain reimbursement from CMS for mid-level services at the full physician rate. Thus, TeamHealth maximizes its revenue by relying heavily on lower-paid mid-levels to provide care, while collecting reimbursements from CMS at the full physician rate.

---

[62] TH-EDTX-00277199-201 at TH-EDTX-00277200.

[63] TH-EDTX-00043162-67 at TH-EDTX-00043165 (emphasis added).

63.     Finally, TeamHealth's business model relies on the implementation of national, standardized billing and coding practices aimed at capturing as much revenue as possible from third-party payers like CMS. As TeamHealth's corporate representative agreed under oath, ██████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.″[64] TeamHealth contracts with hospitals to provide TeamHealth's standardized coding and billing services and performs many of these services at off-site locations across the United States. Coding is the process by which a coder translates a patient's medical record into billable services identified by CPT codes, which TeamHealth then submits to CMS (or private insurers) for reimbursement.

64.     TeamHealth's billing practices are not going unnoticed. On September 16, 2019, the Energy and Commerce Committee of the U.S. House of Representatives launched an investigation into private equity firms that own TeamHealth and other private physician staffing companies. In September 16, 2019 letters[65] to three large private equity firms,[66] the Committee specifically references TeamHealth and broadly requested information and documents pertaining to the firms' ownership of TeamHealth, other private physician staffing, and emergency transportation companies. The letters state that "[e]vidence indicates that these physician staffing firms charge significantly higher in-network rates than their counterparts, thereby driving reimbursement upwards as they enter into staffing arrangements with hospitals…" On December 19, 2019 the United States Senate joined in on the investigation and the committees heading the investigation sent a letter directly to TeamHealth's CEO, Leif Murphy, writing "to request information regarding TeamHealth's billing

---

[64] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 56:7-16.

[65] *See* https://republicans-energycommerce.house.gov/wp-content/uploads/2019/09/Blackstone.2019.9.16.-Letter-re-Surprise-Billing.HE_PRESS.pdf (Letter from Committee Chairman Frank Pallone, Jr. and Committee Member Greg Walden to Stephen A. Schwarzman, CEO of the Blackstone Group) (last visited Sept. 11, 2020).

[66] Including the Blackstone Group, whose affiliates acquired TeamHealth on February 6, 2017.

policies and practices."[67] Although the investigation concerns "surprise billing,"[68] such an investigation highlights TeamHealth's deeper fraudulent business model.

65.     TeamHealth's corporate culture and business model facilitates and encourages fraudulent behavior in its emergency departments. For example, TeamHealth West Associate Medical Director, Elisa Dannemiller, states in an October 2, 2013 Billing and Critical Care PowerPoint presentation, "At Memorial Hospital no one ever dies… Unless their insurance runs out." And as TeamHealth's former Chief Medical Director and Vice President of Billing Operations (and corporate representative), Dr. John Turner, indicated about TeamHealth's ███████████████████████ ████████████████████████████████████████████████████████."[70]

That is just TeamHealth's *modus operandi*. As former TeamHealth employees, Relators have witnessed first-hand several unlawful practices that TeamHealth utilizes to fraudulently increase billing to and reimbursement from CMS. Through their personal knowledge, experience, and investigation, including discovery in this action, Relators have uncovered the two unlawful Schemes described herein—Schemes that TeamHealth systematically and purposely uses to submit false claims to CMS and state payors.

66.     In simple terms, TeamHealth carries out both Schemes by (1) requiring its healthcare providers to falsify medical records/charts (including EMRs), and (2) requiring its coders and billers to submit claims to CMS based on medical records that misrepresent and/or do not contain the

---

[67] *See* https://republicans-energycommerce.house.gov/wp-content/uploads/2019/12/TeamHealth.2019.12.19.-Letter-Surprise-Billing.OI-PRESS.pdf (last visited September 9, 2020) (letter to TeamHealth CEO, Leif M. Murphy, from various United States House and Senate Committee members regarding the Congressional investigation into TeamHealth's "surprise billing" practices).

[68] "Surprise billing" occurs when patients receive higher-than-expected medical bills due to the patient's inadvertent receipt of care from out-of-network providers—*e.g.*, a hospital subcontracts physicians whose services are not part of any insurance company's network, unbeknownst to the patient.

[69] The TeamHealth committee responsible for making billing and coding policy decisions for all of TeamHealth.

[70] *See* TH-EDTX-00236432-34 at TH-EDTX-0023643.

documentation required by CMS to bill for the services for which TeamHealth submits claims to CMS. Thus, TeamHealth uses the Schemes to bill for services that TeamHealth knows were not in fact provided, were not medically necessary, were not supported by the documentation required, did not comply with CMS' clear conditions and requirements for payment for such services, and/or did not qualify for payment from CMS at the reimbursement level for which TeamHealth billed CMS.

**B.     THE MID-LEVEL SCHEME**

*Summary*

67.     Through its first Scheme—the Mid-Level Scheme—TeamHealth fraudulently overbills for mid-level services by submitting claims to CMS for E/M services performed by a mid-level under a physician's NPI. Though CMS rules only allow for reimbursement of mid-level services at 85% of the standard physician rate, by submitting claims for mid-level E/M services under a physician's NPI, TeamHealth improperly obtains 100% of the physician rate. For example, a TeamHealth mid-level treated a patient ██████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████)[71], ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████.

68.     Essentially, TeamHealth misrepresents to CMS that a physician performed the services at issue, when in fact a mid-level performed them, which is also a flagrant violation of CMS regulations. This is akin to a law firm billing clients for legal services performed by an associate at senior partner rates. This is clear fraud. And as TeamHealth's corporate representative agreed under oath, when "████████████████████████████████████████████████████████

---

[71] TH-EDTX-00275367-76.

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████"[72]

69.     As a way to partially cover up the Mid-Level Scheme, TeamHealth falsifies underlying medical charts to invoke the CMS split/shared visit exception and misrepresents that split/shared visits occurred when TeamHealth knows the underlying services and documentation do not meet CMS' payment and reimbursement requirements for split/shared visits. That is, TeamHealth requires its mid-levels and physicians to indicate in mid-level medical charts that both a mid-level *and* a physician provided substantive, face-to-face care to a patient. For example, Cyndi Mackowiak, TeamHealth West Lead for Colorado and Arizona locations, required Relator Whaley to add supervising physicians to patient charts in the September 15 and September 9, 2011 emails below—when the patients were only seen by Relator Whaley.

> **Subject:** Charts on Cerner
> **Date:**    Friday, September 9, 2011 1:21:36 PM Mountain Daylight Time
> **From:**    Cyndi Mackowiak
> **To:**      "jason@rsci.us"
>
> Hi Jason,
>
> Please add the supervising physician so he/she can sign for _____ #67586701 DOS 7/20.
>
> Please let me know when this has been completed.
>
> Thanks,
> Cyndi
>
> Cyndi Mackowiak/Lead AZ & CO
> TeamHealth West
> 480-321-4233
> Fax # 480-321-3849

---

[72] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

**Subject:** Charts to complete on Cerner

**Date:** Thursday, September 15, 2011 4:18:14 PM Mountain Daylight Time

**From:** Cyndi Mackowiak

**To:** "jason@rsci.us"

Hi Jason,

Please complete the following~

8/17-                         # 67706143 add the supervising physician
8/29-                              # 67761007 this pt. was turned over to you, need documentation
8/30-               # 67762526 Sign and add supervising
8/30-              # 67762062 HPI, sign and add supervising
8/31-                     # 67767400 proc. doc.
8/31-                 # 67769356 proc. doc.
9/7-            #67794362 sign and add super

Please let me know when these have been completed.

Thanks,
Cyndi

Cyndi Mackowiak/Lead AZ & CO
TeamHealth West
480-321-4233
Fax # 480-321-3849

70.      A true split/shared visit occurs when both a physician and a mid-level treat and

sufficiently document a ***substantive portion*** of a face to face encounter with the same patient on the

same day.[73] When a true split/shared visit occurs, CMS will allow the mid-level's services to be

submitted under the physician's NPI, such that the mid-level's services will be reimbursed at 100% of

the physician rate. This is because, when a physician and mid-level both provide (and independently

document their provision of) substantive, face-to-face treatment to a patient together (and, thus, split

or share the substantive patient encounter), the mid-level's services are an extension of the physician's

---

[73] *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at §§ 30.6.1(B), 30.6.13(H)         (2020),         available         at         https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf (last visited Sept. 10, 2020).

services. This exception rewards facilities and healthcare providers for providing extra attention to patients when necessary. However, split/shared visits are rarely necessary and therefore almost *never* actually occur at TeamHealth emergency rooms. In fact, TeamHealth's Executive Vice President of Revenue Cycle Operations, Paula Dearolf, indicated in March of 2011 that "███████████████████ ████████████████████████."[74]

71.     Nonetheless, as noted in more detail below, TeamHealth requires its healthcare providers to falsify medical charts to reflect a split/shared visit when, in reality, a physician never even saw the mid-level's patient or, at minimum, did not personally provide a substantive portion of the medically necessary E/M services to the patient face-to-face. This presumably provides TeamHealth with at least some cover (in the unlikely event of an audit) when it submits claims for mid-level services under the physician's NPI. TeamHealth also requires its coders and billers to code and submit claims for split/shared services to CMS based on patient medical records that TeamHealth knows wholly fail to sufficiently document a physician's involvement with the patient, misrepresent a physician's involvement with the patient and/or otherwise do not support, demonstrate or establish that a "split/shared E/M visit," as defined by Medicare Part B payment, policy, occurred. That is, in submitting a claim for reimbursement at the full physician rate under the physician's NPI, TeamHealth systematically and expressly misrepresents to CMS: (i) who provided the services for which TeamHealth billed; (ii) that the services qualify as "split/shared" services as defined by Medicare Part B payment policy and according to CMS' requirements and regulations; and (iii) that the underlying medical records contain the necessary documentation to bill the claim at the physician's rate.

72.     TeamHealth has employed this practice since at least 2006 throughout its emergency departments across the nation. TeamHealth's Mid-Level Scheme clearly violates CMS billing

---

[74] *See* TH-EDTX-00087472.

regulations and guidelines. TeamHealth perpetrates the Scheme on a nationwide basis and, through it, defrauds CMS of tens of millions of dollars each year, in direct relationship to the millions of dollars it bills federally-funded healthcare programs for the referenced services.

### CMS Reimbursement of Mid-Level Services and the Shared Visit Exception

73.      Mid-level healthcare professionals—PAs and NPs—work under the general supervision of physicians but have attained a higher level of education or training than nurses. Accordingly, they are commonly referred to as mid-levels. A qualified mid-level is permitted by law to provide services without his or her supervising physician being physically present or reviewing each patient seen by the mid-level.[75] As such, Congress and CMS have developed specific regulations and requirements that must be met in order for services provided solely by mid-levels to be reimbursed. The billing rates for services provided by mid-levels differ based on the healthcare setting in which the services were provided and the supervising physician's level of involvement. According to Medicare, typical mid-level services shall be billed at 85% of the physician billing rate for E/M services.[76] *See* 42 U.S.C. § 1395l(a)(1)(O).[77] The 85% rate is triggered when the claim for a mid-level's services is submitted under the mid-level's NPI. To determine the allowable fee for a service provided by a mid-level—and properly submitted under the mid-level's NPI—Medicare will select the proper amount

---

[75] *See* Advanced Practice Registered Nurses, Anesthesiologist Assistants, and Physician Assistants, Medicare Learning Network (2020), available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Medicare-Information-for-APRNs-AAs-PAs-Booklet-ICN-901623.pdf (last visited Sept. 12, 2020).

[76] The Medicare statute specifically states, "with respect to services described in 1861(s)(2)(K) [42 USCS § 1395x(s)(2)(K)] (relating to services furnished by physician assistants, nurse practitioners, or clinic nurse specialists), the amounts paid shall be equal to 80 percent of (i) the lesser of the actual charge or 85 percent of the fee schedule amount provided under section 1848 [42 USCS § 1395w-4], or (ii) in the case of services as an assistant at surgery, the lesser of the actual charge or 85 percent of the amount that would otherwise be recognized if performed by a physician who is serving as an assistant at surgery[.]" 42 U.S.C. § 1395l(a)(1)(O).

[77] *See also* MEDICARE CLAIMS PROCESSING MANUAL at Ch. 23, § 30(A).

based on the physician fee schedule and discount that amount by 15% to reach the appropriate 85% mid-level billing rate.

74.     Through its Mid-Level Scheme, TeamHealth wholly ignores federal regulations and requirements governing mid-level reimbursement rates by submitting mid-level services under physicians' NPIs. As a national provider of Medicare and Medicaid services, TeamHealth cannot deny its knowledge of and familiarity with these important rules. As discussed more fully *infra*, TeamHealth has knowledge of the falsity of the claims it submits under this Scheme—by actual knowledge, deliberate ignorance, and reckless disregard.

75.     When TeamHealth submits a mid-level claim under a physician's NPI, CMS presumes the services were performed by a physician rather than a mid-level and, thus, reimburses the claims based on full physician fee schedule without any discount.

76.     CMS provides an exception to the 85% rule in the emergency department context. That exception—the split/shared visit exception—permits providers to bill mid-level services at 100% of the physician rate ***if and only if*** the mid-level performs services in conjunction with a supervising physician, such that both the mid-level and the physician treat the same patient on the same day and each personally perform and sufficiently document a substantive portion of a face-to-face encounter with that patient. In such a scenario, CMS considers the services to be split or shared between both practitioners and, thus, *all* services—including the mid-level's—may be submitted under the physician's NPI. This is because the physician will have personally provided substantive treatment to the patient alongside the mid-level, thereby also directly supervising the mid-level and/or reviewing the mid-level's notations in the patient's chart prior to the patient being discharged, ensuring appropriate care.

77.    Importantly, and as TeamHealth's corporate representative testified to under oath,



"████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████,"[78]

where a "█████████████████████" is defined as "████████████████████████

████████████████████████████████."[79] Simply put, both the

physician and the mid-level must lay eyes on the patient, directly treat the patient, and sufficiently

document a substantive portion of the medically necessary encounter that they personally performed.

78.    **To properly bill a mid-level's services under the physician's NPI as a split/shared**
**visit, the mid-level and physician must both sufficiently and accurately document some portion**
**of the history, exam[80], or medical decision making.** CMS regularly instructs providers, "If it isn't
documented, it hasn't been done."[81] Thus, if a physician does not sufficiently document his or her
involvement with a patient, CMS treats it as if the physician did not treat the patient at all for billing
purposes. Former CEO of TeamHealth, Greg Roth, agreed ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████"[82] Thus, under well-established CMS rules and regulations, a

---

[78] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 135:8-17 (emphasis added).

[79] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 135:18-136:2.

[80] For example, regarding the "exam" portion of the patient encounter, as TeamHealth's corporate representative agreed under oath, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 80:2-7 (emphasis added).

[81] See CMS, Medicare Quarterly Provider Compliance Newsletter Guidance to Address Billing Errors at 4 (April 2013), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedQtrlyComp-Newsletter-ICN908625.pdf. (last visited September 10, 2020).

[82] TH-EDTX-00085922-68 at TH-EDTX-00085943.

physician's signature or attestation alone on a mid-level's chart is *not* sufficient to justify billing the mid-level services at the physician rate.[83]

79.     Because of these documentation requirements, TeamHealth frequently attempts to cover up its Mid-Level Scheme by requiring mid-levels to indicate physician involvement in their medical charts—even when no such involvement occurred. This is often accomplished through an attestation in which the mid-level clicks a box in the EMR indicating he or she was supervised by a physician. TeamHealth then requires its on-duty physicians to sign mid-level charts at the end of the shift and, many times, to attest to supervising the mid-level—despite the fact that the physicians never had the requisite face-to-face contact with the patient to bill for a split/shared visit.

80.     For example, at TeamHealth locations at which Relator Dr. Hernandez worked, Relator personally saw the following false statements on patient charts sent to him, despite the fact that Relator himself had no involvement with the provided medical care for most of the patient charts on which these statements appeared:

- "I delivered care to this patient under the direct supervision of Dr. Hernandez."

- "I was personally supervised by Dr. Hernandez."

- "I was supervised by Dr. Hernandez."

- "Supervised by Dr. Hernandez."

Many mid-level charts that Relator Dr. Hernandez reviewed while working for TeamHealth included similar fraudulent statements that the mid-level was supervised by his or her assigned physician.

---

[83] *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited Sept. 11, 2020) ("**physician attestations by themselves do NOT provide sufficient documentation of medical necessity, even if signed by the ordering physician**") (emphasis added); *See* also CMS, Medicare Quarterly Provider Compliance Newsletter Guidance to Address Billing Errors at 4 (April 2013), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/MedQtrlyComp-Newsletter-ICN908625.pdf. (last visited September 10, 2020).

81.     Relator Whaley also abided by TeamHealth policies, which required Relator to falsely document physician supervision when in fact none occurred. For example, Relator Whaley added supervising physicians to his patient charts indicating that he was "Supervised by Dr. X," despite the fact that neither Relator Whaley nor his patients had interacted with a physician.

82.     As the usual course, by the time a physician signs mid-level charts at the end of their shift, the patients who were treated by the mid-level have already been discharged from the emergency department. As routinely witnessed by Relators, physicians are even assigned mid-level charts for patients seen by mid-levels in the *prior* shift when the signatory physician was not even on-site.

83.     After the physician signs or attests to a mid-level chart, the result is a patient medical record that indicates a split/shared visit (and face-to-face contact between the physician and patient) when in fact the mid-level treated the patient alone. In the case of an audit by CMS, TeamHealth hopes these charts will provide plausible deniability.[84] However, a closer review of the chart will quickly reveal that the physician did not provide any face-to-face treatment of the patient and certainly not the substantive portion components of an E/M service as required by CMS, which is fatal to any claim that the services should be reimbursed as a split/share visit under the physician's NPI.

### Segregation of Physicians and Mid-Levels

84.     In TeamHealth facilities, patients are assigned to either a physician or a mid-level depending on the severity of the patient's condition or injury. However, in TeamHealth facilities, physicians and mid-levels are housed in different areas of the emergency department. For example, the

---

[84] As mentioned throughout this Complaint, the nature of "pass through" was discussed by TeamHealth management at meetings, wherein those in attendance were told "you'll never get audited, don't worry about it."  The same TeamHealth leaders told the medical providers present to document and to not be concerned about such "over documenting" because the coders and billers would figure it out; and that critical care billing was a pass-through bill, so the providers would not get audited.

image below from the North Colorado Medical Center Emergency Department depicts the different emergency department work areas, where physicians and mid-levels are segregated.



85.     Because of this segregation, direct interaction between physicians and mid-levels is exceedingly rare, and it is equally rare for a patient to see both a physician *and* a mid-level. This is intentional, as it prevents overlap and maximizes the number of patients each individual healthcare provider is able to treat. TeamHealth intentionally coordinates its physicians, mid-levels, and billing throughout the Scheme and thereby profits from the results. Under TeamHealth's floor-management models, it is extremely rare that mid-levels and physicians ever see the same patient or even discuss a patient's diagnosis or treatment plan. For example:

- At Gov. Juan F. Luis Hospital in St. Croix in the U.S. Virgin Islands, Relator Dr. Hernandez treated patients in entirely different areas of the hospital than mid-levels.

- In a March 17, 2016 email, TeamHealth physician, Vera Masutti, indicated that

[85]

[85] TH-EDTX-00277199-201 at TH-EDTX-00277200.

- TeamHealth Vice President of Operations, Beth Parks, also indicated in a January 2016 email that many of TeamHealth's " ███████████████████████ ███████████████████████ [86]

86.     This is important because, under the Mid-Level Scheme, TeamHealth submits claims for reimbursement related to mid-level services under a physician's NPI, but it is *highly unlikely* that the physician whose NPI was used ever saw or talked to the mid-level that actually performed the services being billed.

### The Mid-Level Scheme: Medical Record Falsification

87.     During or immediately following treatment, the mid-level will create and complete an EMR (electronic medical record) for the patient, documenting all of the elements of treatment, which will be used for billing later. These elements include a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered, and a description of the medical decision making required. There are several industry-standard software programs used to create and complete EMRs, and such software is implemented in all of TeamHealth's emergency departments.

88.     After the mid-level completes the patient visit and fills out the EMR, TeamHealth requires mid-levels to indicate that he or she was supervised by a physician during the patient's treatment—even though physicians and mid-levels typically do not interact at all. For example, Relator Whaley recalls from his experience at TeamHealth that mid-level providers were instructed to indicate an on-duty "supervising physician" on patient charts, whether or not the mid-level was directly supervised by a physician or the physician saw the patient. TeamHealth strongly encourages healthcare providers to create macros—autocomplete functions with pre-prepared text indicating supervision—

---

[86] TH-EDTX-00043162-67 at TH-EDTX-00043165 (emphasis added).

for their attestation and, in many cases, provides healthcare providers with the language that should be used in such macros (such as the statements in ¶ 80 *supra* and ¶ 96 *infra*).

89.     At the end of the mid-level's shift, most charts he or she created will indicate physician supervision, when in reality no physician involvement occurred whatsoever. For example, Relator Dr. Hernandez estimates that he treated approximately 7,000 patients total, and only saw and treated roughly 30 patients in conjunction with a mid-level during his time working for TeamHealth. Relator Whaley similarly confirms that in his experience with TeamHealth, patients were seen by both a mid-level and a physician in less than 2% of cases. Relator Dr. Hernandez confirms that TeamHealth's policies and procedures with respect to the supervision of mid-levels was the same at every TeamHealth facility Relator worked at, regardless of location.

90.     After the mid-level finalizes and signs the EMR, TeamHealth then requires its physicians to misrepresent their involvement in the care of the patient by, for example, (1) requiring physicians to co-sign mid-level charts or EMRs; and/or (2) requiring physicians to use TeamHealth's boilerplate attestations that wholly fail to sufficiently document the physician had the necessary involvement in the care of the patient to submit a claim to CMS for the services under the physician's NPI. These are blatant misrepresentations within patient medical records that also violate clear CMS guidelines. And TeamHealth completes the fraud by then submitting claims for reimbursement to CMS under the physician's NPI, which misrepresent that: (i) the physician provided the services; (ii) a split/share E/M visit, as defined by Medicare Part B payment policy, occurred; and (iii) the underlying medical record and documentation support that CMS' requirements for reimbursement for split/shared visits were satisfied.

91.     ***First,*** TeamHealth requires its physicians to "countersign" mid-level charts or EMRs. For example, ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████" to which

████████████████████" [87] ██████████████████ (depicted below) from Christa

Cortez,  TeamHealth's  Vice  President  of  Revenue  Support,  Cortez  ████████████

████████████████████████████████████████, and also indicates

that a TeamHealth physician "████████████████████." [88]



92.      The mid-level EMRs are typically sent to the physicians via email or through the EMR

software's internal messaging system (which contains inboxes for each healthcare provider in the

emergency department). In the rare circumstance that paper charts are used at a particular TeamHealth-

managed facility, the mid-level paper charts will be randomly divided and distributed to on-duty

physicians for counter-signature.

93.      TeamHealth tells its personnel that physician countersignatures are required for the

mid-level services to be billed and reimbursed. That is, TeamHealth's explanation to its employees is

---

[87] TH-EDTX-00078474-75.

[88] TH-EDTX-00088992-96 at TH-EDTX-00088994.

that mid-levels' services cannot be billed *<u>at all</u>* without a physician signature. This is wrong. There is no such CMS requirement. Mid-level services that are reflected in an EMR can be billed *<u>under the mid-levels' NPI</u>* without a physician signature—triggering the appropriate 85% billing rate.[89] But, TeamHealth takes advantage of the system and its employees by requiring physician signature (for no legitimate billing reason) and then submitting claims for many of those mid-levels' services under a physician's NPI.

94.     For their part, physicians have no option to disagree with the care or documentation provided by the mid-level. The physicians are not actually present to supervise the mid-level or personally provide the required substantive portion of the treatment to the patient. Given TeamHealth's protocols, it is common that the patient has already left the facility by the time the physician reviews and signs the mid-level patient's chart. The signing physician has no option to change the plan of care— her only options are (1) to sign the chart and continue working at TeamHealth, or (2) refuse to sign the chart and risk her employment (as explained below).

95.     Whatever the case, the following is certainly true: TeamHealth instructs its emergency physicians to sign and approve some amount of mid-level charts or EMRs at the end of each shift. In the vast majority of cases, it would have been physically impossible for the physician to have actually supervised the mid-level during the shift, let alone interacted with the mid-level or the patient.

96.     **Second**, TeamHealth also misrepresents physicians' involvement with the care of patients seen by mid-levels by creating insufficient boilerplate "attestations" or "macros" that it

---

[89] *See* Advanced Practice Registered Nurses, Anesthesiologist Assistants, and Physician Assistants, Medicare Learning Network (2020), available at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Medicare-Information-for-APRNs-AAs-PAs-Booklet-ICN-901623.pdf (last visited Sept. 24, 2018).

requires its facilities to implement for use by TeamHealth's physicians and other providers.[90]
Attestations are pre-written statements (written and approved by TeamHealth corporate) that providers
add to patient medical records by simply checking a box. For example, TeamHealth allows or instructs
its physicians to purportedly attest to their involvement with the care of a patient seen by a mid-level
by simply selecting the following pre-written attestation: "█████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

██████"[91] However, as discussed *infra*, without additional specific documentation by the physician,
this attestation not only misrepresents the physicians' involvement in the care of the patient, but also is
insufficient to support a claim for reimbursement at the physician's rate as a split/shared visit under
CMS regulations. If physicians are uncomfortable with this attestation  (and many were), TeamHealth
allowed or instructed them to select a "supervision" attestation, such as: "███████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████"[92]
This attestation is even less compliant with the split/shared documentation requirements. However,
TeamHealth often submitted claims for split/shared visits to CMS under the physician's NPI when
either of these attestations was the only indications of physician "involvement" (or un-involvement).
By doing so, TeamHealth knowingly overbilled and defrauded CMS.

　　　　97.　　　After a mid-level's medical record contains the foregoing physician misrepresentations
or otherwise wholly fails to sufficiently document the physician's involvement with the mid-level's
patient, TeamHealth then requires its coders and billers to submit split/shared claims to CMS under

---

[90] TH-EDTX-00043162-67 at TH-EDTX-00043163 (Nancy Sier, TeamHealth Director of EMR Integration, indicated in a January 2016 email that ████████████████████████████████████████████████████████████████████████████████████ ").

[91] TH-EDTX-00228614-44 at TH-EDTX-00228615.

[92] TH-EDTX-00277302.

physician NPIs based on such medical records. TeamHealth thereby misrepresents to CMS both (1) that the physician was sufficiently involved in the care of the patient to support a split/shared visit; and (2) that TeamHealth complied with CMS regulations by submitting such claims.

### *The Mid-Level Scheme: Coding and Billing Policies*

98.     To fully execute its Mid-Level Scheme, TeamHealth requires its coders and billers to code and submit claims for split/shared services to CMS based on patient medical records that TeamHealth knows wholly fail to sufficiently document a physician's involvement with the patient and/or misrepresent a physician's involvement with the patient.



99.     For example, ███████████ [93], ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ "[94]

100.    Such an attestation without more, clearly fails to comply with CMS regulations requiring that the physician sufficiently document and "personally perform a substantive portion of an E/M visit," which "involves all or some portion of the history, exam or medical decision making key components of an E/M service."[95] Specifically with reference to the "exam" portion of an E/M service,

---

[93] As discussed more fully below, although TeamHealth changed its split/shared documentation requirements in October of 2016, TeamHealth continued to instruct its coders and billers to submit certain claims to CMS as split/shared services when all the physician documented within the patient's medical record was "I personally evaluated and examined the patient in conjunction with the MLP and agree with the management and disposition of the patient." *See* TH-EDTX-00228614-44 at TH-EDTX-00228615.

[94] TH-EDTX-00228614-44 at TH-EDTX-00228615.

[95] *See* MEDICARE CLAIMS PROCESSING MANUAL, Chapter 12 - Physicians/Nonphysician Practitioners, at §§ 30.6.1(B), 30.6.13(H) (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Guidance/Manuals/Downloads/clm104c12.pdf (last visited Sept. 10, 2020).

███████████████████████ ████████████████████████████████

███████████████████████████████████████ " which TeamHealth's corporate representative

agreed is required " ████████████████████████████████████ ."[96] Additionally, as

CMS made clear in its *March 15, 2013* transmittal, **physician attestations by themselves do NOT**

**provide sufficient documentation of medical necessity, even if signed by the ordering**

**physician**."[97]

      101.    If the CMS regulations were not clear enough, ███████████████████

████████████████████████████████████████████████████████████████s—

██ ████████████████████ Nonetheless, TeamHealth continued submitting split/shared

claims to CMS pursuant to such policies.

      102.    ***First,*** ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████[98]████████████████████████████

████████████████████████████████████████████████████████████████

---

[96] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 80:2-7 (emphasis added).

[97] *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited Sept. 11, 2020) (emphasis added); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, Chapter 3 – Verifying Potential Errors and Taking Corrective Actions, at § 3.3.2.1.1 (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf (last visited Sept. 11, 2020).

[98] TH-EDTX-00058603-04; Transcript of July 10, 2020 Deposition of John Turner, M.D. at 70:17-76:3.

██████████████████████████████████████████████

████████████████████████████████████████ it."[99]



103.    Based on the CMS regulation requirements, ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ ██████████████████████████████████

---

[99] TH-EDTX-00058603-04.

[100] TH-EDTX-00058603-04.



This attestation is nearly identical to TeamHealth's standard form attestation, which TeamHealth instructed its coders and billers *was* sufficient documentation by the physician to support a split/shared visit—and, in fact, TeamHealth required its coders and billers to submit split/shared claims to CMS when all the physician documented within the medical record was the attestation.[102]

███████████████████████████████████████████████ its split/shared billing policies did not comply with the CMS regulations.



104.   ***Second,***

TeamHealth nonetheless continued submitting claims pursuant to its violative split/shared billing policies.

---

[101] TH-EDTX-00058603-04; Transcript of July 10, 2020 Deposition of John Turner, M.D. at 70:17-76:3; 81:2-82:12.

[102] TH-EDTX-00228614-44.

[103] TH-EDTX-00086281-372 at TH-EDTX-00086287-305.

[104] TH-EDTX-00086281-372 at TH-EDTX-00086296-305.

105.   *Finally*, █████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████  ██████████████████████

██████████████████████████████████████████



106.   ████████████████████████████████████

███████████████████████████████████[106]██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

[105] TH-EDTX-00089554-80 at TH-EDTX-00089562.

[106] TH-EDTX-00075911-20 at TH-EDTX-00075911-17.



However, TeamHealth's corporate representative admitted that ██████████████

*The Mid-Level Scheme: Additional Evidence of Fraud*

108.     After receiving TeamHealth's claims data and patient medical records through discovery in this case, Relators confirmed that TeamHealth has, in fact, ***submitted and/or caused the submission of actual false claims to CMS*** by executing its Mid-Level Scheme in the ways described above, *e.g.,* by (1) misrepresenting physicians' involvement in the care of patients treated by TeamHealth mid-level providers; and (2) submitting claims for split/shared services to CMS in violation of clear CMS documentation regulations. Below is a non-exhaustive list of representative

---

[107] *Id.* (TH-EDTX-00075911-20 at TH-EDTX-00075911-17.)

[108] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 184:16-25, 206:8-16.

examples of the false claims that TeamHealth actually submitted to CMS, and for which TeamHealth

fraudulently obtained overpayment from CMS, pursuant to its Mid-Level Scheme:

| Hospital Name | Location | Date of Service | Billing Provider (Physician) | CPT Code | Medical Record Number |
|---|---|---|---|---|---|
| ████████ | ████ | ██ | █████ | ██ | ███ |
| ████████ | ████ | ██ | ██████ | ██ | ███ |
| ███████ | ████ | ███ | ██████ | ██ | ███ |
| ██████ | ████ | ███ | █████ | ██ | ███ |
| ██████ | ████ | ███ | ██████ | ███ | ████ |
| ██████ | ████ | ███ | █████ | ███ | ███ |
| █████ | ████ | ███ | █████ | ███ | ███ |
| ██████ | ████ | ███ | █████ | ███ | ██ |
| █████ | ████ | ███ | █████ | ██ | ███ |
| ██████ | ███ | ██ | █████ | ██ | █ |
| █████ | ███ | ███ | ████ | ██ | ███ |
| ██████ | ██ | ██ | █████ | ██ | ███ |

109.    The physical impossibility of physician involvement in the care of patients treated by

mid-levels is corroborated by the statements of a former TeamHealth coder, **Confidential Witness No.**

---

[109] As the Court is aware, Texarkana is located in this judicial District.

[110] TeamHealth does not possess the underlying medical record for this claim. Therefore, as TeamHealth Director of Health Plan Claim Review & Audits and Client Practice Management agreed under oath, "if there is no medical record at all to support a claim…then that claim cannot – should not be paid or reimbursed." Transcript of September 9, 2020 Deposition of Sandra Steele at 44:1-8.

**1 ("CW1")**. CW1 was employed by TeamHealth as an Emergency Department Coder from February 2012 until August 2013 in Jacksonville, Florida. CW1 received patient charts directly from TeamHealth-managed hospitals and translated the physician services in the charts into codes, which were then submitted for billing. CW1 explained that, at TeamHealth, a physician signature on a patient's chart meant that the physician supervised the PA, was physically present during the patient encounter, saw the patient and the treatment provided with his or her own eyes, and agreed with the mid-level's diagnosis and treatment plan. However, in reviewing patient charts, CW1 discovered on several occasions that, due to the timing of physician signatures on the charts, physicians would have had to have been in two or more places at one time to have actually seen the patient as indicated by the physician's signature.

110.     Nonetheless, TeamHealth administrators adamantly insist that physicians countersign outstanding charts. For example, TeamHealth Employee, Lauren Grossman, stated in a June 12, 2011 email, "ALL MLP [mid-level provider] CHARTS MUST BE COSIGNED BY DOC." TeamHealth administrators often send threatening emails to physicians requesting countersignatures. These TeamHealth administrators also repeatedly press mid-levels to list a supervising physician on all patient charts, regardless of whether the physician had any involvement with the patient or any interaction with the mid-level regarding the patient. In fact, that is TeamHealth's formal policy. TeamHealth's "PA and NP Practice Policy" (as adopted on October 5, 2011 at the North Colorado Medical Center Emergency Department) requires that physicians "***for billing purposes***… review and sign all charts forwarded to them within 48 hours of the encounter, *regardless of whether they saw the patient or not.*" (emphasis added). However, there is no "billing purpose" under the applicable regulations that requires physician review and counter-signature.

111.    When a mid-level submits a chart to TeamHealth's coding department without a physician's signature, the chart is sent back to the mid-level by a TeamHealth documentation specialist with a note to add a supervising physician. For example, in a May 24, 2013 email from Gloria Brunette, Site Coordinator for Banner Gateway Medical Center in Arizona and North Colorado Medical Center in Colorado, Brunette requests "Supporting Physician Documentation" from Relator Dr. Hernandez. Also, in an August 18, 2011 email from Cyndi Mackowiak, TeamHealth West Lead for Colorado and Arizona locations, Mackowiak writes, "All PA's need to add who their supervising physician is & all charts need to be signed within 48hrs of the DOS [or discharge]." CW1 explained that the most common reason a chart would be returned to a hospital for further documentation was a missing physician signature.

112.    TeamHealth ensures charts are submitted as instructed through threats of suspension and withholding compensation. For example, in an April 9, 2014 email to Relator Dr. Hernandez from Elisa Dannemiller, TeamHealth West Associate Medical Director, Dannemiller threatens suspension for incomplete charts. When a physician fails or refuses to countersign mid-level charts, TeamHealth threatens that the physician will lose his or her privileges, be pay-docked, or even fired. For example, in a May 3, 2013 email, TeamHealth employee Jeff Baker threatens a loss of Relator Dr. Hernandez's "Medical Staff privileges" for failure to complete Relator's charts. And in a June 17, 2014 email from TeamHealth employee Matt Ledges (now a Regional Medical Director at TeamHealth) to Relator Dr. Hernandez, Ledges writes, "it looks like your privileges will be suspended if you don't complete some outstanding charts." Ledges also threatened Relator Whaley in a December 28, 2011 email stating, "[d]on't risk suspension, finish your charts today." Further, in a January 17, 2012 email from Elisa Parra of TeamHealth West, Parra states, "[w]hen a chart is incomplete, for any reason, it is sent back

to you for information needed to bill. This holds up your compensation…." Again, the most common reason a chart was "sent back" was because it lacked a physician signature.

113.    Once the physician-signed and/or physician-attested charts (or EMRs) are completed and sent to the billing department, coding and billing specialists working for TeamHealth then reduce the falsified charts to CPT codes for E/M services and select the *physician's* NPI for billing purposes, despite the fact that the physician performed no services at all, or otherwise wholly failed according to CMS requirements to sufficiently document their involvement with, the care of the mid-level's patient. As discussed *supra*, coding and billing specialists working for TeamHealth are trained or told that, when a physician has signed and/or attested to a mid-level chart, that means the physician's NPI should be use for billing purposes. With this training, the chosen CPT codes (which are usually entered into an electronic database program for ease of processing) are then submitted to CMS through a MAC under the physician's NPI, such that the claims are reimbursed at the full physician rate instead of the proper 85% rate. Thus, TeamHealth systematically submits false claims to CMS. In submitting these claims for reimbursement under the physician's NPI, TeamHealth knowingly and systematically misrepresented to CMS: (i) the identity of the provider of the services; (ii) that a split/shared visit, as defined by Medicare Part B payment policy, had occurred; and (iii) that the underlying medical record and documentation associated with each such claim fully complied with and satisfied CMS' requirements for reimbursement for split/shared visits. And in submitting such claims, TeamHealth falsely certified and/or caused TeamHealth's medical providers to falsely certify with respect to each such claim the following:

> In submitting this claim for payment from federal funds, I certify that: (1) the information on this form is true, accurate and complete; (2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; (3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; (4) this claim, whether submitted by me or on my behalf by my designated billing company, complies

with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); (5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare. . . .

I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction . . . This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.[111]

114.    Under CMS practices, claims for mid-level and physician E/M services are "pass through" claims for billing purposes. This means there is little or no front-end review or auditing of these charges—the MAC pays them automatically. In essence, the reimbursement system for the E/M services at issue here is an honor system.

115.    Moreover, CMS does not require underlying EMRs to be submitted along with requests for reimbursement for E/M services. This means that CMS cannot perform a medical chart or EMR review to determine where TeamHeath's claims are accurate. As such, these claims go unnoticed by CMS and are automatically paid. TeamHealth takes advantage of this "pass-through" honor system.

116.    A former TeamHealth employee, **Confidential Witness No. 2 ("CW2")**, corroborates the nature and prevalence of TeamHealth's Mid-Level Scheme. CW2 was employed as an Accounts Receivable Specialist at TeamHealth's corporate headquarters in Lewisville, Tennessee from October 2013 to January 2015. While a TeamHealth employee, CW2 dealt with Medicare billing on behalf of TeamHealth in numerous states, including North Carolina, Pennsylvania, New York, South Carolina, Texas, California and Michigan. CW2 was responsible for denials and appeals for emergency

---

[111]    *See* CMS Form 1500, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf.

department professional billings at TeamHealth-managed hospitals—*i.e.*, the type of claim at issue here.

117.    CW2 commonly reviewed electronic and paper CSM claims submissions. When Medicare denied a claim, CW2 would personally review the underlying EMR in search of the reason for the claim denial. When reviewing EMRs and claims forms, CW2 often observed mid-level signatures on the charts, indicating that mid-levels were involved in the treatment of the patient. However, even when a mid-level had signed a patient's chart, ***only a physician's name and NPI were transferred to the claims form and submitted to CMS***. In other words, TeamHealth submitted the NPI of the physician in order to claim reimbursement for the mid-level's services at the full 100% physician rate, as if each patient encounter were a shared visit.

118.    **Confidential Witness No. 3 ("CW3")** worked at TeamHealth's Knoxville, TN facility in 2010 and 2011 as Billing Operations Analyst. CW3 was responsible for analyzing reimbursement claim denials and assessing customer billing complaints received by TeamHealth. CW3 explained that her department regularly received calls from patients complaining that a physician's name appeared on their bill when they had not been treated by a physician at all. CW3 would then access the patient's underlying medical record to determine if a physician's signature was present. However, CW3 could not confirm from the chart whether the physician actually treated the patient. TeamHealth instructs its billing professionals that a physician's name is required on billing and claims documents, even if the physician did not see or treat the patient. Billing professionals like CW3 relay this misinformation to complaining customers, presumably to appease them. However, TeamHealth bills emergency room claims under physician NPIs.

119.    TeamHealth knowingly submits false claims to CMS for mid-level services under physicians' NPIs for reimbursement at the full physician rate. TeamHealth perpetrates its Scheme by

coordinating the actions of its personnel—and their implementation of its billing policies and procedures—throughout all Team Health Holdings, Inc. subsidiaries. It secures its unlawful profits in holding companies that do not have employees.

120.    TeamHealth systematically perpetrates the Mid-Level Scheme nationwide and extends to and through all TeamHealth subsidiaries and affiliated entities. It is operated, administered, and supported throughout all of the Team Health Holdings. Inc. subsidiaries and affiliated entities through the subsidiaries TEAM HEALTH, INC. and AMERITEAM SERVICES, L.L.C. and their subsidiaries. Relator Dr. Hernandez observed the exact same policies regarding mid-level charting and physician countersignatures at every TeamHealth emergency department that employed him. The uniform nature of the Mid-Level Scheme is also corroborated by TeamHealth's very own Medicare claims data it produced to Relators in this case, as well as by former TeamHealth employees, including CW1 and CW2. TeamHealth's Mid-Level Scheme violates CMS regulations governing reimbursement for E/M services performed by mid-levels and thus the FCA. TeamHealth systematically perpetrates this fraudulent scheme on a nationwide basis.

### *Additional Specific Examples of the Mid-Level Scheme*

121.    The Mid-Level Scheme is evidenced by the experience of Mr. Michael J. Yancey, a colleague of Relator Whaley, who has agreed to waived HIPAA privacy protection for purposes of including these allegations in this Complaint. Mr. Yancey was treated at the TeamHealth-managed emergency department at North Colorado Medical Center on April 24, 2015, for severe injuries sustained to his hand. Mr. Yancey was treated solely by a physician assistant, Ms. Heather Freeman. The Preliminary Bill (depicted below) corroborates the fact that Mr. Yancey was treated solely by the physician assistant, Ms. Freeman—as it only lists "Heather L. Freeman" as having provided services. However, in Mr. Yancey's Final Bill (also depicted below), TeamHealth billed for services provided

by a physician—Dr. Bryan K. Beck, DO. Thus, Mr. Yancey's billing statements depicted in the two images below are one example of the Shared Visit Scheme that TeamHealth has been operating throughout the country.

<u>Mr. Yancey's Preliminary Bill</u>

| | | | NORTH COLORADO MED CENTER | | | | |
|---|---|---|---|---|---|---|---|
| BANNER HEALTH | | | PO BOX 1988<br>GREELEY, CO 80632<br>888 543-3806 | | | BILLING DATE | 1/29/16 |

| PATIENT NAME | | ACCOUNT NUMBER | FEDERAL I.D. NO. | | ADMIT DATE | DISCHARGE DATE | PAGE |
|---|---|---|---|---|---|---|---|
| YANCEY, MICHAEL J | | 94626231 | | 841287638 | 4/24/15 | 4/24/15 | |

|  | | | INSURANCE CARRIER | | |
|---|---|---|---|---|---|
| | | I | 2008   MEDICAID COLORADO | | 2008 |
| GUARANTOR | 000212349 | P | | | |
| | | S | | | |

| | | PT TYPE   E | AMORENO |
|---|---|---|---|
| YANCEY, MICHAEL JAY<br>232 MAPLE AVE<br>EATON, CO 80615 | AGE<br><br>44 | DOCTOR NAME<br><br>FREEMAN, HEATHER L | |

| DATE OF<br>CODE | SERVICE | CHARGE DESCRIPTION | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | | 250   PHARMACY | | | |
| 4/24/15 | 6808166 | DIP/TET/A-PERT 0.5ML IM | 1 | 141.30 | 141.30 |
| 4/24/15 | 6821433 | SOD CL 0.9% 50ML ADD-BAG | 1 | 76.70 | 76.70 |
| 4/24/15 | 6760144 | ACETAMIN 325MG TAB | 3 | .10 | .30 |
| 4/24/15 | 6765762 | CEFAZOLIN SOD/500MG INJ | 2 | 57.60 | 115.20 |
| 4/24/15 | 6778013 | IBUPROFEN 600MG TAB | 1 | .10 | .10 |
| | | 320   DX/X-RAY | | | |
| 4/24/15 | 3221751 | XR HAND 3+ VIEW RT | 1 | 109.00 | 109.00 |
| | | 450   EMERGENCY ROOM | | | |
| 4/24/15 | 4504932 | VISIT LEVEL 4 | 1 | 1433.60 | 1433.60 |
| 4/24/15 | 4505616 | INF IV THRPY 1ST HR | 1 | 400.50 | 400.50 |
| 4/24/15 | 4505608 | INF IV HYDRAT ADDL HR | 1 | 181.80 | 181.80 |
| 4/24/15 | 4506457 | RPR WOUND SIMPLE | 1 | 489.90 | 489.90 |
| | | 771   VACCINE ADMINISTRATION | | | |
| 4/24/15 | 4504809 | IMMUN 1ST VACCINE | 1 | 81.70 | 81.70 |
| | | 998   INSURANCE PAYMENTS | | | |
| 4/30/15 | 9706797 | ADJ/FIN ASSIST-BASIC | 1 | .00 | 1727.16- |
| 5/21/15 | 9920083 | PMT/MEDICAID COLORADO | 1 | .00 | 470.79- |
| 5/21/15 | 9705591 | ADJ/ MEDICAID/AHCCCS | 1 | .00 | 2559.31- |
| 6/11/15 | 9706797 | ADJ/FIN ASSIST-BASIC | 1 | 1727.16 | 1727.16 |

|  | | | | |
|---|---|---|---|---|
| | TRANS TOTALS W/O BAL FWD: | | | |
| | CHARGES | | 3,030.10 | |
| | ADJUSTMENTS | | 2,559.31- | |
| | PAYMENTS | | 470.79- | |

Mr. Yancey's Final Bill

ALCOA BILLING CENTER
3429 REGAL DR
ALCOA TN 37701 3265

DETACH AND RETURN THIS C    N     TH
THE REVERSE SIDE COMPL     P    BY
CREDIT CARD, TO PROVIDE       RA   E
INFORMATION OR FOR CHANGE  F ADDRESS.

Credit card charges will appear as "Team Health"

Patient
Name: MICHAEL J YANCEY          AMT DUE: $937.00

PHYSICIAN SERVICES RENDERED AT: NORTH COLORADO MEDICAL CENTER

                                                    506
55076498-506-1844
PS ▲ 0 2 1 7 9 6
MICHAEL J YANCEY          T95  P1
232 MAPLE AVE
EATON CO 80615-3445

QUANTUM PLUS,LLC
DEPT: A ☐ B ☐ C ☐ (check one - see reverse)
3429 REGAL DR
ALCOA TN 37701-3265

01800055076498903450693338018448000937 0034

↑ Detach Here ↑

| DATE | INVOICE# | DESCRIPTION | PROVIDER | DEBITS | CREDITS |
|------|----------|-------------|----------|--------|---------|
| 04/24/15 | 149419130 | EMERGENCY DEPT VISIT | BECK DO,BRYAN K / FREEMAN PA,HEATHER | $490.00 | |
| 04/24/15 | 149419130 | REPAIR SUPERFICIAL WOUND(S) | BECK DO,BRYAN K / FREEMAN PA,HEATHER | $447.00 | |

THIS IS YOUR PHYSICIAN SERVICES BILL AND IS SEPARATE FROM THE HOSPITAL BILL

ACCOUNT NUMBER:   55076498-506-1844   STATEMENT DATE:  05/10/15   TOTAL NOW DUE:   $937.00

122.    As another example, in or around 2011, Relator Whaley was told by TeamHealth West mid-level Chuck Nemejc to add supervising physicians to Realtor's patient charts and to send the charts to the physician on the shift most closely aligning with Relator's shift. Relator Whaley was surprised by these requirements because he had never had such requirements imposed on him at previous emergency departments at which he worked in his many years working as a PA in non-TeamHealth emergency departments.

123.    Also in November of 2011, while working at Gov. Juan F. Luis Hospital in St. Croix in the U.S. Virgin Islands, Relator Dr. Hernandez was told by the emergency department director, Dr. Dedrick Luikens, to sign the charts of mid-level Rustin Cameron, PA-C, despite never having seen the patients whose charts Relator was signing. When Relator pointed out that he had not seen these

patients, Relator was reassured by the emergency department director that there was no issue. Making it even more unlikely that a true shared/split visit took place, physicians at Juan Luis Phillipe Hospital had to walk to a *separate building* where TeamHealth's mid-levels worked to sign the mid-level charts.

124.    And in a February 2, 2015 email from North Colorado Medical Center emergency room doctor David Wageman to Relator Dr. Hernandez, Dr. Wageman points out that physicians are required by TeamHealth to "sign off on [mid-level] charts without seeing the patients."

125.    Further, in a September 2018 Facebook post, Dr. Elisha Jordan (now Elisha Botnick) describes a vivid example of the Mid-Level Scheme in action at TeamHealth:





126.    TeamHealth has even carried out the Mid-Level Scheme right here in the Eastern District of Texas at Longview Regional Medical Center, and continues to carry out the Scheme today.[112] When TeamHealth's contract at Longview Regional had just begun, TeamHealth first tried to ensure that Longview Regional physicians saw patients face-to-face before requiring physician

---

112

signatures on patient charts. However, TeamHealth soon realized that this was impossible. These facts were confirmed by former Longview Regional mid-level, Alex Lawrence.  Under the direction of Longview Regional Medical Director, Dr. Gene Kelly, Ms. Lawrence was required to send her patient charts to physicians on duty during her shift for signing—regardless of whether those physicians saw the patients. This was as recent as 2018. After mid-levels like Lawrence sent physicians the patient charts for signing, TeamHealth's billing and coding administrators would then email physicians demanding them to sign patient charts for patients whom the physicians had not seen. Ms. Lawrence stated that she assumed the reason was so that TeamHealth could bill the mid-level charts for the physician fee.

127.    After obtaining the signatures and attestations that TeamHealth's policies wrongly dictated were sufficient to bill a split/shared visit, TeamHealth then submits the patient charts to billing and requires its coders and billers to submit claims to CMS based on the patient medical records that misrepresented and/or wholly failed to sufficiently document physician involvement in the care of the mid-level's patient—thereby completing the Mid-Level Scheme. For example, Cyndi Mackowiak, a TeamHealth Documentation Specialist writes in an August 18, 2011 email, "If everyone could let me know when they have completed [their] charts I would really appreciate it, **so I can get them sent into billing**!"  This is also confirmed by TeamHealth's written policy which, again, states that physicians must, "***for billing purposes***… review and sign all charts forwarded to them within 48 hours of the encounter, *regardless of whether they saw the patient or not.*" (emphasis added). There is no plausible "billing purpose" that requires physician review and counter-signature.

*Non-Exhaustive List of Individual Participants in the Mid-Level Scheme*

128.    Below is a non-exhaustive list of individuals with knowledge of the Mid-Level Scheme due to their direct participation in it:

- TeamHealth Chief Administrative Officer, Joe Carmen

- TeamHealth Chief Medical Officer, Dr. Hamilton Lempert

- Former TeamHealth Chief Medical Officer and Vice President of Billing Operations, Dr John Turner

- TeamHealth Executive Vice President of Revenue Cycle Operations, Paula Dearolf

- TeamHealth Director of Compliance for Clinician Coding, Jessica Parks

- TeamHealth Vice President of Revenue Cycle Operations, Christa Cortez

- TeamHealth Director of Health Plan Claim Review & Audits and Client Practice Management, Sandra Steele

- TeamHealth President of the West Group, Dr. Robert Franz

- TeamHealth Associate General Counsel, Linda Thacker

- North Colorado Medical Center emergency room doctor David Wageman

- Associate Medical Director of TeamHealth West, Elisa Dannemiller

- TeamHealth Documentation Specialist, Elisa Parra

- TeamHealth Medical Director at North Colorado Medical Center, Matt Ledges

- TeamHealth West Lead, Cyndi Mackowiak

- TeamHealth mid-level, Alex Lawrence, from TeamHealth's Longview Regional Medical Center

- TeamHealth mid-level, Rustin Cameron, from TeamHealth's Juan Luis Phillipe Hospital in St. Croix in the U.S. Virgin Islands

- TeamHealth West mid-level, Chuck Nemejc

- TeamHealth employee, Jeff Baker

- Site Coordinator for TeamHealth's Banner Gateway Medical Center in Arizona and TeamHealth's North Colorado Medical Center in Colorado, Gloria Brunette

- TeamHealth employee, Lauren Grossman

- TeamHealth administrator located in Kansas, Jan Hook

- TeamHealth West's California facility employee, Kathryn E. Moreno

- TeamHealth mid-level, Heather Freeman

- TeamHealth emergency department physician, Dr. Bryan K. Beck

- TeamHealth Emergency Department Coder in Florida, Confidential Witness No. 1

- TeamHealth Accounts Receivable Specialist at TeamHealth's corporate headquarters in Tennessee, Confidential Witness No. 2

- TeamHealth Billing Operations Analyst at TeamHealth's Tennesee facility, Confidential Witness No. 3

- Relators Dr. Hernandez and Mr. Whaley (Relators participated in the Mid-Level Scheme at TeamHealth's insistence and direction)

## C.  TEAMHEALTH'S CRITICAL CARE SCHEME

### *Summary*

129.   TeamHealth's second Scheme—the Critical Care Scheme—is classic upcoding. TeamHealth fraudulently bills CMS for critical care services which were not provided, were not medically necessary, and/or for which TeamHealth knows the services documented in the underlying medical records do not establish that the services provided met CMS' criteria and payment conditions for "critical care" services and, therefore, do not support claiming reimbursement for such services at

CMS' elevated rate of reimbursement for true critical care services. For example, in one instance, Relator Whaley reviewed a TeamHealth chart that documented 45 minutes of critical care for a patient with normal vitals who had been found to be stable five or six times during his 90-minute stay. This patient should not have been charted as receiving critical care because the patient was in stable condition. And in an April 2014 email from TeamHealth West Associate Medical Director, Elisa Dannemiller, Relator Dr. Hernandez was told, "Just a reminder to keep up the critical care billing! Abnormal vital signs, ICU admits, blood transfusions, trauma activations, and IV ggts all warrant critical care. We are still missing some obvious opportunities…" However, the situations listed in the above email do not necessarily, and likely do not, require critical care in every instance—because they do not meet the CMS definition for "critical care." Specifically, abnormal vital signs may appear even when the patient is not experiencing a life-threatening condition. And, blood transfusion and IV ggts may be necessary even when a patient is nowhere close to being in critical condition. Yet Dannemiller told healthcare providers that all of these situations "warrant critical care" every time. Dannemiller also explains in an October 2, 2013 PowerPoint presentation that, "[y]ou can bill for critical care and send the patient home!" However, sending a patient home does not typically indicate that the patient was in a critical, life-threatening situation.

130.    TeamHealth instructs its healthcare providers to manipulate medical charts to support billing for ordinary emergency services at the higher "critical care" rate. Critical care is a heightened level of emergency treatment necessary when a patient has a severe medical condition (usually, an imminently life-threatening condition) that requires healthcare providers to exercise a higher degree of medical decision-making and devote undivided attention to that patient's treatment.[113] CMS

---

[113] *See* Medicare Claims Processing Manual, Chapter 12 - Physicians/Nonphysician Practitioners, at § 30.6.12 (2018), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c12.pdf (last visited Sept. 24, 2018).

reimburses providers for critical care services at a much higher rate than ordinary emergency services. Thus, TeamHealth views critical care reimbursement as a lucrative opportunity.

131.    TeamHealth imposes unrealistic critical care quotas—typically 6% of patient encounters or more—on healthcare providers and threatens to pay-dock, suspend, or terminate those providers who fail to meet such quotas. For example, the image below depicts TeamHealth's critical care billing quota of 6% for the first quarter of 2014 (from an October 2, 2013 PowerPoint presentation prepared by TeamHealth West Associate Medical Director Elisa Dannemiller).



132.    TeamHealth administrators directly communicate with and threaten providers to enforce these critical care billing quotas. For example, Relator Dr. Hernandez has personally received emails from TeamHealth administrators threatening to pay-dock him for his failure to document critical care for a particular patient. Relator Whaley was also told by TeamHealth's Medical Director at North Colorado Medical Center, Matt Ledges, that critical care billing should account for 6% of the emergency department's total billing. However, as TeamHealth's  former Chief Medical Director and Vice President of Billing Operations (and corporate representative), Dr. John Turner, testified under

oath, "███████████████████████████████████████████████████████

███████████████████████████████████████████████"[114] However, to meet the quotas, TeamHealth trains providers to falsify medical charts to indicate that critical care is required when, in fact, only ordinary emergency treatment is required. TeamHealth then uses the falsified medical charts to submit claims to CMS at the higher critical care rate.

133.    TeamHealth has been upcoding routinely for critical care since at least 2006 within its emergency departments across the nation, and continues to do so today. This Critical Care Scheme too accounts for millions of dollars in overpayment by CMS to TeamHealth every year.

134.    Under the Critical Care Scheme, TeamHealth requires physicians to falsify medical charts to show that critical care was performed when it was not required and submits claims to CMS for reimbursement at the higher critical care rate based on the falsified charts that TeamHealth knows do not support the misrepresentation that CMS' explicit criteria for "critical care" services were satisfied. TeamHealth sets monthly or quarterly quotas for critical care that must be met by healthcare providers at each of its facilities and also incentivizes its providers to bill more critical care. TeamHealth openly discusses with its employees the fact that these critical care quotas are in place to drive revenue.

135.    As with the Mid-Level Scheme, TeamHealth forces healthcare providers to comply with its critical care policies by threatening pay reduction, privilege suspension, and even firing. However, healthcare providers have no control over the amount of true critical care that will be required in any given time period. Thus, to meet the quotas, TeamHealth encourages its healthcare providers to document critical care for patients who only required ordinary (*i.e.*, non-critical) emergency care. TeamHealth's Critical Care Scheme violates CMS regulations and the FCA.

---

[114] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 15:10-16:7.

### CMS Reimbursement of Critical Care Services

136.   Like the Mid-Level Scheme, the Critical Care Scheme begins when a patient enters a TeamHealth-operated emergency department. During or immediately after the administration of medical care, the provider completes the EMR (electronic medical record) like any other patient encounter, noting the required elements—*i.e.*, a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered and a description of the medical decision making required. The EMR will indicate to the coder the level of care provided.

137.   CMS divides emergency medical treatment into five levels of care based on severity of the condition(s) presented. Level 1 represents the lowest severity condition, and Level 5 represents the highest severity condition. The higher the severity level, the higher the reimbursement rate CMS will pay. Specifically, according to the CMS Physician Fee Schedule, a Level 1 patient encounter is reimbursed at $21.60, a Level 5 at $176.04, and Levels 2, 3, and 4 at amounts in between.[115] These reimbursement rates are flat payments and are *not* based on the amount of time the provider spends with the patient. Thus, a Level 1 encounter will be reimbursed at $21.60 whether it lasts 10 minutes or 2 hours.

138.   However, there is a level of care above Level 5: "critical care." Critical care is the level of treatment and decision-making required by the highest severity conditions and can generally be described as that level of care required by imminently life-threatening emergency conditions. Specifically, CMS defines "critical care" as "physician(s) medical care for a critically ill or critically injured patient," whose "critical illness or injury acutely impairs one or more vital organ systems such

---

[115] The reimbursement rates quoted above and listed below were obtained using CMS's Physician Fee Schedule Lookup Tool for 2015B at the National Payment Amount (available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PFSLookup/index.html?redirect=/pfslookup/).

that there is a <u>high probability of imminent or life threatening deterioration</u> in the patient's condition." MEDICARE CLAIMS PROCESSING MANUAL at Ch. 12, § 30.6.12(A) (emphasis added).

139.    True critical care conditions are rare, with the overwhelming majority of critical patients ultimately being admitted to critical care units within the hospital.[116] According to CMS, "[c]ritical care involves high complexity decision making to assess, manipulate, and support vital system functions(s) to treat single or multiple vital organ system failure and/or to prevent further life threatening deterioration of the patient's condition." *Id.* at § 30.6.12(A). Further, all critical care services must be *medically necessary* and reasonable. *Id.* at § 30.6.12(B) (emphasis added).

140.    Due to its complex nature, CMS reimburses critical care at a higher rate than ordinary emergency care. Also, unlike Levels 1 through 5, critical care billing is based on the amount of time the physician spends treating the critical patient such that the more time a physician administers critical care, the more reimbursement money the emergency department will receive. The chart below shows the 2018 National Payment billing rates for Level 1 through critical care:

| CPT Code | 2018 Medicare Reimbursement Amount (National Payment Amount) |
|---|---|
| 99281 (ED Level 1) | $21.60 |
| 99282 (ED Level 2) | $42.12 |
| 99283 (ED Level 3) | $63.00 |
| 99284 (ED Level 4) | $119.52 |
| 99285 (ED Level 5) | $176.04 |
| 99291 (Critical Care, 1st 30-74 min) | $226.80 |
| 99292 (Critical Care, subsequent 30 min) | $113.55 |

---

[116] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3756824/. ("Between 2001 and 2009, annual visits by critically ill patients to U.S. EDs increased by 79% from 1.2 to 2.2 million. The proportion of ED visits resulting in admission to a critical care bed increased by .75% from 0.9% to 1.6%."). *See also* https://www.cdc.gov/nchs/fastats/emergency-department.htm.

### *The Critical Care Scheme: EMR Falsification*

141.    According to TeamHealth, critical care provides a lucrative opportunity to increase reimbursement revenues. For example, Elisa Dannemiller, Associate Medical Director of TeamHealth West explains in an October 2, 2013 PowerPoint presentation, "[t]he more revenue we generate as a group, the higher potential for annual bonus… and critical care pays well." Indeed, the first 30 minutes of critical care alone provide a minimum of $50 in additional revenue over and above an hours-long Level 5 encounter.

142.    Thus, TeamHealth sets minimum quotas for critical care billing that it expects healthcare providers to meet—typically 5-6% of all patient encounters. TeamHealth administrators circulate communications to employees of TeamHealth-managed emergency departments, indicating that TeamHealth physicians should be billing critical care in the 6-12% range. For example, in an October 26, 2014 email, Associate Medical Director of TeamHealth West, Elisa Dannemiller, imposes a critical care billing quota "in the 6-12% range." These administrators further encourage TeamHealth providers to bill critical care time and to capitalize on opportunities to improve critical care billing. As another example, Dannemiller states in an April 4, 2014 email, "Just a reminder to keep up the critical care billing!" Further, TeamHealth Meeting Minutes from the Emergency Medical Department in Colorado on December 3, 2014 reveal that Dannemiller, "discussed that critical care times have gone down…[and] reminded members to bill critical care times on patients." However, TeamHealth's quotas do not jive with the national critical care hospital admission rate of approximately 1%.

143.    To be reimbursed for critical care, a physician must sufficiently document his or her critical care treatment of a critical illness or injury, as defined by CMS, in the medical record (*i.e.,* patient specific information). Along with documentation of the physician's specific critical care treatment, to qualify for critical care billing, the treating physician must specifically document in the

medical record that he or she performed "critical care" and notate the amount of time (typically in minutes) such critical care was administered.

144.    In order to meet TeamHealth's unrealistic critical care quotas, TeamHealth requires physicians to document critical care within patient medical records when critical care treatment was not necessary.

145.    Healthcare providers working for TeamHealth are desensitized to this over-charting and upcoding because TeamHealth constantly hammers them with training that contradicts the medical education that providers received during medical school or residency. During such training, TeamHealth redefines what constitutes critical care for its healthcare providers. In addition, TeamHealth publicly calls out healthcare providers who fail to document critical care in situations where TeamHealth claims they should. TeamHealth also incentivizes providers to document more critical care.

146.    TeamHealth's training (or re-training) sessions are often conducted by non-physician coders. Further, TeamHealth coding specialists also regularly send "feedback" to healthcare providers, attaching specific patient charts and instructing them on what additional information should have been included so that a chart can meet the higher-revenue critical care billing requirements. For example, in a November 11, 2010 email to a TeamHealth physician, TeamHealth Documentation Specialist, Elisa Parra, ████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ "[117]

147.    TeamHealth has also designed a uniform policy that encourages healthcare providers to memorize those medical conditions that, according to TeamHealth, will require critical care every time. For example, Medical Director of TeamHealth's North Colorado Medical Center, Elisa

---

[117] TH-EDTX-00078500-501.

Dannemiller, instructed TeamHealth physicians that their critical care billing rates "

."[118]

TeamHealth emergency departments even have "critical care committees" that meet periodically to monitor critical care billing levels and brainstorm about how to increase those billing levels.

148.     TeamHealth systematically perpetrates this one-size-fits-all Critical Care Scheme nationwide, rather than relying on trained healthcare professionals to provide the level of care they believe to be most appropriate. For example, the TeamHealth West flyer depicted below indicates that TeamHealth Documentation Specialist, Elisa Parra (from TeamHealth West's California office), visited the TeamHealth facility in Colorado to train TeamHealth employees and contractors on, among other things, Critical Care billing.



[118] TH-EDTX-00040861-63 at TH-EDTX-00040862.

149.     Evidencing this one-size-fits all approach to critical care charting, TeamHealth physicians typically use uniform critical care language in their EMR charts, such that the charts are merely rubber stamped with insufficient statements or attestations such as "Performed critical care for 30-74 minutes." This language simply parrots the CMS critical care requirements so that TeamHealth can "check the box" for critical care billing. Indeed, often times, TeamHealth EMRs contain literal boxes next to this type of formulaic language that a treating physician will click or check. Each such click means more money for TeamHealth. However, CMS regulations clearly provide that "physician attestations by themselves do NOT provide sufficient documentation of medical necessity, even if signed by the ordering physician."[119] Thus, TeamHealth clearly violates CMS regulations when it submits claims for critical care services to CMS based solely on a physician attestation or otherwise insufficient documentation within the medical record to establish or support that CMS' explicit criteria for "critical care" services were met, complied with and satisfied.

### *Critical Care Scheme: Coding and Billing Policies*

150.     TeamHealth also executes the Critical Care Scheme by instructing its coders and billers to code and submit claims to CMS for critical care services based on patient medical records that TeamHealth knows do not contain the necessary documentation to satisfy and comply with CMS' explicit criteria for designating services as "critical care" services. TeamHealth instructs its coders and billers (who follow those instructions) to code and submit claims to CMS for payment for critical care services based on medical records and documentation that TeamHealth knows do not establish that the services provided met CMS' criteria and payment conditions for "critical care" services and, therefore, do not support claiming reimbursement for such services at CMS' elevated rate of reimbursement for

---

[119] *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited Sept. 11, 2020) (emphasis added); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, Chapter 3 – Verifying Potential Errors and Taking Corrective Actions, at § 3.3.2.1.1 (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf (last visited Sept. 11, 2020).

true critical care services. That is, through its policies and requirements, TeamHealth systematically submitted claims to CMS for payment for "critical care" services, as defined by CMS' explicit criteria, that expressly misrepresented the level and nature of the services provided and expressly and impliedly misrepresented that CMS' clear requirements and conditions for payment for "critical care" services were satisfied by the associated and supposedly supporting documentation and medical records.

151.    TeamHealth's critical care coding and billing policies have violated CMS regulations since ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████—no other documentation was required,

██████████████████████████████████████████████

██████████████████████████. The screenshot below is an email excerpt from Dr. Turner in November of 2014 describing such policy:



152.    For  years,  ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████, the patient presented with a "critical illness or injury [that] acutely impair[ed] one or more vital

---

[120] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 252:4-17.

organ systems such that there [was] a <u>high probability of imminent or life threatening deterioration</u> in the patient's condition."[121] TeamHealth simply instructed its coders and billers ████████████

████████████████████████████████████████████████

███████████████████████████ " However, this policy clearly violated CMS regulations, █

██████████████████████████████ .

    153.   ████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████[122], ████

████████████████████████████████████████████████

██████████████████ . ██████████████████████████████

███████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[121] Medicare Claims Processing Manual at Ch. 12, § 30.6.12(A).

[122] TH-EDTX-00269444-61.

154.    Thus, ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ Nonetheless, TeamHealth continued submitting critical care

claims to CMS pursuant to such policies.

155.    Additionally, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ ██████████████████████████████████████████

████████████████████████████████



156.    TeamHealth continued submitting claims for critical care services to CMS pursuant to

its critical care policies ████████████████████—seemingly basing its policy decision

making on ████████████████████████ as Dr. Turner accused TeamHealth's Coding

[123] TH-EDTX-00087599-604 at TH-EDTX-00087603.

Oversight Committee (COC) of doing regarding other policy decisions it had made (see the screenshot below).[124]



157.    By continuing to submit claims to CMS for critical care services based solely on a single statement by the physician within the patient's medical record, TeamHealth not only misrepresents the physician's involvement with the patient, but also knowingly violates CMS regulations requiring that the patient's "critical illness or injury acutely impairs one or more vital organ systems such that there is a <u>high probability of imminent or life threatening deterioration</u> in the patient's condition."[125, 126]

158.    ███████████████████████████████████████████
███████████████████████████████████████████

---

[124] *See, e.g.,* TH-EDTX-00236432-34 at TH-EDTX-0023643.

[125] MEDICARE CLAIMS PROCESSING MANUAL at Ch. 12, § 30.6.12(A) (emphasis added)

[126] And again, CMS made clear in its March 15, 2013 Transmittal that "**physician attestations by themselves do NOT provide sufficient documentation of medical necessity, even if signed by the ordering physician**." *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited Sept. 11, 2020) (emphasis added); *see also* MEDICARE PROGRAM INTEGRITY MANUAL, Chapter 3 – Verifying Potential Errors and Taking Corrective Actions, at § 3.3.2.1.1 (2020), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c03.pdf (last visited Sept. 11, 2020).

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████ .[127]



█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ .

159.   ██████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████ [128]

---

[127] TH-EDTX-00032240-44 at TH-EDTX-00032241.

[128] TH-EDTX-00077760-63 at TH-EDTX-00077760.



160. ███████████████████████████████████████████████████████

███████████████████████████████████████████ it's clear that TeamHealth submitted thousands,

if not millions, of false critical care claims to CMS ██████████████████████████████

████████████████████████████████████████. But what did TeamHealth do

to look back in time to refund CMS for such false claims ██████████████████? TeamHealth's

corporate representative testified under oath that he "████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████."[129]

161. █████████████████, TeamHealth continues to operate its Critical Care Scheme

today. For example, ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

[129] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 226:8-17.



162.     Relators observed the same policies with respect to critical care at every TeamHealth emergency department they have worked in. At every TeamHealth-managed facility the Relators worked at, healthcare providers were encouraged and/or required to increase the amount of critical care they performed and were consistently told that critical-care billing was a priority.

---

[130] TH-EDTX-0027416-34 at TH-EDTX-0027417.

163.    Importantly, as with the charges for mid-level billing, TeamHealth is able to disguise these fraudulent claims in plain sight because a critical care claim is a "pass through" claim for billing purposes, meaning there is no front-end auditing of these charges. The absence of the risk of auditing emboldens TeamHealth to encourage the submission of fraudulent claims for reimbursement of critical care services with impunity. And, even if TeamHealth is required to submit underlying EMRs (such as, in accordance with an ad hoc audit or probationary period implemented by a MAC), the EMRs will theoretically evidence the provision of critical care, when in fact critical care was not required or medically necessary.

164.    For example, the April 2, 2014 TeamHealth Meeting Minutes reveal the following regarding charting and billing: "Critical care billing has tapered to 3% compliance in February. There is significant variability in billing for those services and continued efforts are occurring to reach the desired 5-8%. Anything that can be done to enhance charting to collect more through billing is greatly appreciated and *members noted that this type of charge is a pass through for billing, noting there is no auditing of these charges.*" (emphasis added). Elisa Dannemiller, Associate Medical Director of TeamHealth West also explains in an October 2, 2013 PowerPoint presentation that "[c]ritical care is a pass through; if you have the elements necessary for documentation, it is billed." (emphasis added).

165.    It is evident that the Critical Care Scheme is a company-wide policy. National and regional TeamHealth administrators often send emails to TeamHealth physicians and Mid-Levels instructing and reminding them of TeamHealth's critical care policy. For example, in April 10, 2013 and December 12, 2014 emails from Texas-located TeamHealth administrator, Kim-Diep Do, to Relator Dr. Hernandez at TeamHealth's Colorado facility, Do explains TeamHealth's critical care documentation policy. And, as shown below, Relators have identified ***actual false claims*** submitted

by TeamHealth for critical care services purportedly rendered in TeamHealth facilities across the nation.

*Specific Examples of the Critical Care Scheme and False Claims Submitted*

166.    After receiving TeamHealth's claims data and patient medical records through discovery in this case, Relators confirmed that TeamHealth has, in fact, ***submitted and/or caused the submission of actual false claims to CMS*** pursuant to its Critical Care Scheme. Below is a non-exhaustive list of representative examples of such claims:

| Hospital Name | Location | Date of Service | Billing Provider (Physician) | CPT Code | Medical Record Number |
|---|---|---|---|---|---|
| ██████ | ████ | ████████ | ████████ | ██ | ███ |
| ██████ | ████ | ████ | █████████ | ██ | ███ |
| ██████ | ████ | | █████████ | ██ | ███ |
| ██████ | ████ | | █████████ | ██ | ███ |
| █████ | ████ | | ████████ | | |
| ███████ | ████ | ████ | ████████ | ██ | ██ |
| | ████ | ███ | █████████ | | |
| ██████ | ████ | | █████████ | ██ | ███ |
| ██████ | ████ | ████ | █████████ | ██ | ███ |
| █████ | ████ | | █████████ | ██ | |
| ██████ | ████ | ████ | █████████ | ██ | ███ |

---

[131] As the Court is aware, Gainesville is located in this judicial District.

167.    The screenshot below is from TeamHealth's ████████████████████ ██████████ which indicates that TeamHealth ████████████████████ ████████████



168.    Additionally, ████████████████████████████████, TeamHealth Chief Medical Officer and corporate representative, Dr. Hamilton Lempert, ████████████ ████████████████████████████████████████ ████████████████████████████ ████████████████████

---

132 TH-EDTX-00044141-333 at TH-EDTX-00044219.

133 Exhibit 83 (TH-EDTX-00270235) to the September 3, 2020 deposition of Hamilton Lempert, M.D.

████████████████████████████████████████

██████████████████████████████[134]

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

169.     The first three examples that follow demonstrate TeamHealth's fraudulent activity under the Critical Care Scheme. The patients in these examples did not meet the CMS definition for "critical care," and critical care was not medically necessary, as required by CMS. CMS defines "critical care" as "physician(s) medical care for a critically ill or critically injured patient," whose "critical illness or injury acutely impairs one or more vital organ systems such that there is a <u>high probability of imminent or life threatening deterioration in the patient's condition.</u>" MEDICARE CLAIMS PROCESSING MANUAL at Ch. 12, § 30.6.12(A) (emphasis added).

170.     First, Relator Whaley reviewed a chart while at TeamHealth in which a patient was admitted to the hospital with normal vitals. The patient was documented as stable five or six times during the patient's initial 90 minutes in the emergency department. After 90 minutes, a CT/angiogram

---

[134] Transcript of September 3, 2020 deposition of Hamilton Lempert, M.D. at 252:4-17.

was ordered and the patient was diagnosed with pulmonary embolism. The treating emergency physician documented 45 of the initial 90 minutes as critical care despite the fact that the patient did not meet the CMS definition for "critical care," and despite the fact that critical care was not medically necessary—*i.e.,* because the patient was documented as stable during the *entirety* of the patient's initial 90 minutes in the emergency department.  Patients cannot be stable and critical at the same time.

171.    Second, Relator Whaley reviewed one chart in June or July of 2014 where a patient had come into the emergency department presenting symptoms of COPD (a chronic lung disease). The emergency department physician, Dr. Lauren Demmers, documented that the patient had low serum oxygen and placed the patient back on oxygen, which the patient was already taking at home (the patient elected to drive to the hospital off of oxygen, leading to their low oxygen measurement on arrival). After placing the patient on oxygen, the physician documented their services as critical care in the patient's chart. However, the patient did not meet the EMS definition of "critical care" and critical care was not medically necessary—*i.e.,* because the patient was merely placed back on oxygen and then sent home.

172.    Third, the notes of a 2016 patient chart (depicted below and in compliance with HIPAA) reviewed by Relator Whaley show that TeamHealth billed 75 minutes of critical care for a patient. However, critical care was not medically necessary. According to the chart notes, the patient had pneumonia and atrial fibrillation. But a patient with pneumonia and atrial fibrillation, without more (such as documentation of severe sepsis), does not require critical care. The examples that follow further demonstrate TeamHealth's Critical Care Scheme.



173.    In a February 2, 2015 email from North Colorado Medical Center emergency room doctor David Wageman to Relator Dr. Hernandez regarding critical care billing, Dr. Wageman points out that TeamHealth requires that physicians code services as critical care: "we have multiple emails pressuring us to chart critical care inappropriately on our charts and even on [patients] we discharge home. It was also mentioned in a meeting that , if we don't comply with this, it could be reflected in our pay/bonuses."

174.    There must be a minimum of 30 minutes of critical care provided to the patient to qualify for critical care billing under the critical care CPT codes 99291 and/or 99292. *See* MEDICARE CLAIMS PROCESSING MANUAL at Ch. 12, § 30.6.12(F). However, when TeamHealth providers billed for less than 30 minutes of critical care, TeamHealth administrators would contact the providers in an attempt to increase the amount of billed critical care time. For example, in a May 9, 2014 email from Dee Ann Ware, a TeamHealth Documentation Specialist, Ware requests TeamHealth physician, Dr. Demers, to "clarify" his amount of billed critical care because there was "only 3 minutes listed."

175.     In the fall of 2012, Relator Dr. Hernandez had a conversation with TeamHealth Medical Director at North Colorado Medical Center, Matt Ledges. In this conversation, Ledges instructed and required Relator to bill more critical care time. Ledges told Relator that the critical care billing at the hospital should be at 6% based on the size and patient volume of the hospital. Ledges further said that he was going to start contacting other physicians to instruct them to increase their critical care billing.

176.     On or around October 2, 2013, Associate Medical Director of TeamHealth West, Elisa Dannemiller, instructed Relator Dr. Hernandez to document critical care for "chest pain" in every case. However, chest pain alone does not necessarily require critical care. There are many causes of chest pain that do not meet CMS requirements for billing critical care, such as panic attacks, "heart burn," upset stomach…etc. Chest pain cannot, however, receive a blanket critical care designation because three conditions must be met first: (1) a life threatening diagnosis; (2) critical intervention; and (3) care so intensive it requires the physicians undivided attention (the provider cannot see other patients).

177.     And in the May 9, 2014 email depicted below, TeamHealth Documentation Specialist Dee Ann Ware brings attention to Relator Dr. Hernandez and other providers in an attempt to collect more critical care billing.[135] Ware even calculated the specific dollar amount of *possible* critical care time ("Poss CC time") that Relator Dr. Hernandez should have billed.

---

[135] Because TeamHealth purports to be "physician-led," it either knows or should know that empowering those without the requisite knowledge or legal power to diagnose (such as Ms. Ware) to pressure and penalize doctors with regard to billing requirements that depend on the requisite knowledge or legal power to diagnose places its operations in reckless conflict with the accuracy that is required by government payors. *See* https://www.teamhealth.com/our-company/ (last visited September 19, 2019).

**From:** Ware, Dee Ann
**Sent:** Friday, May 09, 2014 9:06 AM
**To:** Taylor, Meredith C; Gray, Sarah; Fain, Marilyn G
**Cc:** Peterson, Kim
**Subject:** follow ups for missing charges

Good Morning,

I'm just going back to see what we have queried and have not gotten responses to and/or chars we are reviewing to capture revenue.
The department will not receive revenue due to late or no documentation; unanswered queries, preliminary reports without proper documentation to charge and reports finalized after the finance due date.

92955053  DOS 5/3
Demers – Queried/no response
Clarify amount of CC time – only 3 minutes listed –
CC time = $7030.60

92954718  DOS 5/3
Dannemiller – Queried/no response
Splint application = $199.60

92957299 DOS 5/4
Hernandez – finalized 4 days post discharge
CC time = $7030.60

92963784 DOS 5/5
Hernandez – not finalized (trauma)
Poss CC time = $7030.60

92962752 DOS 5/5
Hernandez – not finalized
Poss CC time = $7030.60

92969674 DOS 5/6
Saint – not finalized
Repair incomplete
$467.70 - $488.10 (depending on documentation)

**$28,810.10** from 4 days ~

**Query charges captured!**
**92974799**
**Nace**
**$307.50**

Please let me know your questions or how we can help ~
Thanks,

**Dee**

178.   Finally, in the following March 10, 2016 email from TeamHealth Associate Director, Erik Adler, to TeamHealth employees, Adler required physicians to bill more critical care time by setting critical care billing quotas and even offering to buy TeamHealth employees beer as an incentive to bill more critical care:

91

> **From:** Erik Adler <erikadlermd@gmail.com>
> **Sent:** Thursday, March 10, 2016 5:45 PM
> **To:** Elisa Dannemiller; Erik Adler; Ken Bassett; Bryan Beck; Benjamin Busch; Laura K Cicuto; Andrew Coleman; Will Comfort; Brian Cooper; Jenna Gantner; Elena Garcia; Reggie Gaylord; Brad Stevinson; Home; Avery Kong; Robert Lowe; clint; Bradley Nace; Jessica Paisley; Thayer Phelan; Josh Poles; Elva Saint; Sovndal Shannon; Ian Tate; Hadley Trotter; David Wageman; Brook Wager; Jeannine Walters; Susan Watson; Jill L Hanck; Matthew Ledges; Todd A Arnold; michelle anderson; Jesse A Dewaard; Maud Darger; Mike Swindle; aebonner3@gmail.com; saoneil@mac.com; Lisa Smith-Schohl
> **Subject:** Critical Care Billing
>
> Hey gang,
> We are going to start emailing you your critical care billing percentages. Our goal is to have all providers billing at 6%. If you get an email from me, it means you are below this amount. Please reference the cards that we put in front of the computer and look at your patient logs at the end of each shift to think of who may warrant critical care time documented.
>
> The February winners are as follows-
> First place- Dr. Sovondal (18.8%)
> Second place- Dr. Dannemiller (15%)
> Third place- Dr. Coleman (12.1%)
>
> Please expect a hug from me as a prize. Unless a hug from Adler is a disinsentive to billing more. In which case I'll buy you a beer.
>
> Thanks gang,
> Erik

Again, as TeamHealth's former Chief Medical Director and Vice President of Billing Operations (and corporate representative), Dr. John Turner, testified under oath, "

███████████████████████████████████████████████████████████████████████

██████████████████████████████████"[136] After obtaining false critical care documentation, TeamHealth's off-site billing department bills CMS for the non-existent or unnecessary critical care— thereby completing the Critical Care Scheme. That is, through its policies and requirements, TeamHealth systematically submitted claims to CMS for payment for "critical care" services, as defined by CMS' explicit criteria, that expressly misrepresented the level and nature of the services provided and expressly and impliedly misrepresented that CMS' clear requirements and conditions for payment for "critical care" services were satisfied by the associated and supposedly supporting

---

[136] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 15:10-16:7.

documentation and medical records. And in doing so, TeamHealth falsely certified and/or caused

TeamHealth providers to falsely certify with respect to such claims that:

> In submitting this claim for payment from federal funds, I certify that: (1) the information on this form is true, accurate and complete; (2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; (3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; (4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); (5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare. . .

> I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction . . . This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.[137]

179.   Lastly, The table below shows Dr. Turner's corporate testimony compared to

TeamHealth's fraudulent critical care billing practices and course of conduct.



| TeamHealth Corporate Representative Testimony | TeamHealth's Fraudulent Billing Practices And Course of Conduct |
|---|---|
|  |  |

---

[137] *See* CMS Form 1500, *available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf.

[138] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 23:6-11.

[139] TH-EDTX-00005453.



---

[140] TH-EDTX-00042879-81 at TH-EDTX-00042881.

[141] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 22:3-10.

[142] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 15:10-21.

[143] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 29:24-30:13.

[144] TH-EDTX-00040861-63 at TH-EDTX-00040862.

[145] *See, e.g.,* TH-EDTX-00000569-71.

[146] TH-EDTX-00001968-70; Transcript of the August 31, 2020 Deposition of Elisa Dannemiller, M.D. at 76:9-18.

[147] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 20:16-22.

[148] TH-EDTX-00000383-89 at TH-EDTX-00000388.



[149] TH-EDTX-00005462-64.

[150] TH-EDTX-0040828-31.

[151] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 20:23-21:6.

[152] TH-EDTX-00001204-05; Transcript of the August 31, 2020 Deposition of Elisa Dannemiller, M.D. at 104:20-105:17.

[153] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 23:12-25.

[154] TH-EDTX-00042829, M.D.; Transcript of the August 31, 2020 Deposition of Elisa Dannemiller, M.D. at 113:4-114:11.

[155] Transcript of July 22, 2020 Deposition of John Turner, M.D. at 25:23-26:5.



156 TH-EDTX-00042661-65; Transcript of the August 31, 2020 Deposition of Elisa Dannemiller, M.D. at 102:7-104:8.

157 TH-EDTX-00042828; Transcript of the August 31, 2020 Deposition of Elisa Dannemiller, M.D. at 113:4-114:22, 115:21-116:20.

158 Transcript of July 22, 2020 Deposition of John Turner, M.D. at 25:1-10.

159 RELATORS-0000133-135 at RELATORS-0000133-134.

160 Transcript of July 22, 2020 Deposition of John Turner, M.D. at 31:12-32:2.

161 RELATORS-0000273-76 at RELATORS-0000274.

*Non-Exhaustive List of Individual Participants in Critical Care Scheme*

180.     Below is a non-exhaustive list of individuals with knowledge of the Critical Care Scheme due to their direct participation in it at TeamHealth's insistence and direction:

- TeamHealth Chief Administrative Officer, Joe Carmen

- TeamHealth Chief Medical Officer, Dr. Hamilton Lempert

- Former TeamHealth Chief Medical Officer and Vice President of Billing Operations, Dr John Turner

- TeamHealth Executive Vice President of Revenue Cycle Operations, Paula Dearolf

- TeamHealth Director of Compliance for Clinician Coding, Jessica Parks

- TeamHealth Vice President of Revenue Cycle Operations, Christa Cortez

- TeamHealth Director of Health Plan Claim Review & Audits and Client Practice Management, Sandra Steele

- TeamHealth President of the West Group, Dr. Robert Franz

- TeamHealth Associate General Counsel, Linda Thacker

- TeamHealth Associate Director, Erik Adler

- North Colorado Medical Center emergency room physician, Dr. David Wageman

- Texas-located TeamHealth administrator, Kim-Diep Do

- Associate Medical Director of TeamHealth West, Elisa Dannemiller

- TeamHealth Documentation Specialist, Elisa Parra

- TeamHealth Medical Director at North Colorado Medical Center, Matt Ledges

- TeamHealth Documentation Specialist, Dee Ann Ware

- TeamHealth employee, Jill L. Hanck

- Relators Dr. Hernandez and Mr. Whaley

# VI.    CAUSES OF ACTION

## Count One
## Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

181.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

182.    The FCA, 31 U.S.C. § 3729(a)(1)(A) imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval to the United States government.

183.    When submission of such false claims are discovered by private citizens, the FCA allows those citizens to bring an action on behalf of the United States against the perpetrators. 31 U.S.C. § 3730(b)(1).

184.    Through their conduct, Defendants have knowingly submitted, or caused to be submitted, false claims for payment, as set forth above, in violation of 31 U.S.C. § 3729(a)(1). Defendants have engaged in a systemic and fraudulent course of conduct as alleged herein.

185.    Specifically, as alleged herein, Defendants have submitted false claims for reimbursement to CMS for evaluation and management ("E/M") services performed and sufficiently documented solely by non-physician practitioners (mid-levels) in TeamHealth emergency departments as if they were performed by or in conjunction with a physician. That is, TeamHealth knowingly and systematically presents and causes to be presented (for example, through its coding and billing policies) to CMS claims for split/shared services (under physician NPIs) based on patient medical records wherein TeamHealth physicians misrepresented and/or failed to sufficiently document (as CMS regulations require) their involvement with the care of patients actually treated by TeamHealth mid-levels. In simple terms, TeamHealth fraudulently overbills for mid-level services by submitting claims to CMS for E/M services performed by a mid-level under a physician's NPI. Though CMS rules only allow for reimbursement of mid-level services at 85% of the standard physician rate, by submitting

claims for mid-level E/M services under a physician's NPI, TeamHealth improperly obtains 100% of the physician rate.

186.    In particular, TeamHealth submitted and/or caused to be submitted claims to CMS under its Mid-Level Scheme for payment at the 100% physician rate in which TeamHealth: (i) expressly misrepresented the identity of the provider who rendered the services for which TeamHealth claimed reimbursement by submitting claims for mid-levels' services under a physician's NPI; (ii) expressly misrepresented and falsely certified that a split/shared E/M visit, as defined by Medicare Part B payment policy, had occurred when TeamHealth knew that the documentation and medical record underlying the claim did not comply with CMS regulations and requirements; (iii) expressly, but falsely and fraudulently, certified that each such claim "complie[d] with all applicable Medicare . . . laws, regulations, and program instructions for payment[,]" when TeamHealth knew and had previously been notified on numerous occasions that the documentation upon which it relied to claim the services were split/shared services did not satisfy or comply with CMS' requirements; and (iv) at a minimum, impliedly certified that a necessary condition to CMS' payment of a claim for a split/shared visit at the physician rate—that the documentation and medical records underlying the claim sufficiently established and documented that a split/shared E/M visit, as defined by Medicare Part B payment policy and according to all CMS requirements—was satisfied, when in reality, TeamHealth knew that this condition was not satisfied and that the underlying documentation did not comply with CMS requirements.

187.    Further, as alleged herein, Defendants have submitted false claims for reimbursement for medically unnecessary or non-existent "critical care." TeamHealth requires its providers to (1) meet stated arbitrary critical care quotas each month; (2) falsify critical care on patient medical records when the care they provided did not meet CMS critical care requirements; and/or (3) perform and chart

critical care services when those services were not required, medically necessary, or otherwise proper for reimbursement. TeamHealth then knowingly and systematically presents and causes to be presented (for example, through its coding and billing policies) to CMS claims for critical care services by requiring its coding and billing personnel to submit claims for reimbursement to CMS for the critical care services reflected in patient medical records that misrepresent that physicians provided critical care services and/or fail to sufficiently document critical care services per CMS critical care requirements.

188.    In particular, TeamHealth submitted and/or caused to be submitted claims to CMS under its Critical Care Scheme in which TeamHealth: (i) expressly misrepresented the level and nature of the services provided, when TeamHealth knew that critical care services were not actually provided or medically necessary; (ii) expressly misrepresented and falsely certified that the services for which TeamHealth billed met CMS' explicit criteria and conditions for payment for "critical care" services, when TeamHealth knew the documentation underlying such claims supported no such representation; (iii) expressly, but falsely and fraudulently, certified that each such claim "complie[d] with all applicable Medicare . . . laws, regulations, and program instructions for payment[,]" when TeamHealth knew the documentation upon which it relied to claim the services it billed under CPT Codes 99291 and 99292 did not satisfy or comply with CMS' requirements; and (iv) at a minimum, impliedly certified that a necessary condition to CMS' payment of a claim for payment for "critical care" services—that the documentation and medical records underlying the claim sufficiently established that each element of CMS' explicit criteria for "critical care" services had been performed and properly documented according to CMS requirements—was satisfied, when in reality, TeamHealth knew that this condition was not satisfied and that the underlying documentation did not comply with CMS requirements.

189.     Relators have brought this action pursuant to 31 U.S.C. § 3730(b)(1) and provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

190.     Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., CMS would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████."[162] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that "████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████"[163] And each of the CMS requirements and regulations described herein for the documentation and billing of E/M services were a critical and necessary condition for CMS to pay reimbursement at the rate and level for which TeamHealth submitted its false and fraudulent claims under its Mid-Level and Critical Care Schemes.

191.     By reason of Defendants' actions, the United States has incurred and continues to incur damages.

**Count Two**
**Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

192.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

---

[162] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[163] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

193.     Section 3729(a)(1)(B) of the FCA imposes liability upon those who make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the United States government. *See* 31 U.S.C. § 3729(a)(1)(B).

194.     Through their conduct, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B). Defendants have engaged in a systemic and fraudulent course of conduct as alleged herein.

195.     Specifically, as alleged herein, Defendants have submitted false claims for reimbursement to CMS for evaluation and management ("E/M") services performed and sufficiently documented solely by non-physician practitioners (mid-levels) in TeamHealth emergency departments as if they were performed by or in conjunction with a physician. And as discussed herein, TeamHealth submits claims to CMS for split/shared services (under physician NPIs) based on patient medical records wherein TeamHealth physicians—as required by TeamHealth—misrepresented and/or failed to sufficiently document (as CMS regulations require) their involvement with the care of patients actually treated by TeamHealth mid-levels. Thus, TeamHealth knowingly and systematically makes, uses, and causes to be made and used, false records and statements material to false and fraudulent claims it submits to CMS. In simple terms, TeamHealth fraudulently overbills for mid-level services by submitting claims to CMS for E/M services performed by a mid-level under a physician's NPI. Though CMS rules only allow for reimbursement of mid-level services at 85% of the standard physician rate, by submitting claims for mid-level E/M services under a physician's NPI, TeamHealth improperly obtains 100% of the physician rate.

196.     In particular, TeamHealth made, used, or caused to made or used, false records or statements material to its false or fraudulent claims under its Mid-Level Scheme by, among other

things: (i) expressly misrepresenting the identity of the provider who rendered the services for which TeamHealth claimed reimbursement by submitting claims for mid-levels' services under a physician's NPI; (ii) expressly misrepresenting and falsely certifying that a split/shared E/M visit, as defined by Medicare Part B payment policy, had occurred when TeamHealth knew that the documentation and medical record underlying the claim did not comply with CMS regulations and requirements; (iii) expressly, but falsely and fraudulently, certifying that each such claim "complie[d] with all applicable Medicare . . . laws, regulations, and program instructions for payment[,]" when TeamHealth knew and had previously been notified on numerous occasions that the documentation upon which it relied to claim the services were split/shared services did not satisfy or comply with CMS' requirements; and (iv) at a minimum, impliedly certifying that a necessary condition to CMS' payment of a claim for a split/shared visit at the physician rate—that the documentation and medical records underlying the claim sufficiently established and documented that a split/shared E/M visit, as defined by Medicare Part B payment policy and according to all CMS requirements—was satisfied, when in reality, TeamHealth knew that this condition was not satisfied and that the underlying documentation did not comply with CMS requirements.

197.    Further, as alleged herein, Defendants have submitted false claims for reimbursement for medically unnecessary or non-existent "critical care." TeamHealth requires its providers to (1) meet stated arbitrary critical care quotas each month; (2) falsify critical care on patient medical records when the care they provided did not meet CMS critical care requirements; and/or (3) perform and chart critical care services when those services were not required, medically necessary, or otherwise proper for reimbursement. That is, TeamHealth requires its physicians to misrepresent within patient medical records that the physicians provided critical care services, in violation of CMS regulations. TeamHealth also fails to require its physicians to sufficiently document critical care services per CMS critical care

requirements. Thus, TeamHealth makes, uses, and causes to be made and used, false records and statements material to false and fraudulent claims it submits to CMS. Again "relying" on falsified medical records, TeamHealth requires its coding and billing personnel to submit claims for reimbursement to CMS for the critical care services reflected in patient medical records that misrepresent that physicians provided critical care services and/or fail to sufficiently document critical care services per CMS critical care requirements.

198.    In particular, TeamHealth made, used, or caused to made or used, false records or statements material to its false or fraudulent claims under its Critical Care Scheme by, among other things: (i) expressly misrepresenting the level and nature of the services provided, when TeamHealth knew that critical care services were not actually provided or medically necessary; (ii) expressly misrepresenting and falsely certifying that the services for which TeamHealth billed met CMS' explicit criteria and conditions for payment for "critical care" services, when TeamHealth knew the documentation underlying such claims supported no such representation; (iii) expressly, but falsely and fraudulently, certifying that each such claim "complie[d] with all applicable Medicare . . . laws, regulations, and program instructions for payment[,]" when TeamHealth knew the documentation upon which it relied to claim the services it billed under CPT Codes 99291 and 99292 did not satisfy or comply with CMS' requirements; and (iv) at a minimum, impliedly certifying that a necessary condition to CMS' payment of a claim for payment for "critical care" services—that the documentation and medical records underlying the claim sufficiently established that each element of CMS' explicit criteria for "critical care" services had been performed and properly documented according to CMS requirements—was satisfied, when in reality, TeamHealth knew that this condition was not satisfied and that the underlying documentation did not comply with CMS requirements.

199.    Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., CMS would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████"[164] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that "████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████"[165] And each of the CMS requirements and regulations described herein for the documentation and billing of E/M services were a critical and necessary condition for CMS to pay reimbursement at the rate and level for which TeamHealth submitted its false and fraudulent claims under its Mid-Level and Critical Care Schemes.

200.    By reason of Defendants' actions, the United States has incurred and continues to incur damages.

### Count Three
### Violation of the Connecticut False Claims Act,
### CONN. GEN. STAT. § 4-274 *et seq.*

201.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

202.    Similar to Medicare, the Connecticut Medicaid rules reimburse services provided by NPs at a rate below the physician's rate. Specifically, Connecticut reimburses for the services of NPs

---

[164] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[165] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

at a rate of ninety percent (90%) of the department's fees for physician procedure codes. *See* Conn. Agencies Regs. § 17b-262-617. Also similar to Medicare, Connecticut Medicaid rules and regulations provide for reimbursement of services provided by PAs at a rate below the physician's rate. Specifically, Connecticut Medicaid reimburses for services rendered by a PA at ninety percent (90%) of the physician department's fees for physician procedure codes. *See* Conn. Agencies Regs. § 17b-262-347; *see also* Connecticut Medical Assistance Program, Policy Transmittal 2013-19, PB 2013-40 (July 2013).

203.    Like Medicare, the Connecticut Medicaid rules also reimburse for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care. *See, e.g.*, Connecticut Medical Assistance Program Enhanced Fee Schedule, at 32 (March 30, 2016).[166]

204.    The Connecticut False Claims Act imposes liability upon those who knowingly present, or cause to be presented, false or fraudulent claims for payment or approval under a state-administered health or human services program. Conn. Gen. Stat. §§ 4-274, 4-275. Additionally, it imposes liability upon those who knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim under a state-administered health or human services program. *Id.*

205.    Through their conduct, Defendants have knowingly presented or caused to be presented, false or fraudulent claims for reimbursement, as set forth above, to the Connecticut Medicaid program in violation of Connecticut General Statute § 4-275.

---

[166] The Connecticut Medical Assistance Program Enhanced Fee Schedule is available online at https://www.ctdssmap.com/CTPortal/Portals/0/StaticContent/Publications/Fee_Schedule_Instructions.pdf.

206.     Through their conduct, Defendants have additionally knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of Connecticut General Statute § 4-275.

207.     Relators bring this action in accordance with the civil action provision in Connecticut General Statute § 4-277 and have served a copy of this Complaint and written disclosure of substantially all material evidence and information on the Connecticut Attorney General as provided thereunder.

208.     Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., the state would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████.″[167] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that "██████████████████████████

████████████████████████████████████████████████

█████████████████████████████.″[168]

209.     By reason of Defendants' actions, the State of Connecticut has incurred and continues to incur damages.

---

[167] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[168] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

**Count Four**
**Violation of the Florida False Claims Act,**
**FL. STAT. § 68.081 *et seq.***

210.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

211.    Florida statutes enable the Agency for Health Care Administration to establish the maximum allowable fee for providers through Medicaid rules, policy manuals and handbooks. Fl. Stat. §§ 409.901(2), 409.908. Similar to Medicare, the Florida Agency rules allow for reimbursement for PA services and NP services at a rate below the physician rate, specifically at eighty percent (80%) of the physician rate. Florida Medicaid Practitioner Services Coverage and Limitations Handbook (April 2014), Ch. 3, § 3-6.

212.    Also, like Medicare, the Florida Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care. *See, e.g.*, Florida Medicaid Practitioner Fee Schedule (January 1, 2016).[169]

213.    The Florida False Claims Act imposes liability upon those who knowingly present or cause to be presented a false or fraudulent claim for payment or approval and those who knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim. Fl. Stat. § 68.082(2).

214.    Through their conduct, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval, as set forth above, to the Florida Medicaid system in violation of Florida Statute § 68.082(2).

---

[169]    The Florida Medicaid Practitioner Fee Schedule is available online at http://portal.flmmis.com/FLPublic/Portals/0/StaticContent/Public/FEE%20SCHEDULES/2016-01-01_Practitioner_Fee_Schedule_v1-2.pdf.

215.    Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of Florida Statute § 68.082(2).

216.    Relators bring this action in accordance with the civil action provision in Florida Statute § 68.083(2) and have complied with all requirements therein.

217.    Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., the state would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████"[170] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that "████████████████████████████

████████████████████████████████████████████████

██████████████████████████."[171]

218.    By reason of Defendants' aforementioned actions, the State of Florida has incurred and continues to incur damages.

**Count Five**
**Violation of the Georgia State False Medicaid Claims Act,**
**GA. CODE § 49-4-168**

219.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

---

[170] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[171] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

220.    Similar to Medicare, Georgia Medicaid rules limit reimbursement for services provided by a Physician Assistant to no more than 90% of the maximum allowable amount paid to a physician. *See* Georgia Department of Community Health, Division of Medicaid, Policies and Procedures for Physician Services Handbook Ch. 1001.

221.    Also, like Medicare, the Georgia Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care. *See, e.g.*, Georgia Department of Community Health, Georgia Medicaid Management Information System, Schedule of Maximum Allowable Physician Payments (April 2016).[172]

222.    The Georgia State False Medicaid Claims Act imposes liability upon those who knowingly present or cause to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval and those who knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim to the Georgia Medicaid program. Ga. Code § 49-4-168.

223.    Through their conduct, Defendants have knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, as set forth above, in violation of Georgia Code § 49-4-168.

224.    Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the Georgia Medicaid program, as set forth above, in violation of Georgia Code § 49-4-168.

---

[172]   The Georgia Medicaid Practitioner Fee Schedule for April 2016 is available online at https://www.mmis.georgia.gov/portal/Portals/0/StaticContent/Public/ALL/FEE%20SCHEDULES/Schedule%20of%20%20%20Maximum%20%20Allowable%20Payments%20Physician%20April%202016/2014-03-2016%20213423.pdf.

225.    Relators assert this claim in accordance with the civil action provision in Georgia Code § 49-4-168.2 and have complied with all requirements therein.

226.    Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., the state would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ ."[173] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ ."[174]

227.    By reason of the Defendants' actions, the State of Georgia has incurred and continues to incur damages.

**Count Six**
**Violation of the Indiana Medicaid**
**False Claims and Whistleblower Protection Act,**
**IND. CODE § 5-11-5.7-1 *et seq.***

228.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

229.    Similar to Medicare, the Indiana Medicaid rules allow for reimbursement of services provided by NPs at a rate below the physician's rate, specifically at seventy-five percent (75%) of the physician rate on file. Indiana Health Coverage Programs BR 200422 (June 1, 2004).

---

[173] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[174] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

230.     Also, like Medicare, the Indiana Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.[175]

231.     The Indiana Medicaid False Claims and Whistleblower Protection Act imposes liability upon those who knowingly present, or cause to be presented, a false claim to the State of Indiana for payment or approval and those who make, use, or cause to be made or used, a false record or statement that is material to a false or fraudulent claim. Ind. Code § 5-11-5.7-2.

232.     Through their conduct, Defendants have knowingly presented, or caused to be presented, false claims to the State of Indiana for payment or approval, as set forth above, in violation of Indiana Code § 5-11-5.7-2.

233.     Through their conduct, Defendants have also made, used, or caused to be made or used, false records or statements that are material to false or fraudulent claims submitted to the State of Indiana for payment or approval, as set forth above, in violation of Indiana Code § 5-11-5.7-2.

234.     Relators assert this claim in accordance with the civil action provision in Indiana Code § 5-11-5.7-4 and have complied with all requirements therein.

235.     Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., CMS would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[175] The Indiana Health Coverage Programs allows the most recent Fee Schedules to be downloaded at the following URL: http://provider.indianamedicaid.com/ihcp/Publications/MaxFee/fee_home.asp.

████████████."[176] Further, regarding the Critical Care Scheme, another TeamHealth

corporate representative testified that ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████."[177]

236.    By reason of Defendants' actions, the State of Indiana has incurred and continues to

incur damages.

### Count Seven
### Violation of the Louisiana Medical Assistance Programs Integrity Law,
### LA. REV. STAT. § 46:437.1 *et seq.*

237.    The preceding factual statements and allegations are incorporated herein by reference

as if fully set forth herein.

238.    Similar to Medicare, Louisiana Medicaid rules allow for reimbursement of services

provided by NPs and PAs at a rate below the physician rate, specifically at eighty percent (80%) of the

fee for physician services. Louisiana Medicaid Professional Services Fee Schedule, Report No. RF-0-

76 (Jan. 1, 2016).

239.    Also, like Medicare, the Louisiana Medicaid rules allow for reimbursement for critical

care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary,

or non-critical, levels of care. *See* Louisiana Medicaid Program, *Professional Services Provider*

*Manual*, Ch. 5, Sect. 5.1.[178]

240.    The Louisiana Medical Assistance Programs Integrity Law imposes liability upon

those who  knowingly present or cause to be presented a false or fraudulent claim and those who

---

[176] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[177] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

[178] The Louisiana Medicaid Program enables the most recent Professional Services Fee Schedules to be downloaded at the following URL: http://www.lamedicaid.com/provweb1/fee_schedules/ProfServ_FS htm.

knowingly engage in misrepresentation or make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the State's medical assistance programs. La. Rev. Stat. § 46:438.3.

241.    Through their conduct, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims to the State of Louisiana, as set forth above, in violation of Louisiana Revised Statute § 46:438.3.

242.    Through their conduct, Defendants have also knowingly engaged in misrepresentation and/or made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the Louisiana medical assistance programs, as set forth above, in violation of Louisiana Revised Statute § 46:438.3.

243.    Relators bring this action in accordance with the civil action *qui tam* provision in Louisiana Revised Statute §§ 46:439.1 – 46:439.4 and have complied with all requirements therein.

244.    Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., the state would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ███████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████"[179] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that ███████████████████████████████████████

---

[179] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

███████████████████████████████████████████████████

████████████████████████████████.**"180**

245.    By reason of Defendants' actions, the State of Louisiana has incurred and continues to incur damages.

**Count Eight**
**Violation of the Massachusetts False Claims Act,**
**MASS. GEN. LAWS CH. 12 § 5B *et seq*.**

246.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

247.    Similar to Medicare, Massachusetts Medicaid rules allow for reimbursement for services provided by Mid-Levels at a rate below the physician's rate, specifically at eighty-five percent (85%) of the physician fee on file. 101 Code Mass. Regs. § 317.03(4) (2013).

248.    Also, like Medicare, the Massachusetts Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care. *See* 101 Code Mass. Regs. § 317.04(4) (Fee Schedule).

249.    The Massachusetts False Claims Act imposes liability upon those who knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval and those who knowingly make, use or cause to be made or used a false record or statement material to a false or fraudulent claim. Mass. Gen. Laws Ann. 12 § 5B.

250.    Through their conduct, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the Commonwealth of Massachusetts, as set forth above, in violation of Massachusetts General Law 12 § 5B.

---

180 Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

251.    Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the Commonwealth of Massachusetts, as set forth above, in violation of Massachusetts General Law 12 § 5B.

252.    Relators bring this action in accordance with the civil action *qui tam* provision in Massachusetts General Law 12 § 5C and have complied with all requirements therein.

253.    Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., the state would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████"[181] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that "█████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████"[182]

254.    By reason of Defendants' actions, the Commonwealth of Massachusetts has incurred and continues to incur damages.

---

[181] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[182] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

## Count Nine
## Violation of the Tennessee Medicaid False Claims Act,
## TENN. CODE ANN. § 71-5-181 *et seq.*

255.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

256.    Similar to Medicare, Tennessee Medicaid rules allow for reimbursement for services performed by a PA at a rate below the physician rate, specifically at no more than sixty percent (60%) of the charges provided for licensed physicians. Tenn. Code Ann. § 71-5-129.

257.    Also, like Medicare, the Tennessee Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care.[183]

258.    The Tennessee Medicaid False Claims Act imposes liability upon those who knowingly present, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program and those who knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program. Tenn. Code Ann. § 71-5-182.

259.    Through their conduct, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval under the Tennessee Medicaid program, as set forth above, in violation of Tennessee Code § 71-5-182.

260.    Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted under the Tennessee Medicaid program, as set forth above, in violation of Tennessee Code § 71-5-182.

---

[183] TennCare allows the Professional Services Fee Schedules for TennCare's managed care organizations to be downloaded from the following website: https://www.tn.gov/tenncare/topic/providers-managed-care-organizations.

261.    Relators bring this action in accordance with the civil action *qui tam* provision in Tennessee Code § 71-5-183 and have complied with all requirements therein.

262.    Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., the state would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████"[184] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that "████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████"[185]

263.    By reason of Defendants' actions, the State of Tennessee has incurred and continues to incur damages.

## Count Ten
### Violation of the Texas Medicaid Fraud Prevention Act,
### TEX. HUM. RES. CODE § 36.002 *et seq.*

264.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

265.    Similar to Medicare, Texas Medicaid rules allow for reimbursement for services provided by a Mid-Levels at a rate below the physician rate, specifically at ninety-two percent (92%)

---

[184] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[185] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

of the reimbursement for the same professional service paid to a physician. Tex. Admin. Code tit. 1, §§ 355.8093, 355.8281.

266.    Also, like Medicare, the Texas Medicaid rules allow for reimbursement for critical care services provided, under the same CPT Codes, at a higher reimbursement rate than for ordinary, or non-critical, levels of care. *See* TEXAS MEDICAID & HEALTHCARE PARTNERSHIP, *Texas Medicaid Provider Procedures Manual* (March 2016), Vol. 2, *Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook* § 9.2.58.6.4 ("Critical Care").[186]

267.    The Texas Medicaid Fraud Prevention Act imposes liability upon those who: (1) knowingly make or cause to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, and (2) knowingly conceal or fail to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. Tex. Hum. Res. Code § 36.002. Notably, the Texas Medicaid Fraud Prevention Act does not require the presentment of a false claim for liability to attach. *See* Tex. Hum. Res. Code § 36.002 (1) & (2).

268.    Through their conduct, Defendants have (1) knowingly made or caused to be made false statements or misrepresentation of material fact in order to receive payment under the Texas Medicaid program that is not authorized, and/or (2) knowingly concealed or failed to disclose information to receive payment under the Texas Medicaid program that is not authorized, as set forth above, in violation of Texas Human Resources Code § 36.002.

---

[186] The *Texas Medicaid Provider Procedures Manual* can be downloaded at the following URL: http://www.tmhp.com/TMHP_File_Library/Provider_Manuals/TMPPM/2016/Mar_2016%20TMPPM.pdf.

269.     Relators bring this action in accordance with the civil action *qui tam* provision in Texas Human Resources Code § 36.101 and have complied with all requirements therein.

270.     Defendants' fraudulent conduct described herein is material to the government's decision to reimburse Defendants for services billed (i.e., the state would not authorize reimbursements of claimed services if it was aware of Defendants' fraud). Regarding the Mid-Level Scheme, TeamHealth's corporate representative agreed under oath, ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ [187] Further, regarding the Critical Care Scheme, another TeamHealth corporate representative testified that "████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████." [188]

271.     By reason of Defendants' actions, the State of Texas has incurred and continues to incur damages.

## VII.     DEMAND FOR JURY TRIAL

272.     Relators expressly demand a trial by jury.

## VIII.     PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of themselves, the United States and the Plaintiff States, request that this Court:

(a)     Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. §§ 3729-3733;

---

[187] Transcript of July 10, 2020 Deposition of John Turner, M.D. at 54:16-24.

[188] Transcript of September 3, 2020 Deposition of Hamilton Lempert, M.D. at 224:9-16.

(b)      Enter judgment against each Defendant in an amount equal to three times the damages the United States has sustained as a result of each and all of Defendants' actions, as well as a civil penalty against each Defendant of $11,000 for each violation of 31 U.S.C. § 3729;

(c)      Find joint and several liability against Defendants pursuant to 31 U.S.C. § 3729;

(d)      Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims violating the statutes of the respective Plaintiff States as pled herein;

(e)      Enter judgment against each Defendant in an amount equal to three times the damages the respective Plaintiff States have sustained as a result of each and all Defendants' actions, as well as a civil penalty against each Defendant in the maximum amount allowable under the statutes of each respective Plaintiff State for each and every false record, statement, certification and claim submitted to the respective Plaintiff States;

(f)      Award Relators the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and the relevant provisions of the statutes of each of the Plaintiff States;

(g)      Award Relators all costs and expenses of this action, including court costs, expert fees, and all attorneys' fees incurred by Relators in prosecution of this action; and

(h) That the United States, the Plaintiff States and Relators be granted each other and further relief as the Court deems just and proper.


Dated: September 15, 2020

Respectfully submitted,

*/s/ Trey Duck*
Trey Duck, TX Bar No. 24077234
tduck@nixlaw.com

Michael Angelovich, TX Bar No. 785666
mangelovich@nixlaw.com
Cody L. Hill, TX Bar No. 24095836
codyhill@nixlaw.com
Bradley W. Beskin, TX Bar No. 24105463
bbeskin@nixlaw.com
**NIX PATTERSON, LLP**
3600 N. Capital of Texas Hwy.
Building B, Suite 350
Austin, TX 78746
Telephone: 512.328.5333
Facsimile: 512.328.5335

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of September 2020, I filed this Third Amended Complaint with the Clerk of the Court by means of the Court's ECF system, which served copies of the filing on all counsel of record entered in the case.

.

*/s/ Trey Duck*
Trey Duck

*Counsel for Relators*