**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CALEB HERNANDEZ and JASON WHALEY, Relators<br><br>    *Plaintiffs*,<br><br>v.<br><br>TEAM HEALTH HOLDINGS INC., *et al.*<br><br>    *Defendants*. | CASE NO. 2:16-CV-00432-JRG<br><br>█████████████ |

## <u>JOINT FINAL PRE-TRIAL ORDER</u>

This cause came before the Court at a pre-trial management conference held on January

14, 2021, pursuant to Local Rule CV-16 and Rule 16 of the Federal Rules of Civil Procedure.

**A.** **<u>COUNSEL FOR THE PARTIES</u>**

<u>Plaintiff(s)</u>:

Trey Duck, TX Bar No. 24077234
tduck@nixlaw.com
Michael Angelovich, TX Bar No. 785666
mangelovich@nixlaw.com
Bradley E. Beckworth, TX Bar No. 24001710
bbeckworth@nixlaw.com
Karl Rupp, TX Bar No. 24035243
krupp@nixlaw.com
Drew Pate, TX Bar No. 24079111
dpate@nixlaw.com
Cody L. Hill, TX Bar No. 24095836
codyhill@nixlaw.com
R. Winn Cutler, TX Bar. No. 24084364
winncutler@nixlaw.com
Ross Leonoudakis, TX Bar. No. 24087915
rossl@nixlaw.com
Bradley W. Beskin, TX Bar No. 24105463
bbeskin@nixlaw.com
Nicholas W. Shodrok, TX Bar. No. 24117050
nshodrok@nixlaw.com
Kim Saindon, TX Bar No. 24117006
ksaindon@nixlaw.com
**Nix, Patterson LLP**

<u>Defendant(s)</u>:

Thomas M. Melsheimer
Michael Brett Johnson
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Tel: (214) 453-6500
Fax: (214) 453-6400
tmelsheimer@winston.com
mbjohnson@winston.com

Paula Weems Hinton
WINSTON & STRAWN LLP
800 Capitol Street, 24th Floor
Houston, TX 77002
Tel: (713) 651-2600
Fax: (713) 651-2700
*phinton@winston.com*

Eric H. Findlay
Roger Brian Craft
FINDLAY CRAFT, P.C.
102 N. College Avenue
Suite 900
Tyler, TX 75702
Tel: (903) 534-1100
Fax: (903) 534-1137
efindlay@findlaycraft.com
bcraft@findlaycraft.com

George B. Breen
Erica Sibley Bahnsen
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, NW
Washington, DC 20037
Tel: (202) 861-1823
Fax: (202) 861-3523
GBreen@ebglaw.com
ESibley@ebglaw.com

Christopher Farella
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
Tel: (973) 639-8541
Fax: (973) 639-8739
cfarella@ebglaw.com

**B.**     **STATEMENT OF JURISDICTION**

This Court has jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345 because this civil action arises under the laws of the United States.

Defendants allege that the Court is deprived of subject matter jurisdiction pursuant to the federal False Claims Act's public disclosure bar.

**C.**     **NATURE OF ACTION**

**Relators' Statement of the Nature of the Action**

This is a federal False Claims Act ("FCA") case wherein Relators Dr. Caleb Hernandez and Jason Whaley ("Relators") bring suit on behalf of the United States of America against Defendants Team Health Holdings Inc., Team Finance, L.L.C., Team Health Inc., AmeriTeam Services, L.L.C., HCFS Health Care Financial Services, L.L.C., and Quantum Plus, L.L.C. ("Defendants") and seek damages, civil penalties, and other remedies under the FCA. Relators contend that Defendants operated two nationwide coding and billing schemes to defraud the federal Government (in particular, Medicare) █████████████████████.

**Defendants' Statement of the Nature of the Action**

Relators allege violations of the federal FCA involving purportedly improper billing of emergency department services, involving split/shared services and critical care services. After lengthy investigation into Relators' claims, the United States declined to intervene in this FCA action. For each alleged set of violations, Relators must demonstrate that Defendants submitted a false claim to the Government, with the requisite knowledge, that was material to the Government's decision to remit Medicare payment to Defendants. After months of discovery spanning ██████ years, Relators are unable to carry their burdens of proof on any of these essential elements.

D.    **CONTENTIONS OF THE PARTIES**

**Relators' Statement of Their Contentions**

Relators' claims and contentions are set forth in far more detail in their Third Amended

Complaint (Dkt. No. 161) and briefing in opposition to Defendants' Motion for Summary

Judgment. *See* Dkt. Nos. 190 & 247, which are incorporated by reference herein. A summary of

their material contentions is set forth below. Relators contend that, ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████  ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

Relators contend that Defendants ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ ██████████████████████████████████

████████████████████████████████████████████████.

### *Medicare*

Under Medicare's programs, the federal government reimburses healthcare providers on a fee-for-service basis according to published fee schedules. Physicians and mid-levels must sufficiently document patient encounters in their medical charts. Medicare has developed specific documentation guidelines that it requires healthcare providers to use for documenting medical decision-making and care during a patient encounter so that coders can translate services into what are called CPT codes for billing purposes. The people coding patient medical records (sometimes called "coders") must select the appropriate CPT code that relates to the services provided and submit the provider's National Provider Identifier ("NPI") in each claim for reimbursement from Medicare. The NPI identifies the individual healthcare provider that performed the services to be reimbursed. Thus, the NPIs and CPT codes selected by the coder determine the amount of reimbursement that Medicare pays. Defendants take advantage of this system and unlawfully increase their revenue through two Schemes.

---

[1] *See, e.g.*, *Ruckh v. Salus Rehab, LLC*, 963 F.3d 1089, 1104-06 (11th Cir. 2020); *United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 477 (5th Cir. 2015); *United States v. Semrau*, 693 F.3d 510, 514 (6th Cir. 2012); *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001); *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 608-11 (S.D. Tex. 2016); *United States ex rel. Schiff v. Marder*, 208 F. Supp. 3d 1296, 1314 n.21 (S.D. Fla. 2016); *United States v. Robinson*, 2015 U.S. Dist. LEXIS 41123, at *14-17 (E.D. Ky. Mar. 31, 2015); *United States ex rel. Martin v. Life Care Ctrs. of Am.*, 114 F. Supp. 3d 549, 560, 557-72 (E.D. Tenn. 2014).

*Mid-Level Scheme*

The first scheme is the "Mid-Level Scheme." Under the Mid-Level Scheme, Defendants knowingly overbilled Medicare for emergency evaluation and management ("E/M") services provided and documented by mid-level providers (*e.g.*, nurse practitioners and physician assistants) at the full 100% physician rate. By statute, Medicare may only pay for E/M services provided by a mid-level at a rate that equals 85% of Medicare's physician fee schedule. 42 U.S.C. §13951(a)(1)(O); 42 C.F.R. §§405.520(a), 414.52, 414.56. That is, a mid-level's E/M services are reimbursed at 85% of the standard physician rate, while services rendered by a physician are reimbursed at 100% of the standard physician rate. However, under a provision of the Medicare Claims Processing Manual ("MCPM"), Medicare Part B's payment policy allows for reimbursement of a mid-level's services at 100% of the physician rate when the MCPM's requirements for a "split/shared visit" are met.

Relators contend that Defendants knew that any services for which it claimed entitlement to reimbursement from Medicare must be supported by documentation in the underlying medical record that established those services were actually provided and justified the reimbursement rate claimed.[2] Defendants' CEO has agreed that ███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ Dkt. No. 190-20. This is consistent with Medicare's instruction that ████████████████ ██████████ Dkt. No. 190-64 at 4. And the CPT Code Book published by the AMA (codes which the HHS Secretary adopted, 45 C.F.R. §162.1002) instructs that "[a]ny service or procedure should be adequately documented in the medical record." Dkt. No. 247-2; *Marder*, 208 F. Supp. 3d at 1307.

---

[2] *See, e.g.*, *Ruckh*, 963 F.3d at 1105; *United States ex rel. Druding v. Druding*, 952 F.3d 89, 97-98 (3d Cir. 2020); *Semrau*, 693 F.3d at 525; *United States v. Janati*, 237 F. App'x 843, 845-47 (4th Cir. 2007); *United States v. Canon*, 141 F. App'x 398, 401-05 (6th Cir. 2005); *Mackby*, 261 F.3d at 827; *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1067-68 (N.D. Cal. 2020); *Marder*, 208 F. Supp. 3d at 1307, 1314; *Robinson*, 2015 U.S. Dist. LEXIS, at *12-18; *Martin*, 114 F. Supp. 3d at 557-72.

Relators contend that a split/shared E/M visit is (and has been since 2002) defined by Medicare Part B payment policy as "a medically necessary encounter with a patient where the physician and a qualified NPP [non-physician practitioner, or mid-level provider] each personally perform a substantive portion of an E/M visit face-to-face with the same patient on the same date of service." MCPM, Chapter 12 §30.6.13(H). ████████████████████████████████████

████████████████████████████████████████████ *Id.*

Relators contend that, pursuant to their Mid-Level Scheme, Defendants submitted and/or caused to be submitted claims to CMS for payment at the 100% physician rate in which claims Defendants: ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████[3]

Specifically, Relators contend that Defendants carried out the Mid-Level Scheme in at least four interrelated ways. First, Defendants required mid-level providers, including Relator Whaley, to falsely indicate on medical records that a physician was involved in patient encounters, when in fact a physician never saw or substantively treated the patient. Second, Defendants required its physicians, including Relator Dr. Hernandez, to sign mid-level medical records, whether or not the physicians ever saw the patient or had any interaction with the mid-level whose chart they signed. Defendants ensured

---

[3] The terms "knowing," "knowingly" and their grammatically appropriate iterations and forms (e.g., "knew") have the statutory meaning ascribed to them in the FCA, 31 U.S.C. §3729(b)(1).

compliance with such signing requirements through, for example, threats of suspension. Third, Defendants required physicians, including Relator Dr. Hernandez, to use boilerplate "attestations" or "macros" that misrepresented or otherwise failed to document substantive physician involvement with the care of a mid-level's patient, as required by Medicare. However, Medicare instructs that "physician attestations by themselves do NOT provide sufficient documentation of medical necessity, even if signed by the ordering physician."[4] Fourth, to complete the scheme, Defendants then required their coders and billers—through uniform billing policies and practices—to code and submit claims to Medicare for payment for split/shared services under physician NPIs when Defendants knew the services were not performed as documented and/or the underlying medical records did not support such claims. That is, Defendants instructed coders to submit split/shared claims to Medicare for money to which they were not entitled. Defendants used their coding and billing policies to cause their coders to code such services uniformly and to submit such claims (or bill) for payment to Medicare. Medicare then overpaid Defendants for these claims at the physician's rate based on the physician NPI submitted.

Relators contend that Defendants' physicians and mid-levels rarely, if ever, treated patients together—in part, due to Defendants' floor management models, which physically segregated physicians and mid-levels. Relators contend it was more economically profitable for Defendants to keep such providers segregated, but then submit claims for inflated reimbursements as if the physician had provided the services. And, among many other factual contentions that demonstrate Defendants carried out this scheme knowingly, Relators contend that Defendants were notified on numerous occasions, beginning in at least 2010, if not earlier, that Defendants' split/shared documentation, coding and billing policies did not comply with Medicare's requirements. However, Defendants continued to submit claims to Medicare pursuant to these policies despite receiving these warnings. Defendants

---

[4] *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited Oct. 21, 2020).

knew that Medicare ████████████████████████████████████████████
████████████████████████████████████████████. And Defendants
knew that ██████████████████████████████████████. However, in
the few instances that MACs actually reviewed Defendants' documentation purportedly supporting
their claims for split/shared services, Defendants' misrepresentations directly affected the MAC's
payment decisions and caused the MACs to deny payment at the rate Defendants claimed. Despite
now contending that Medicare's requirements were not clear, Defendants did not communicate
with Medicare or any MAC to seek clarity regarding these requirements.  And while Defendants
made certain changes to their policies *during the damages and claims period* at issue here,
Defendants continued submitting false and fraudulent claims under this scheme through 2020.

Relators contend that Defendants knowingly submitted, or caused to be submitted, at least
██████ false and fraudulent split/shared claims to Medicare during the relevant period. The
differential overpayment amount for false split/shared claims submitted to Medicare by
Defendants is at least ████████████, and the total amount Medicare paid to Defendants as a result
of these false split/shared claims is at least ████████████.

*Critical Care Scheme*

Under Defendants' second Scheme, the "Critical Care Scheme," Relators contend that
Defendants billed Medicare for "critical care" services, the highest level of emergency treatment,
when Defendants knew that the patient was not critical, critical care services were not actually
provided, and/or the underlying medical records did not support that this level of service was

provided, according to Medicare's criteria in the MCPM Ch. 12 § 30.6.12, and therefore did not justify submitting the claims under CPT Codes for critical care services: 99291 and 99292.

Relators contend that Defendants submitted and/or caused to be submitted claims to Medicare under their Critical Care Scheme in which Defendants: ███████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████

Specifically, Defendants carried out their Critical Care Scheme in at least the following ways. First, from at least ████████████ Defendants did not require their coders to actually review charts to verify that the services documented actually supported or justified billing them as critical care before submitting claims that so claimed to Medicare. So long as a physician merely checked a boilerplate attestation box that they provided critical care for the minimum time required, then Defendants' national uniform billing policies required coders to bill such medical records to Medicare as critical care, without any regard as to whether the services documented met Medicare's requirements for reimbursing for critical care services or not. Moreover, Medicare instructs that "physician attestations by themselves do NOT provide sufficient documentation of medical necessity, even if signed by the ordering physician."[5]

---

[5] *See* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R455PI.pdf (last visited Oct. 21, 2020).

Second, at the same time, Defendants pressured providers to increase critical care billing by, for example:  offering providers incentives; imposing and tracking critical care billing quotas; and instructing, and threatening providers to document improper critical care. All of these tactics enabled Defendants to obtain inflated payments at the upcoded critical care rate, even when the services provided and/or documented did not meet Medicare's requirements for reimbursement for critical care services. Such tactics caused Defendants' providers, including Relator Dr. Hernandez, to falsely document critical care within patient medical records. Relator Dr. Hernandez even admitted to falsely documenting critical care services because Defendants pressured him to do so. Dr. Hernandez also identified his own medical records from his time as an emergency department physician for Defendants in which he falsely documented critical care due to Defendants' pressure and instructions. Defendants similarly pressured other providers to do so as well. And like the Mid-Level Scheme, Defendants were made aware on several occasions— beginning in 2012, if not earlier—that they were submitting claims for critical care services that did not meet Medicare's critical care requirements. Nonetheless, Defendants made the conscious decision to continue enforcing their uniform, violative policies. Although Defendants made certain changes to the critical care policies *during the damages and claims period at issue here*, including in ████████████, Defendants continued submitting, or causing the submission of, false and fraudulent claims for critical care services ███████████████.

Relators contend that Defendants submitted at least ███████ false critical care claims since ███████ The differential overpayment amount for false critical care claims submitted to Medicare by Defendants is at least ████████████ and the total amount Medicare paid to Defendants as a result of these false critical care claims is at least ██████████.

Relators seek an award of treble damages, civil penalties and statutory fees and costs for their two FCA causes of action against all Defendants.

**Defendants' Statement of Their Contentions**

Contrary to Relators' Third Amended Complaint, Defendants have not violated the federal FCA by improperly coding or billing Medicare for critical care or split/shared emergency department services or in any other way.[6] Defendants' Motion for Summary Judgment, or Alternatively, Partial Summary Judgment (Dkt. 172) demonstrates that Relators' have presented insufficient evidence for there to exist  genuine issues of material fact regarding whether (████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████

Further, Relators conflate the several Team Health Defendant entities and cannot hold Team Health Holdings, Inc., Team Finance, L.L.C., Team Health, L.L.C., or AmeriTeam Services, L.L.C. liable in any respect because neither Team Health Holdings, Inc., Team Finance, L.L.C., Team Health, L.L.C., nor AmeriTeam Services play any role in coding or billing of emergency medicine services. Moreover, Relators have no evidence that the corporate veil of any of these four separate entities should be pierced.

---

[6] Defendants have moved to dismiss Relators' Third Amended Complaint (Dkt. 181), currently pending before the Court, on the grounds that sub-regulatory guidance cannot form the basis of a FCA enforcement action, that Relators' new theories of liability are barred by the FCA public disclosure bar, and that Relators failed to follow the statutorily mandated sealing and disclosure provisions of the FCA.

**Split/Shared Services**

No Defendant has knowingly presented or caused to be presented false claims for payment to the United States government, nor has any Defendant made, used, or caused to be made or used false records or statements material to false or fraudulent claims related to emergency department split/shared services.  Relators' theory of liability in the Third Amended Complaint with respect to split/shared services is legally impermissible because a FCA violation cannot be based on sub-regulatory guidance. In particular, under *Azar v. Allina Health* Services, 139 S.Ct. 1804 (2019), the informal guidance that underlie Relators split/shared services allegations violate the Medicare Act because they establish or change a substantive legal standard without the required notice and comment procedures.  *See also Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916, 935–36 (E.D. Pa. 2019) (holding that inpatient billing standards contained in the Medicare Benefit Policy Manual cannot form the basis of an FCA case under *Allina*).   Additionally, CMS and DOJ policy now prohibit bringing enforcement actions based on sub-regulatory guidance,[7] making any claims

---

[7] *See* DOJ, Justice Manual § 1-20.000 *et seq.* (LIMITATION ON USE OF GUIDANCE DOCUMENTS IN LITIGATION), https://www.justice.gov/jm/1-20000-limitation-useguidancedocuments (prohibiting "actions based solely on allegations of noncompliance with guidance documents"); *see also* Press Release, DOJ, PR No. 18-96: Associate Attorney General Brand Announces End To Use of Civil Enforcement Authority to Enforce Agency Guidance Documents (Jan. 25, 2018), https://www.justice.gov/opa/pr/associate-attorney-general-brand-announces-end-use-civilenforcement-authority-enforce-agency (linking to the Brand Memo) (stating that the Department "may not use its enforcement authority to effectively convert agency guidance documents into binding rules" and "may not use noncompliance with guidance documents as the basis for proving violations of applicable law"); Executive Order on Promoting the Rule of Law Through Transparency and Fairness in Civil Administrative Enforcement and Adjudication (Issued October 9, 2019) (stating that "[t]he agency may not treat noncompliance with a standard of conduct announced solely in a guidance document as itself a violation of applicable statutes or regulations"). And on August 19, 2020, the DOJ issued an interim final rule that provides: "An agency guidance document may not be used as a substitute for regulation and may not be used to impose new standards of conduct on persons outside the Executive Branch except as expressly authorized by law or as expressly incorporated into a contract." Prohibition on the Issuance of Improper Guidance Documents Within the Justice Department, 85 Fed. Reg. 50951, 50953 (proposed August 19, 2020) (to be codified at 28 C.F.R. pt. 50). Thus, the Government has demonstrated repeatedly—through DOJ memoranda, DOJ policy, an Executive

based on them (such as those Relators assert) immaterial as a matter of law under the rigorous materiality standards set forth in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S.Ct. 1989, 2003-04 (2016) ("*Escobar I*").   Further, Relators cannot show that any Defendant engaged in a knowing violation of the FCA in the submission of emergency department split/shared services to Medicare, nor can they show that any such alleged action was material to the Government's decision to pay any claim.   Indeed, the Government continued to reimburse for the alleged improperly billed services both during and after its substantial investigation of Relators' claims and continues to reimburse for the relevant services to this day.   As Defendants argue in their Motion for Summary Judgment (Dkt. 172 at p. 25) and as reflected in the TAC, the Government—through Medicare Administrative Contractors ("MAC")—had also knowledge of the facts underlying Relators' alleged fraudulent schemes in 2012, 2013, 2014, and 2015. *See* Dkt. 162 at ¶¶ 18, 104-05, 155; *see also* Dkt. 253 at pp. 4-6.

**Critical Care Services**

No Defendant has knowingly presented or caused to be presented false claims for payment to the United States government, nor has any Defendant made, used, or caused to be made or used false records or statements material to false or fraudulent claims related to emergency department critical care services.   Relators' theory of liability in the Third Amended Complaint with respect to critical care services is legally impermissible because a FCA violation cannot be based on differences in medical judgment or on sub-regulatory guidance. In particular, under *Azar*, the informal guidance that underlie Relators critical care allegations violate the Medicare Act because they establish or change a substantive legal standard without the required notice and comment

_____

Order, and an interim final rule—that the FCA should not be used as an enforcement mechanism for alleged violations of guidance documents.

procedures.  *See also Polansky v. Exec. Health Res., Inc.*, 422 F. Supp. 3d 916, 935-36 (E.D. Pa. 2019) (holding that inpatient billing standards contained in the Medicare Benefit Policy Manual cannot form the basis of an FCA case under *Allina*).   Additionally, CMS and DOJ policy now prohibit bringing enforcement actions based on sub-regulatory guidance, [8] making any claims based on them (such as those Relators assert) immaterial as a matter of law under the rigorous materiality standards set forth in *Escobar I*.   Further, Relators cannot show that any Defendant engaged in a knowing violation of the FCA in the submission of emergency department critical care services to Medicare, nor can they show that any such alleged action was material to the Government's decision to pay any claim.  Indeed, the Government continued reimburse for the alleged improperly billed services both during and after its investigation of Relators' claims and continues to reimburse for the relevant services to this day.

### **Affirmative Defenses**

With respect to all claims at issue here, the FCA's six-year statute of limitations applies here and limits Relators' claims to those arising on or after April 25, 2010. Further, Relators' claims are barred because any actions taken by Defendants were undertaken in good faith, without culpable intent, and in compliance with Defendants' reasonable and independent interpretations of evolving laws, rules, regulations, and other guidance regarding billing for, and appropriately documenting the provision of, split/shared and critical care services, and constitute lawful, justified and appropriate conduct.

Defendants assert that the Government has suffered no harm or damages, as Defendants have provided all services paid for by the United States, and the quality of care rendered is not at

---

[8] *See supra* n. 10.

issue in this matter. The Government has always received and continues to receive what it pays for.

Defendants also cannot be held liable for any alleged violations committed by third-party independent contractors, over whom Defendants had neither control nor responsibility.

Additionally, certain of Relators' allegations in the Third Amended Complaint are barred because substantially the same allegations or transactions were publicly disclosed directly to the Government multiple times in administrative audits before Relators filed their original *qui tam* complaint. Relators are not original sources of this information because, not only do they not have knowledge that is independent of and materially adds to the publicly disclosed information, but Relators never voluntarily provided such information to the Government at any point either prior to the public disclosure or prior to filing their action. The doctrines of waiver and ratification Relators' allegations.

Regarding Relators' claimed damages, any award of penalties or treble damages to the Government in this case would violate the constitutional safeguards provided to Defendants in the Fifth, Fourteenth, and Eighth Amendments to the United States Constitution. Further, Defendants maintain that Relators' claims are barred to the extent that the Government and Relators would be unjustly enriched from any recovery in this case.

Finally, Relators have not pursued their allegations related to violations of state Medicaid False Claims Acts, so all Relators' Medicaid claims must be dismissed.

E.   **STIPULATIONS AND UNCONTESTED FACTS**

The parties stipulate to the following facts:

1.   Defendants are in the business of providing emergency-department  staffing services.

2. Relator Dr. Hernandez is a licensed physician who worked as an emergency department physician for Defendant Quantum Plus in Colorado from 2012 to 2015.

3. Relator Jason Whaley is a licensed physician assistant who worked for Defendant Quantum Plus in Colorado from 2011 to 2013 as an emergency-department physician assistant.

4. Emergency departments can render healthcare services to beneficiaries of public healthcare programs including Medicare.

5. Medical claim forms can be submitted to Medicare Administrative Contractors that process the claims and reimburse providers according to Medicare's fee schedule.

*Mid-Level Services and Split/Shared Visits*

6. Medicare reimburses for E/M services provided solely by a mid-level provider at a rate that equals 85% of Medicare's Fee Schedule for physicians.

7. Medicare allows for reimbursement of mid-level providers' services at the full physician rate when a "split/shared visit" occurs.

*Critical Care Services*

8. Critical care is "physician(s) medical care for a critically ill or critically injured patient," whose "critical illness or injury acutely impairs one or more vital organ systems such that there is a high probability of imminent or life threatening deterioration in the patient's condition."  The CPT codes for critical care are 99291 and 99292.

F.      **CONTESTED ISSUES OF FACT AND LAW**

**Relators' Statement of Contested Issues of Fact and Law**

• Whether Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval to the Medicare program;

- Whether Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim to the Medicare program;

- If the answer to either of the first two questions is found to be "Yes," then:

    o The total number of such false or fraudulent claims, records or statements; and

    o The amount of actual damages the United States Government sustained because of Defendants' acts;[9]

- Whether any of the Defendants were "alter-egos" of one another;

**Defendants' Statement of Contested Issues of Fact and Law**

1. Whether Caleb Hernandez, D.O. and Jason Whaley, PA-C are proper Relators.

    a. Whether Relator Hernandez and Relator Whaley are original sources of and have direct and independent knowledge of all publicly disclosed information that the allegations are based upon.

2. Whether Defendants Team Health Holdings, Inc., Team Finance, L.L.C., Team Health, L.L.C., and AmeriTeam Services, L.L.C. may be held liable for any alleged violations of the FCA.

    a. THHI and TF are both holding companies—their sole assets are their investment in, and ownership of, the membership interests of other operating subsidiaries within the Team Health organization. THHI, TF, THI, and AmeriTeam do not have any connection to the provision of any patient care, including emergency medicine.

---

[9] The trebling of damages, imposition of civil penalties, and any award of statutory fees and costs will be determined by the Court following a verdict.

3.  Whether Defendants' coding and billing policies aligned with the Medicare Program's requirements for billing critical care and split/shared services at all times at issue in this matter.

4.  Whether Defendants researched and reviewed applicable laws, rules, and regulations relative to such split/shared and critical care Medicare billing requirements to develop and implement compliant coding and billing policies in good faith and without culpable intent.

5.  Whether any Defendant has knowingly presented or caused to be presented false emergency department split/shared claims for payment or approval to Medicare.

6.  Whether any Defendant has knowingly presented or caused to be presented false emergency department critical care claims for payment or approval to Medicare.

7.  Whether any Defendant knowingly made, used, or caused to be made or used, false records or statements material to false emergency department split/shared claims for payment or approval to Medicare.

8.  Whether any Defendant knowingly made, used, or caused to be made or used, false records or statements material to false emergency department critical care claims for payment or approval to Medicare.

9.  Whether Relators' claims are barred because Defendants made no express or implied false certification with respect to a claim for payment to the federal government.

10. Whether Relators' false certification claims were timely raised.

11. Whether Relators' claims are barred because Defendants' conduct was not material to payment or receipt of money or property in connection with any alleged false or fraudulent claim.

12. Whether Relators' claims are barred because sub-regulatory guidance cannot form the basis of an FCA enforcement action.

13. Whether Relators' claims are barred because they are not material as a matter of law because DOJ and CMS policy prevent enforcement actions based on informal guidance.

14. Whether Relators' claims are barred because they are not material as a matter of law because the informal guidance underlying the allegations violates the Medicare Act.

15. Whether Team Health's alleged false statements or claims caused the federal government to forfeit federal funds.

    a. Whether there is any causal link between any alleged false certifications or statements the federal government's decision to pay federal funds for split/shared services

    b. Whether there is any causal link between any alleged false certifications or statements the federal government's decision to pay federal funds for critical care services

16. Whether the federal government has incurred any damages.

    a. Whether the federal government got what it paid for in connection with Defendants' claims for emergency department split/shared services;

    b. Whether the federal government got what it paid for in connection with Defendants' claims for emergency department critical care services;

    c. Whether the federal government paid, and what amounts of, federal funds for emergency department split/shared services;

    d. Whether the federal government paid, and what amounts of, federal funds for emergency department critical care services;

e. Whether the federal government received the full benefit of its bargain in any reimbursement of emergency department split/shared services;

f. Whether the federal government received the full benefit of its bargain in any reimbursement of emergency department critical care services;

g. Whether there is any difference between the amount the federal government bargained to receive for split/shared services and the value of the services the federal government actually received;

h. Whether there is any difference between the amount the federal government bargained to receive for critical care services and the value of the services the federal government actually received;

i. Whether there is any difference between the federal government paid for split/shared services in federal reimbursement monies and what it should have paid absent the alleged false statements;

j. Whether there is any difference between the federal government paid for critical care services in federal reimbursement monies and what it should have paid absent the alleged false statements.

17. The calculation of any damages allegedly incurred by the federal government.

18. Whether Relators' designated experts used proper methodology for their respective calculations.

19. Whether Relators' claims are barred to the extent any alleged injuries or damages were not were caused, if at all, by the acts or omissions of third-parties over whom Defendants had neither control nor responsibility, and whose actions or inactions cannot be imputed to Defendants.

20. Whether any award of penalties or treble damages to the Governments in this case would be a violation of the constitutional safeguards provided to Defendants under the Constitution of the United States of America.

21. Whether any imposition of penalties and treble damages against Defendants are an unconstitutionally excessive fine under the Eighth Amendment to the United States Constitution because any award would be grossly disproportional to the gravity of Defendants' offense.

22. Whether Relators' claims are barred to the extent that the Governments and Relators would be unjustly enriched from any recovery in this case.

23. Whether Relators' claims are barred in whole or in part by the doctrines of waiver and ratification to the extent of any Governments and/or their authorized agents reviewed, approved and audited of any claims actually at issue in this case.

24. Whether Relators' claims are subject to the six-year statute of limitations prescribed by the False Claims Act.

G.   **LIST OF WITNESSES**

Each side has served their updated list of witnesses with this Joint Pretrial Order. Relators' witness list is attached hereto as Exhibit A. Defendants' witness list is attached hereto as Exhibit B.

H.   **LIST OF EXHIBITS**

Each side has served their updated list of exhibits with this Joint Pretrial Order. Relators' exhibit list is attached hereto as Exhibit C. Defendants' exhibit list is attached hereto as Exhibit D.

I.    **LIST OF DEPOSITION DESIGNATIONS**

Each side has served their updated list of deposition designations with this Joint Pretrial

Order. Relators' deposition designations are attached hereto as Exhibit E. Defendants'

deposition designations are attached hereto as Exhibit F.

J.    **LIST OF ANY PENDING MOTIONS**

1.  Defendants' Motion to Exclude the Opinion Testimony of Relators' Designated Experts Kristen Folding and Bruce Wapen (Dkt. No. 165);

2.  Defendants' Motion to Exclude the Opinion Testimony of Relators' Designated Statistical Expert Douglas Steinley (Dkt. No. 166);

3.  Relators' Motion to Exclude the Testimony of Patrick P. Marion (Dkt. No. 168);

4.  Defendants' Motion for Summary Judgment, or Partial Summary Judgment in the Alternative (Dkt. No. 172);

5.  Defendants' Motion to Dismiss Relators' Third Amended Complaint, or Alternatively, for a Continuance (Dkt. No. 181);

6.  Defendants' Motion to Exclude and Strike Relators' Fact Witnesses (Dkt. No. 196);

7.  Relators' Motions in Limine Nos. 1 Through 6 and Brief in Support (Dkt. No. 238);

8.  Defendants' Motions in Limine Nos. 1 Through 23 (Dkt. No. 240);

9.  Defendants' Motion in Limine No. 24 (Dkt No. 371);

10. Defendants' Motion for Leave to File Supplemental Memorandum in Further Support of Their Motion to Exclude the Opinion Testimony of Relators' Designated Expert Bruce Wapen (Dkt. No. 337);

11. Defendants' Motion for Leave to Take a Trial Deposition of Dr. Turner (Dkt. No. 357);

12. Defendants' Motion to Compel (Dkt. No. 364); and

13. Defendants Agreed Motion for Leave to Take Depositions After Fact Discovery Deadline (Dkt. 373).

K.    **PROBABLE LENGTH OF TRIAL**

Relators believe the probable length of trial is fourteen days.

Relators reasonably believe they will need seven trial days to put on their case-in-chief.

Defendants reasonably believe each side will need seventeen (17) hours per side (not inclusive of voir dire, opening statement, and closing argument), but if the Court is inclined to grant more than seventeen (17) hours to Relators, Defendants respectfully request an equal amount of time.

L.   **CERTIFICATIONS**

The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

(1)   Full and complete disclosure has been made in accordance with the Federal Rules of Civil Procedure and the Court's orders;

(2)   Discovery limitations set forth in the Federal Rules of Civil Procedure, the Local Rules, and the Court's orders have been complied with;

(3)   Each exhibit in the List of Exhibits herein:

(a)   is in existence;

(b)   is numbered; and

(c)   has been disclosed and shown to opposing counsel.


January 12, 2021

Approved as to form and substance:

*/s/ Trey Duck*
Trey Duck, TX Bar No. 24077234
tduck@nixlaw.com
Michael Angelovich, TX Bar No. 785666
mangelovich@nixlaw.com
Bradley E. Beckworth, TX Bar No. 24001710

bbeckworth@nixlaw.com
Andrew G. Pate, TX Bar No. 24079111
dpate@nixlaw.com
Cody L. Hill, TX Bar No. 24095836
codyhill@nixlaw.com
Winn Cutler, TX Bar No. 24084364
winncutler@nixlaw.com
Ross Leonoudakis, TX Bar No. 24087915
rossl@nixlaw.com
Bradley W. Beskin, TX Bar No. 24105463
bbeskin@nixlaw.com
Nicholas W. Shodrok, TX Bar No. 24117050
nshodrok@nixlaw.com
Kim Saindon, TX Bar No.
ksaindon@nixlaw.com
**NIX, PATTERSON LLP**
3600 N. Capital of Texas Hwy.
Building B, Suite 350
Austin, TX 78746
Telephone: 512.328.5333
Facsimile: 512.328.5335

Karl Rupp, TX Bar No. 24035243
krupp@nixlaw.com
**NIX, PATTERSON LLP**
Advancial Building, Suite 1050
1845 Woodall Rodgers Freeway
Dallas, TX 75021
Telephone: 972.831.1188
Facsimile: 972.444.0716

**ATTORNEYS FOR RELATORS**


By: */s/Eric H. Findlay___*
Eric H. Findlay
Roger Brian Craft
Findlay Craft, P.C.
102 N College Avenue
Suite 900
Tyler, TX 75702
Tel: (903) 534-1100
Fax: (903) 534-1137
efindlay@findlaycraft.com
bcraft@findlaycraft.com

Thomas M. Melsheimer (*Lead Attorney*)
Michael Brett Johnson
Winston & Strawn LLP
2121 N. Pearl Street
Suite 900
Dallas, TX 75201
214-453-6500
Fax: 214-453-6400
tmelsheimer@winston.com
mbjohnson@winston.com

Paula Weems Hinton
Robine Kirsty Morrison Grant
Winston & Strawn LLP
800 Capitol St., 24th Floor
Houston, TX 77002
Tel: (713) 651-2600
Fax: (713) 651-2700
*phinton@winston.com*
*rgrant@winston.com*

George B. Breen
EPSTEIN BECKER & GREEN, P.C.
1227 25th Street, NW
Washington, DC 20037
Tel: (202) 861-1823
Fax: (202) 861-3523
GBreen@ebglaw.com

Christopher Farella
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, NJ 07102
Tel: (973) 639-8541
Fax: (973) 639-8739
cfarella@ebglaw.com

***Counsel for Defendants Team Health Holdings Inc., Team Finance, L.L.C., Team Health Inc., AmeriTeam Services, L.L.C., HCFS Health Care Financial Services, L.L.C., and Quantum Plus, L.L.C.***

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of January 2021, I served the foregoing document on counsel for Relators via electronic mail.

*/s/ Eric H. Findlay*
Eric H. Findlay

## CERTIFICATE PURSUANT TO LOCAL RULE CV-5(a)(7)(B)

I hereby certify that a motion to seal this document has been filed separately and immediately before the filing of this document.

*/s/ Eric H. Findlay*
Eric H. Findlay